USDC SCAN INDEX SHEET

















AXR    5/19/06    8:48

3:04-CV-02459   TACKETT V. IMPERIAL COUNTY OF

*49*

*NTCF.*

93629

J. Scott Tiedemann, Bar No. 180456
stiedemann@lcwlegal.com
Mark H. Meyerhoff, Bar No. 180414
mmeyerhoff@lcwlegal.com
Laura J. Kalty, Bar No. 199520
lkalty@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045
Telephone: (310) 981-2000
Facsimile: (310) 337-0837

Attorneys for Defendants
COUNTY OF IMPERIAL and IMPERIAL
COUNTY SHERIFF'S DEPARTMENT

**FILED**

MAY 1 8 2006

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN TACKETT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF IMPERIAL, a governmental entity, and IMPERIAL COUNTY SHERIFF'S DEPARTMENT, a governmental entity doing business in the State of California, and, DOES 1 through 50, inclusive,,<br><br>Defendants. | Case No.: 04cv2459 J (NAJ)<br><br>Assigned for All Purposes To:<br>Judge Napoleon Jones, Courtroom 12<br><br>Complaint Filed: December 9, 2004<br><br>**DEFENDANTS' APPENDIX OF EVIDENTIARY SUPPORT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>**[VOLUME 1 OF 3, EXHIBITS 1-16]**<br><br>Date: June 26, 2006<br>Time: 10:30 a.m.<br>Dept: 12<br><br>[Filed concurrently with Defendants' Notice of Motion and Motion for Summary Judgment or Partial Summary Judgment; Memorandum of Points and Authorities; [Proposed] Judgment; and [Proposed] Order]<br><br>[Exempt from filing fees pursuant to Gov. Code, § 6103.] |

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

ORIGINAL

189569.3 IM040-015

1    Defendants COUNTY OF IMPERIAL and IMPERIAL COUNTY

2    SHERIFF'S DEPARTMENT (collectively "Defendants") hereby lodge with this

3    Court the following Index of Evidentiary Support in support of their Motion for

4    Summary Judgment, or in the Alternative Partial Summary Judgment, against

5    Plaintiff JUSTIN TACKETT ("Plaintiff"):

6        Declaration of Mark H. Meyerhoff;

7        Declaration of Harold Carter;

8        Declaration of Sharon Housouer;

9        Declaration of Dan DeVoy;

10       Declaration of Jesse Obeso;

11       Declaration of Charles Jernigan;

12       Declaration of Myron King;

13       Declaration of Scott Sheppeard;

14       Declaration of Gilbert G. Otero;

15       Declaration of Manuel Avila;

16       Declaration of Ed McErlain;

17       Declaration of Jake Holguin;

18       Declaration of Michael Coleman;

19       Declaration of Beverly Barrett;

20       Declaration of Deborah D. Owen;

21    Exhibit 1:   First Amended Complaint for Damages, filed on

22                 March 21, 2005;

23    Exhibit 2:   Relevant excerpts from the transcripts of Plaintiff's depositions,

24                 Volumes I, II and III, taken on January 17, 2006, January 31,

25                 2006, and April 17, 2006, respectively;

26    Exhibit 3:   Defendants' First Set of Special Interrogatories, served on

27                 November 21, 2005;

28    ///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

Defendants' Appendix Of Evidentiary Support In
Support Of Motion For Summary Judgment
04CV2459 J (NAJ)

1    Exhibit 4:    Plaintiff's Responses to First Set of Special Interrogatories,

2              served on January 5, 2006;

3    Exhibit 5:    Plaintiff's Supplemental Responses to First Set of Special

4              Interrogatories, served on February 21, 2006;

5    Exhibit 6:    September 25, 2001 Notice of Proposed Disciplinary Action –

6              two days suspension without pay;

7    Exhibit 7:    November 16, 2001, Notice of Final Disciplinary Action - two

8              days suspension without pay;

9    Exhibit 8:    February 7, 2002, Imperial County Sheriff's Department

10             Significant Event Review Committee ("SERC") Report, C.R.

11             0111-0017;

12   Exhibit 9:    California Highway Patrol Traffic Collision Report;

13   Exhibit 10:   March 5, 2002, Internal Affairs Investigation No. 2002-009;

14   Exhibit 11:   June 21, 2002, Notice of Proposed Disciplinary Action – five

15             days suspension without pay;

16   Exhibit 12:   July 12, 2002, Transcript of Pre-disciplinary Skelly Conference;

17   Exhibit 13:   October 18, 2002, Notice of Final Disciplinary Action – five

18             days suspension without pay;

19   Exhibit 14:   December 29, 2001 Memorandum from Sgt. Myron King to

20             Chief Deputy Sharon Housouer;

21   Exhibit 15:   January 14, 2002, Case Handling Form (Lackey);

22   Exhibit 16:   April 26, 2002, Interoffice Memo from Chief Deputy Sharon

23             Housouer to Sgt. Delphino Matus;

24   Exhibit 17:   July 8, 2002, Internal Affairs Investigation No. 2002-018;

25   Exhibit 18:   October 3, 2002, Notice of Proposed Disciplinary Action - two

26             days suspension without pay;

27   Exhibit 19:   November 8, 2002, Transcript of pre-disciplinary conference for

28             IA Nos. 2002-007 and 2002-018;

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

189569.3 IM040-015                 - 3 -        Defendants' Appendix Of Evidentiary Support In
                                                 Support Of Motion For Summary Judgment
                                                           04CV2459 J (NAJ)

Exhibit 20: February 24, 2003, Second Notice of Proposed Disciplinary Action – two days suspension without pay;

Exhibit 21: April 4, 2003, Final Notice of Disciplinary Action – two days suspension without pay;

Exhibit 22: February 11, 2002, Interoffice Memo from Sgt. Manuel Avila to Chief Deputy Sharon Housouer;

Exhibit 23: February 13, 2002, Interoffice Memo from Chief Deputy Sharon Housouer to Sgt. Delfino Matus;

Exhibit 24: February 14, 2002, Internal Affairs Investigation No. 2002-007;

Exhibit 25: October 3, 2002, Notice of Proposed Disciplinary Action – termination from employment effective October 11, 2002;

Exhibit 26: February 24, 2003, Second Notice of Proposed Disciplinary Action – termination from employment;

Exhibit 27: April 4, 2003, Final Notice of Disciplinary Action – thirty days suspension without pay;

Exhibit 28: July 29, 2003, Case Handling Form (Macias);

Exhibit 29: Administrative Investigation, IA #2003-0128;

Exhibit 30: November 25, 2003, Notice of Proposed Disciplinary Action – termination (Macias);

Exhibit 31: June 16, 2003, Complaint Form filed by Reno Bertussi;

Exhibit 32: June 23, 2003, Case Handling Form (Bertussi);

Exhibit 33: Administrative Investigation, IA#2003-0122;

Exhibit 34: November 25, 2003, Notice of Proposed Disciplinary Action – termination (Bertussi);

Exhibit 35: December 19, 2003, Deputy Tackett Letter of Resignation;

Exhibit 36: June 14, 2004, Tort Claims for Damages Against the County of Imperial;

///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

- 4 -

Professional Indexes & Files 800-422-9191 www.proindexes.com

# DECLARATION OF MARK H. MEYERHOFF

I, Mark H. Meyerhoff, declare as follows:

1.      I am an attorney at law licensed to practice before all of the courts of the State of California and the Southern District of the United States District Court, and am an associate at Liebert Cassidy Whitmore, the attorneys of record for Defendants County of Imperial and the Imperial County Sheriff's Department (collectively "Defendants") in this action.  I have personal knowledge of the following facts and could competently testify thereto if called as a witness.

2.      A true and correct copy of the First Amended Complaint, the operative complaint in the above-entitled action, filed on or about March 21, 2005, is attached to Defendants' Appendix of Exhibits ("Appendix") as Exhibit 1.

3.      On January 17, 2006, January 31, 2006 and April 17, 2006, Plaintiff Justin Tackett ("Plaintiff") provided deposition testimony in the above-entitled action.  True and correct copies of relevant portions of Plaintiff's deposition transcripts, Volumes I, II and III, respectively, are attached to Defendants' Appendix as Exhibit 2.

4.      On or about November 21, 2005, Defendants served Special Interrogatories, Set No. One, on Plaintiff.  A true and correct copy of Defendants' Special Interrogatories is attached to Defendants' Appendix as Exhibit 3.

5.      On or about January 5, 2006, Plaintiff served his responses to the First Set of Special Interrogatories.  A true and correct copy of Plaintiff's Responses to the First Set of Special Interrogatories is attached to Defendants' Appendix as Exhibit 4.

6.      On or about February 21, 2006, Plaintiff served Supplemental Responses to the First Set of Special Interrogatories.  A true and correct copy of

///

///

///

189259v1

Declaration of Mark H. Meyerhoff

1

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA  90045

1  Plaintiff's Supplemental Responses to the First Set of Special Interrogatories is
2  attached to Defendants' Appendix as Exhibit 5.
3       I declare under penalty of perjury under the laws of the State of California
4  that the foregoing is true and correct.
5       Executed this _17th_ day of May, 2006, at _Los Angeles_ ,
6  California.

8                              Mark H. Meyerhoff

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

- 2 -

2

Professional Indexes & Files 800-422-9191 www.proindexes.com

1

## **DECLARATION OF HAROLD CARTER**

2      I, Harold Carter, declare as follows:

3      1.      I have personal knowledge of the facts set forth below and if called

4  upon to do so, I would competently testify as to such facts.

5      2.      I am currently the Sheriff for the Imperial County Sheriff's

6  Department ("Department"), and I have held this position since in or about 1999.

7  Prior to being Sheriff for the Department, I was a police officer with the El Centro

8  Police Department for thirty years.

9      3.      On or about January 24, 2000, the Department hired Deputy Justin

10  Tackett as a Deputy Sheriff Recruit.  As Sheriff, I had the ultimate approval for the

11  decision to hire Deputy Tackett.  The Department then paid for Deputy Tackett to

12  attend Peace Officer Academy so that Deputy Tackett could become a sworn peace

13  officer.

14      4.      On or about November 16, 2001, the Department served upon Deputy

15  Justin Tackett a Notice of Final Disciplinary Action, suspending Deputy Tackett for

16  two days, based upon the grounds that Deputy Tackett caused substantial damage to

17  his patrol vehicle on three different occasions from July 2000 through June 2001.  I

18  reviewed and approved the Notice of Final Disciplinary Action in my capacity as

19  Sheriff.  A true and correct copy of the November 16, 2001 Final Notice of

20  Disciplinary Action is attached to Defendants' Appendix of Exhibits ("Appendix")

21  as Exhibit 7.

22      5.      On or about October 18, 2002, the Department served upon Deputy

23  Tackett a Notice of Final Disciplinary Action, suspending Deputy Tackett for five

24  days, based upon Deputy Tackett's conduct and the November 1, 2001 traffic

25  accident.  I reviewed and approved the Notice of Final Disciplinary Action in my

26  capacity as Sheriff.  A true and correct copy of the October 18, 2002 Final Notice

27  of Disciplinary Action is attached to Defendants' Appendix as Exhibit 13.

28  ///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA  90045

188998.1                                                      Declaration of Harold Carter

1    6.    On or about November 8, 2002, I conducted a pre-disciplinary

2    conference with Deputy Tackett and his attorney, in response to an October 3, 2002

3    proposed Notice of Suspension, related to a December 28, 2001 incident involving

4    Deputy Tackett and Randy Lackey.  A true and correct copy of the transcript of the

5    November 8, 2002 pre-disciplinary conference is attached to Defendants' Appendix

6    as Exhibit 19.  Following the pre-disciplinary conference, I decided to order further

7    investigation in to the incident after Deputy Tackett alleged during the pre-

8    disciplinary conference that he could not see the subject vehicle on the night in

9    question.

10    7.    On or about April 4, 2003, the Department served upon Deputy

11    Tackett a Notice of Final Disciplinary Action, suspending Deputy Tackett for two

12    days, based upon Deputy Tackett's conduct in relation to the December 28, 2001

13    incident involving Mr. Lackey.  I reviewed and approved the Notice of Final

14    Disciplinary Action in my capacity as Sheriff.  A true and correct copy of the April

15    4, 2003 Final Notice of Disciplinary Action is attached to Defendants' Appendix as

16    Exhibit 21.  Deputy Tackett was disciplined based upon my determination that he

17    engaged in inappropriate conduct related to the Lackey incident, and was not

18    disciplined based on any personal relationships between the parties involved.

19    8.    During the November 8, 2002 pre-disciplinary conference, Deputy

20    Tackett was also allowed an opportunity to respond to an October 3, 2002 Notice of

21    Proposed Termination regarding Deputy Tackett's conduct in relation to a January

22    31, 2002 order given by Sergeant Manuel Avila that Deputy Tackett not conduct

23    probation or parole searches.  A true and correct copy of the transcript of the

24    November 8, 2002 pre-disciplinary conference is attached to Defendants' Appendix

25    as Exhibit 19.  During the pre-disciplinary conference, Deputy Tackett asserted that

26    Sergeant Avila was aware of his actions during the incident in question.  I ordered a

27    further investigation into this matter based upon Deputy Tackett's assertion.

28

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

- 2 -

9.      On or about April 4, 2003, the Department served upon Deputy Tackett a Notice of Final Disciplinary Action to suspend Deputy Tackett for thirty days based upon my determination that Deputy Tackett engaged in misconduct in relation to the January 31, 2002 order given by Sergeant Avila that Deputy Tackett not conduct probation or parole searches. I reviewed and approved the Notice of Final Disciplinary Action in my capacity as Sheriff. A true and correct copy of the April 4, 2003 Final Notice of Disciplinary Action is attached to Defendants' Appendix as Exhibit 27. My decision to reduce Deputy Tackett's discipline from a proposed termination to a thirty day suspension was motivated by my belief that Deputy Tackett could eventually become an effective Deputy and my desire to give Deputy Tackett another change to correct his substandard performance. Deputy Tackett was nonetheless disciplined, however, based on his inappropriate conduct and in particular based on the fact that he had been ordered not to conduct probation and parole searches without permission.

10.      On or about May 22, 2003, Deputy Tackett was involved in an incident with Reno Bertussi which raised issues regarding Deputy Tackett's conduct. Thereafter, on or about July 27, 2003, Deputy Tackett was involved in an incident with Ernesto Macias which raised issues regarding Deputy Tackett's conduct. The investigations of each of these incidents were referred to an outside, independent investigator. At that point in time, the Department anticipated certain complaints related to its investigation of Deputy Tackett regarding the Bertusssi and Macias incidents; in particular, complaints from Gary and Mary Tackett, Deputy Tackett's parents, as well as Deputy Tackett's grandfather, were expected. Thus, despite the fact that I did not have any concerns or suspicions of bias, discrimination or improper conduct by anyone in the Department, these matters were nonetheless referred to an outside, independent investigator to avoid even the possibility of any complaints about disparate treatment, and to avoid even the appearance of impropriety.

- 3 -

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

11.   Any and all final disciplinary actions taken against Deputy Tackett were based solely upon my determination that Deputy Tackett engaged in misconduct and violated Department policies.  None of the disciplinary actions were motivated by a desire to retaliate or discriminate against Deputy Tackett.

12.   I was never aware of any complaints by Deputy Tackett, at any time during his employment, regarding any unlawful conduct within the Department.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 16TH day of May, 2006, at _EL CENTRO CA_____, California.

_____
Harold Carter

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W Century Boulevard, Su te 500
Los Angeles, CA 90045

Professional Indexes & Files 800-422-9191 www.proindexes.com

# DECLARATION OF SHARON HOUSOUER

I, Sharon Housouer, declare as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to do so, I would competently testify as to such facts.

2.     I am currently the Undersheriff for the Imperial County Sheriff's Department ("Department"), and I have been employed in this position since in or about April 2005. From in or about 2000 through April 2005, I was a Chief Deputy for the Department. I have been employed with the Department for 25 years.

3.     In total, Deputy Tackett was a Patrol Deputy for approximately 19 months. Initially, Deputy Tackett was assigned to Court Services. Deputy Tackett was then transferred to North County Patrol on or about December 29, 2000. At his request, Deputy Tackett was transferred back to Court Services on or about March 22, 2002. Thereafter, on or about March 21, 2003, Deputy Tackett was transferred to South County Patrol, where he remained until on or about July 31, 2003, at which time he was again transferred to Court Services. Deputy Tackett remained in Court Services until his resignation in or about December 2003.

4.     On or about September 25, 2001, the Department served Deputy Justin Tackett with a Notice of Intent of Suspension for two days. I reviewed and executed the Notice of Intent in my capacity as Chief Deputy. A true and correct copy of the September 25, 2001 Notice of Intent is attached to Defendants' Appendix of Exhibits ("Appendix") as Exhibit 6. The September 25, 2001 Notice of Intent was based upon my determination that Deputy Tackett caused substantial damage to his patrol vehicle on three different occasions from July 2000 through June 2001. Specifically, the Notice states that (1) on July 23, 2000, Deputy Tackett caused damage to his patrol vehicle by driving onto soft sand, (2) on April 15, 2001, Deputy Tackett caused damage to his patrol vehicle by driving into a trench, and (3) on June 13, 2001, Deputy Tackett caused substantial damage to his patrol vehicle by driving into a ditch.

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045



5.    On or about November 1, 2001, Deputy Tackett was involved in a traffic accident while responding to a service call. On or about June 21, 2002, the Department served Deputy Tackett with a Notice of Intent of Suspension for five days based upon Deputy Tackett's conduct and the November 1, 2001 traffic accident. I reviewed and executed the Notice of Intent in my capacity as Chief Deputy. A true and correct copy of the June 21, 2002 Notice of Intent is attached to Defendants' Appendix as Exhibit 11.

6.    On or about December 29, 2001, I received a memorandum from Sergeant Myron King regarding a December 28, 2001 incident involving Deputy Justin Tackett. A true and correct copy of the Memorandum I received is attached to Defendants' Appendix as Exhibit 14. After reviewing the Memorandum, I requested in a Memorandum dated April 26, 2002 that the Department investigate Deputy Tackett regarding his response to a service call on a suspected hit and run. A true and correct copy of the Memorandum I prepared is attached to Defendants' Appendix as Exhibit 16. Thereafter, on or about July 8, 2002, the Department initiated an internal affairs investigation of Deputy Tackett regarding the December 28, 2001 incident, IA #2002-018.

7.    My actions related to the December 28, 2001 incident involving Deputy Tackett and my request that an internal affairs investigation be conducted were not based on any personal relationships between any of the parties involved and were not motivated by a desire to retaliate or discriminate against Deputy Tackett; rather, my decision was based solely upon my determination that Deputy Tackett engaged in potential misconduct.

8.    On or about October 3, 2002, the Department served Deputy Tackett with a Notice of Intent of Suspension for two days without pay, in relation to Deputy Tackett's conduct in the December 28, 2001 incident involving Mr. Lackey. I reviewed and executed the Notice of Intent in my capacity as Chief Deputy. A true and correct copy of the October 3, 2002 Notice of Intent is attached to

- 2 -

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

1   Defendants' Appendix as Exhibit 18.  The October 3, 2002 Notice of Intent was

2   based upon my determination that Deputy Tackett did not have probable cause to

3   enter Mr. Lackey's private property and that Deputy Tackett exceed his instructions

4   to wait for the Brawley Police Department before entering Mr. Lackey's property.

5   The Notice also concluded that Deputy Tackett failed to observe that the vehicle on

6   Mr. Lackey's property could not have been the vehicle involved in the hit and run.

7   Finally, the Notice concluded that Deputy Tackett engaged in unbecoming conduct

8   by preventing Mr. Lackey from re-entering his house to obtain proper clothing and

9   subsequently handcuffing Mr. Lackey when he attempted to enter his house.

10          9.      After the November 8, 2002 pre-disciplinary hearing, Sheriff Carter

11   ordered an additional investigation into the accident after Deputy Tackett alleged

12   that he could not see the vehicle in question during the incident.  After further

13   investigation, there was no basis upon which to alter the original proposed

14   discipline, and on or about February 24, 2003, the Department served Deputy

15   Tackett with a Second Notice of Intent of Suspension for two days.  I reviewed and

16   executed the Second Notice of Intent in my capacity as Chief Deputy.  A true and

17   correct copy of the February 24, 2003 Second Notice of Intent is attached to

18   Defendants' Appendix as Exhibit 20.

19          10.     On or about February 11, 2002, I received an Interoffice Memo from

20   Sergeant Manuel Avila regarding Deputy Tackett's conduct in relation to probation

21   and parole searches, and in particular a January 31, 2002 incident.  A true and

22   correct copy of the Interoffice Memo I received is attached to Defendants'

23   Appendix as Exhibit 22.  After reviewing the Memorandum, I then requested in a

24   Memorandum dated February 13, 2002 that the Department investigate Deputy

25   Tackett regarding his conduct in relation to probation and parole searches and his

26   alleged untruthfulness to Sergeant Avila.  A true and correct copy of the

27   Memorandum I prepared is attached to Defendants' Appendix as Exhibit 23.

28   Thereafter, on or about February 14, 2002, the Department initiated an internal

- 3 -

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

1  affairs investigation of Deputy Tackett regarding the January 31, 2002 incident, IA

2  #2002-007.

3      11.    My actions related to the January 31, 2002 incident involving Deputy

4  Tackett and my request that an internal affairs investigation be conducted were not

5  motivated by a desire to retaliate or discriminate against Deputy Tackett; rather, my

6  decision was based solely on Deputy Tackett's conduct, and specifically his

7  dishonest and improper conduct with respect to probation and parole searches.

8      12.    On or about October 3, 2002, the Department served Deputy Tackett

9  with a Notice of Proposed Termination. I reviewed and executed the Notice of

10  Proposed Termination in my capacity as Chief Deputy. A true and correct copy of

11  the October 3, 2002 Notice of Proposed Termination is attached to Defendants'

12  Appendix as Exhibit 25. The October 3, 2002 Notice of Proposed Termination was

13  based upon my determination that Deputy Tackett had knowingly and intentionally

14  violated Sergeant Avila's orders and had engaged in conduct unbecoming. The

15  proposed termination was also based on my determination that Deputy Tackett

16  attempted to deceive the Department's internal affairs investigator during the

17  investigation.

18      13.    After the November 8, 2002 pre-disciplinary hearing, Sheriff

19  Carter ordered an additional investigation into the incident after Deputy

20  Tackett claimed that his supervisor knew about his actions during the

21  incident. After further investigation, there was no basis upon which to alter

22  the original proposed discipline, and on or about February 24, 2003, the

23  Department served Deputy Tackett with a Second Notice of Intent to

24  Terminate. A true and correct copy of the February 24, 2003 Second Notice

25  of Intent is attached to Defendants' Appendix as Exhibit 26.

26  ///

27  ///

28  ///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

1    I reviewed and executed the Second Notice of Intent in my capacity as Chief

2    Deputy.

3         I declare under penalty of perjury under the laws of the State of California

4    that the foregoing is true and correct.

5         Executed this 15th day of May, 2006, at El Centro,

6    California.

7

8                                         Sharon Housouer

9

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

11

Professional Indexes & Files 800-422-9191 www.proindexes.com

# DECLARATION OF DAN DEVOY

I, Dan DeVoy, declare as follows:

1.    I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently as to such facts.

2.    I am currently the Director of Human Resources and Risk Management for the County of Imperial ("County"), and have held this position for approximately 2 years. I have been employed with the County for 6 years.

3.    I am the custodian of records for the County, including but not limited to the personnel files of employees of the Imperial County Sheriff's Department ("Department").

4.    Deputy Justin Tackett was a sworn employee of the Department from in or about January 2000 through in or about December 2003. Throughout his employment with the Department, a personnel file for Deputy Tackett was maintained by the County. True and correct copies of the documents referenced herein were included as part of Deputy Tackett's personnel file.

5.    On or about May 22, 2003, Deputy Tackett was involved in an incident involving Reno Bertussi. Thereafter, Mr. Bertussi filed a citizen complaint with the Department, on or about June 16, 2003. A true and correct copy of the June 16, 2003 citizen complaint is attached to Defendants' Appendix as Exhibit 31. The complaint alleged that Deputy Tackett (1) entered Mr. Bertussi's property illegally by climbing over a fence without a warrant or reasonable cause, (2) handcuffed Mr. Bertussi and, (3) searched Mr. Bertussi's property and person without consent. In the complaint, Mr. Bertussi further claimed that Deputy Tackett arrested him and placed him in a patrol vehicle with the windows closed on a hot day, thus causing Mr. Bertussi to kick out the window of the vehicle in order to get air.

6.    From on or about August 2, 2003 until the time of his resignation, Deputy Tackett was on administrative leave/suspension, with pay. On or about

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

188986.1

Declaration of Dan DeVoy

Professional Indexes & Files 800-422-9191 www.proindexes.com



# DECLARATION OF JESSE OBESO

I, Jesse Obeso, declare as follows:

1. I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently as to such facts.

2. I am currently employed as a Chief Deputy with the Imperial County Sheriff's Department ("Department"), and have held this position since approximately 1999. I have been employed with the Department for approximately 27 years.

3. In or about November 2001-February 2002, I was the ranking member of the Imperial County Sheriff's Department's Significant Event Review Committee ("SERC"). The SERC is a committee which reviews significant events in order to evaluate whether or not there should be changes to certain polices and/or practices of the Department. The SERC does not handle internal investigations or discipline, but evaluates significant events in an effort to prevent them from reoccurring in the future.

4. On February 7, 2002, the SERC convened to review Deputy Justin Tackett's involvement in a November 1, 2001 traffic accident. A true and correct copy of the SERC Report, C.R. 0111-0017 is attached to Defendants' Appendix of Evidence ("Appendix") as Exhibit 8.

   a. In the Report, SERC concluded that Deputy Tackett was responsible for the November 1, 2001 traffic accident, and that the cause of the accident was driving at a speed greater than was reasonable or prudent.

   b. Also included and relied upon in the Report by SERC was a California Highway Patrol ("CHP") traffic collision report which found that Deputy Tackett was the cause of the collision due to his unsafe speed. A true and correct copy of the CHP traffic collision report is attached to Defendants' Appendix as Exhibit 9.

///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045



LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

1        c.    In the Report, SERC also concluded that Deputy Tackett had

2  developed a pattern of negligent and reckless vehicle operation as evidenced

3  by at least four prior incidents during the course of a year in which Deputy

4  Tackett damaged his patrol vehicle.

5        d.    In conclusion, in the Report, SERC recommended that the

6  Department discipline Deputy Tackett as it deemed appropriate.

7       5.    My analysis and conclusions in the SERC report were in no way

8  motivated by a desire to retaliate or discriminate against Deputy Tackett. Rather,

9  my actions as part of SERC as set forth herein were motivated by Deputy Tackett's

10  conduct as a Patrol Deputy.

11       6.    On or about November 25, 2003, the Department served Deputy

12  Tackett with a Notice of Intent to terminate his employment on the grounds that

13  Deputy Tackett violated orders from his superiors, conducted an unlawful search

14  and seizure and needlessly risked his own life and the life of a fellow officer. I

15  reviewed and executed the Notice of Intent in my capacity as Chief Deputy. A true

16  and correct copy of the November 25, 2003 Notice of Intent is attached to

17  Defendants' Appendix as Exhibit 30. The November 25, 2003 Notice of Intent was

18  based upon a July 27, 2003 incident between Deputy Tackett and Ernesto Macias.

19       7.    Also on or about November 25, 2003, the Department served Deputy

20  Tackett with a Notice of Intent to terminate his employment based on a May 22,

21  2003 incident involving Reno Bertussi. I reviewed and executed the Notice of

22  Intent in my capacity as Chief Deputy. A true and correct copy of the November

23  25, 2003 Notice of Intent is attached to Defendants' Appendix as Exhibit 34. The

24  November 25, 2003 Notice of Intent was based upon the grounds that Deputy

25  Tackett unlawfully entered and searched Mr. Bertussi's property without

26  ///

27  ///

28  ///

1   permission or a warrant and subsequently place Mr. Bertussi in a hot patrol vehicle

2   for an extended period of time without air conditioning.

3       I declare under penalty of perjury under the laws of the State of California

4   that the foregoing is true and correct.

5       Executed this _13th_ day of May, 2006, at _El Centro_ ,

6   California.

7

8   Jesse Obeso

9

10

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Professional Indexes & Files 800-422-9191 www.proindexes.com

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

# DECLARATION OF CHARLES JERNIGAN

I, Charles Jernigan, declare as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently as to such facts.

2.     I am currently retired. Prior to my retirement, I was employed by the Imperial County Sheriff's Department ("Department") in the position of Undersheriff, among other positions. I held the position of Undersheriff for approximately 2-3 years. Prior to becoming the Undersheriff, I was employed by the Department in various positions for approximately 33 years. I retired from the Department in or about 2005.

3.     In or about July 2002, I was an Assistant Sheriff, and one of my duties at the time was to handle personnel matters, including but not limited to conducting pre-disciplinary Skelly Conferences. On July 12, 2002, I conducted the Skelly pre-disciplinary Conference regarding Deputy Tackett's November 1, 2001 traffic accident and the proposed 5-day suspension of Deputy Tackett related thereto. A true and correct copy of the transcript of the July 12, 2002 conference is attached to the Defendants' Appendix of Evidence ("Appendix") as Exhibit 12.

4.     As noted in the transcript of the July 12, 2002 pre-disciplinary hearing, neither Deputy Tackett nor his attorney alleged that the proposed discipline was discriminatory or retaliatory in any way. Moreover, neither Deputy Tackett nor his

///

///

///

188988

Declaration of Charles Jernigan

17

Professional Indexes & Files 800-422-9191 www.proindexes.com

# DECLARATION OF MYRON KING

I, Myron King, declare as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently to such facts. I am a retired Sergeant of the Imperial County Sheriff's Department. I worked as a Sergeant at the Imperial County Sheriff's Department from 1985 until 2003.

2.     In or about December 2001, I was a Sergeant assigned to patrol in the Sheriff's Department Central Patrol Division. Deputy Justin Tackett was a patrol deputy who was under my supervision at the time.

3.     On or about December 29, 2001, I prepared a memorandum regarding Deputy Justin Tackett for Chief Sharon Housouer. The subject of the memorandum was Deputy Tackett's conduct during an investigation related to a suspected hit and run which occurred on or about December 28, 2001. Attached hereto as Exhibit 14 to the Appendix is a true and correct copy of my December 29, 2001 memorandum.

    a.     In the December 29, 2001 memorandum, I reported that on December 28, 2001, the Brawley Police Department requested a Department deputy to respond to a residence to determine if a vehicle at that residence matched a vehicle involved in an earlier accident. I reported that Deputy Tackett responded to the call and upon arriving at the address, the City of Brawley requested that Deputy Tackett stand by and wait for a Brawley police officer to arrive. I also reported that shortly after Deputy Tackett was advised to wait for a Brawley police officer, I heard Deputy Tackett request backup, and I then responded to the scene.

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

1    b.    I then reported that upon arriving at the scene, Deputy Tackett

2    told me that he had arrested the owner of the vehicle, Mr. Randall Lackey. I

3    described how Deputy Tackett told me that he arrested Mr. Lackey because

4    Mr. Lackey had failed to obey his command and had tried to go back into his

5    house to put on more clothing, since the temperature at the time was cold.  I

6    included in my report how I then ordered Deputy Tackett to release Mr.

7    Lackey from the handcuffs, and to cite him rather than book him into jail.

8    c.    I reported how at the Brawley Substation following the incident,

9    I advised Deputy Tackett that the greater officer safety concern was his

10   failure to wait for a Brawley police officer which then unnecessarily

11   instigated the incident with Mr. Lackey.

12   d.    In my December 29, 2001 memorandum, I also reported to

13   Chief Housouer that Deputy Tackett should have discovered that the vehicle

14   on Mr. Lackey's property could not have been involved in the hit and run

15   because it was obvious that the vehicle had not been moved recently.

16   Further, I reported to Chief Housouer that Deputy Tackett should not have

17   detained Mr. Lackey and should have allowed Mr. Lackey to put on proper

18   clothing for the weather.  Finally, I reported to Chief Housouer that Deputy

19   Tackett's reluctance to accept my advice demonstrated Deputy Tackett's

20   inability to control his emotions.

21

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1    4.    My December 29, 2001 memorandum to Chief Housouer was not in

2    any way motivated by a personal relationship I had with any citizen of the County.

3    To the contrary, my memorandum was motivated by my perception and

4    professional opinion that Deputy Tackett engaged in improper tactics.

5         I declare under penalty of perjury under the laws of the State of California

6    that the foregoing is true and correct.

7         Executed this 1st day of May, 2006, at El Centro                   ,

8    California.

9

10

          Myron King

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

Professional Indexes & Files 800-422-9191 www.proindexes.com

# DECLARATION OF SCOTT SHEPPEARD

I, Scott Sheppeard, declare as follows:

1.      I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently as to such facts.

2.      I am currently employed as a Sergeant with the Imperial County Sheriff's Department ("Department"), and have held this position for 3 years. I have been employed with the Department for 8 years.

3.      I am the custodian of records for Internal Investigations files for the Department.

4.      On or about March 5, 2002, the Imperial County Sheriff's Department Administrative Investigations Unit ("AIU") began its investigation of a November 1, 2001 traffic accident involving Deputy Justin Tackett. I have reviewed IA#2002-009, and the document attached to Defendants' Appendix of Evidence ("Appendix") as Exhibit 10 is a true and correct copy of IA#2002-009.

5.      On or about July 8, 2002, the Department's AIU began its investigation of a December 28, 2001 incident involving Deputy Tackett and Randy Lackey. I have reviewed IA#2002-018, and the document attached to Defendants' Appendix as Exhibit 17 is a true and correct copy of IA#2002-018.

6.      On or about February 14, 2002, the Department's AIU began its investigation of a January 31, 2002 incident involving Deputy Tackett and his involvement in a probation search. I have reviewed IA#2002-007, and the document attached to Defendants' Appendix as Exhibit 24 is a true and correct

189257v1                                                    Declaration of Scott Shepard

22

1   copy of IA#2002-007.

2         I declare under penalty of perjury under the laws of the State of California

3   that the foregoing is true and correct.          328 AppleHill Rd.

4         Executed this   5th   day of May, 2006, at     ElCentro          ,

5   California.

6                                          Scott Sheppeard

7

8

9

10

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

23

Professional Indexes & Files 800-422-9191 www.proindexes.com

1

## DECLARATION OF GILBERT G. OTERO

2    I, Gilbert G. Otero, declare as follows:

3    1.    I have personal knowledge of the facts set forth below and if called

4    upon to do so, I would testify competently to such facts.

5    2.    I am employed by the County of Imperial in the position of District

6    Attorney and have held this position for approximately 11 ½ years. In my position

7    as District Attorney, I am the elected official in charge of the District Attorney's

8    Office and making policy decisions. I, along with my assistant, generally review

9    sensitive, political and/or difficult cases which come through the District Attorney's

10   Office. I actively discuss and oversee much of the case work of all Deputy District

11   Attorneys within the District Attorney's Office. As part of my duties, I am

12   responsible for all charges filed by sworn personnel employed by the Imperial

13   County Sheriff's Department.

14   3.    On or about January 14, 2002, Deputy Justin Tackett submitted to the

15   District Attorney's Office a request for charges to be filed against Randy Lackey

16   for an alleged violation of California Penal Code section 148 (resisting or

17   interfering with a peace officer.) Deputy District Attorney Deborah Owen was

18   assigned to review the request. During her review of the request, Ms. Owen

19   discussed the request with me in my capacity as District Attorney. Upon reviewing

20   the request and the facts contained in the police report, I agreed with Ms. Owen that

21   there was insufficient evidence to prove a crime.

22   4.    Ms. Owen, under my supervision and with my concurrence, rejected

23   the charge and noted the rejection of the charge on a Case Handling Form. A true

24   and correct copy of the Case Handling Form issued regarding the Lackey charge is

25   attached to Defendants' Appendix of Evidence ("Appendix") as Exhibit 15. The

26   Case Handling Form notes that the charge was rejected in the "interest of justice"

27   and for "lack of evidence to prosecute."

28   ///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

188999.1                                    Declaration of Gilbert Otero

24

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

5.     I did not speak with anyone from the Imperial County Sheriff's Department regarding Deputy Tackett's request that charges be filed against Mr. Lackey.  No official, employee or supervisor from the Imperial County Sheriff Department influenced, or attempted to influence, my decision to recommend rejection of charges against Mr. Lackey.  Rather, my decision to recommend rejection of the charge was based upon my own review of the facts, my experience and ethical obligation as a District Attorney and my professional opinion that the claimed charge was not supported by the evidence.

6.     On or about June 23, 2003, Deputy Tackett submitted to the District Attorney's Office a request for charges to be filed against Reno Bertussi for several alleged violations of the California Penal Code.  Deputy District Attorney Beverly Barrett was assigned to review the request.  After making the decision to reject the case, Ms. Barrett discussed her decision with me, and I expressed that I agreed with her decision that Deputy Tackett's conduct which resulted in the filing of the charge was inappropriate.

7.     Ms. Barrett rejected the charge and noted the rejection of the charge on a Case Handling Form.  A true and correct copy of the Case Handling Form issued in regards to the Bertussi charge is attached to Defendants' Appendix as Exhibit 32.  The Case Handling Form notes that there were "search and seizure" issues regarding the manner in which Deputy Tackett entered Mr. Bertussi's property without a warrant.  The Form also notes that Deputy Tackett's subsequent warantless search of Mr. Bertussi's property and seizure of property from Mr. Bertussi's residence raised search and seizure issues.  The Form further concludes that Deputy Lackey's placement of Mr. Bertussi in a hot patrol vehicle with no air conditioning made the charge "problematic."

///

///

///

- 2 -

8.    I did not speak to anyone from the Imperial County Sheriff's Department regarding Deputy Tackett's request that charges be filed against Mr. Bertussi, and no official, employee or supervisor from the Imperial County Sheriff's Department influenced or attempted to influence me regarding the requested charges against Mr. Bertussi.

9.    On or about July 29, 2003, Deputy Tackett submitted to the District Attorney's Office a request for charges to be filed against Ernesto Macias for alleged violations of the California Health and Safety Code, Penal Code and Vehicle Code.  Deputy District Attorney Beverly Barrett was assigned to review the request.

10.    Ms. Barrett rejected the charge and noted the rejection of the charge on a Case Handling Form.  A true and correct copy of the Case Handling Form issued in regards to the Macias charge is attached to Defendants' Appendix as Exhibit 28 The Case Handling Form notes that there were "4th Am. Violations" regarding the manner in which Deputy Tackett entered and searched Mr. Macias' motel room without a warrant.  The Form also notes that once Mr. Macias was handcuffed, he was under arrest, and Deputy Tackett did not have consent to enter Mr. Macias' motel room without a warrant.  There was no reason legally to justify a protective sweep of the room, which was in fact a thinly disguised excuse to do a warrantless search with no legal exception to the warrant requirement.  The form concludes that the pipe in the drawer was not in plain view because Deputy Tackett was not in a place where he was legally permitted to be.

///
///
///
///
///
///

-3-

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

1       11.    I did not speak to anyone from the Imperial County Sheriff's

2   Department regarding Deputy Tackett's request that charges be filed against Mr.

3   Macias, and no official, employee or supervisor from the Imperial County Sheriff's

4   Department influenced or attempted to influence me regarding the requested

5   charges against Mr. Macias.

6       I declare under penalty of perjury under the laws of the State of California

7   that the foregoing is true and correct.

8       Executed this _9th_ day of May, 2006, at _El Centro_ ,

9   California.

10

11

12                 Gilbert G. Otero

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

- 4 -

27

Professional Indexes & Files 800-422-9191 www.proindexes.com

1    ## DECLARATION OF MANUEL AVILA

2    I, Manuel Avila, declare as follows:

3    1.    I have personal knowledge of the facts set forth below and if called

4    upon to do so, I would testify competently as to such facts.

5    2.    I am currently retired.  Prior to my retirement, I was employed by the

6    Imperial County Sheriff's Department ("Department") in the position of Sergeant.

7    I was employed as a Sergeant for approximately 3 years.  Prior to becoming a

8    Sergeant, I was employed by the Department as a Deputy for approximately 23

9    years.  I retired from the Department in 2003.

10   3.    In or about January, 2002 I was assigned as a Patrol Sergeant in the

11   Department's North County Division.  Deputy Justin Tackett was a patrol deputy in

12   the North County Division at the time and I was one of Deputy Tackett's direct

13   supervisors.

14   4.    During the latter part of 2001, I advised Deputy Tackett that his

15   primary function as a Patrol Deputy was to respond to calls for service.  I further

16   advised Deputy Tackett that he was not a Probation Officer or a Parole Agent and

17   that he should not be conducting probation or parole searches.  I further advised

18   Deputy Tackett at this time that if he had information on probationers or parolees,

19   he should contact the appropriate Probation Officer or Parole Agent for further

20   action.

21   5.    In or about January, 2002, Deputy Tackett told me that he wanted to

22   conduct a parole search of a specific individual.  I again instructed Deputy Tackett

23   that he was not to do parole or probation searches.

24   6.    On or about February 11, 2002, I prepared a memorandum to my

25   supervisor, Chief Deputy Sharon Housouer, requesting that the Department conduct

26   an internal affairs investigation in regards to an incident involving Deputy Tackett

27   that occurred on January 31, 2002.  I requested the investigation based upon my

28   belief that Deputy Tackett was untruthful to me in my capacity as one of his direct

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

188991.1                                    Declaration of Manuel Avila

1    supervisors. The specific contents of my February 11, 2002 memorandum to Chief

2    Housouer are set forth below:

3          a.    On January 31, 2002, Deputy Tackett informed me that he was

4    going to assist a Department employee in following up on some cases.

5          b.    I contacted the Department employee that Tackett was allegedly

6    going to assist and was informed that Deputy Tackett had approached the employee

7    to request copies of documents relating to the probations of two individuals for the

8    purpose of conducting a probation search of the individuals.

9          c.    I contacted Deputy Tackett and asked him if he was conducting

10   probation searches that day or doing a follow-up investigation. Deputy Tackett

11   informed me that he was doing a follow-up investigation to make sure that certain

12   individuals were complying with their probation conditions. I ordered Deputy

13   Tackett not to conduct any probation searches.

14         d.    Later that day, I learned that Deputy Tackett had assisted the

15   Calipatria Police Department in a probation search.

16         e.    A true and correct copy of my February 11, 2002 memorandum

17   to Chief Deputy Housouer is attached to Defendants' Appendix of Evidence

18   ("Appendix") as Exhibit 22.

19         7.    My instructions to Deputy Tackett to not conduct probation or parole

20   searches was based upon my belief as one of Tackett's direct supervisors that his

21   main job duty as a Patrol Deputy was to respond to calls of service with the County

22   of Imperial. Deputy Tackett was not employed by the County as a probation or

23   parole officer.

24         8.    My memorandum to Chief Housouer was based upon my belief that

25   Deputy Tackett had misrepresented to me his activities on January 31, 2002.

26   Specifically, I believed that Deputy Tackett was not honest to me when he advised

27   me that he was doing a follow-up investigation when, in fact, he intended to

28   conduct a probation search. I also believed that Tackett was violating my previous

- 2 -

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

Professional Indexes & Files 800-422-9191 www.proindexes.com

## DECLARATION OF ED MC ERLAIN

I, Ed McErlain, declare as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently as to such facts.

2.     I am a contract employee as a Senior Investigator for Norman A. Traub Associates, an organization specializing in investigations involving sexual harassment, employee dishonesty and other acts of misconduct, excessive force complaints, hostile work environment, executive background investigations and training in governmental ethics.  I have 32 years of experience in law enforcement, including 10 years of experience as a captain for the Huntington Beach Police Department.  During my law enforcement career, I commanded the Investigation, Uniform, and Administrative Divisions; I was an Investigation Division Commander responsible for the management and coordination of all criminal investigations; and, I was an Administrative Division Commander responsible for the management of the Professional Standards Unit (internal affairs).

3.     On or about August 5, 2003, the Imperial County Sheriff's Department commissioned the services of Norman A. Traub Associates to conduct an independent administrative investigation of a matter involving Reno Bertussi and Deputy Justin Tackett.

4.     On or about August 5, 2003, I was a Senior Associate/Investigator for Norman A. Traub Associates.  I was assigned to conduct the independent administrative investigation into the Bertussi matter.

5.     During the course of my investigation, I reviewed all pertinent documents relating to the Bertussi incident, including transcripts of all interviews conducted by Sergeant Jake Holguin, the Sergeant who conducted the initial internal affairs investigation regarding Deputy Tackett's conduct in the Bertussi incident.

///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

188997.1

6.    During the course of my investigation of the Bertussi matter, I also interviewed Deputy Tackett.

7.    On or about October 17, 2003, I finalized my Report of the Confidential Administrative Investigation regarding the Bertussi matter.  A true and correct copy of my final Report is attached to Defendants' Appendix of Evidence ("Appendix") as Exhibit 33.  My Report contained the following findings which are summarized below:

a.    Deputy Tackett unlawfully entered Bertussi's property, and thus did not have any legal right to search and/or handcuff Mr. Bertussi, search Mr. Bertussi's workshop on his property, or recover any property from Mr. Bertussi's premises.

b.    Deputy Tackett acted negligently when he left Mr. Bertussi in a patrol vehicle for a substantial amount of time, on a hot day, without any air conditioning.

c.    Deputy Tackett failed to thoroughly report the incident.

8.    The conclusions I reached in the Report of the Confidential Administrative Investigation regarding the Bertussi matter were based on my investigation and years of experience.  No official, employee or supervisor of the County of Imperial and/or the Imperial County Sheriff's Department influenced the findings and conclusions I reached in the Bertussi Report.

9.    On or about August 5, 2003, the Imperial County Sheriff's Department commissioned the services of Norman A. Traub Associates to conduct an independent administrative investigation of a matter involving Ernesto Macias and Deputy Tackett.

10.    On or about August 5, 2003, I was assigned to conduct the independent administrative investigation into the Macias matter.

11.    During the course of my investigation, I reviewed all pertinent documents relating to the Macias incident, including the transcript of the interview

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

- 2 -



1  of Mr. Macias conducted by Sergeant Holguin, the Sergeant who conducted the

2  initial internal affairs investigation regarding Deputy Tackett's conduct in the

3  Macias incident.

4     12.   During the course of my investigation of the Macias matter, I also

5  interviewed Deputy Tackett.

6     13.   On or about October 17, 2003, I finalized my Report of the

7  Confidential Administrative Investigation regarding the Macias matter. A true and

8  correct copy of my final Report is attached to Defendants' Appendix as Exhibit 29.

9  My Report contained the following findings which are summarized below:

10        a.   Despite having been counseled on at least two occasions by two

11     different supervisors and told not to make traffic stops in incorporated areas,

12     Deputy Tackett stopped Mr. Macias in the City of Brawley.

13        b.   Deputy Tackett did not follow common law enforcement

14     practice when he failed to call, or request dispatch to call, the registered

15     owner of the vehicle, relative, employer or other individual who could be

16     queried to validate the information provided by the driver. Further, Deputy

17     Tackett's request to transport Mr. Macias to his motel to obtain his

18     identification was not in keeping with normal law enforcement practice. Mr.

19     Macias should have been arrested, cited and released, or released with a

20     warning.

21        c.   Deputy Tackett displayed poor discretion and was premature in

22     towing the vehicle when he did; Deputy Tackett's decision to tow the vehicle

23     when he did permitted him to conduct an "inventory search" of the truck,

24     which otherwise would not have been permissible absent Mr. Macias'

25     consent.

26        d.   When Deputy Tackett had Mr. Macias' vehicle towed,

27     transported him to his motel in the rear seat of a patrol vehicle and

28     handcuffed him at some point prior to escorting him to his room, he was

- 3 -

33

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045



under arrest, not simply being detained.  This was a coercive situation that, absent a search warrant, constituted an improper entry into Mr. Macias' room by Deputy Tackett.

> e.    Deputy Tackett had no right to be in Mr. Macias' room, thus any search or directed search of what was contained in the room was unlawful, and Deputy Tackett did not have the right to search the adjoining rooms to see if other people were present.

> f.    In sum, when Deputy Tackett escorted Mr. Macias to his motel room, made entry, and conducted and/or participated in a search of the room, his actions constituted an unreasonable intrusion into Mr. Macias' privacy and an improper search.

14.    The conclusions I reached in the Report of the Confidential Administrative Investigation regarding the Macias matter were based on my investigation and years of experience.  No official, employee or supervisor of the County of Imperial and/or the Imperial County Sheriff's Department influenced the findings and conclusions I reached in the Report.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _5th_ day of May, 2006, at ___LAGUNA NIGUEL___, California.

_____
Ed McErlain

Professional Indexes & Files 800-422-9191 www.proindexes.com

## DECLARATION OF JAKE HOLGUIN

I, Jake Holguin, declare as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently as to such facts.

2.     I am currently employed as a Sergeant with the Imperial County Sheriff's Department ("Department"), and have held this position since in or about 1988.

3.     In or about May and June 2003, I was a Sergeant assigned to the Administrative Investigations Unit.  I conducted the Administrative Investigation, PC#2003-0122, of Deputy Justin Tackett regarding a May 22, 2003 incident involving Reno Bertussi and the June 16, 2003 citizen complaint filed by Mr. Bertussi in relation thereto.  A true and correct copy of the Administrative Investigation, PC#2003-0122, is attached to Defendants' Appendix of Evidence ("Appendix") as Exhibit 33.

4.     As part of the Administrative Investigation, I interviewed all percipient witnesses to the May 22, 2003 incident involving Deputy Tackett and Mr. Bertussi. Attached as part of the Administrative Investigation are true and correct copies of the transcripts of the interviews I conducted.

5.     After I completed the majority of my investigation, it was determined with my concurrence that the matter should be referred to a private investigator to avoid even the appearance of impropriety.  Accordingly, I did not make any findings with regard to my investigation of the incident involving Mr. Bertussi.

6.     I thereafter collected and turned over the Bertussi investigation materials to private investigator Ed McErlain.  I did nothing to influence, suggest or in any way sway Mr. McErlain's investigation and findings regarding the Bertussi matter.

///

///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

189001.1

Declaration of Jake Holguin

1    7.    I never had any communications with anyone in the District Attorney's

2    Office in an attempt to improperly influence the DA to either sustain or drop the

3    charges against Deputy Tackett with regard to the incident involving Mr. Bertussi.

4    8.    My investigation of Deputy Tackett regarding the incident involving

5    Mr. Bertussi was in no way motivated by a desire to retaliate or discriminate against

6    Deputy Tackett.  Rather, my actions as set forth herein were motivated by Deputy

7    Tackett's conduct as a Patrol Deputy.

8    9.    I also began the Administrative Investigation, IA#2003-0128, of

9    Deputy Tackett regarding a July 27, 2003 incident involving Ernesto Macias.

10   10.   As part of the Administrative Investigation, I interviewed Mr. Macias.

11   11.   After I began my investigation, it was determined with my

12   concurrence that the matter should be referred to a private investigator to avoid

13   even the appearance of impropriety.  Accordingly, I did not make any findings with

14   regard to my investigation of the incident involving Mr. Macias.

15   12.   I thereafter collected and turned over the investigation materials to

16   private investigator Ed McErlain.  I did nothing to influence, suggest or in any way

17   sway Mr. McErlain's investigation and findings regarding the Macias matter.

18   13.   I never had any communications with anyone in the District Attorney's

19   Office in an attempt to improperly influence the DA to either sustain or drop the

20   charges against Deputy Tackett with regard to the incident involving Mr. Macias.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA  90045

- 2 -

14.    My investigation of Deputy Tackett regarding the incident involving Mr. Macias was in no way motivated by a desire to retaliate or discriminate against Deputy Tackett.  Rather, my actions as set forth herein were motivated by Deputy Tackett's conduct as a Patrol Deputy.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this __11__ day of May, 2006, at _____ / 11:30 Am , California.

_____
Jake Holgan

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA  90045

Professional Indexes & Files 800-422-9191 www.proindexes.com

## DECLARATION OF MICHAEL COLEMAN

I, Michael Coleman, declare as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently to such facts.

2.     I am the Senior Special Agent in Charge of the San Diego Regional Office for the California Department of Justice, Bureau of Narcotics Enforcement. My current employer is the State of California.  As Senior Special Agent in Charge, I am responsible for the management, coordination and enforcement of narcotic laws and violations on behalf of the State of California for San Diego and Imperial Counties.  I have 29 years of service as a full time sworn peace officer in the State of California, with approximately 17 years of experience in narcotic enforcement.

3.     From approximately 1999 to 2001, I was the Special Agent Supervisor, Task Force Commander for the Imperial County Narcotic Task Force ("ICNTF").  The ICNTF is a multi-agency drug task force, consisting of federal, state and local law enforcement agencies.  The purpose of the ICNTF is to reduce drug trafficking, thereby reducing the impact of illicit drugs in the Imperial County region. To accomplish this mission, the ICNTF assists in the coordination of joint operational initiatives to deter, disrupt, dismantle, and ultimately eliminate illicit drugs in the region.

4.     On or about October 23, 2001, the ICNTF coordinated and supervised the investigation and removal of marijuana plants from a large agricultural field in Imperial County.  I was the supervisor in charge of this operation.  Deputy Justin Tackett of the Imperial County Sheriff's Department was one of the law enforcement personnel who participated in the operation.

///

///

///

///

188985.1

Declaration of Michael Coleman

38

5.     After confirming the discovery of marijuana plants in the agricultural field, I ordered the plants removed from the field and destroyed. There was no procedure in place for the destruction of marijuana plants in Imperial County. I made arrangements to have the plants destroyed along with marijuana plants seized in San Diego County. The plants were transported to San Diego County and released to the marijuana eradication officer assigned to the San Diego Narcotic Task Force.

6.     In my experience as a law enforcement officer, it is not unusual to find a crop of marijuana plants growing in a large agricultural field with legitimate agricultural products. In my experience, it is not feasible to conduct surveillance of marijuana plants contained in a large agricultural field due to the expense and difficulty of actually observing the growers of the marijuana plants returning to remove the plants. For these reasons, it is routine practice for the ICNTF to remove marijuana plants found in large agricultural fields.

7.     In my experience, investigations related to marijuana cultivation are a labor intensive process. Courts require extensive evidence to prove cultivation, and usually prefer videotape over testimony. The cost and difficulty of maintaining surveillance, however, is significant. Thus, surveillance in such cases, such as the operation on October 23, 2001, is usually not feasible because it is not usually effective or cost-efficient.

8.     Following the October 23, 2001 investigation and removal of marijuana from a field in Imperial County and based upon my interview of Mr. Mohammed, it was clear there was no evidence to support a violation of marijuana cultivation on the part of Mr. Mohammed. No other suspects were identified in this investigation. I made the decision there was no basis to bring this matter to the Imperial County District Attorney's Office for prosecution because the basic elements needed to prosecute a drug-related crime were not established. No

///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

- 2 -

39

Professional Indexes & Files 800-422-9191 www.proindexes.com

## DECLARATION OF BEVERLY BARRETT

I, Beverly Barrett, declare as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently as to such facts.

2.     I am currently employed by the County of Riverside in the position of Deputy District Attorney.  Prior to working for the County of Riverside, I was a Deputy District Attorney for the County of Imperial from approximately January 2003 through January 2005.  In my position as Deputy District Attorney for the County of Imperial, I was a senior level career prosecutor, and my job duties included reviewing and issuing cases, conducting trials and settlements, interviewing witnesses, acting as a liaison between witnesses and agencies, and general case management .  I have approximately 24 years of experience as a criminal lawyer.

3.     On or about June 23, 2003, Deputy Justin Tackett submitted to the District Attorney's Office a request for charges to be filed against Reno Bertussi for several alleged violations of the California Penal Code.  James Queenan was initially assigned to review the request and initially approved the charge as a misdemeanor based upon Deputy Tackett's report of the incident.  The approval of the charge, however, had not yet been processed or communicated to anyone. Sometime thereafter, I received a phone call from Sergeant Jake Holguin, a Sergeant assigned to the Administrative Investigations Unit at the time.  Sergeant Holguin indicated that he wanted to bring this matter to the District Attorney's attention because the file and arrest report were not complete as to what really happened in the incident involving Deputy Tackett and Mr. Bertussi.  Sergeant

189305v1

Declaration of Beverly Barrett

41

Holguin then forwarded to me Deputy Tackett's transcripts from the Department's Internal Affairs Investigation into the Bertussi matter. After reading the transcript of his recorded statement, I then reevaluated the Bertussi charge.

4.     At no point did anyone from either the County of Imperial or the Imperial County Sheriff's Department attempt to improperly influence or pressure me in terms of rejecting or approving the Bertussi charge. To the contrary, based on the evidence in his possession, it is my understanding and belief that Sergeant Holguin was in fact obligated to bring the information regarding Deputy Tackett to the attention of the District Attorney.

5.     As part of my review of the Bertussi charge, I discussed the request with the District Attorney Gilbert Otero. We agreed that Deputy Tackett's conduct which resulted in the filing of the charge was inappropriate. I therefore rejected the Bertussi charge, and noted the rejection of the charge on the Case Handling Form. A true and correct copy of the Case Handling Form issued in regards to the Bertussi charge is attached to Defendants' Appendix of Exhibits ("Appendix") as Exhibit 32. I noted on the Case Handling Form that there were "search and seizure" issues regarding the manner in which Deputy Tackett entered Mr. Bertussi's property without a warrant. I also noted on the Case Handling Form that Deputy Tackett's subsequent warrantless search of Mr. Bertussi's property and seizure of property from Mr. Bertussi's residence raised search and seizure issues. I concluded on the Case Handling Form that Deputy Tackett's placement of Mr. Bertussi in a hot patrol vehicle with no air conditioning made the charge "problematic."

6.     At the time of my review of the request, I was not aware that Mr. Bertussi was related to any County officials.

-2-

42

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

1    7.    On or about July 29, 2003, Deputy Tackett submitted to the District

2    Attorney's Office a request for charges to be filed against Ernesto Macias for

3    alleged violations of the California Health and Safety Code, Penal Code and

4    Vehicle Code.

5

6    8.    At no point did anyone from either the County of Imperial or the

7    Imperial County Sheriff's Department attempt to improperly influence or pressure

8    me in terms of rejecting or approving the Macias charge.

9

10   9.    After my review of the request, I rejected the Macias charge, and noted

11   the rejection of the charge on the Case Handling Form.   A true and correct copy of

12   the Case Handling Form issued in regards to the Macias charge is attached to

13   Defendants' Appendix as Exhibit 28.   I noted on the Case Handling Form that "the

14   4th Am. Violations are almost too numerous to list."   I also noted on the Case

15   Handling Form that once Mr. Macias was handcuffed, he was under arrest, and

16   Deputy Tackett did not have consent to enter Mr. Macias' motel room without a

17   warrant.   There was no reason legally to justify a protective sweep of the room,

18   which was in fact a thinly disguised excuse to do a warrantless search with no legal

19   exception to the warrant requirement.   I concluded that the pipe in the drawer was

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

- 3 -

1  not in plain view because Deputy Tackett was not in a place where he was legally

2  permitted to be.

3      I declare under penalty of perjury under the laws of the State of California

4  that the foregoing is true and correct.

5      Executed this _8_ day of May, 2006, at _____,

6  California.

8  Beverly Barrett

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

- 4 -

Professional Indexes & Files 800-422-9191 www.proindexes.com

## DECLARATION OF DEBORAH D. OWEN

I, Deborah D. Owen, declare as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to do so, I would testify competently as to such facts.

2.     I am employed by the County of Imperial in the position of Senior Deputy District Attorney and have been a Deputy District Attorney for approximately 10 years. In my position as Senior Deputy District Attorney, I supervise Deputy District Attorneys, prosecute sex offense cases, and on a day to day basis review and either approve or reject all levels of cases.

3.     On or about January 14, 2002, Deputy Justin Tackett submitted to the District Attorney's Office a request for charges to be filed against Randy Lackey for an alleged violation of California Penal Code section 148 (resisting or interfering with a peace officer). I was assigned to review the charge.

4.     After reviewing the request, I found that the facts contained in the police report were insufficient to prove a crime. Accordingly, I rejected the charge and noted the rejection of the charge on a Case Handling Form. A true and correct copy of the Case Handling Form issued regarding the Lackey charge is attached to Defendants' Appendix of Evidence ("Appendix") as Exhibit 15. The Case Handling Form notes that the charge was rejected in the "interests of justice" and for "lack of evidence to prosecute."

5.     My decision to reject the Lackey charge was based upon my own review of the facts, my experience as a Deputy District Attorney and my professional opinion that there was not enough evidence to prove a crime.

///

///

///

///

///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

189306v1                                        Declaration of Deborah D. Owen

1    6.    At no point over the last 10 years has anyone from either the County of

2  Imperial or the Imperial County Sheriff's Department ever attempted to improperly

3  influence or pressure me in terms of rejecting or approving a charge.

4    I declare under penalty of perjury under the laws of the State of California

5  that the foregoing is true and correct.

6    Executed this  5  day of May, 2006, at *El Centro, Ca* .

7  California.

8

9    _Deborah D. Owen_

10

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DEBORAH D. OWEN

1  Joe B. Cordileone, Esq. (State Bar No. 73606)
2  Cynthia L. Stratton, Esq. (State Bar No. 185652)
   JOE B. CORDILEONE & ASSOCIATES
3  438 Camino del Rio South, Suite 213
   San Diego, CA 92108
4  Telephone: (619) 718-4820
5  Facsimile: (619) 718-4825

6  Attorneys for Plaintiff, JUSTIN TACKETT

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11 JUSTIN TACKETT, an individual,          Case No.:  04cv2459 J (AJB)

12             Plaintiff,                   1ˢᵗ AMENDED COMPLAINT FOR DAMAGES:

13     vs.                                  1)  WRONGFUL TERMINATION IN VIOLATION
                                                OF CALIFORNIA LABOR CODE § 1102.5
14 COUNTY OF IMPERIAL, a governmental       2)  RETALIATION IN VIOLATION OF PUBLIC
   entity, and IMPERIAL COUNTY SHERIFFS         POLICY
15 DEPARTMENT, a governmental entity doing  3)  VIOLATION OF 42 USC §1983
   business in the State of California; and,  4)  RACE DISCRIMINATION IN VIOLATION OF
16 DOES 1 through 50, inclusive,                FEHA
                                            5)  RACE DISCRIMINATIN IN VIOLATION OF
17             Defendants.                      TITLE VII
                                            6)  INTENTIONAL INFLICTION OF EMOTIONAL
18                                             DISTRESS

19

20                                         REQUEST FOR JURY TRIAL

21       Plaintiff, JUSTIN TACKETT (hereinafter, referred to as  "TACKETT") complains and alleges

22 as follows:

23                            JURISDICTION

24     1.     Plaintiff, TACKETT is, and at all relevant times was, a resident of the County of

25 Imperial, State of California.

26     2.     Defendant, COUNTY OF IMPERIAL, is a governmental agency which at all relevant

27 times, was doing business and employing agents and employees in the County of Imperial, State of

28 California.

# Ex. 1

1     3.     Defendant, IMPERIAL COUNTY SHERIFFS DEPARTMENT, (hereinafter, collectively

2 referred to with COUNTY OF IMPERIAL as "COUNTY"), is a governmental agency which at all

3 relevant times, was doing business and employing agents and employees in the County of

4 Imperial, State of California.

5     4.     Each Defendant was at all relevant times mentioned herein, the authorized agent,

6 representative and/or employee of the other Defendants.  In doing all the acts alleged herein, each

7 Defendant was acting within the course and scope of the agency and/or employment and with the

8 consent and/or authority of each other Defendant.  Further, each Defendant at all relevant times

9 mentioned herein, ratified, condoned and affirmed the acts of each remaining Defendant were

10 acting within the course and scope of his/her employment and/or agency with the consent and/or

11 authority of each other Defendants.

12 GENERAL ALLEGATIONS

13     5.     On January 17, 2000, TACKETT was hired as Deputy Sheriff.

14     6.     TACKETT took and passed his Deputy exam and, because of the results of the exam,

15 was promoted to a Deputy Sheriff position, just after completion of Correctional Academy.

16     7.     While at Deputy Academy, TACKETT was ranked 3rd over all.

17     8.     During the last stage of Field Patrol Training, TACKETT requested early completion

18 because of his satisfactory execution of duties and exhibition of competence.

19     9.     COUNTY initially rejected TACKETT's request but ultimately granted TACKETT's

20 request.

21     10.     TACKETT was placed as a bailiff with the Courts.

22     11.     After TACKETT worked with the courts for a period of time, he was eventually

23 permitted to go on patrol.

24     12.     While on patrol, TACKETT made several high profile drug busts and arrests.

25     13.     On one occasion, TACKETT made an arrest of a high profile individual who was

26 related to a retired reserve sheriff, who was friends with the current and former sheriff.  This was

27 told to TACKETT at the scene of arrest, by Sergeant Myron King in an intimidating and threatening

28 manner.  Sergeant Manuel Avila advised TACKETT to "leave it alone" because the case "was not

**Ex. 1**

COMPLAINT FOR DAMAGES<br>47

1   going anywhere."

2   14.   Investigator Gabe Vela also advised TACKETT to "leave the case alone" and

3   warning that pressing the case "will lead to them (administration) coming after you."

4   15.   Supervisor Avila also advised TACKETT to "stop pushing" the high profile individual

5   regarding its prosecution.

6   16.   On another occasion, TACKETT made the largest marijuana bust in the inland

7   valley. TACKETT uncovered millions of dollars in street valued marijuana plants.

8   17.   NTF Agent John Seaman also advised TACKETT during removal of marijuana

9   plants" "You know what's going on" "Let it go. Forget about it."

10   18.   TACKETT learned that while the Special Prosecution Deputy District Attorney John

11   Weis prepared to initiate an investigation, the Deputy District Attorney was ultimately instructed by

12   COUNTY and the District Attorney to close the case and pursue it no further.

13   19.   TACKETT learned that this individual involved with the marijuana was a high profile

14   campaign contributor, to both the Sheriff and District Attorney, along with being personal friends

15   with each.

16   20.   On yet another of TACKETT's arrests, the perpetrator was the brother-in-law of a

17   member of the Board of Supervisors.

18   21.   The Brother-in-law was intoxicated and in possession of stolen property.

19   22.   Ultimately the Brother-in-law alleged that he was not Mirandized and that he did not

20   give consent to TACKETT to search his premises.  However, consent had been obtained by the in-

21   law's spouse for access to an area where the stolen property was found.

22   23.   The District Attorney approved the case but later rejected the case on the Sheriff's

23   Department's request.

24   24.   COUNTY took the intoxicated brother-in-law's word over that of their own Deputies,

25   including TACKETT, Carrasco and Menesis.

26   25.   After each incident where TACKETT refused to look the other way on the criminal

27   activity of a high profile campaign contributor or family members and elected officials, he was

28   issued an Internal Audit based on falsified information and suspended from duty.

**Ex. 1**

26.   After each incident, TACKETT followed all internal grievance procedures regarding the falsified Internal Audits.

27.   TACKETT reported his concerns of interference with law enforcement activities to his superiors at the COUNTY because it is a crime to interfere, participate or further the commission of criminal activity.   Plaintiff TACKETT expressed his concern that he would be complicit in these crimes if he complied with his superior's orders and he did not want to participate in any such illegal activity.   TACKETT reported these concerns to his supervisors both verbally and in detailed internal memoranda.

28.   If TACKETT had followed the orders of his superiors at COUNTY, he himself would be in violation of laws, contained in Title 7 of the Penal Code, entitled Of Crimes Against Public Justice, which addresses the fact that it is a crime to interfere with the prosecution of criminal activity.   Specifically, Penal Code § 96.5(a) states:   Every judicial officer, court commissioner, or referee who commits any act that he or she knows perverts or obstructs justice, is guilty of a public offense punishable by imprisonment in a county jail for not more than one year.   Penal Code §137(c) states that: Every person who knowingly induces another person to give false testimony or withhold true testimony not privileged by law or to give false material information pertaining to a crime to, or to withhold true material information pertaining to a crime from, a law enforcement official is guilty of a misdemeanor.   Furthermore, if TACKETT had followed his supervisor's orders, he would have violated Government Code §53894, which provides that an officer of a local agency who willfully and knowingly renders a false report is guilty of a misdemeanor.

29.   In retaliation for TACKETT's refusal to ignore crimes of the well connected and due to his reported concerns in this regard, COUNTY intentionally sabotaged TACKETT's promotional and transfer positions, changed panel scores, procedures for transfer positions and revealed confidential information about TACKETT in violation of the Peace Officer Bill of Rights.

30.   TACKETT also testified as a witness in a discrimination case filed against the department.   The officer who interviewed him in that case later became his Chief and it was clear that the Chief continued to hold a grudge against TACKETT due to his service as a witness.

31.   TACKETT also noticed that he, as well as other Caucasian and Black deputies, were

**Ex. 1**

1   not provided preferential assignments given to Hispanic Deputies.

2       32.   Upon information and belief, COUNTY approached several Deputies and requested
3   that they falsify reports regarding Caucasian Deputies including TACKETT.

4       33.   TACKETT reported his concerns of illegal favoritism based on race to his superiors at
5   the COUNTY.  Because TACKETT was employed by a governmental agency, he fully expected that
6   his governmental supervisor would conduct an internal investigation into his concerns.

7       34.   COUNTY advised TACKETT not to perform the functions of his job.  Specifically,
8   TACKETT was instructed that if he witnessed a crime, not to act on it but rather call to local
9   department and continue driving.

10       35.   COUNTY advised TACKETT that if he saw a parolee or probationer in violation of
11   the law, not to stop the violator but to drive on and contact the local department.

12       36.   Upon information and belief, COUNTY instructed its deputies not to provide backup
13   to TACKETT and to "stay away" from TACKETT.

14       37.   This instruction was communicated to TACKETT.

15       38.   Because of the instruction not to provide back up to TACKETT, TACKETT was in
16   great fear for his personal safety.  While in the line of duty, TACKETT was in numerous situations
17   where he feared no backup would arrive, even if called for, leaving him in grave danger.

18       39.   Because of this directive and prior similar situations of such orders, TACKETT was
19   forced to resign his position with COUNTY.

20       40.   In his forced notice of resignation, TACKETT gave written notice to his governmental
21   supervisors regarding his grave concerns about the failure to receive back-up and the flagrant
22   interference with his duties as a peace officer.

23       41.   After TACKETT's forced resignation, COUNTY continued to violate and attempt to
24   violate TACKETT's Police Office Bill of Rights and invaded his privacy rights.

25       42.   TACKETT timely filed administrative complaints with the EEOC and DFEH.

26       43.   TACKETT timely filed a Government Tort Claim which was rejected on July 27,
27   2004.

28       44.   TACKETT exhausted all administrative requirements prior to filing this complaint

**Ex. 1**

COMPLAINT FOR DAMAGES
**49A**

FIRST CAUSE OF ACTION
WRONGFUL TERMINATION IN VIOLATION OF
CALIFORNIA LABOR CODE SECTION 1102.5
(Against All Defendants)

45.    Plaintiff incorporates by reference and re-alleges each and every paragraph of this complaint as if fully set forth herein.

46.    Defendants, and each of them, constructively terminated TACKETT's employment on December 15, 2003.

47.    The discharge of TACKETT by Defendants, and each of them, violated the public policy of the State of California, as expressed in the provisions of California Labor Code § 1102.5 et. seq., and Labor Code §1102.7, which prohibit public and private employers from discriminating against, harassing or retaliating against employees based on, among other things, their report of workplace illegalities where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a potential violation or noncompliance with a state or federal rule or regulation; an employee's refusal to participate in an activity that would violate a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation, see Labor Code §1102.5(c); an employee's report of a suspected crime, which is a matter of public interest and affects the welfare of third parties over and above the employer's private interests, see *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117; and/or an employee's report of violations of fiduciary responsibility by a corporation or limited liability company to its shareholders, investors or employers, which is also a matter of public interest, see California Labor Code §1102.7.

48.    TACKETT reported his concerns of interference with law enforcement activities to his superiors at the COUNTY because it is a crime to interfere, participate or further the commission of criminal activity.   Plaintiff TACKETT expressed his concern that he would be complicit in these crimes if he complied with his superior's orders and he did not want to participate in any such illegal activity.   TACKETT reported these concerns to his supervisors both verbally and in detailed internal memoranda.

49.    If TACKETT had acted as his supervisors instructed and disregarded criminal activity

**Ex. 1**

1 or falsified his reports with regard to said criminal activity, he himself would have committed

2 violations of laws, contained in Title 7 of the Penal Code, entitled *Of Crimes Against Public Justice*,

3 which addresses the fact that it is a crime to interfere with the prosecution of criminal activity.

4 Specifically, Penal Code § 96.5(a) states:  *Every judicial officer, court commissioner, or referee*

5 *who commits any act that he or she knows perverts or obstructs justice, is guilty of a public offense*

6 *punishable by imprisonment in a county jail for not more than one year.*  Penal Code §137(c)

7 states that: *Every person who knowingly induces another person to give false testimony or withhold*

8 *true testimony not privileged by law or to give false material information pertaining to a crime to,*

9 *or to withhold true material information pertaining to a crime from, a law enforcement official is*

10 *guilty of a misdemeanor.*  Furthermore, if TACKETT had followed his supervisor's orders, he would

11 have violated Government Code §53894, which provides that *an officer of a local agency who*

12 *willfully and knowingly renders a false report is guilty of a misdemeanor.*

13         50.    TACKETT also reported his concerns to his supervisors regarding the preferential

14 assignments given to the Hispanic deputies and the disparate disfavor afforded to deputies of

15 Caucasian lineage, such as TACKETT.  The facts stated in TACKETT's expressed concerns depicted

16 COUNTY's violation of Government Code §12940(a).

17         51.    TACKETT also reported his concerns to his supervisors regarding the fact that his

18 fellow deputies were instructed not to provide TACKETT with back-up if he required it on patrols.

19 This final concern was stated in his forced resignation notice, as he could not continue his

20 employment with COUNTY if it meant placing his life in peril.

21         52.    The Legislative intent behind Labor Code §1102.5 was to protect all whistleblowers,

22 not just those who report directly to a government agency.  In TACKETT's case, since he worked for

23 a governmental agency, his reports and pleas for help to his supervisors constituted the requisite

24 report to a government agency.  Furthermore, TACKETT fully expected that his supervisors would

25 conduct an investigation into his concerns.

26         53.    Plaintiff suffered adverse consequences in the workplace following his refusal to

27 overlook or participate in illegalities; his reports of his refusal to commit obstruction of justice; his

28 reports of disparate treatment based on illegal racial favoritism; and his reports of COUNTY's

**Ex. 1**

COMPLAINT FOR DAMAGES

7

51

1 | inherent interference and threats to his right to life.

2 |     54.    The retaliatory backlash which followed shortly after TACKETT's reports included

3 | groundless suspensions, denied merit increases, unfounded write-ups and false internal audits.

4 |     55.    As a further proximate result of each Defendant's conduct as described herein, and

5 | in violation of public policy, Defendants constructively terminated TACKETT's employment.

6 |     56.    As a direct and proximate result of each Defendant's unlawful retaliatory conduct,

7 | and each of them, TACKETT suffered and continues to suffer a loss of income, benefits and

8 | additional amounts of money he would have received had Defendants not violated his rights.

9 | TACKETT has also been harmed in that he suffered intangible losses of employment-related

10 | opportunities as a result of Defendant's unlawful misconduct.  TACKETT has also suffered non-

11 | economic injuries as a direct result of each Defendant's unlawful conduct, including, but not

12 | limited to, mental anguish, physical distress, defamation of character and humiliation.  As a result

13 | of Defendant's unlawful actions, TACKETT has suffered damages in an amount within the court's

14 | jurisdiction according to proof at trial.

15 |

16 | **SECOND CAUSE OF ACTION**<br>RETALIATION IN VIOLATION OF PUBLIC POLICY

17 | (Against All Defendants)

18 |     57.    Plaintiff incorporates by reference and re-alleges each and every paragraph of this

19 | complaint as if fully set forth herein.

20 |     58.    Defendants, and each of them, violated the public policy of the State of California,

21 | as expressed in the provisions of California Labor Code § 1102.5 et. seq., and Labor Code

22 | §1102.7, which prohibit public and private employers from discriminating against, harassing or

23 | retaliating against employees based on, among other things, their report of workplace illegalities

24 | where the employee has reasonable cause to believe that the information discloses a violation of

25 | state or federal statute, or a potential violation or noncompliance with a state or federal rule or

26 | regulation; an employee's refusal to participate in an activity that would violate a state or federal

27 | statute, or a violation or noncompliance with a state or federal rule or regulation, an employee's

28 | report of a suspected crime, which is a matter of public interest and affects the welfare of third

**Ex. 1**

1   parties over and above the employer's private interests.

2       59.   TACKETT reported his concerns of interference with law enforcement activities to his

3   superiors at the COUNTY because it is a crime to interfere, participate or further the commission of

4   criminal activity.   Plaintiff TACKETT expressed his concern that he would be complicit in these

5   crimes if he complied with his superior's orders and he did not want to participate in any such

6   illegal activity.  TACKETT reported these concerns to his supervisors both verbally and in detailed

7   internal memoranda.

8       60.   If TACKETT had acted as his supervisors instructed and disregarded criminal activity

9   or falsified his reports with regard to said criminal activity, he himself would have committed

10  violations of laws, contained in Title 7 of the Penal Code, entitled Of Crimes Against Public Justice,

11  which addresses the fact that it is a crime to interfere with the prosecution of criminal activity.

12  Specifically, Penal Code § 96.5(a) states:   *Every judicial officer, court commissioner, or referee*

13  *who commits any act that he or she knows perverts or obstructs justice, is guilty of a public offense*

14  *punishable by imprisonment in a county jail for not more than one year.*   Penal Code §137(c)

15  states that: *Every person who knowingly induces another person to give false testimony or withhold*

16  *true testimony not privileged by law or to give false material information pertaining to a crime to,*

17  *or to withhold true material information pertaining to a crime from, a law enforcement official is*

18  *guilty of a misdemeanor.*  Furthermore, if TACKETT had followed his supervisor's orders, he would

19  have violated Government Code §53894, which provides that *an officer of a local agency who*

20  *willfully and knowingly renders a false report is guilty of a misdemeanor.*

21      61.   TACKETT also reported his concerns to his supervisors regarding the preferential

22  assignments given to the Hispanic deputies and the disparate disfavor afforded to deputies of

23  Caucasian lineage, such as TACKETT.   The facts stated in TACKETT's expressed concerns depicted

24  COUNTY's violation of Government Code§12940(a).

25      62.   TACKETT also reported his concerns to his supervisors regarding the fact that his

26  fellow deputies were instructed not to provide TACKETT with back-up if he required it on patrols.

27  This final concern was stated in his forced resignation notice, as he could not continue his

28  employment with COUNTY if it meant placing his life in peril.

# Ex. 1

COMPLAINT FOR DAMAGES

53

63.   The Legislative intent behind Labor Code §1102.5 was to protect all whistleblowers, not just those who report directly to a government agency.  In TACKETT's case, since he worked for a governmental agency, his reports and pleas for help to his supervisors constituted the requisite report to a government agency.  Furthermore, TACKETT dutifully followed the chain of command in making his reports and fully expected that his supervisors would conduct an investigation into his concerns.

64.   Plaintiff suffered adverse consequences in the workplace following his refusal to overlook or participate in illegalities; his reports of his refusal to commit obstruction of justice; his reports of disparate treatment based on illegal racial favoritism; and his reports of COUNTY's inherent interference and threats to his very right to life.

65.   The retaliatory backlash which followed shortly after TACKETT's reports included groundless suspensions, denied merit increases, unfounded write-ups and false internal audits.

66.   As a further proximate result of each Defendant's conduct as described herein, and in violation of public policy, Defendants constructively terminated TACKETT's employment.

67.   As a direct and proximate result of each Defendant's unlawful retaliatory conduct, TACKETT suffered and continues to suffer a loss of income, benefits and additional amounts of money he would have received had Defendants not violated his rights.  TACKETT has also suffered non-economic injuries as a direct result of Defendant's unlawful conduct including, but not limited to, mental anguish, physical distress and humiliation.  As a result of Defendant's unlawful actions, TACKETT has suffered damages in an amount within the court's general jurisdiction according to proof at trial.

### THIRD CAUSE OF ACTION
VIOLATION OF 42 USC §§1983
(Against All Defendants)

68.   Plaintiff incorporates by reference and re-alleges each and every paragraph of this complaint as if fully set forth herein.

69.   COUNTY, under color of authority of statute, ordinance, regulation, custom, usage and/or of the State, caused TACKETT to be deprived of his rights, privileges and immunities secured by the Constitution and other laws.

# Ex. 1

70.   As a further proximate result of each Defendant's conduct as described herein, Defendants constructively terminated TACKETT's employment.

71.   As a direct and proximate result of each Defendant's unlawful conduct, and each of them, TACKETT suffered and continues to suffer a loss of income, benefits and additional amounts of money she would have received had Defendants not violated his rights.   TACKETT has also been harmed in that he suffered intangible losses of employment-related opportunities as a result of Defendant's unlawful misconduct.  TACKETT has also suffered non-economic injuries as a direct result of each Defendant's unlawful conduct, including, but not limited to, mental anguish, physical distress, defamation of character and humiliation.  As a result of Defendant's unlawful actions, TACKETT has suffered damages in an amount within the court's jurisdiction according to proof at trial.

FOURTH CAUSE OF ACTION
RACE DISCRIMINATION IN VIOLATION OF FEHA
(Against COUNTY)

72.   Plaintiff incorporates by reference and re-alleges each and every paragraph of this complaint as if fully set forth herein.

73.   COUNTY is an employer within the meaning of the California Fair Employment and Housing Act, Government Code §12900 et. seq. ("FEHA").

74.   COUNTY is also an employer within the meaning of California Government Code §12926(d)(1).   Accordingly, COUNTY is liable for the racial discriminatory acts of its supervisors.

75.   Manuel Avila, Ralph Cardova, Josie Heath, Charles Jernigan, Delfino Matus and Jesse Obeso were at all pertinent times, agents of COUNTY and acted in a managerial capacity for COUNTY.

76.   Accordingly, at all times mentioned herein, defendants were governed by the provisions of FEHA, including those provisions related to unlawful discrimination on the basis of race.

**Ex. 1**

77.    As more fully set forth above, Manuel Avila, Ralph Cardova, Josie Heath, Charles Jernigan, Delfino Matus and Jesse Obeso as managing agents for COUNTY, and in carrying out their managerial duties, discriminated against TACKETT on the basis of his race.

78.    Defendants violated FEHA when they treated TACKETT differently than other employees because of his race.  COUNTY knew, or should have known of defendant's illegal conduct.  COUNTY ratified and permitted defendant's discrimination as evidenced by its failure to act to remedy or stop the discrimination.

79.    As a direct and proximate result of defendants' unlawful conduct, TACKETT suffered a loss of income, benefits and additional amounts of money he would have received had defendants not violated her rights. TACKETT has also been harmed in that he suffered intangible losses of employment-related opportunities as a result of defendants' unlawful misconduct. TACKETT has also suffered non-economic injuries as a direct result of defendants' unlawful conduct, including, but not limited to, mental anguish, physical distress, defamation of character and humiliation.  As a result of defendants' unlawful action, TACKETT has suffered damages in an amount within the court's jurisdiction, according to proof at trial.

FIFTH CAUSE OF ACTION
RACE DISCRIMINATION IN VIOLATION OF TITLE VII
(Against COUNTY)

80.    Plaintiff incorporates by reference and re-alleges each and every paragraph of this complaint as if fully set forth herein.

81.    COUNTY is an employer within the meaning of the Title VII of the Civil Rights Act of 1964.  COUNTY is also an employer within the meaning of the Unruh Civil Rights Act, codified at Civil Code §§51 and 52. Accordingly, COUNTY is liable for the racial discriminatory acts of its supervisors.

82.    Manuel Avila, Ralph Cardova, Josie Heath, Charles Jernigan, Delfino Matus and Jesse Obeso were at all pertinent times, agents of COUNTY and acted in a managerial capacity for COUNTY.

**Ex. 1**

COMPLAINT FOR DAMAGES

12

56

83.   Accordingly, at all times mentioned herein, defendants were governed by the provisions of Title VII, including those provisions related to unlawful discrimination on the basis of race.

84.   As more fully set forth above, Manuel Avila, Ralph Cardova, Josie Heath, Charles Jernigan, Delfino Matus and Jesse Obeso, as managing agents for COUNTY, and in carrying out their managerial duties, discriminated against TACKETT on the basis of his race.

85.   Defendants violated Title VII when they treated TACKETT differently than other employees because of his race.  COUNTY knew, or should have known of defendant's illegal conduct.  COUNTY ratified and permitted defendant's discrimination as evidenced by its failure to act to remedy or stop the discrimination.

86.   As a direct and proximate result of defendants' unlawful conduct, TACKETT suffered a loss of income, benefits and additional amounts of money he would have received had defendants not violated her rights. TACKETT has also been harmed in that he suffered intangible losses of employment-related opportunities as a result of defendants' unlawful misconduct. TACKETT has also suffered non-economic injuries as a direct result of defendants' unlawful conduct, including, but not limited to, mental anguish, physical distress, defamation of character and humiliation.  As a result of defendants' unlawful action, TACKETT has suffered damages in an amount within the court's jurisdiction, according to proof at trial.

SIXTH CAUSE OF ACTION<br>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>(Against All DEFENDANTS)

87.   Plaintiff incorporates by reference and re-alleges each and every paragraph of this complaint as if fully set forth herein.

88.   Defendants, and each of them, acted outrageously towards TACKETT in the manners detailed above.

89.   Defendants' actions were taken with the intent to cause TACKETT emotional distress.  In addition, defendants' actions could not be characterized as a normal part of the employment relationship.

**Ex. 1**

90.     Defendant's actions described above caused TACKETT extreme and severe emotional distress and physical manifestations thereof such as depression and anxiety and other related damages.  Defendants caused TACKETT emotional and physical injury and damage in an amount subject to proof at the time of trial.

91.     TACKETT is informed and believes, and thereon alleges, as to all defendants except COUNTY, that in taking the actions alleged above, defendants acted with malice, fraud or oppression and in reckless disregard of TACKETT's rights with the intent to cause injury and emotional distress to TACKETT.  Defendant's conduct was outrageous and despicable and warrants the award of punitive damages against defendants in an amount sufficient to punish defendants, except COUNTY, and make an example of them.

## REQUEST FOR JURY TRIAL

Plaintiff TACKETT hereby requests a jury trial for all those causes of action and factual allegations, which may be decided by a jury.

WHEREFORE, TACKETT prays for judgment as follows:

1.     For economic damages in an amount within this Court's unlimited jurisdiction, according to proof at the time of trial;

2.     For general non-economic damages for emotional and physical distress, humiliation defamation of character and mental anguish in an amount within this Court's jurisdiction, according to proof at the time of trial;

3.     For general damages according to proof;

4.     For punitive damages in an amount sufficient to punish Defendants, except for COUNTY, for their wrongful conduct and set an example for others;

5.     For interest on the sum of damages calculated from the date of wrongful conduct;

6.     For attorneys' fees;

7.     For costs of suit incurred; and

# Ex. 1

1       8.    For any other equitable relief as the Court may deem just and proper.

2 Dated: March 17, 2005                  JOE B. CORDILEONE & ASSOCIATES

3

4                            By

5                            CYNTHIA L. STRATTON, ESQ.

6                            Attorneys for Plaintiff JUSTIN TACKETT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Ex. 1**

*Tackett vs. County of Imperial, et al.*
U.S. District Court –Southern District Case No. 04cv2459 J(AJB)

### PROOF OF SERVICE

I, the undersigned, declare:

I am a citizen of the United States of America, am over the age of eighteen (18) years, and not a party to the within action. I am an employee of Joe B. Cordileone & Associates, and my business address is 438 Camino del Rio South, Suite 213, San Diego, CA  92108. On the date below, I caused to be served the following documents:

### PLAINTIFF'S 1ST AMENDED COMPLAINT FOR DAMAGES

on the parties involved addressed as follows:

J. Scott Tiedemann, Esq.
Mark Meyerhoff, Esq.
Liebert, Cassidy, Whitmore
6033 W. Century Blvd., Suite 500
Los Angeles, CA  90045-6410
Tel: 310-981-2000
Fax:310-337-0837

(✓)  **BY MAIL:** I caused each envelope, with postage thereon fully prepaid, to be placed in the United States mail at San Diego, California. I am readily familiar with the business practice for collection and processing of mail in this office, and that in the ordinary course of business said documents would be deposited with the U.S. Postal Service in San Diego on that same day. I understand that service shall be presumed invalid upon motion of a party served if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing contained in this declaration.

( )  **BY PERSONAL DELIVERY:** I caused each such envelope to be delivered by hand to the offices of each addressee above.

( )  **BY FACSIMILE:** By use of facsimile machine telephone number (619) 718-4825, I served a copy of the documents(s) on the above interested parties at the facsimile number(s) listed above. The transmission was reported as complete and without error. The transmission report, which is attached to this proof of service, was properly issued by the transmitting facsimile machine.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this __21__ day of March, 2005, at San Diego, California.

# Ex. 1

*Jennifer Cannone*

PROOF OF SERVICE

60

1               UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    JUSTIN TACKETT,                    )

5                    Plaintiff,         )
                                        )
6                                       )
          VS.                           )    Case No.
7                                       )    04CV2459J(AJB)
     COUNTY OF IMPERIAL, a              )    Volume I
8    governmental entity, and IMPERIAL  )
     COUNTY SHERIFF'S DEPARTMENT, a     )
9    governmental entity business       )
     in the State of California; and,   )
10   DOES 1 through 50, inclusive,      )
                                        )
11                   Defendants.        )
     _____)

12

13

14

15

16        VIDEOTAPED DEPOSITION OF JUSTIN TACKETT

17              Tuesday, January 17, 2006

18        ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

19

20

21

22   REPORTED BY:      IMHOF AND ASSOCIATES, INC.
                       COURT REPORTERS AND VIDEOGRAPHERS
23   VICTORIA IMHOF, RPR,
     CSR NO. 7999      7720 Painter Ave  20650 Adam
24                     Suite A          Yorba Linda, CA
                       Whittier, Ca 90602         92886
25   Job No. 060117V

                                          **Ex. 2**   1

                                                       61

1                   UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    JUSTIN TACKETT,                    )
                                        )
5                    Plaintiff,         )
                                        )
6                                       )
          VS.                           )   Case No.
7                                       )   04CV2459J(AJB)
     COUNTY OF IMPERIAL, a              )   Volume I
8    governmental entity, and IMPERIAL  )
     COUNTY SHERIFF'S DEPARTMENT, a     )
9    governmental entity business       )
     in the State of California; and,   )
10   DOES 1 through 50, inclusive,      )
                                        )
11                   Defendants.        )
     _____

12

13

14

15

16        VIDEOTAPED DEPOSITION OF JUSTIN TACKETT

17              Tuesday, January 17, 2006

18        ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

19

20

21

22   REPORTED BY:      IMHOF AND ASSOCIATES, INC.
                       COURT REPORTERS AND VIDEOGRAPHERS
23   VICTORIA IMHOF, RPR,
     CSR NO. 7999      7720 Painter Ave  20650 Adam
24                     Suite A           Yorba Linda, CA
                       Whittier, Ca 90602          92886
25   Job No. 060117V

**Ex. 2**    1

61

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   JUSTIN TACKETT,                    )
                                       )
5                   Plaintiff,         )
                                       )
6                                      )
        VS.                            )    Case No.
7                                      )    04CV2459J(AJB)
    COUNTY OF IMPERIAL, a              )    Volume I
8   governmental entity, and IMPERIAL )
    COUNTY SHERIFF'S DEPARTMENT, a     )
9   governmental entity business       )
    in the State of California; and,  )
10  DOES 1 through 50, inclusive,     )
                                       )
11  _____Defendants._____)

12

13

14

15         VIDEOTAPED DEPOSITION OF JUSTIN TACKETT,

16      taken on behalf of Defendants, at 940 West

17      Main Street, in the City of El Centro,

18      California, commencing at 9:14 a.m. and

19      concluding at 4:14 p.m. on Tuesday,

20      January 17, 2005, before VICTORIA IMHOF, RPR,

21      CSR No. 7999.

22

23

24

25                                     **Ex. 2**

                                                    2

                                                   62

```
 1                        APPEARANCES

 2   For The Plaintiff:   JOE B. CORDILEONE &
                          ASSOCIATES, ALC
 3                        BY: CYNTHIA L. STRATTON, ESQ.
                          438 Camino Del Rio South
 4                        San Diego, California  92108
                          (619) 718-4820
 5

 6   For the Defendants:  LIEBERT CASSIDY WHITMORE
                          BY:  MARK MEYERHOFF, ESQ
 7                        6033 West Century Boulevard
                          Suite 500
 8                        Los Angeles, California  90045
                          (310) 981-2000
 9
     Also present:        Frank Kap, video technician
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Ex. 2**

3

1                          I N D E X

2    WITNESS                 EXAMINATION              PAGE

3    JUSTIN TACKETT

4                          BY MR. MEYERHOFF            6

5

6                          EXHIBITS

7    DEFENDANTS'                                      PAGE

8    1 - Three-page Imperial County Sheriff's         80
         Department counseling memo made out to
9        Deputy Justin Tackett, signed by
         Sergeant Manuel Avila and dated 2/11/02
10
11   2 - One-page letter written on the stationery   92
         of the Imperial County Sheriff's
12       Department, addressed to Justin Tackett,
         signed by Michael T. Schneewind, dated
13       November 16, 2001, in re:  Notice of
         Final Disciplinary Action (Pursuant To
14       Chapter 4-5 of the Imperial County
         Ordinances) and Bates stamped 00198

15   3 - Three-page Imperial County Employee         121
         Grievance Report made out to
16       Justin Tackett, signed by Sharon
         Housouer and dated 2/20/02
17
18   4 - Five-page letter written on the             176
         stationery of Imperial County
19       Sheriff's Office, addressed to
         Justin Tackett, dated April 4, 2003,
20       in re:  Final Notice of Disciplinary
         Action and Bates stamped 0024
21       through 0028

22               INFORMATION REQUESTED

23                      (None)

24               UNANSWERED QUESTIONS

25                      (None)

                                    **Ex. 2**

                                                    4

                                                   64

|  |  |  |
|---|---|---|
|  | 1 | El Centro, California, Tuesday, January 17, 2006 |
|  | 2 | 9:14 a.m. |
|  | 3 |  |
| 16:00:00 | 4 | THE VIDEOGRAPHER:  We are on the record. |
|  | 5 | The time is 9:14 a.m.  Today's date is Tuesday, |
| 09:14:59 | 6 | January 17, 2006. |
|  | 7 | This is volume number one of the |
|  | 8 | videotaped deposition of Justin Tackett in the |
|  | 9 | matter of Justin Tackett versus County of Imperial, |
|  | 10 | et al., case pending in United States District |
|  | 11 | Court, Southern District of California, case number |
|  | 12 | 04CV2459J (AJB). |
| 09:15:29 | 13 | This deposition is taking place at 940 |
|  | 14 | West Main Street in El Centro, California and being |
|  | 15 | videotaped on behalf of the Plaintiff.  My name is |
|  | 16 | Frank Kap, the certified legal video specialist |
|  | 17 | from Charles Heller and Company with a business |
|  | 18 | address of 815 Lockhearn Street, Los Angeles, |
|  | 19 | California. |
|  | 20 | I certify that I am neither counsel for, |
|  | 21 | employed by, nor related to any party in this |
|  | 22 | action, nor am I interested in the results thereof. |
|  | 23 | Will counsel and all present please |
|  | 24 | introduce yourselves and state your appearances. |
|  | 25 | MR. MEYERHOFF:  Mark Meyerhoff on behalf |

**Ex. 2**

5

65

09:16:00   1    of Defendants, County of Imperial and Imperial

          2    County Sheriff's Department.

          3           MS. STRATTON:  Cynthia Stratton appearing

          4    on behalf of the Plaintiff, Justin Tackett.

          5           THE WITNESS:  Justin Tackett, Plaintiff.

          6           THE REPORTER:  Vicki Imhof, the court

          7    reporter.

          8           THE VIDEOGRAPHER:  The witness may be

          9    sworn in.

         10

         11                  JUSTIN TACKETT,

         12           called as a witness herein, having

         13           first been duly sworn, was examined

         14                and testified as follows:

         15

         16                  EXAMINATION

         17    BY MR. MEYERHOFF:

09:16:28  18      Q    Mr. Tackett, have you ever had your

         19    deposition taken before?

         20      A    No -- yes.

         21      Q    "Yes"?

         22      A    Yes.

         23      Q    And when was that?

         24      A    This deposition was for another case, not

         25    this case.

**Ex. 2**

                                                          6

|     |     |
|-----|-----|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| 09:17:00 | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| 09:17:28 | 22 |
| | 23 |
| | 24 |
| | 25 |

    Q    When did you have your deposition taken?

    A    That was -- I can't recall.  It was on an OSHA case.

    Q    What case?

    A    An industrial accident case.

    Q    And were you -- what was your connection with the case?

    A    I was the officer that was on the case that took the report.

    Q    I'm just going to go over some ground rules with you so you understand the process.

    You've just been given an oath.  That's the same oath that you would have received if you were in a court of law and you could be subject to the penalties of perjury as if you were in a court of law.

    Do you understand that?

    A    Yes.

    Q    Okay.

    You notice that to your right there's a court reporter who is transcribing everything that we say.

    At the end of the deposition, sometime afterwards, you will get a copy of that transcript and be able to review it.  You can make corrections

**Ex. 2**   7

67

1    to the transcript, as well, but I should caution

2    you that if you do make any corrections to the

3    transcript, we could ask that a finder of fact

4    could take adverse inference to the fact you

5    corrected something.

6          Do you understand that?

7      A    Yes.

8      Q    Since she is taking down everything that

9    we say, she can only take down verbal responses.  I

10   will ask you to respond verbally.  Sometimes we

09:18:00   11   have a tendency to nod our head or shake our head,

12   but she can't really take that down.

13     A    Okay.

14     Q    As I ask questions, I will ask that you

15   give me the opportunity to finish my question, and

16   I will give you the opportunity to finish your

17   answer and things should go smoothly.

18          If you have any questions or if you have

19   to take a break, just let me know and we can take a

20   break, but I will ask you wait until we are done

21   with a question and answer before you ask for a

22   break.

09:18:29   23          Is that okay?

24     A    Yes.

25     Q    Have you had any medication within the

**Ex. 2**   8

68

```
 1    last 24 hours that you think would affect your
 2    ability to answer questions truthfully today?
 3         A    No.
 4         Q    Have you had any alcohol in the last 24
 5    hours?
 6         A    No.
 7         Q    Is there any reason that you think you
 8    can't answer truthfully the questions today?
 9         A    No.
10         Q    Okay.
11              One other thing I want to go over is that
12    I'm entitled to your best answer, but I don't want
13    you to guess or speculate as to things.
14              So if you give an answer, I will assume
15    that you are giving that answer out of some
16    personal knowledge.
17              Do you understand that?
18         A    Yes.
19         Q    Have you talked to anybody regarding your
20    deposition today?
21         A    Just my attorney.
22         Q    Okay.
23              Have you reviewed any documents in
24    preparation for your deposition?
25         A    No.
```

09:18:58

**Ex. 2**

9

69

09:19:31

1       Q    Mr. Tackett, when did you begin your

2    employment with the County of Imperial?

3       A    To my knowledge, I believe it was in

4    August of '99.

5       Q    And what was your position at the time you

6    began?

7       A    Correctional officer.

8       Q    And where did you work in the county?

9       A    In the correctional facility.

10       Q    And where is that located?

09:19:56    11       A    I believe the address is on Applestill.

12       Q    Applestill Road, is it?

13       A    Correct, in El Centro.

14       Q    And how long were you a correctional

15    officer?

16       A    Five months, I believe, approximately.

17       Q    Just briefly, can you tell me what your

18    duties were as a correctional officer?

19       A    The care, custody and control of the main

09:20:29    20    center correctional facility.

21       Q    Was that your first law enforcement job?

22       A    Correct.

23       Q    And who was your immediate supervisor in

24    that position?

25       A    To my recollection, I believe it was at

**Ex. 2**   10

70

1       A    I was at the police officer academy.

2       Q    So you were at the police officer academy?

3       A    At that time, yes.

09:24:58  4   Q.   When did you perform bailiff duties?

5       A    After FTO.

6       Q    Okay.

7            So beginning of June 2000, that's when you

8    began patrol duties and bailiff duties sort of at

9    the same time?

10      A    No.

11      Q    Okay.

12           In June of 2000 -- let me just get this

13   straight -- when did you start the academy?

14      A    January 2000.

15      Q    Okay.

16           And you completed the academy in June of

17   2000?

18      A    Correct.

09:25:28  19   Q    And during that time, you were just at the

20   academy; is that correct?

21      A    Correct.

22      Q    You didn't perform any other services for

23   the county?

24      A    No, you are full-time at the academy.

25      Q    Upon graduation from the academy, you went

**Ex. 2**    14

71

1     to the patrol training?

2          A    Correct.

3          Q    And were you doing anything else for the

4     academy besides going through the patrol

5     training?

6          A    No.

7          Q    And at the end of patrol training, what

8     was your next assignment with the county?

9          A    Court services, bailiff.

09:26:00   10          Q    Do you recall when you began that

11     assignment?

12          A    To the best of my knowledge, I believe it

13     was August or September, that I can recall.

14          Q    That would be 2000?

15          A    Correct.

16          Q    All right.

17              And were you doing anything else for the

18     county while you were a bailiff doing court

19     services?  Or was that your only assignment?

20          A    No, I did some patrol time and overtime

09:26:29   21     special assignment duties.

22          Q    So beginning in August or September 2000,

23     in addition to being a court services bailiff, you

24     also did some patrol time, some overtime assignment

25     duties; is that correct?

**Ex. 2**    15

72.

1              And do you recall how many times you put

2      in a request before you were actually transferred

3      to patrol?

4              A    Not to my knowledge.

5              Q    Was it true that you were in court

6      services for approximately four or five months; is

10:10:29   7   that correct?  The first time you were in court

8      services.

9              A    I believe it's an approximation.  That's

10     correct.

11             Q    Okay.

10:10:58  12             While you were in court services, was

13     there any action by the department or county that

14     you felt was retaliatory in any way?

15             A    While I was in court services?

16             Q    Right.

17             The first time in court services in 2000?

18             A    Not to my knowledge my knowledge.

19             Q    Was there any action by the county while

20     you were in court services in 2000 that you felt

10:11:26  21   was discriminatory in any way based upon your

22     gender or race or anything like that?

23             A    Not to my knowledge my knowledge at this

24     time.

25             MR. MEYERHOFF:  Why don't we take a quick

**Ex. 2**   47

73

1 break, about five minutes or so, and then we'll

2 come back.

3    MS. STRATTON: Sounds good.

4    THE VIDEOGRAPHER: We are going off the

10:11:57 5 record. The time is 10:11 a.m.

10:25:48 6     (Recess taken.)

7    THE VIDEOGRAPHER: We are back on the

8 record. The time is 10:25 a.m.

9 BY MR. MEYERHOFF:

10  Q Mr. Tackett, during the time that you

10:25:57 11 worked in corrections for the county -- that was

12 1999; is that correct?

13  A Correct.

14  Q Until you went to the academy?

15  A Police academy, correct.

16  Q Okay.

17    Did the -- did you -- did the county do

18 anything to you during your time in corrections

19 that you felt was retaliatory in any way?

20  A Not to my knowledge at this time.

21  Q Did the county discriminate against you in

22 any way that you are aware of while you were in

10:26:30 23 corrections?

24  A Not to my knowledge at this time.

25  Q At the time that you were transferred to

**Ex. 2** 48

74

1    my knowledge patrol in December of 2000, who was

2    your immediate supervisor in patrol?

3         A    Can you repeat the question?

4         Q    Sure.

5              You were transferred to my knowledge

6    patrol in December 2000; is that correct?

7         A    Correct.

8         Q    Do you recall who your immediate

10:26:57  9    supervisor was when you were transferred?

10         A    No, I can't remember who the immediate

11    supervisor was.

12         Q    Do you recall who you reported to my

13    knowledge in patrol?

10:27:24  14         A    That was Mike Leo -- there was a document

15    that you showed me just a few minutes ago that said

16    Mike Leo.

17         Q    When you did training, where did you do

18    field training out of?  What segment of the county?

19    Were you in North County or South County?

20         A    To the best of my knowledge, it was both.

21         Q    During patrol training, did the county do

10:27:58  22    anything to you that you felt was retaliatory for

23    anything?

24         A    Not to my knowledge.

25         Q    During patrol training, did the county

**Ex. 2**  49

75

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455 (714) 693-1213

1  discriminate against you in any way that you are

2  aware of?

3       A    Not that I'm aware of at this time.

10:28:34  4       Q    When you were transferred to North County

5  Patrol in December 2000, were you partnered with

6  any deputy, or did you ride alone in your patrol

7  vehicle?

8       A    We were single units.

9       Q    Do you recall what your initial -- what

10  your shift was when you were transferred over?

10:28:59  11       A    No, not to my knowledge.

12       Q    So this would be your first assignment as

13  a single patrol unit?  This would be your first

14  time as a patrol deputy in a single unit; is that

15  correct?

16       A    I don't believe so.

17       Q    When did you patrol in a single unit prior

18  to being transferred?

19       A    I believe I did some overtime while I was

20  a bailiff, to my knowledge.

10:29:29  21       Q    How many times did you patrol single unit

22  patrol while you were a bailiff?

23       A    I'm not sure.

24       Q    Any estimate as to how often?  More than

25  five times?  Less than five?

**Ex. 2**
50

76

1          Q    Do you feel that the department

2    discriminated against you at any time while you did

3    patrol during that time period?

10:30:59   4          A    Not to my knowledge at this time.

10:31:01   5          Q    After you were assigned to the North

6    County Patrol in December of 2000 -- first of all,

7    do you recall how long that you were assigned to

8    patrol in North County?

9          A    No, I can't recall.

10          Q    Was this March of 2002?

11               Does that sound accurate from when you

12    were transferred out of North County Patrol?

13          A    I don't know.

14          Q    Okay.

10:32:00  15               Do you recall if it was approximately a

16    year and a half that you were in patrol in North

17    County?

18          A    I'm not sure.

19          Q    During the time that you were assigned to

20    patrol in North County, do you feel that the

10:32:30  21    department retaliated against you in any way?

22          A    Yes.

23          Q    What was the first incidence of

24    retaliation that you believe occurred?

25          A    I'm not sure of the order.

**Ex. 2**  52

77

1        Q    Go ahead and tell me what incident you are

2    referring to -- or any incident?

10:33:01    3        A    One would be in regards to Sergeant Avila

4    and a personal friend that I had pulled over -- of

5    his.

6        Q    Do you recall when this -- was this a

7    traffic stop you are referring to?

8        A    That's correct.

9        Q    Do you recall when that traffic stop

10    occurred?

11        A    No, I don't believe I remember the time.

10:33:28    12        Q    The individual's name that you pulled

13    over?

14        A    I don't recall.

15        Q    And Sergeant Avila, was he your

16    supervisor?

17        A    To the best of my knowledge, he was one of

18    my supervisors.

19        Q    Did you know Sergeant Avila prior to going

20    to North County Patrol?

21        A    Correct.

22        Q    Sorry.

23             Did you know him?

24        A    Yes.

25        Q    Okay.

**Ex. 2**  53

78

|    |    |                                                          |
|----|----|----------------------------------------------------------|
|          | 1  | A    Aggressive, irate, forceful.                        |
|          | 2  | Q    Where did you have this conversation with           |
|          | 3  | Sergeant Avila?                                           |
|          | 4  | A    It was in -- inside our North County                |
| 10:36:56 | 5  | office inside the report writing room for deputies.      |
|          | 6  | Q    Was there any other individual present in           |
|          | 7  | the room besides you and Sergeant Avila?                 |
|          | 8  | A    I'm not sure.                                        |
|          | 9  | Q    To the best of your recollection, what did          |
|          | 10 | Sergeant Avila say to you?                               |
| 10:37:28 | 11 | A    He advised me that there was to be                  |
|          | 12 | no -- we need to cut down on traffic stops within        |
|          | 13 | the city jurisdictions.  And I need to not place         |
|          | 14 | individuals in my back seat of a patrol car if I'm       |
| 10:37:58 | 15 | going to be conducting a search of the interior of       |
|          | 16 | the vehicle.                                             |
|          | 17 | Q    The traffic stop that you made, where did          |
|          | 18 | that traffic stop occur?                                 |
|          | 19 | A    It was on the corner of Main Street and I           |
| 10:38:27 | 20 | believe that would be Highway 111, I believe.            |
|          | 21 | Q    Is that within a -- within the parameters          |
|          | 22 | of a city?  Or is that in an unincorporated area?        |
|          | 23 | A    It was the main thoroughfare through the            |
|          | 24 | city.                                                    |
|          | 25 | Q    And what city is that?                             |

**Ex. 2** 56

79

```
 1        A    Not to my knowledge.
 2        Q    If you can tell me, again, what was it --
 3   you said he was giving an order.
 4             What did he actually tell you,
 5   Sergeant Avila, during this conversation?
 6        A    To my best recollection, I believe he was
 7   advising me not -- to not place individuals in the
 8   back of the patrol car upon searches.  And I
 9   believe that was the extent of that conversation, I
10   believe.
11        Q    Prior to Sergeant Avila telling you this,
12   had anybody else in the department ever instructed
13   you on how to perform searches on a vehicle?  Let
14   me rephrase it.
15             Had anybody else ever told you not to
16   place individuals in the back of a patrol car while
17   performing a patrol search?
18        A    I was actually trained to, a technique.
19        Q    Who trained you to place individuals in
20   the patrol car?
21        A    My training officers.
22        Q    And I think you identified four different
23   training officers that you had.
24             Do you recall if each of them instructed
25   you as to that?  Or was it just one of them?
```

10:47:58   (line 4)
10:48:33   (line 11)
10:49:00   (line 20)

**Ex. 2** 63

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455  (714) 693-1213

1   And I believe he had a ride-along that was a

2   dispatcher at the time.

3      Q  Now, you said some of these deputies told

4   you that it was retaliatory.

10:58:27   5       What was the retaliation?

6      Did they tell you why they felt that it

7   was retaliatory?

8      A  I believe the basic discussion was

9   retaliatory in nature, the fact that it was being

10   done against me and nobody else, and that it came

11   from a personal friend of his.

12      Q  Prior to this conversation, had Sergeant

10:59:00   13   Avila ever done anything to you that you felt was

14   retaliatory?

15      A  I'm not sure of the time when this

16   happened.  But to the best of my knowledge, that

17   would be yes.

18      Q  The answer would be "yes"?

19      A  At this time.

20      Q  Did Sergeant Avila mention anything else

21   that concerned him about your stop of this

22   individual other than --

23      A  Not to my knowledge.

10:59:30   24      Q  Do you believe that Sergeant Avila spoke

25   to you or -- do you recollect that Sergeant Avila

**Ex. 2** 70

81

1   minutes.

2       Q    Other than talking to you about the

3   placing the person in the back of your vehicle and

4   stopping the person in the city of Brawley, did

5   Sergeant Avila mention anything else that was wrong

6   with the stop?

7       A    Not to my knowledge.

8       Q    Did Sergeant Avila tell you at any time

11:02:59   9   that you should not -- well, strike that.

10          Other than having the conversation with

11   you, did Sergeant Avila take any other action

12   against you because of the traffic stop?

13       A    I don't understand what you mean by "other

11:03:28  14   action."

15       Q    Did you feel that Sergeant Avila

16   retaliated against you in any other way for pulling

17   over a friend of his?

18       A    That I can recall, I believe he wrote a

11:03:56  19   memo after I consulted with the chief on the

20   directive that he gave me.

21       Q    So after Sergeant Avila had this

22   conversation with you, you -- did you go and report

23   this conversation to somebody else?

24       A    Yes.

25       Q    Who did you report it to?

**Ex. 2** 73

82

|       |                                                          |
|-------|----------------------------------------------------------|
| 1     | A    Not at this time.                                   |
| 2     | Q    Did you take any notes about either the            |
| 3     | conversation with Sergeant Avila or Chief Housouer?     |

11:08:29  4    A·   Not at the time, no.

5        Q    How about afterwards?  Did you write down

6    any notes about the conversations?

7        A    I believe I wrote a grievance, I believe,

8    to the County.

9        Q    And you felt that it was retaliatory

10   because you had pulled over a friend of Sergeant

11   Avila's; is that correct?

12       A .  Correct.

13       Q    Was there any other basis why you felt

14   this -- that it was in retaliation?

11:08:59  15    A    That it was only being applied to me and

16   other deputies than myself were conducting the same

17   type of searches, on top of placing individuals in

18   the back of their patrol unit and also to the

19   condition that they were continually stopping

20   within same jurisdictions at the same time --

21   during and before and after this incident.

22       Q    Did you have any conversations with

23   anybody about whether you should be pulling over

11:09:28  24   vehicles in the City of Brawley?  Any other

25   deputies or anything like that?

**Ex. 2**  77

83

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| 11:25:24 | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:26:00 | 15 |

1   Mr. Tackett's right to privacy of the contents of

2   his personnel file.  That being said, we have

3   agreed -- counsel and I have agreed that without

4   waiving any of Mr. Tackett's objections or any of

5   his privacy rights, that we are going to enter into

6   a protective order to protect further dissemination

7   of these documents if they are admitted to this

8   deposition today over objection and to that they

9   are admitted at the trial -- that they are

10  protected from further dissemination.  Again, over

11  further objection.

12          MR. MEYERHOFF:  Yes, that's accurate.

13  Objection obviously noted, but we will discuss a

14  protective order that that is satisfactory to

15  Ms. Stratton.

16  BY MR. MEYERHOFF:

17      Q   The exhibit that's before you,

18  Mr. Tackett, Exhibit 1, do you recognize this

19  document?

20      A   Yes.

21      Q   And did you receive this document from

22  Sergeant Avila?

23      A   Yes.

24      Q   And it's dated February 11, 2002.

25          Do you recall when you received the

**Ex. 2**  81

84

|          | 1  | me that you had when he first told you about this,      |
|          | 2  | were there any other conversations with                 |
| 11:38:00 | 3  | Sergeant Avila about this incident?                      |
|          | 4  | A    Again, the actual receiving this memo and           |
|          | 5  | my signing it.                                           |
|          | 6  | Q    At the time -- did Sergeant Avila give you         |
|          | 7  | this counseling memo?                                    |
|          | 8  | A    I believe so, yes.                                  |
|          | 9  | Q    Do you recall when he said anything when           |
|          | 10 | he gave it to you?                                       |
|          | 11 | A    I believe he stated that he had a memo to          |
|          | 12 | give me -- counseling memo.                              |
|          | 13 | Q    Anything else that you recall him saying?          |
|          | 14 | A    Not that I can recall.                              |
|          | 15 | Q    Do you recall if you responded in any way          |
|          | 16 | to Sergeant Avila?                                       |
|          | 17 | A    Not that I recall.                                  |
| 11:38:39 | 18 | Q    Did Sergeant Avila instruct you or inform          |
|          | 19 | you at any time that he was angry that you had           |
|          | 20 | pulled over a friend of his?                             |
|          | 21 | A    Did he instruct me?                                 |
|          | 22 | Q    Did he tell you that's why he was angry?           |
|          | 23 | A    No.                                                 |
| 11:38:57 | 24 | Q    But that's your belief, that that is why           |
|          | 25 | he was angry, because you pulled over a friend of        |

**Ex. 2**   91

85

1    his?

2         A    Correct.

3         Q    Other than your own belief, do you have

4    any evidence that that's why he was angry?

5         A    Not at this time, no.

11:39:32   6    Q    Prior to receiving that counseling memo

7    from Sergeant Avila, had you received any previous

8    discipline while working patrol for the department?

9         A    I'm not sure.

11:40:30  10    Q    Let me have you look at what we will mark

11   as Exhibit 2.

12            MS. STRATTON:  Same objections as to

13   Exhibit 2.  And I'm assuming we can agree to the

14   same protective or we will work on the same

15   protective order.

16            MR. MEYERHOFF:  We will assume for every

17   exhibit that you object to on the basis of privacy,

18   that we can discuss making those subject to a

19   protective order, yeah.

20            MS. STRATTON:  Great.

21                (Defendant's Exhibit 2 was marked

22                for identification, a copy of which is

23                attached hereto.)

24   ///

25   ///

**Ex. 2**   92

86

BY MR. MEYERHOFF:

11:40:58    Q    Did you receive a two-day suspension on November 16, 2001, Mr. Tackett?

A    I believe it's what it states here, yes.

Q    Do you recall what the basis for this suspension was?

A    I believe it was vehicle damage.

Q    To a patrol unit?

A    Correct.

Q    And what was the cause of the damage?

11:41:23    A    One was sand causing damage to a bumper. That was fixed and needed no further repair.  And the second was damage to a fender while in pursuit

11:41:42    of a felon.  I believe those were the incidents, to my knowledge.

Q    At the time you received discipline for those accidents, did you feel that that discipline

11:42:21    was retaliatory in any way?

A    No, not retaliatory.

Q    Did you feel it was discriminatory in any way?

A    No.

11:42:58    Q    Did you feel it was unfair in any way?

A    Yes.

Q    Why did you feel it was unfair?

**Ex. 2**  93

87

```
 1        Q    Going back to your conversation with
 2   Sergeant Avila for a minute.
 3        A    Yes.
 4        Q    When Sergeant Avila ordered you to not
 5   place suspects in the back of your vehicle that
 6   were not under arrest and not to pull people over
 7   in the City of Brawley, did you feel that his
 8   orders were unlawful in any way?
 9        A    Yes, to some extent, yes.
10        Q    How did you feel they were unlawful?
11        A    Because he was advising me to --
12             THE VIDEOGRAPHER:  Go ahead.
13             THE WITNESS:  Advising me to ignore a
14   crime actually being committed in my presence.  And
15   he was advising me -- and he was placing my life in
16   jeopardy as a police officer, and that violates the
17   oath that I was given.  And I took an oath to
18   enforce that law.
19   BY MR. MEYERHOFF:
20        Q    How would his order put your life in
21   danger?
22        A    He was advising me not to place people in
23   the back of my patrol unit, which would mean they
24   would be outside of the unit while -- while
25   conducting the search, it would be.
```

11:45:00 (at line 6)
11:45:25 (at line 11)
11:46:00 (at line 22)

**Ex. 2**   95

88

1   life or property?

2       A   No.  He has in writing "emergency or life

3   and property was in jeopardy," but upon

4   communication of that and me relaying to him that

5   that I would encompass a violation of law, he

6   stipulated as far as a common statement that unless

7   somebody is actually being stabbed or murdered,

8   that was supposed to ignore it, drive through the

11:47:56  9   city and have our dispatch call their dispatch to

10  have an officer respond.

11      Q   When you say "ignore" -- is that that he

12  instructed you to ignore it?  What do you mean?

13  Did he instruct you to turn your back on it or take

14  some other action?

15      A   He advised me to contact the local P.D.

16  and have them respond and keep track of it.

17      Q   And you feel that's a violation of law?

18      A   Correct.

19      Q   And what law are you aware of that that

20  violates?

21      A   As far as the law that states that there's

11:48:29  22  any felony being committed in my presence, I was

23  supposed to act on it.

24      Q   And what does it mean to you to act on it?

25      A   Excuse me?

**Ex. 2**  97

```
 1        A    Not that I can recall.
 2        Q    Did you feel that that comment was asking
 3   you to do something unlawful?
 4        A    I think that comment was not only unlawful
 5   but deceitful abuse of funds of the taxpayer paying
 6   for public safety.
 7        Q    Did you say you felt that that comment was
 8   asking you to do something unlawful?
 9        A    Yes.
10        Q    What was it asking you to do that was
11   unlawful?
12        A    Ignore crimes that I am seeing.
13        Q    At the time Sergeant Avila made that
14   comment, did you ask him any questions about it?
15        A    No.
16        Q    Is there any other reason that you felt
17   the order was unlawful or the comment was unlawful?
18        A    The reason I just stipulated.
19        Q    Prior to getting this counseling memo, had
20   Sergeant Avila ever instructed you or talked to you
21   about staying in your patrol area?
22        A    Not to my knowledge, again.
23        Q    During your time at the North County
24   Patrol station, was there anything else that
25   happened at that station that you felt was
```

13:20:58 (line 5)
13:21:29 (line 14)
13:22:00 (line 21)
13:22:32 (line 23)

**Ex. 2** 115

90

```
 1    unquote, I believe it was "I'll take Tackett out."
 2         Q    Were you working in North County before
 3    Sergeant Avila arrived there?
 4         A    Correct.
 5         Q    When did Sergeant Avila arrive?
 6         A    I'm not sure of the exact date.
 7         Q    How long after you started working there
 8    did he arrive?
 9         A    I'm not certain.
10         Q    And you came to North County in December
11    2001; is that correct?
12         A    December 29th of 2001.  I believe that's
13    what the document said.
14         Q    And Sergeant Avila gave you this
15    counseling memo in February of 2001 or 2002; is
16    that correct?
17         A    Counseling memo, yes.
18         Q    And I assumed he was working at the North
19    County when he gave you the counseling memo; is
20    that correct?
21         A    Yes.
22         Q    Did you know Sergeant Avila before he was
23    transferred to North County?
24         A    Yes.
25         Q    Did you have any trouble with him prior to
```

13:53:28 (at line 12)

**Ex. 2**   133

91

1   behalf.

2        Q    Okay.

15:18:36   3        All right.

4        I guess we should take them one at a time,

5   then, Mr. Tackett, the retaliation, why do you feel

6   you were being retaliated against?

7        What's the first basis for your belief

8   that you were being retaliated against?

9        A    For what?  What we just talked about?

10       Q    Yeah, you just listed a number of things,

11   making some complaints, making complaints about

12   your sergeant.

13       Why don't we go through them one at a

15:18:59   14   time?  What did you do that you felt the department

15   was retaliating against you for by giving you this

16   discipline?

17       A    What did I do?  I arrested an individual

18   that knew the sheriff and knew the sergeant on hand

19   and knew the former sheriff.  And those connections

20   I feel are used in getting not only charges

21   dismissed and charges swept underneath the rug, so

15:19:29   22   to speak.

23       Q    Are you talking about the charges against

24   Mr. Lackey?

25       A    That's correct.

**Ex. 2**   182

92

1    already testified to?

2         A    Correct.

3         Q    Did you have any other conversations with

4    anybody else regarding the Lackey incident that you

5    felt supported your claim that that was

6    retaliatory?

7         A    Do I have anybody else that I talked to

8    about it?

9         Q    Yeah.

10        A    Well, my parents.

15:44:40  11        Q    Mr. Tackett, you have alleged that you

12   felt you were retaliated against after you made the

13   largest marijuana bust in the Inland Valley; is

14   that correct?

15        A    That's correct.

16        Q    What was your involvement in making this

17   marijuana bust?

18        A    I was the reporting officer and the

15:44:58  19   officer disseminating the information.

20        Q    When did this occur?

21        A    I'm not sure of the exact date.  I don't

22   know the approximation of the time and date.

23        Q    Any idea what year it occurred?

24        A    Not at this time.

25        Q    And how were you -- how did you get the

**Ex. 2**  197

93

1    information about the marijuana?

2         A    Confidential informant.

15:45:30   3    Q    And you reported that information to who?

4         A    My supervisor at the time.

5         Q    Who was that?

6         A    Pompeyo Tavarez.

7         Q    What happened after you reported it?

8         A    It was to be addressed to the local -- or

9    to the chief in reference to the -- see if we could

10   take action on it.

11        Q    Would that be Chief Housouer?

12        A    That's correct.

13        Q    And was it addressed to him?

14        A    It was addressed to him.

15:45:59   15   Q    And did the department take action?

16        A    No.

17        Q    The department took no action whatsoever?

18        A    Basically they referred -- chief referred

19   me to go to an outside agency to see if they could

20   take the case.

21        Q    So the chief authorized you to go to an

22   outside agency?

23        A    Correct.

24        Q    Was that standard procedure, or was that

25   unusual?

**Ex. 2**  198

94

1          A    As far as for this type of case, it's

2     unknown to me because this would be the first case

15:46:30   3     that I had known for myself from the department's

4     angle.

5          Q    So you didn't know if it was normal for a

6     chief to refer you to an outside agency or if that

7     was unusual?  You didn't know one way or another?

8          A    As far as for this particular incident, I

9     didn't know.

10         Q    What outside agency did you contact?

11         A    It was -- I believe, the name of it was

12    NTF, Narcotics Task Force.

15:46:59  13         Q    And what type of agency is that?  Do you

14    know?

15         A    It's a task force put together of all of

16    the local law enforcement agencies.  They also made

17    one officer to -- a task force, so to speak -- to

18    what you call the area or region.

19         Q    And did the Sheriff's Department help you

20    in any way in contacting NTF or assist you in any

21    way?

15:47:30  22         A    Pointed me in that direction to give the

23    case to.

24         Q    Okay.

25              And was it Chief Housouer who mentioned

**Ex. 2**   199

95

1    the NTF might be the best agency?

2         A    Correct.

3         Q    At the time that you talked to

4    Chief Housouer, had you told her where the

5    marijuana was allegedly located?

6         A    I'm uncertain if I did it.

15:48:07  7         Q    Do you recall what you told her about what

8    the informant had told you?

9         A    I told her that information I had at hand

10   and the information that we had at hand.  And she

11   made a ruling from there saying that we had -- we

12   didn't have enough personnel to do an

13   investigation.

15:48:24  14         Q    And who did you contact at the NTF?

15        A    It was a sheriff personnel by the name of

16   Joe Nava.

17        Q    Do you know what the agency -- does he

18   work for a local agency besides NTF?

19        A    Yes, I just said sheriff department.

20        Q    So he worked for Imperial County Sheriff's

21   Department?

22        A    That's correct.

23        Q    Did you know Nava before this?

24        A    Yes.

15:49:00  25        Q    And what happened after you contacted

**Ex. 2**    200

96

REPORTER'S CERTIFICATE

1

2

3          I, VICTORIA IMHOF, RPR, CSR NO. 7999,

4   Certified Shorthand Reporter, certify:

5          That the foregoing proceedings were

6   taken before me at the time and place therein set

7   forth, at which time the witness was put under oath

8   by me;

9          That the testimony of the witness and

10  all objections made at the time of the examination

11  were recorded stenographically by me and were

12  thereafter transcribed;

13         That the foregoing is a true and

14  correct transcript of my shorthand notes so taken.

15         I further certify that I am not a

16  relative or employee of any attorney or of any of

17  the parties, nor financially interested in the

18  action.

19         Dated this 30th day of January, 2006.

20

21

22

23  _____

24  VICTORIA IMHOF, RPR, CSR No. 7999

25

**Ex. 2**  227

97

1    REPORTER CERTIFICATION OF CERTIFIED COPY

2

3

4

5              I, VICTORIA IMHOF, RPR, CSR

6    No. 7999, a Certified Shorthand Reporter in

7    the State of California, certify that the

8    foregoing pages 1 through 227 constitute a

9    true and correct copy of the original

10   deposition of JUSTIN TACKETT, taken on

11   Tuesday, January 17, 2006.

12              I declare under penalty of perjury

13   under the laws of the State of California

14   that the foregoing is true and correct.

15              Dated this 20th day of January,

16   2006.

17

18

19

20

21

22   _____

23   VICTORIA IMHOF, RPR, CSR No. 7999

24

25

**Ex. 2**

98

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455  (714) 693-1213

1           UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   JUSTIN TACKETT,                           **Certified Copy**

5                    Plaintiff,          )
                                         )
6                                        )
          VS.                            )   Case No.
7                                        )   04CV2459J(AJB)
    COUNTY OF IMPERIAL, a                )   Volume II
8   governmental entity, and IMPERIAL   )
    COUNTY SHERIFF'S DEPARTMENT, a       )
9   governmental entity business        )
    in the State of California; and,    )
10  DOES 1 through 50, inclusive,       )
                                         )
11                  Defendants.          )
    _____

12

13

14

15

16      VIDEOTAPED DEPOSITION OF JUSTIN TACKETT

17            Tuesday, January 31, 2006

18     ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

19

20

21

22  REPORTED BY:      IMHOF AND ASSOCIATES, INC.
                      COURT REPORTERS AND VIDEOGRAPHERS
23  VICTORIA IMHOF, RPR,
    CSR NO. 7999      7720 Painter Ave   20650 Adam
24                    Suite A            Yorba Linda, CA
                      Whittier, Ca 90602          92886
25  Job No. 060131V

                                          **Ex. 2**   228

                                                99

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    JUSTIN TACKETT,                    )
                                        )
5                   Plaintiff,          )
                                        )
6                                       )
         VS.                            )   Case No.
7                                       )   04CV2459J(AJB)
     COUNTY OF IMPERIAL, a              )   Volume II
8    governmental entity, and IMPERIAL )
     COUNTY SHERIFF'S DEPARTMENT, a     )
9    governmental entity business       )
     in the State of California; and,   )
10   DOES 1 through 50, inclusive,      )
                                        )
11   _____Defendants._____)

12

13

14

15            VIDEOTAPED DEPOSITION OF JUSTIN TACKETT,

16       taken on behalf of Defendants, at 940 West

17       Main Street, in the City of El Centro,

18       California, commencing at 9:08 a.m. and

19       concluding at 4:52 p.m. on Tuesday,

20       January 31, 2006, before VICTORIA IMHOF, RPR,

21       CSR No. 7999.

22

23

24

25

**Ex. 2**
                                                    229
                                        100

```
1                          APPEARANCES

2    For The Plaintiff:   JOE B. CORDILEONE &
                          ASSOCIATES, ALC
3                         BY: CYNTHIA L. STRATTON, ESQ.
                          438 Camino Del Rio South
4                         San Diego, California  92108
                          (619) 718-4820
5

6    For the Defendants:  LIEBERT CASSIDY WHITMORE
                          BY:  MARK MEYERHOFF, ESQ.
7                         6033 West Century Boulevard
                          Suite 500
8                         Los Angeles, California  90045
                          (310) 981-2000
9
     Also present:        Frank Kap, video technician
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Ex. 2**   230

101

1               I N D E X

2  WITNESS                  EXAMINATION              PAGE

3  JUSTIN TACKETT           (Continued)

4                           BY MR. MEYERHOFF          234

5

6                        EXHIBITS

7  DEFENDANTS'                                       PAGE

8   5 - Notice of Final Disciplinary Action,         257
         dated October 18, 2000
9

10  6 - Three-page document captioned "Narrative/    280
         Supplemental, with an incident dated of
11       11/01/2001 and Bates stamped 00618 through
         00620
12

13  7 - Report for an accident which occurred        281
         November 1st, 2001
14

15  8 - Three-page narrative for crime report        303
         0112-0996, Bates stamped 00916 through
16       00918

17  9 - One-page document captioned "Case            304
         Handling Form," and Bates stamped 01075
18

19  10 - Final Notice of Disciplinary Action, dated 315
          April 4, 2003
20

21  11 - 12-page response letter from Justin         339
          Tackett
22
    12 - Four-page response letter from              355
23        Justin Tackett

24  13 - Two-page letter addressed to Chief          368
          Housouer from Deputy Justin Tackett,
25        dated March 7, 2002 and referencing
          a memo requested on Grievance Issues

                                        **Ex. 2**  231

                                             102
       IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
       (800) 939-DEPO(3376)   (562) 907-4455 (714) 693-1213

1                      EXHIBITS (Continued)

2     DEFENDANTS'                                          PAGE

3     14 - One-page inter office memo addressed          371
           to Chief Deputy Sharon Housouer, from
4          Deputy Justin Tackett, subject:
           Response to Grievance Memo As Directed,
5          and dated April 18, 2002

6     15 - Seven-page letter written on the              400
           letterhead of Imperial County Sheriff's
7          Office, addressed to Justin Tackett,
           Deputy Sheriff, signed by Jesse Obeso,
8          Chief Deputy, dated November 25, 2003
           and Bates stamped 00133 through 00139
9

10    16 - One-page document captioned "Imperial         428
           County District Attorney Case Handling
11         (CH) Form," and Bates stamped 00145

12    17 - Six-page Notice of Proposed                   439
           Disciplinary Action, dated
13         November 25, 2003 and Bates stamped
           00121 through 00126
14

15    18 - One-page letter written by Justin             454
           Tackett to himself, undated and
16         unsigned

17    19 - Four-page document captioned "Charge of       485
           Discrimination"

18

19                    INFORMATION REQUESTED

20                         (None)

21                    UNANSWERED QUESTIONS

22                    PAGE    LINE

23                     251     24

24

25
                                             **Ex. 2**
                                                        232
                                                     103

|           |    |                                                      |
|-----------|----|------------------------------------------------------|
|           | 1  | EL CENTRO, CALIFORNIA, TUESDAY, JANUARY 31, 2006     |
| 09:05:51  | 2  | 9:08 a.m.                                            |
|           | 3  |                                                      |
| 09:08:45  | 4  | THE VIDEOGRAPHER:  We are on the record.             |
|           | 5  | The time is 9:08 a.m.  Today's date is Tuesday,      |
|           | 6  | January 31st, 2006.  This is volume number II of     |
|           | 7  | the videotaped deposition of Justin Tackett in the   |
| 09:08:58  | 8  | matter of Justin Tackett versus County of Imperial,  |
|           | 9  | et al., case pending in United States District       |
|           | 10 | Court, Southern District of California, case number  |
|           | 11 | 04CV2459(AJB).                                       |
|           | 12 | This deposition is taking place at 940               |
|           | 13 | West Main Street, El Centro, California and is       |
|           | 14 | being videotaped on behalf of the Defendants.  My    |
| 09:09:28  | 15 | name is Frank Kap.  I am the certified video         |
|           | 16 | specialist with Charles Heller & Company with a      |
|           | 17 | business address 815 Lockhearn Street, Los Angeles,  |
|           | 18 | California.                                           |
|           | 19 | I certify that I'm neither counsel for,              |
|           | 20 | employed by, nor related to any party in this        |
|           | 21 | action, nor am I interested in the results thereof.  |
|           | 22 | Will counsel and all present please                  |
|           | 23 | introduce yourselves and state your appearances.     |
|           | 24 | MR. MEYERHOFF:  Mark Meyerhoff on behalf             |
|           | 25 | of Defendants.                                       |

**Ex. 2**  233

104

1                  MS. STRATTON:  Cynthia Stratton on behalf

2       of the Plaintiff, Justin Tackett.

09:09:58   3            THE WITNESS:  Plaintiff, Justin Tackett.

4                  MR. MEYERHOFF:  Mr. Tackett, last time we

5       went over --

6                  THE VIDEOGRAPHER:  The witness may be

7       sworn in.

8                  MR. MEYERHOFF:  Oh, sorry, Frank.

9

10                      JUSTIN TACKETT,

11             called as a witness herein, having

12           first been duly sworn, was examined

13                 and testified as follows:

14

15                  EXAMINATION (Continued)

16      BY MR. MEYERHOFF:

17         Q   Last time we were here, Mr. Tackett, we

18      went over some admonitions.

19             Do you recall those?  Or would you want me

20      to go over those for you?

21         A   No, I recall them.

09:10:29  22      Q   Okay.

23             I just want to also remind you that the

24      oath you just took again is the same oath you would

25      take in a court of law and you would be subject to

**Ex. 2**   234

105

|   | |
|---|---|
| 1 | the same penalties of perjury if you were |
| 2 | untruthful in this proceeding. |
| 3 | Do you understand that? |
| 4 | A   Yes. |
| 5 | Q   Okay. |
| 6 | Mr. Tackett, do you recall -- I will show |
| 09:10:58  7 | it to you -- do you recall that you had previously |
| 8 | when you worked for the Sheriff's Department |
| 9 | received discipline for three different vehicle |
| 10 | accidents? |
| 11 | Do you recall that -- that you did receive |
| 12 | discipline for being in three different vehicle |
| 13 | accidents? |
| 14 | A   I believe so. |
| 15 | Q   Okay. |
| 16 | And the first vehicle accident being on |
| 17 | June 13, 2000 -- sorry -- first one being |
| 09:11:29  18 | July 23rd, 2000. |
| 19 | Do you recall that you were disciplined |
| 20 | for that accident, driving onto soft sand and the |
| 21 | unit bottoming out? |
| 22 | Do you recall that one? |
| 23 | A   I believe that was combined with another |
| 24 | one, yes. |
| 25 | Q   Okay. |

**Ex. 2**  235

106

1    these accidents at all?

2         A    Yes, I told you I did.  I was the driver.

3         Q    But you don't feel you should have been

4    disciplined for it; is that correct?

5         A    No.

6         Q    Okay.

09:30:59   7         Last time we talked, we also talked about

8    these marijuana drug busts that NTF conducted.

9              Do you recall that conversation?

10        A    Yes.

11        Q    And you felt that -- did you feel that you

12   were retaliated against in regards to this

13   incident?

14        A    Retaliated against?

09:31:28   15        Q    Yes.

16        A    No.

17        Q    Just to clarify, we are talking about the

18   NTF drug bust in the asparagus field.  Do you

19   recall that incident in 2001?  That's correct?

20        A    That's correct.

21        Q    And you don't feel that the department

22   retaliated against you in any way stemming from

23   this incident?

09:31:58   24        A    Well, if you -- if it's the belief, I

25   guess, that not following through with a crime.

**Ex. 2**   255

107

1   Then to find the suspects that I had turned over

2   investigation on as a punishment, then I would say

3   yes, then it's retaliatory.  If that's not a

4   punishment to you, then it wouldn't be retaliatory.

5        Q   I'm interested in your thoughts,

6   Mr. Tackett.

7            How did you feel you were retaliated

8   against stemming from this incident?

09:32:39   9        A   I don't necessarily think that that

10   incident was a retaliatory incident.

09:33:26   11        Q   Mr. Tackett, do you recall being

09:33:28   12   disciplined for an accident that occurred with your

13   patrol vehicle on November 1st, 2001?

14        A   Well, I'm not sure of the day.

15            Can you be specific on what happened?

16        Q   Sure.

17            Do you recall that your vehicle rolled

18   over on November 1st, 2001?

19        A   That sounds about right -- close enough

20   date.

09:33:57   21        Q   And do you recall receiving a five-day

22   suspension as a result of that accident?

23        A   That's correct.

24        Q   Let me give you a copy of the final

25   notice.  And we will mark this as an exhibit -- I

**Ex. 2**   256

108

1    Mr. Lackey -- combined with the fact that he made

2    the statements and that -- in a transcript or

3    transcribed communication -- I believe, it was in

4    the Internal Affairs -- that he had; and along with

5    the fact that there was people that had witnessed

6    Mr. King and the chief at the birthday party for

10:14:57    7    those individuals, I believe, later that year.

8         Q    Okay.

9              So you are saying that Sergeant King,

10    during his Internal Affairs interview, mentioned he

11    had a relationship with Mr. Lackey?

12         A    I believe that's when it was mentioned,

13    yes.

14         Q    Did Mr. King, to your memory, mention at

15    any time that that's what motivated his order to

16    you that you release Mr. Lackey?

17         A    Can you repeat that?

18         Q    Sure.

19              Well, strike that question.

20              Okay.   Then you spoke to some other people

21    who said that they saw Sergeant King at a birthday

10:15:30    22    party?

23         A    That's correct.

24         Q    Do you have any evidence that Sergeant

25    King ordered you to release Mr. Lackey based upon

**Ex. 2**    286

**109**

1   his personal relationship with Mr. Lackey?

2          A    Not that I know of at this time.

3          Q    Did you feel that Sergeant King's order

4   that you cite and release Mr. Lackey was a

10:15:58   5   violation of any state or federal law that you are

6   aware of?

7          A    For the crimes he instructed me to cite,

8   yes.

9          Q    What was your basis for believing that his

10   ordering you to cite and release Mr. Lackey

11   violated some state or federal law?

12          A    By him advising me to cite and release on

10:16:28   13   one particular crime when another one was also

14   committed and to leave that one off along with not

15   allowing me to collect the evidence of the crime to

16   be able to use that to substantiate those charges,

17   I believe he was in violation of a law for not

18   allowing me to do that.

19          Q    Did Sergeant King tell you not to put

20   anything in your police report?  Strike that.

21          Did Sergeant King tell you not to put

22   something in your police report with regard to this

23   incident?

10:16:57   24          A    He advised me only to charge for resisting

25   arrest.

**Ex. 2**   287

110

1          A    It appears to be Debra Owens.

2          Q    Did you have any conversations with

3     Ms. Owens regarding this case?

4          A    No, not that I can recall.

10:58:11    5     Q    Other than what you have testified to,

6     Mr. Tackett, do you know of any other reason why

7     you felt that the rejection of this case was

8     retaliatory against you?

9          A    Not at this time, no.

10         Q    Do you have any personal knowledge that

10:58:27   11     anybody in the sheriff's department influenced

12    or -- influenced Ms. Owens to reject this

13    complaint?

14         A    No, I don't have any knowledge at this

15    time.

16         Q    Is there anything that would refresh your

17    memory as to any knowledge of anybody in the

18    department influencing Ms. Owens?

19         A    Not at this time, no.

10:58:58   20     Q    Are you aware of any personal knowledge or

21    any communications between the department and

22    Ms. Owens in regard to this complaint?

23         A    The one that I have knowledge of would be

24    Investigator Vela and Debra Owens.

25         Q    And what did Investigator Vela tell you of

**Ex. 2**

305

111

| | |
|---|---|
| 1 | A    I believe it was by the sergeant. |
| 2 | Q    Sergeant -- what sergeant? |
| 3 | A    Avila. |
| 4 | Q    And last time we talked about Sergeant |
| 5 | Avila having a counseling session with you; is that |
| 11:14:52   6 | correct, regarding a -- |
| 7 | MS. STRATTON:  Sorry. |
| 8 | (Telephonic interruption.) |
| 9 | BY MR. MEYERHOFF: |
| 10 | Q    Do you recall a conversation that you had |
| 11 | with Sergeant Avila in the later part of 2001 where |
| 12 | he instructed you not to -- that you are not a |
| 13 | probation officer and you shouldn't do probation or |
| 14 | parole searches? |
| 15 | A    I believe we had conversation.  I don't |
| 16 | know when the exact date was. |
| 17 | Q    Okay. |
| 18 | Do you recall more than one conversation |
| 19 | with Sergeant Avila regarding him instructing you |
| 11:15:27  20 | not to do probation or parole searches? |
| 21 | A    Yes. |
| 22 | Q    Do you have any idea when those |
| 23 | conversations took place? |
| 24 | A    Whenever I asked permission to be granted |
| 25 | such as this instance or this particular matter |

**Ex. 2**

316

112

1    here.

2         Q    Do you have any idea when those

3    conversations took place?

11:15:58   4         A    They were arbitrary.  I don't know when

5    the dates were.

6         Q    The later part of 2001, does that sound

7    correct as to when Sergeant Avila instructed you

8    not to do probation or parole searches?

9         A    Like I said, I don't recall certain times

10    or dates.

11         Q    And I think last time we looked at a

12    counseling memo that Sergeant Avila gave you.

13              Do you recall receiving the counseling

14    memo from Sergeant Avila regarding his instruction

11:16:26   15    that you shouldn't be doing parole and probation

16    searches?

17         A    I believe there's a memo, correct.

18         Q    Do you recall asking Sergeant Avila in

19    January '02 that you wanted to do a search -- a

20    parole search of a person named Antonio D'Avila.

21              Do you recall instructing him about that?

11:16:57   22         A    I don't know the particular date.  I know

23    there was a Sergeant Avila and an individual, but

24    there was a time where I asked permission, correct.

25         Q    Do you recall that Sergeant Avila told you

**Ex. 2**

317

113

```
      1    again that you are not to do a probation or parole

      2    search?

      3         A    I believe so, correct.

11:17:30   4         Q    The discipline that is referenced in

      5    Exhibit 10, Mr. Tackett, did you feel that this

      6    discipline was retaliatory?

      7         A    Yes.

      8         Q    And what's your basis for believing it was

      9    retaliatory?

     10         A    Again, for the department trying to

     11    constructively terminate me, they were trying to,

     12    in my belief, manipulate facts to cause actions

     13    against me so they can terminate me.

11:18:00  14         Q    Why did you feel the department wanted to

     15    terminate you?

     16         A    Because of different things that has been

     17    said, along with the repeated continuance of

     18    manipulating facts to favor their outcome as far as

     19    actions.

     20         Q    Why did you feel the department wanted to

     21    manipulate facts against you?

     22         A    And that's what was done in this

     23    particular case, as well.

     24         Q    And what's your personal knowledge as to

11:18:27  25    why the department was allegedly manipulating facts
```

**Ex. 2**   318

114

1    authorization of any Department

2    supervisor and instead began recruiting

11:23:30 3    deputies to assist you in the forbidden

4    probation search."

5    One, the order that was given by the

6 sergeant was one that was, by his own accord,

7 memo -- underneath his supervision, not under other

8 sergeants' supervisions, so it's not necessarily

9 forbidden.

10   Q Did Sergeant Avila have the right to order

11 you not to conduct parole or probation searches?

12   A Correct.  Under his watch.  Not under

13 other supervisor watches.

11:23:59 14   Q Did you feel that his order that you

15 should not conduct probation or parole

16 searches -- that that was unlawful -- that that

17 order violated any federal or state law that you

18 are aware of?

19   A I believe that it -- in order to -- I

20 believe, yes, it did.

11:24:28 21   Q What state or federal law did that

22 violate?

23   A I'm not sure of the exact law.  But I

24 believe that by not allowing me to conduct

25 probation or parole searches would hinder me in

**Ex. 2**

323

115

1   doing investigations or getting all of the facts

2   that I was supposed to do when I'm arresting

3   somebody for a crime.

4       Q   So you felt the order not to do probation

5   or parole searches interfered with your ability to

6   arrest people; is that correct?

7       A   That's correct.  To arrest people and

8   investigate for crimes that have been committed.

11:24:59   9       Q   What state or federal law would that be a

10   violation of?

11       A   I don't know the exact federal code or

12   state law, but I'm sure I could find a reference to

13   it.

14       Q   Do you have any idea what that state or

15   federal law provides for?

16       A   No, not at this time.

17       Q   Do you have any idea what the substance of

18   that state or federal law was that you felt was

19   being violated?

20       A   Not at this time.

21       Q   Did you have this feeling that it was a

22   violation of state or federal law at the time that

23   Sergeant Avila gave you the order?

11:25:36   24       A   I had concerns about it.

25       Q   Did you complain to anybody at the time

**Ex. 2**   324

116

1   that Sergeant Avila gave you the order that you

2   felt that he was violating the state or federal

3   law?

4        A    I expressed my concerns to the chief in

5   regards to that order.

6        Q    And what did you tell the chief?

7        A    I'm not sure of the exact facts or

8   statements.

9        Q    Who was the chief?

10       A    Chief Housouer.

11:26:00  11    Q    Do you recall the substance, generally or

12   specifically -- anything you told Chief Housouer?

13       A    Not at this time.

14       Q    Do you recall if you ever told Chief

15   Housouer you felt that Chief Housouer was violating

16   the state or federal law?

17       A    I don't know if I put it in that context,

18   no.

19       Q    Did you put it generally in that context?

20   Or anything that you recall?

21       A    I cannot recall at this time.

22       Q    Is there anything that would help refresh

23   your memory as to that?

24       A    Not at this time.

25       Q    Did you complain to anybody else that you

**Ex. 2**   325

117

11:26:29

1    can think of that this was somehow a violation of
2    state or federal law?
3         A    Not that I can recall at this time.
4         Q    So in general, you felt that the basis for
5    this discipline, Exhibit 10, the April 4th, 2003,
6    30-day suspension -- these facts were distorted in
7    some way?
8         A    Correct.

11:26:58

9         Q    Other than what you have testified to, any
10   other reasons why you feel the department was
11   distorting these facts against you?
12        A    Do you want me to go through and find
13   more?
14        Q    The question is:  Do you have any belief
15   as to why the Department was distorting facts
16   against you?
17        A    Like I said, for those reasons I
18   stipulated so far.
19        Q    You mentioned a comment made to your
20   mother; is that correct?
21        A    That's one other one, correct.
22        Q    You felt they were distorting facts just
23   based upon reading this notice; is that correct?
24        A    That's one other one, correct.
25        Q    Anything else?

**Ex. 2**  326

118

1    put in.

2        Q    Did you feel that Sergeant Avila's request

3    that you don't make an arrest in incorporated

4    cities -- that that's unlawful -- that that

5    violates a state or federal law?

6        A    I believe that violates an oath that you

7    took as a peace officer that if I saw a crime

8    committed in my presence, that I will act on it.

9    And I believe also being sworn deputy in this

10   county, it enables me to act on any crime being

11:31:58  11   committed -- whether it's any city within this

12   county, to act on it.  And then also state power

13   given to me by this state, by this county when they

14   hired me, that I could still possibly act on that

15   if I saw a crime or something out of this county.

16       Q    What state or federal law are you aware of

17   that Sergeant Avila's instruction violated?

18       A    Like I said, I can't recall at this time

19   what exact code or section it is.

20       Q    Didn't Sergeant Avila tell you if you saw

21   a crime being committed in an incorporated city,

11:32:27  22   that you should contact that city's police force or

23   police department?

24       A    That's what he -- what his guidance was as

25   to crimes being committed, yes.

**Ex. 2**  329

119

1    is being stabbed or murdered and you call the

2    department and keep driving, you have some

3    negligence for not acting on it as an officer.

4         Q    Sergeant Avila told you to act on murders,

5    didn't he?

6         A    Well, not necessarily murders.  Say

7    somebody is getting beaten with a bat, he is not

8    being murdered.

9         Q    Are you aware of any law that the

10   instruction that Sergeant Avila gave you -- any law

11   that that instruction violated?

12              MS. STRATTON:  If you know.

13              THE WITNESS:  No, not at this time.

14   BY MR. MEYERHOFF:

15        Q    Did you complain to anybody in the

16   department that you felt Sergeant Avila was telling

17   you to do something unlawful by telling you to

18   contact the department in that jurisdiction if you

19   saw a crime?

20        A    Not sure at this time.

21        Q    Do you have any knowledge or memory at

22   this time of telling anybody that you felt that was

23   a violation of the law?

24        A    Not that I recall at this time.

25        Q    Is there anything that would refresh your

**Ex. 2**   332

120

11:34:58

1       Q    Did you ever personally see the County

14:26:57    2    intimidating anybody to be a witness for or against

3    anyone else?

4       A    Personally?

5       Q    Yeah.

6       A    No, I never witnessed that personally.

7       Q    Did you ever document anywhere that the

8    County was intimidating people?

9       A    I may have put that in the resignation

10   letter or something of that sort or in documents to

11   the Unemployment Appeals Board and possibly EEOC, I

14:27:29   12   believe.  I'm not sure, though.

14:27:59   13      Q    I'm going to mark this as Exhibit 15.

14           Do you recognize this document,

15   Mr. Tackett?

16      A    It appears to be a Notice of Disciplinary

17   Action.

18              (Defendant's Exhibit 15 was marked

19              for identification, a copy of which is

20              attached hereto.)

21   BY MR. MEYERHOFF:

22      Q    In relation to the Bertussi incident; is

23   that correct?

24      A    That's correct.

25      Q    You received this Notice of Intent?

**Ex. 2**  400

121

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | A    That's correct.                                     |
|          | 2  | Q    Do you feel that this Notice of                     |
| 14:28:28 | 3  | Intent -- that it was retaliatory?                       |
|          | 4  | A    I believe so.                                       |
|          | 5  | Q    And why do you believe it was retaliatory?          |
|          | 6  | A    They were using it to further punish me             |
|          | 7  | when I didn't violate any crime.  They even, in          |
|          | 8  | this case, went back to the DA, went back to get it      |
|          | 9  | rejected.  And according to the DA's office, that        |
|          | 10 | was done on behest of the Sheriff's Department           |
|          | 11 | coming in and telling them to reject the case, not       |
| 14:28:59 | 12 | because they actually -- not because they felt it        |
|          | 13 | would be rejected on its own accord.                     |
|          | 14 | Q    Okay.                                               |
|          | 15 |      Hold on.  I assume you have read this                |
|          | 16 | document before; is that correct?                        |
|          | 17 | A    I believe I have seen it before.                    |
|          | 18 | Q    Is it your contention you didn't violate            |
|          | 19 | any -- that you were properly on Mr. Bertussi's          |
|          | 20 | property?  You didn't trespass on his property           |
|          | 21 | without a warrant?                                        |
|          | 22 | A    That's correct.                                     |
|          | 23 | Q    And you believe that you had the right to           |
|          | 24 | enter his property because of officer safety             |
| 14:29:30 | 25 | issues?                                                   |

**Ex. 2**   401

1          Q    Did you suffer discrimination from that

2     drug bust?

3          A    I felt it was just one of many things

4     showing political favoritism, one showing unlawful

5     acts that are being committed by certain

6     individuals, but the County overlooks it because of

7     who they are or knowledge that certain people have

8     as far as friendships.

9          Q    Did you feel you were the victim of

10    retaliation relating to that drug bust in any way?

14:48:05   11     A    As far as retaliation, no.  Not that I

12    recall at this time.

13         Q    Well, is there anything that would refresh

14    your memory as to whether you felt that that was

15    retaliatory?

16         A    Not that I recall at this time.

17         Q    Do you anticipate knowing at some other

18    time whether you felt that was retaliatory?

19         A    Depending on any documents or anything

14:48:29   20    that refreshes my memory that I don't have at this

21    time.

22         Q    Right now you don't know?

23         A    Not right now, I don't.

24         Q    Okay.

25              Are you under any medication that affects

**Ex. 2**   420

123

```
 1        A    That's correct.

 2        Q    And is that your basis for saying

 3   according to the Sheriff?

 4        A    That's correct.

 5        Q    Any other basis for your statement?

 6        A    That, to me, is a pretty concrete basis if

 7   it's going to the Sheriff.

 8        Q    Any other basis for your testimony?

 9        A    Not that I can recall at this time.

10        Q    Any other reason that you felt this

11   discipline was -- this Notice of Intent to

12   Terminate was retaliatory other than what you have

13   testified to?

14        A    Yes.

15        Q    What is that?

16        A    The other deputies that were with me, no

17   actions were sought against them even though they

18   partook in the same actions other than myself, I

19   received them.

20        Q    Did you feel any other deputies did

21   anything wrong during the Bertussi incident?

22        A    Well, I felt I didn't do anything wrong

23   but according to the disciplinary action, I did.

24        Q    Well, did you feel that any other deputies

25   had done anything wrong during the Bertussi
```

15:01:59

15:02:27

15:02:59

**Ex. 2**   434

124

1  correct?

2       A    He was first in my patrol vehicle and then

3  went to another patrol vehicle.

4       Q    But you were the one who initially put

5  Mr. Bertussi in your patrol vehicle; isn't that

6  correct?

7       A    I'm not sure.

15:04:29    8       Q    Somebody else may have put him in your

9  patrol vehicle?

10      A    Possibly.  One of the other deputies.

11      Q    Any other reason you felt that this

12 was -- this discipline stemming from the Bertussi

13 incident was retaliatory?

15:04:43    14      A    Not that I recall at this time.

15           MR. MEYERHOFF:  Why don't we take a

15:05:13    16 10-minute break.

17                    (Recess taken.)

18           THE VIDEOGRAPHER:  We are back on the

19 record.  The time is 3:21 p.m.

20 BY MR. MEYERHOFF:

21      Q    Mr. Tackett, the Notice of Termination

15:21:58    22 stemming from the Bertussi incident -- did you feel

23 that that notice was given to you because you

24 complained about any violation of state or federal

25 law?

**Ex. 2**

436

125

| | | |
|---|---|---|
| | 1 | A   Because I complained about it? |
| | 2 | Q   Right. |
| | 3 | A   No. |
| | 4 | Q   Sorry?  No? |
| 15:22:37 | 5 | A   No. |
| | 6 | If I may? |
| | 7 | Q   Do you have something to add to that? |
| | 8 | A   Let me clarify. |
| | 9 | Q   Uh-huh. |
| | 10 | A   You are saying that -- do I think this |
| | 11 | investigation -- the reason I was given is because |
| | 12 | of something that was done in violation of state or |
| | 13 | federal law? |
| | 14 | Q   No. |
| | 15 | Did you feel that this Notice of Intent |
| 15:22:56 | 16 | was given to you because you complained about any |
| | 17 | violation of state or federal law? |
| 15:23:23 | 18 | A   I think it's like I stated earlier in the |
| | 19 | other one.  I think it has to do with me making |
| | 20 | arrests and then something being done as far as |
| | 21 | favoritism or legal -- saying to me to avoid |
| | 22 | something because of favoritism or somebody they |
| | 23 | know -- which is against a federal or state law -- |
| | 24 | I'm sure. |
| 15:23:55 | 25 | Can I get some water? |

**Ex. 2**   437

126

BY MR. MEYERHOFF:

Q It's a Notice of Intent to terminate based upon an accident with a -- Mr. Macias; is that correct?

A Somebody with the name of "Mr. Macias." I believe it to be with the name of "Mr. Macias," yes.

Q Do you have any evidence that this -- that "Macias" was not the real name of the individual?

15:27:28  A I don't have any evidence for or against, no.

Q Do you believe that this Notice of Intent was given to you out of retaliation?

A Yes.

Q What's your basis to believe that this was an act of retaliation by the department?

A Just to further punish me, trying to constructively terminate me. And I feel that's the retaliation I'm speaking of.

Q Punish you for what?

15:28:00  A Punish me for quote, unquote -- I guess to me, it would be not going along with their program, I guess you would say, or their code of silence or not showing the favoritism they want me to.

Q What's the basis for your belief that you

**Ex. 2** 440

127

|   | 1 | and Mr. Otero personally, as well -- but I also |
|---|---|---|
|   | 2 | know that because when they approached on the |
| 15:51:57 | 3 | marijuana field together, side by side, hands over |
|   | 4 | their shoulders, that it was, again, "Do you know |
|   | 5 | my friend, Mr. Mohammed?" "Mr. Mohammed, do you |
|   | 6 | know my friend Justin" -- "Deputy Tackett" I should |
|   | 7 | say, not "Justin." |
|   | 8 | Q   So while you were out in the marijuana |
|   | 9 | field, Gilbert Otero introduced you to |
|   | 10 | Mr. Mohammed? |
|   | 11 | A   That's correct. |
|   | 12 | Q   What do you mean "hands over their |
|   | 13 | shoulders"? |
|   | 14 | A   Hands over their shoulders walking |
| 15:52:29 | 15 | side-by-side and hands draped over their shoulders. |
|   | 16 | Q   Who was that? |
|   | 17 | A   Like I said before, Commander Coleman, |
|   | 18 | Mr. Mohammed and Gilbert Otero. |
|   | 19 | Q   And all three of them were walking with |
|   | 20 | their arms around each other's shoulders? |
|   | 21 | A   That's correct. |
|   | 22 | Q   Now, you mentioned that you believe that |
| 15:53:00 | 23 | the County instructed deputies to not provide |
|   | 24 | backup to you, to stay away from you; is that |
|   | 25 | correct? |

**Ex. 2**

461

128

1      A    That's correct.

2      Q    What's your personal knowledge as to

3    deputies being instructed not to provide backup to

4    you?

5      A    One is Mr. Lopez.

6      Q    Who is Mr. Lopez?

7      A    J.L. Lopez.

8      Q    Who is that?

9      A    He is a former deputy that works for

10   Corona P.D.

11     Q    Did he formally work for the Sheriff's

12   Department?

13     A    That's correct.

14     Q    When did he stop working for the

15   department?

16     A    I'm not sure of that.

15:53:2   17     Q    Was it while you were still employed by

18   the department?  Effective before, or after?

19     A    I believe he left after I resigned -- I

20   believe.  It may have been at the end of my --

21   before the resignation.

22     Q    So Mr. Lopez worked for the department

23   while you worked there?

24     A    Yes.

25     Q    What did Mr. Lopez say to you that led you

**Ex. 2**  462

129

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 15:53:59 | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| 15:54:30 | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 15:54:59 | 25 |

1   to believe that deputies were not to provide backup

2   to you?

3        A    That I can recall, I believe Mr. Lopez

4   stated to go to the effect that he was told to stay

5   away or to not back me up.  That was pretty much to

6   that effect.  I don't recall any more specific than

7   that.

8        Q    When did you have that conversation with

9   Mr. Lopez?

10        A    I'm not sure of the time again.

11        Q    Can you tell us a year or anything at all?

12        A    No.  It was at the later part of -- like I

13   said, as far as the time from Sheriff's Department

14   and his time with the Sheriff's Department before

15   he left because that was one of the reasons that he

16   was telling why he said.

17        Q    And he left after you resigned?

18        A    I believe so, correct.

19        Q    What exactly did he say to you?

20        A    Again, that I can recall, just to the

21   effect that he was told not to back me up or to

22   stay away from him.

23        Q    Did he tell you who told him that?

24        A    I believe he did.  I believe it was

25   Sergeant Steve Dial.

**Ex. 2**   463

130

1    is Deputy Jason Lushia was present.  I'm not sure

2    if he overheard it.  And I believe Officer Eric

3    Granada was also in the area.  I'm not sure if he

4    heard it.

5        Q    Deputy Lushia, is he with the County

6    Sheriff's Department?

7        A    Not anymore.

8        Q    Where does he work now?

15:58:29  9    A    Riverside County Sheriff's Department.

10       Q    Officer Granada, he works for the County

11   of Imperial?

12       A    Correct.

13       Q    Do you know if they overheard this

14   conversation?

15       A    My personal knowledge, I'm not sure.

16       Q    And what happened to this receipt that you

17   wrote this on?

18       A    I don't know.  It either got thrown away

19   or swept out, or I'm not sure where it went.

15:59:02  20    Q    Any other basis for believing that the

21   department instructed others not to back you up?

22       A    There's other incidents where I felt prior

23   even to that that I felt that that was something

24   that was ongoing.

25       Q    And why did you feel that way?  What

**Ex. 2**    467

131

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455  (714) 693-1213

1   incidence?

2        A    Backup was either delayed, other than the

15:59:27   3   norm or, like we talked about earlier, there was no

4   response back on the radio.  I wasn't -- I was on a

5   suicide by cop call, and the same thing with as far

6   as response to that seemed to be slower than the

7   norm.

8        Q    Okay.

9             The no response on the radio, are you

10  referring to the time you tried to communicate with

11  Sergeant Avila?

12       A    That would be one.

13       Q    Okay.

14            What was the purpose for your trying to

15  communicate with Sergeant Avila at that time?

15:59:59  16       A    For assistance.

17       Q    What type of call was it?

18       A    It was two felons that escaped that were

19  in the area, residential areas.

20       Q    Do you have any reason -- any personal

21  knowledge that Sergeant Avila didn't respond to

22  that call because he didn't want to send backup to

23  you?

24       A    I don't have any personal knowledge of

25  what he thought.

**Ex. 2**   468

132

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455 (714) 693-1213

|     |                                                          |
|-----|----------------------------------------------------------|
| 1   | Q    Okay.                                               |
| 2   | What other incidents were there where you                |
| 3   | felt that people were not providing backup to you        |
| 4   | intentionally?                                           |

16:00:29

|     |                                                          |
|-----|----------------------------------------------------------|
| 5   | A    Another one where I felt that response was          |
| 6   | slow is a suicide by a cop that was outside of           |
| 7   | Brawley.  And I believe that that -- there was a         |
| 8   | slow response from our deputies when I advised them      |
| 9   | that this individual is going to basically try to        |
| 10  | commit a suicide by cop and have me kill him.            |
| 11  | Q    Were you the only deputy on the scene?              |
| 12  | A    That's correct at that time.                        |

16:00:58

|     |                                                          |
|-----|----------------------------------------------------------|
| 13  | Q    And how long did it take backup to arrive?          |
| 14  | A    I'm not sure of the exact time.  It's               |
| 15  | probably on the dispatch reports.                        |
| 16  | Q    And what leads you to believe that these            |
| 17  | deputies responded slowly or due to some                 |
| 18  | instruction by the department?                           |
| 19  | A    Just my personal feeling.                           |
| 20  | Q    Do you have any personal knowledge or               |
| 21  | facts to support that feeling?                           |
| 22  | A    Just my personal feeling as far as my               |
| 23  | knowledge of what the response time was as far as        |

16:01:30

|     |                                                          |
|-----|----------------------------------------------------------|
| 24  | other incidents that I had been on prior.                |
| 25  | Q    Did other deputies eventually arrive at             |

**Ex. 2**   469

133

1   the scene?

2       A   I think they arrived at a later -- their

3   time after Highway Patrol and Border Patrol arrived

4   to assist before them.

5       Q   Do you have any personal knowledge as to

6   why other deputies didn't arrive as quickly as you

7   expected they would?

8       A   No.

9       Q   Do you have any personal knowledge that

16:01:57  10   the department instructed any deputy not to arrive

11   in a timely fashion to back you up?

12       A   Do I have any knowledge on that incident?

13       Q   On that incident.

14       A   Not that I know of at this time.

15       Q   Any other incidents where you felt that

16   the department instructed deputies not to provide

17   backup to you?

18       A   I know of another incident where the

19   deputies advised me that they felt they didn't want

16:02:26  20   to provide backup with me to a location because

21   they felt they would get in trouble, yes, I did.

22       Q   What incident was that?

23       A   That involved service of a warrant in

24   Niland.  And it turned into a possible meth lab.

25   And the deputies that were there were more than

**Ex. 2**   470

134

```
1                    REPORTER'S CERTIFICATE

2

3         I, VICTORIA IMHOF, RPR, CSR NO. 7999,

4    Certified Shorthand Reporter, certify:

5         That the foregoing proceedings were

6    taken before me at the time and place therein set

7    forth, at which time the witness was put under oath

8    by me;

9         That the testimony of the witness and

10   all objections made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed;

13        That the foregoing is a true and

14   correct transcript of my shorthand notes so taken.

15        I further certify that I am not a

16   relative or employee of any attorney or of any of

17   the parties, nor financially interested in the

18   action.

19        Dated this 13th day of February, 2006.

20

21

22

23        _____

24        VICTORIA IMHOF, RPR, CSR No. 7999

25
```

**Ex. 2**   513

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455 (714) 693-1213

1     REPORTER CERTIFICATION OF CERTIFIED COPY

2

3

4

5

6          I, VICTORIA IMHOF, RPR, CSR   .

7     No. 7999, a Certified Shorthand Reporter in

8     the State of California, certify that the

9     foregoing pages 228 through 513 constitute a

10    true and correct copy of the original

11    deposition of JUSTIN TACKETT, taken on

12    Tuesday, January 31, 2006.

13          I declare under penalty of perjury

14    under the laws of the State of California

15    that the foregoing is true and correct.

16          Dated this 13th day of February,

17     2006.

18

19

20

21

22

23    _____

24    VICTORIA IMHOF, RPR, CSR No. 7999

25

                                    **Ex. 2**

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455 (714) 693-1213

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                                    **Certified Copy**

4    JUSTIN TACKETT,                    )
                                        )
5                   Plaintiff,          )
                                        )
6                                       )
          VS.                           )   Case No.
7                                       )   04CV2459J(AJB)
     COUNTY OF IMPERIAL, a              )   Volume III
8    governmental entity, and IMPERIAL  )
     COUNTY SHERIFF'S DEPARTMENT, a     )
9    governmental entity business       )
     in the State of California; and,   )
10   DOES 1 through 50, inclusive,      )
                                        )
11                  Defendants.         )

12

13

14

15

16      VIDEOTAPED DEPOSITION OF JUSTIN TACKETT

17            Monday, April 17, 2006

18      ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

19

20

21

22   REPORTED BY:    IMHOF AND ASSOCIATES, INC.
                     COURT REPORTERS AND VIDEOGRAPHERS
23   VICTORIA IMHOF, RPR,
     CSR NO. 7999    7720 Painter Ave  20650 Adam
24                   Suite A           Yorba Linda, CA
                     Whittier, Ca 90602         92886
25   Job No. 060417V

                              **Ex. 2**   513

                                              137

1              UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    JUSTIN TACKETT,                  )
                                      )
5                   Plaintiff,        )
                                      )
6                                     )
           VS.                        )   Case No.
7                                     )   04CV2459J(AJB)
     COUNTY OF IMPERIAL, a            )   Volume III
8    governmental entity, and IMPERIAL )
     COUNTY SHERIFF'S DEPARTMENT, a   )
9    governmental entity business     )
     in the State of California; and, )
10   DOES 1 through 50, inclusive,    )
                                      )
11                  Defendants.       )

12

13

14

15         VIDEOTAPED DEPOSITION OF JUSTIN TACKETT,

16     taken on behalf of Defendants, at 940 West

17     Main Street, in the City of El Centro,

18     California, commencing at 9:12 a.m. and

19     concluding at 3:53 p.m. on Monday,

20     April 17, 2006, before VICTORIA IMHOF, RPR,

21     CSR No. 7999.

22

23

24

25

**Ex. 2**   514

138

```
1                    APPEARANCES

2   For the Plaintiff:   JOE B. CORDILEONE &
                         ASSOCIATES, ALC
3                        BY: CYNTHIA L. STRATTON, ESQ.
                         438 Camino Del Rio South
4                        San Diego, California  92108
                         (619) 718-4820
5

6   For the Defendants:  LIEBERT CASSIDY WHITMORE
                         BY:  MARK MEYERHOFF, ESQ.
7                        6033 West Century Boulevard
                         Suite 500
8                        Los Angeles, California  90045
                         (310) 981-2000
9

10  Also present:        Frank Kap, video technician

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Ex. 2**   515

139

1                          I N D E X

2      WITNESS                  EXAMINATION              PAGE

3      JUSTIN TACKETT           (Continued)

4                               BY MR. MEYERHOFF         518

5

6                              EXHIBITS

7      DEFENDANTS'                                       PAGE

8      20 - Supplemental Responses to Defendant's        550
            County of Imperial and Imperial County
09:49:30   9       Sheriff's Department Special
            Interrogatories, Set One"

10

11     21 - Performance evaluation                       659

12     22 - Logbook pages                                668

13     23 - Resignation letter                           703

14     24 - One-page letter written on the letterhead    766
            of Imperial County Sheriff's Office
15          Harold D. Carter, addressed to
            Mr. Justin Tackett, signed by Harold D.
16          Carter, dated January 15, 2004 and
            Bates stamped 00103

17

18                    INFORMATION REQUESTED

19                         (None)

20

21                   UNANSWERED QUESTIONS

22                    PAGE    LINE

23                    717      18

24

25
                                              **Ex. 2**   516
                                                   140

16:00:00   1        EL CENTRO, CALIFORNIA, MONDAY, APRIL 17, 2006

2                      9:12 a.m.

3

4            THE VIDEOGRAPHER:  We are on the record.

5    The time is 9:12 a.m.  Today's date is Monday,

6    April 17, 2006.

7            This is volume number 3 of the videotaped

8    deposition of Justin Tackett in the matter of

9    Justin Tackett versus County of Imperial, et al.

10           The case is pending in the United States

11   District Court, Southern District of California,

09:12:53  12   case number 04CV2459J(AJB).

13           This deposition is taking place at

14   940 West Main Street, Suite 102, El Centro,

15   California, and being videotaped on behalf of the

16   Defendants.

17           My name is Frank Kap, the certified legal

18   video specialist with Charles Heller & Company with

19   a business address of 815 Lockhearn Street,

20   Los Angeles, California.

21           I certify that I am neither counsel for,

09:13:30  22   employed by, nor related to any party in this

23   action, nor am I interested in the results thereof.

24           Will counsel and all present please

25   introduce yourselves and state your appearance.

**Ex. 2**   517

141

1              MR. MEYERHOFF:  Mark Meyerhoff on behalf

2      of Defendants County of Imperial, Imperial County

3      Sheriff's Department.

4              MS. STRATTON:  Cynthia Stratton from

5      Cordilone & Associates appearing on behalf of the

6      Plaintiff, Justin Tackett.

7              THE WITNESS:  I am Justin Tackett, the

8      Plaintiff.

9              THE REPORTER:  Vicki Imhof, the court

10     reporter.

11             THE VIDEOGRAPHER:  The witness may be

12     sworn in.

13

14                    JUSTIN TACKETT,

15             called as a witness herein, having

16             first been duly sworn, was examined

17                  and testified as follows:

18

09:14:04  19                    EXAMINATION

20     BY MR. MEYERHOFF:

21        Q   Mr. Tackett, we went over some admonitions

22     the first time we were together.

23             Do you want me to repeat those

24     admonitions?

25        A   That's okay.

**Ex. 2**     518

142

1      Q    And you still understand that you are

2    under oath.

3      A    That's correct.

4      Q    Okay.

5           Mr. Tackett, the first discipline you

6    received -- the two-day suspension for the car

7    accident -- three car accidents -- do you recall if

8    you went through an Internal Affairs investigation

09:14:30   9    in regards to that discipline?

10     A    I know that I went through a process with

11   my PORAC attorney, but I'm not sure if there was an

12   Internal Affairs done on that or done on the

13   actions that I had -- me and my attorney came up to

14   dispute.

15     Q    Okay.

16          Do you recall being interviewed by anybody

09:14:58   17   in the Department regarding the accidents?

18     A    Not that I can recall.

19     Q    Okay.

20          Did you ever see an Internal Affairs

21   report or any report at all regarding those

22   accidents?

23     A    Not that I can recall at this time.

24     Q    Okay.

25          The second discipline being a five-day

**Ex. 2**      519

143

|  | 1 | This is the end of tape 1, disk 1, Volume III of |
|---|---|---|
|  | 2 | the videotaped deposition of Justin Tackett. |
|  | 3 | We are going off the record.  The time is |
| 10:31:22 | 4 | 10:31 a.m. |
|  | 5 | (Recess taken.) |
| 10:47:58 | 6 | THE VIDEOGRAPHER:  This is the beginning |
|  | 7 | of tape and disk 2, Volume III, of the videotaped |
|  | 8 | deposition of Justin Tackett.  We are back on the |
| 10:48:29 | 9 | record and the time is 10:48 a.m. |
|  | 10 | BY MR. MEYERHOFF: |
|  | 11 | Q   Mr. Tackett, sticking with the Exhibit 20, |
|  | 12 | the Special Interrogatory Responses, I want you to |
|  | 13 | turn to page 22. |
|  | 14 | A   Okay. |
|  | 15 | Q   In your Response to Special Interrogatory |
|  | 16 | Number 23.  The bottom paragraph on that page |
|  | 17 | starts: |
|  | 18 | "My Fourth Amendment right was |
|  | 19 | violated, that my right to be secure |
|  | 20 | and my papers and effects were |
| 10:48:58 | 21 | unreasonably searched and taken from |
|  | 22 | personnel files.  This was done with |
|  | 23 | papers that were submitted to |
|  | 24 | Chief Housouer that were later taken |
|  | 25 | out of my file in order to prevent it |

**Ex. 2**   587

144

1          from being produced."

2          Can you tell me what you are referring to

3     in that response?

4          A    In regards to a correspondence that was

10:49:24  5     written by then-Sergeant Steven Gutierrez in

6     support of the -- an accident in the vehicle that

7     had occurred was something that couldn't have been

8     avoided at the time due to the nature of driving

9     conditions and slope of the terrain, et cetera.

10         Q    Which accident was that?

10:49:53  11        A    That was the one that Highway 111 --

12    Highway 111, north of Fredericks Road, I believe.

13         Q    Was that the rollover, or a different

14    accident?

15         A    No, that was a dirt road.

16         Q    Your car got stuck in the sand?

17         A    No, that was a small ditch.

18         Q    Okay.

19              Was this a traffic accident that was part

20    of a discipline that you received?

21         A    I believe so, yes.

10:50:27  22        Q    And Sergeant Gutierrez, was he with you at

23    the time that this accident occurred?

24         A    He arrived.  And then was there when

25    C.H.P. arrived, as well.  He was the one that had

**Ex. 2**    588

145

1    then responded.

2         Q    And it's your contention that he wrote a

3    memo concerning this accident?

4         A    Yes.

5         Q    And that this memo was removed from your

6    file?

7         A    Yes.

8         Q    How do you know the memo was removed from

9    your file?

10        A    I know that he had written it and he said

10:50:59  11  he was submitting it, so I'm thinking that he did

12   and it's just been removed from my file since.

13        Q    Did you ever see the memo that he wrote?

14        A    Yes, he had me look over it and read it to

15   make sure that the situation and circumstances he

16   was writing about was true and accurate.

17        Q    Do you have any personal knowledge that he

18   submitted it to the department?

19        A    Other than him saying he was submitting it

10:51:23  20  the next day -- other than that, no.

21        Q    Do you know that the memo was not

22   currently in your personnel file?

23        A    Not that I know of.

24             Go ahead.

25        Q    When was the last time you reviewed your

**Ex. 2**

589

146

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455 (714) 693-1213

```
 1        Q    No, sir, there's a question pending.
 2             Did you prepare this response?
 3        A    I think it gets into attorney/client.
 4   That's why I want to object.
 5             MS. STRATTON:  Why don't I object under
 6   Rifkind.  And it's requesting a legal conclusion so
 7   you won't have to answer it, Justin.
 8   BY MR. MEYERHOFF:
 9        Q    Did you prepare this response,
10   Mr. Tackett?
11        A    Can I talk to you now?
12             MS. STRATTON:  Yes, let's go ahead and go
13   off the record.
14             THE VIDEOGRAPHER:  We are going off the
15   record.  The time is 10:59 a.m.
16                  (Recess taken.)
17             THE VIDEOGRAPHER:  We are back on the
18   record.  The time is 11:02 a.m.
19   BY MR. MEYERHOFF:
20        Q    The responses that we are looking at,
21   Mr. Tackett, a Response to Interrogatory 23 -- did
22   you prepare that one?
23        A    Yes.
24        Q    Can you tell me how the paragraph starting
25   on line 11 -- how the County violated your Seventh
```

10:59:59
11:00:00
11:02:37
11:02:56

**Ex. 2**   596

147

```
         1    Amendment rights?
         2         A    The attorney that was representing the
         3    counsel -- County Counsel and the County stated
         4    that they could win this case if it went to trial.
11:03:28 5         Q    And that statement violated your Seventh
         6    Amendment rights?
         7         A    Correct.  I think it concluded me from
         8    having my trial by jury on this issue.
         9         Q    Who was the attorney?
        10         A    For the County?
        11         Q    The attorney who represented that --
        12         A    County?
        13         Q    That he or she could win the case.
        14         A    Okay.  I'm confused.  Who was the attorney
        15    for Lackey Rohatas or for the County?
        16         Q    When you said the attorney represented to
11:03:59 17   County Counsel that the case so is one -- was that
        18    your testimony?
        19         A    The County Counsel and County had retained
        20    an attorney to represent them, yes.
        21         Q    Who made the statement about -- the
        22    statement about the case could be won?
        23         A    The attorney that was retained by the
        24    County Counsel and the County.
        25         Q    Who was that?
```

**Ex. 2**    597

148

1   that they settled this lawsuit as a way to

2   retaliate against you -- County settled it as a way

3   to retaliate against you other than what you have

4   told me?

5       A    Not that I recall at this time.

11:12:31   6   Q    And you believe settling this lawsuit was

7   a violation of your Constitutional rights?

8       A    I believe so.

9       Q    Going back to page 23, Mr. Tackett,

10  page -- line 16, you state:

11              "My Eighth Amendment was violated

12          by the County and Sheriff's Department

13          imposing unusual and excessive

11:12:58   14          disciplines against me."

15       What disciplines were posed against you

16  that you felt were cruel and unusual?

17      A    I believe the time on paid administrative

18  leave where they had me isolated inside a house by

19  myself and isolated from my peers.

20      Q    Are you referring to this as an Eighth

21  Amendment violation being put on administrative

22  leave?

23      A    I believe it was unusual and excessive

24  discipline falls under that.

11:13:29   25   Q    So you believe being put on admin leave

**Ex. 2**

606

149

1    was a violation of your Constitutional rights?

2         A    I believe the manner in which it was used.

3         Q    What do you mean the manner in which it

4    was used?

5         A    Me being placed on admin leave for an

6    excessive period of time, even after investigation

7    has been complete.

8         Q    What investigation are you referring to?

9         A    I believe there was a couple.  But I'm not

10   sure which one that was completed.  But they still

11:14:00   11   had me at the residence.

12        Q    How long were you on admin leave,

13   Mr. Tackett?

14        A    I'm not sure of the exact times.

15        Q    Can you approximate for me?

16        A    I couldn't even do that.

17        Q    Well, you stated it was a violation of

18   your Constitutional right.

19             Do you have any idea how long you were on

20   admin leave at all?

21        A    If I had the documents, I could give it to

22   you, but I can't recall at this time.

23        Q    You were being paid while you were at

24   admin leave; is that correct?

25        A    That's correct.

**Ex. 2**      607

150

11:14:35     1        Q    Other than being placed on admin leave

2    with complete pay, is there any other reason why

3    you feel that that was a violation of your

4    Constitutional rights?

5        A    Well, even though it's complete pay, the

6    Sheriff's Department here is one of the lowest paid

7    in the State of California.  And we were known for

8    deputies having to work overtime to pay bills.  And

11:14:59     9    I think the County knew that and took that into

10    account, knowing that I just bought a house and

11    made some investments.  And they played into that,

12    as well, knowing that I was making a large amount

13    of overtime hours, and then to cut me off and the

14    amount that that would affect me.

15        Q    So the County put you on admin leave

16    because according to you it knew that you had

17    bought a house and made some investments?

11:15:28    18        A    I think they knew that it was going to

19    affect me financially.

20        Q    Any personal knowledge to support that

21    claim?

22        A    Not at this time, no.

23        Q    Just you guessing; is that correct?

24        A    That's me having the timeliness of things

25    and circumstances of things all come into play.

**Ex. 2**        608

151

|    |    |
|----|----|
|    | 1  That's my personal opinion. |
|    | 2       Q    And you also felt being put on admin leave |
| 11:15:59 | 3  was a violation of your 13th Amendment rights; is |
|    | 4  that correct? |
|    | 5       A    I believe that's what I have down here, |
|    | 6  correct. |
|    | 7       Q   ´That that was a form of involuntary |
|    | 8  servitude? |
|    | 9       A    Correct. |
|    | 10      Q    Did you ever complain to anybody in the |
|    | 11  Department that you felt your 8th or 13th Amendment |
|    | 12  rights were being violated by being put on admin |
|    | 13  leave? |
| 11:16:30 | 14      A    I don't believe I necessarily told them |
|    | 15  that my 8th or 13th Amendment right was being |
|    | 16  violated, but I do believe that I told persons who |
|    | 17  were in the Department that I felt the disciplines |
|    | 18  were unusual and excessive against me.  And I felt |
|    | 19  that I was being placed on administrative leave for |
|    | 20  the extent that I was at my dwelling -- past |
|    | 21  investigation and having me report in the morning |
|    | 22  during that extent was excessive. |
|    | 23      Q    So you were asked to call in in the |
| 11:17:00 | 24  morning and you felt that was excessive? |
|    | 25      A    Correct, they were having me call in every |

**Ex. 2**

609

151A

1    morning.

2         Q    Was it a hardship for you to call in every

3    morning?

4         A    No, but it got to be a jovial thing with

5    the sergeant.

6         Q    What do you mean by "a jovial thing"?

7         A    Where they would -- I would call in the

8    morning and they would kind of laugh about it with

9    some individuals being in the room sometimes

10   saying, "Yeah, Tackett, okay.  We got you going,"

11:17:29  11   and they would be laughing about it while they were

12   saying it.

13        Q    How did you know they were laughing about

14   that situation?

15        A    Well, I presume -- when I'm telling them

16   and they are laughing, I'm presuming they were

17   laughing about myself.

18        Q    Any other reason that was a burden --

19   calling in every morning?

20        A    Well, I don't think I ever said it was a

21   burden.

22        Q    So you didn't feel it was a burden at all?

11:17:58  23        A    No, I think it was unusual and excessive

24   from what they would normally do.  And the actions

25   as far as by the personnel when I did it --

**Ex. 2**    610

152

```
 1        Q    Sorry.

 2             Actions of what?

 3        A    Personnel -- sheriff's personnel when I

 4   would call in.

 5        Q    That's what you just testified to?

 6        A    Correct.

 7        Q    So Mr. Tackett, you felt that you applied

 8   for certain promotions or special assignments

 9   within the Department that you didn't receive; is

10   that correct?

11        A    That's correct.

12        Q    You felt that those denials were

13   retaliatory against you or discriminatory?

14        A    Correct.

15        Q    What's the first promotion or special

16   assignment you sought that you felt you were denied

17   unfairly?

18        A    I'm not sure exactly what it was first or

19   what order I could give you.

20        Q    Give me the first one you can remember.

21        A    I asked Sergeant Avila about Field

22   Training Officer.

23        Q    And was that while you were at

24   North County Patrol?

25        A    That's correct.
```

11:19:03  (line 7)

11:19:30  (line 19)

**Ex. 2**   611

1    would just put it in the file because it wouldn't

2    be considered yet.  But she could refer back to it

3    at a later date if I ever wanted to petition for

4    that position again.

5         Q    Did she tell you anything else?

11:23:30   6    A    I believe after I told her -- I basically

7    told her after that -- I told her -- so basically

8    what she was telling me was that I could put in for

9    it, but it ain't going to go anywhere -- she goes,

10   "Well, I could say I will just put it in your

11   file."  That was the conclusion of the

12   conversation.

13        Q    Did you do anything else in connection

14   with your application or your inquiry into being an

15   FTO?

16        A    Not that I can recall.

11:23:55   17   Q    Did you ever formally apply to become an

18   FTO?

19        A    I'm not sure if I did or not.

20        Q    You felt that this was retaliatory in some

21   way?

22        A    I believe, yeah, I believe it was

23   retaliatory in some way.

24        Q    How did you feel it was retaliation?

25        A    I believe it's still a concerted effort by

**Ex. 2**   615

1    Q   Any other reason you felt that the inquiry

2  for the FTO position was retaliatory other than

3  what you have testified to?

4    A   Not that I recall at this time.

5    Q   Did you feel you weren't given the FTO

6  position because of your race in any way?

11:29:58   7    A   No, I don't think that played a factor in

8  the FTO decision.

9    Q   What other promotional or assignment

10  opportunity do you feel that you were unfairly

11  denied?

12    A   I applied for the SERT Team.

13    Q   S-E-R-T?

14    A   Correct.

15    Q   What is a SERT Team?

16    A   It's basically another name for SWAT.

17    Q   Okay.

18        When did you apply for that?

19    A   I'm not sure of the exact time or date.

20    Q   Do you know where you were assigned at the

11:30:30   21  time?

22    A   I believe I was assigned still to courts

23  and I had just gone off of my probation.

24    Q   So you -- was this when you were assigned

25  to court prior to going to North County?

**Ex. 2**   620

155

|   |   |
|---|---|
|  | 1 |
again -- the fact that he didn't think that I

was what they wanted on the SERT Team.

    Q    When did you have this conversation with

Obeso?  How long after you applied?

11:37:30    A    I think it was a couple of weeks -- in the

hallway of the main Sheriff's Department next to

the investigations area.

    Q    Did he tell you why you were not what they

wanted on the SERT Team?

    A    No.

    Q    Did you ask him?

    A    I'm not going to ask any further.

    Q    Anything else in regards to your

application with the SERT Team?

11:38:01    A    Not that I can think of at this time.

    Q    You never went to the tryout at all?

    A    No, I wasn't going to when they told me

not to show up.

    Q    Deputy DeMorst told you not to show up,

right?

    A    Yeah, and DeMorst when I called him.

    Q    DeMorst?

    A    Correct.

    Q    Did you feel that this was retaliation

against you -- being told not to show up?

**Ex. 2**   626

156

11:38:27

    1        A    No, I felt that issue was not only

    2   retaliation, but I felt it was discriminatory.

    3        Q    You felt you were told not to show up

    4   because of your race?

    5        A    Correct.

    6        Q    And why do you feel that?

    7        A    Because the majority -- other than the

    8   ones that have been on there for quite some time,

    9   did -- and that were being picked up were all

   10   Hispanic.

   11        Q    How many members are on the SERT Team?

   12        A    At the time, I don't remember how many

   13   there were.

   14        Q    How many Hispanics were on the SERT Team

   15   at the time?

   16        A    Again, I don't know the number.

11:38:57   17        Q    Were there Caucasians on the SERT Team, as

   18   well?

   19        A    There were a few.

   20        Q    But you felt that the majority

   21   were Hispanic and that's why you weren't chosen?

   22        A    Correct.

   23        Q    Do you have any evidence to support that?

   24        A    Not at this time.

   25        Q    Any other reason you felt that it was

**Ex. 2**   627

157

1    discriminatory why you weren't chosen for the SERT

2    Team?

3         A    Not that I can recall at this time.

11:39:28   4         Q    Why did you feel it was retaliatory?

5              MS. STRATTON:  Objection, Rifkind.  It

6    calls for a legal conclusion.

7    BY MR. MEYERHOFF:

8         Q    You said you felt this was retaliatory --

9    not being chosen for the SERT Team?

10        A    Correct.

11        Q    Why did you feel it was retaliatory?

12        A    I just felt that the actions they were

11:39:46   13   taking was -- a personal action on race and

14   somebody's belief and not actually letting me prove

15   in a trial that I was capable of doing the

16   function.

17        Q    But you have no idea, according to

18   Sergeant Obeso, that they felt you weren't right

19   for the SERT Team?

20             You don't know why that determination was

21   made, do you?

22        A    I don't know why anybody formed that

23   personal opinion, no.

24        Q    Do you have any belief as to why the

11:40:27   25   Department would want to retaliate against you at

**Ex. 2**

628

158

1   this point?

2        A    Not that I know of.

3        Q    What other promotional opportunity or

4   assignment did you apply for that you felt the

5   Department unfairly rejected you?

6        A    I applied to a position with DEA as a

7   special assignment.

8        Q    "DEA" being a federal agency?

11:40:59  9        A    It's a federal agency, but they assign

10  officers from a local agency within.

11        Q    When did you apply to work with the DEA?

12        A    I am not sure what the exact date is.  I

13  think there's a memo to that effect.

14        Q    Do you recall where you were assigned to

15  work at the time?

16        A    I believe it was Patrol.

11:41:27  17        Q    Around May 2003, does that sound correct?

18        A    I'm not sure of the exact date.

19        Q    How did you go about applying for the DEA?

20        A    I put a memo request in for the position.

21        Q    And who did you submit the request to?

22        A    I'm not sure exactly who we went to.

23  Maybe we went to Fairlene Taylor, who I think it

24  was accepted in the memos, I believe.

25        Q    Fairlene was the first name?

**Ex. 2**    629

159

1   what he has done.

2      Q   Did you feel that the fact that you

3   weren't chosen for this position was based upon

4   your race in any way?

11:48:38  5      A   I don't know whether it was or it wasn't.

6      Q   Did you feel that your not being chosen

7   for this position was retaliation by the Department

8   for something you did?

9         MS. STRATTON:  Objection, calls for a

11:48:56  10  legal conclusion.  Rifkind.

11  BY MR. MEYERHOFF:

12      Q   Do you believe that it was retaliation,

13  that the Department was trying to get back at you

14  for something?

15         MS. STRATTON:  Objection, calls for a

16  legal conclusion.

17  BY MR. MEYERHOFF:

18      Q   You can answer.

19      A   Go ahead and answer that?

20         MS. STRATTON:  I don't think you need to

21  answer that, Justin.  It calls for a legal

22  conclusion, so I'm going to instruct him not to

23  answer.

24  BY MR. MEYERHOFF:

25      Q   Do you know what "retaliation" means,

**Ex. 2**

635

160

opinion.

Q   You said that you had applied for some drug positions prior to the SERT Team; is that correct?

A   That's correct.

Q   What other drug-related positions or assignments have you applied for?

11:50:57   A   You had the SIT Team.

Q   And what letters?

A   S-I-T.

Q   S-I-T Team?

A   Correct.

Q   Street Interdiction Team?

A   Correct.

Q   Do you recall when you applied for that team?

A   I'm not sure when I applied for that one.

11:51:15   Q   Okay.

Mr. Tackett, didn't you actually apply for the Street Interdiction Team after you had applied for the DEA position?

11:51:59   A   I'm not sure what the order -- whether it was the position that came open again.

Q   Okay.

A   I think that I was giving it to you in

**Ex. 2**   637

161

```
 1        A   No, I don't recall.

 2        Q   Okay.

 3            Did anything happen in the interview that

 4    you felt was unfair in any way?

 5        A   No, not that -- I felt the individuals

 6    that placed higher than me had time and narcotics

 7    knowledge, I believe.

 8        Q   Sorry.

 9            Say that again one more time.

10        A   The time and narcotics knowledge --

11    narcotics knowledge.

12        Q   People who interviewed you had time to do

13    it and had experience in narcotics?

14        A   The individuals who placed higher than me.

15        Q   The individuals who placed higher than

16    you?

17        A   Yes.

18        Q   They had more experience?

19        A   I believe they had more experience and I

20    believe they had time with the Department.

21        Q   Did you feel that not getting this

22    assignment was based upon your race?

23        A   No.

24        Q   Did you feel that it was in retaliation

25    for something that you had done in the past?
```

11:53:33  (line 6)

11:54:00  (line 21)

**Ex. 2**   639

162

13:12:41    1           EL CENTRO, CALIFORNIA, MONDAY, APRIL 17, 2006

            2                         (Afternoon session)

            3

            4

13:22:01    5                THE VIDEOGRAPHER:  Okay.  We are back on

            6      the record and the time is 1:22 p.m.

            7      BY MR. MEYERHOFF:

            8           Q    Mr. Tackett, we were talking about

            9      promotions or assignments that you applied for.

           10      And we talked about the SERT Team, the DEA position

           11      and the SIT Team.

           12                Were there any other assignments or

           13      promotions that you applied for that -- and you

           14      didn't receive them with the Department?

           15           A    Yes, the Narcotics Task Force --

           16           Q    Okay.

           17           A    -- assignment.

13:22:28   18           Q    When did you apply for the Narcotics Task

           19      Force?

           20           A    Again, I don't know the day, but I know

           21      it's on the memo.

           22           Q    Do you know what assignment you had at the

           23      time you applied?

           24           A    No, I don't.

           25           Q    2001 -- would that -- does that refresh

**Ex. 2**

                                                                    641.

163

13:24:58   1           Was there anything about your nonselection

2     that you felt was because of your race in any way?

3           A    No.

4           Q    Did you feel you weren't selected because

5     of anything that you had done -- any retaliation?

6           A    No.

7           Q    Were there any other assignments or

8     promotions that you applied for within the

9     Department?

10           A    K-9 position.

11           Q    Okay.

12           And when do you recall applying for a K-9

13     position?

14           A    Again, I believe there's a memo to that

15     date.

13:25:36   16           Q    April 2002, does that sound right?

17           A    That's -- sounds accurate, I believe.

18           Q    And how did you apply for the K-9

19     position?

20           A    Same way, same manner.  Memo to, I

21     believe, Fairlene Taylor.

22           Q    And what happened after you applied?

23           A    I went through an interview process.

13:26:01   24           Q    And was this interview panel that was

25     convened?

**Ex. 2**

644

164

|   |   |
|---|---|
| | 1 |
| | 2 |
| 13:27:00 | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| 13:27:29 | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

1    A    Not that I know of as of now.

2    Q    But after the interview you heard about

3  something you felt was unfair?

4    A    Correct.

5    Q    Okay.

6         Who did you hear this from?

7    A    I heard it from a close coworker of the

8  individual that was doing the interviews.

9    Q    Coworker of the individuals doing the

10  interviews?

11    A    Correct.

12    Q    How many people were conducting the

13  interview?

14    A    There was three.

15    Q    Do you recall --

16    A    I believe.

17    Q    Do you recall who they were?

18    A    Rick Watson from Imperial County Sheriff's

19  Department.  There was a lieutenant from Border

20  Patrol.  And there was, I believe, a captain or

21  maybe less from the Highway Patrol.

22    Q    Okay.

23         And this coworker you spoke to, which of

24  these individuals was -- did this individual work

25  with?

**Ex. 2**    646

165

13:31:59  1 | he would talk to him about it and get back to me.

2 |     Q    Okay.

3 |          Was that all that was talked about during

4 | that telephone conversation?

5 |     A    Pretty much.

6 |     Q    Okay.

7 |          Then after that conversation, did you have

8 | a further conversation with Mr. McLufsky?

9 |     A    Yes.

10 |     Q    How soon after?

11 |     A    I think it was about a week or sometime

12 | after that.  I'm not sure exactly what the time

13 | frame was.  But there was communication, I believe.

14 |     Q    And what happened during this

15 | communication?

13:32:29  16 |     A    He told me that he spoke to his coworker

17 | and the coworker -- oh, in the previous

18 | conversation he had -- I told him where I was

19 | ranked at.  And my score.  And he went -- so when I

20 | talked to him after he talked to his coworker, he

21 | came back and said the coworker said, "That was not

22 | the score that was given and you were actually

23 | second.  And you weren't" -- I think I was number

13:33:00  24 | five on their list -- "four or five on their list

25 | and you were actually second when they submitted --

**Ex. 2**  651

166

1    the lieutenant from Border Patrol submitted the

2    scores."

3        Q    So when you looked at the list, I thought

4    you told me you were second or third on the list.

5        A    That's a different list.

6        Q    What list was McLufsky talking about?

7        A    That's the K-9.

8        Q    Okay.

9        A    Second or third was the NTF.

13:33:29   10    Q    Did you ever see any physical list of

11    rankings after the K-9 position interview?

12        A    Yes.

13        Q    And where were you ranked?

14        A    Like I said, I think I was fourth or

15    fifth.  Somewhere around there.

16        Q    And you had told Mr. McLufsky that you

17    were fourth or fifth when you talked to him?

18        A    Correct.

19        Q    And then when you talked to him again, you

20    said this coworker had said that you were actually

21    second on the list?

22        A    Correct.

23        Q    And what else did McLufsky tell you?

24        A    He told me that the individual also said

13:33:59   25    that they brought up my IA's after I had walked

**Ex. 2**

652

167

1   this lieutenant told him that the rankings had been

2   changed and that your IA's were discussed, do you

3   have any personal knowledge that that actually

4   happened other than McLufsky telling you that?

13:40:29   5        A    Not that I know of to this point.

6        Q    Was there anything else that happened

7   during this process for the K-9 position that you

8   felt was unfair in any way?

9        A    Not that I can recall right now.

10        Q    Did you feel that your race had anything

11   to do with your not getting the K-9 position?

13:40:59   12        A    No, at that point, I felt it was more of a

13   retaliation and harassment than a discrimination.

14        Q    Were there any other positions that you

15   applied for, promotions or assignments?

13:41:41   16        A    I think there was another position, but

17   I'm not sure what it was.

18        Q    Okay.

19             Any other position that you felt you

20   didn't receive because of your race?

21        A    Not that I recall at this time.

13:41:59   22        Q    Were there any other positions that you

23   felt you didn't receive because of retaliation or

24   the Department was getting back at you for

25   something you had done in the past?

**Ex. 2**

658

168

```
 1        A    Not that I can recall at this time unless

 2   I can see the memos or things I put in for and then

 3   I can tell you -- that might refresh my

 4   recollection.

 5        Q    Sitting here today, can you think of any

 6   other position that you applied for that you felt

 7   you didn't get because of retaliation?

 8        A    Not offhand.  Not right now.

 9        Q    Okay.

10             I'm going to hand you this performance

11   evaluation, Mr. Tackett.  I will mark this as

12   Exhibit 21.

13             Do you recall receiving this evaluation?

14        A    Yeah, but I'm not sure -- it looks like an

15   alteration of the date under the appraisal date.

16   It doesn't look like it's typed.  It looks like it

17   went back and scribbled in there.

18                  (Defendant's Exhibit 21 was marked

19                  for identification, a copy of which is

20                  attached hereto.)

21   BY MR. MEYERHOFF:

22        Q    Sorry.

23             What?

24        A    It looks like the date under the appraisal

25   date, it looks like that's been altered or
```

13:42:31   8

13:42:58   11

13:43:29   17

**Ex. 2**   659

169

1   retaliatory actions."  And then you state toward

2   the bottom, "Therefore, as much as I want to stay

3   in law enforcement and serve our community and

4   citizens, I am forced, due to stress, ongoing

5   harassment and retaliation, to tender my

6   resignation immediately."

14:53:29  7       These were all of the reasons that you

8   resigned?  Stress, ongoing harassment and

9   retaliation?

10     A   Some of the reasons.

11     Q   Okay.

12       So you resigned also because you didn't

13   want other officers to be disciplined?

14     A   That's correct.

15     Q   Okay.

16       But you didn't put in there that you also

17   resigned because you didn't feel that you were

18   being backed up on the field?

19     A   Like I said, there could have been a lot

20   of things that I forgot.  I was mentally

14:53:59  21  distraught.  I had lots of sleepless nights,

22   insomnia during this time.

23     Q   You have alleged that the Department has

24   intentionally caused you emotional distress, are

25   you aware of that?

**Ex. 2**   709

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)  (562) 907-4455 (714) 693-1213

1      A    Yes.

2      Q    What's your basis for saying that the

3   Department intentionally caused you to become

4   emotionally distressed?

5      A    I think they did things intentionally such

6   as having me at my house for an over extended

7   period of time.

8      Q    So one of the reasons that caused the

9   emotional distress intentionally was by putting you

10  on extended leave?

14:54:29  11      A    I would prefer "excessive" or "unusual"

12  time, yes.

13      Q    But you have no idea how long that time

14  was?

15      A    If I had the documents showing you when I

16  was off, I could show you and tell you.

17      Q    But sitting here today, you are telling me

18  that this caused you emotional distress.

19           Can you remember how long it was that you

20  were sitting at home that caused you such distress?

21      A    No, usually people with mental distress

22  don't go over that kind of thing.

23      Q    Usually that's true of people with

24  emotional distress?

25      A    To me, they wouldn't be going over dates.

**Ex. 2**  710

171

14:54:57   1   They would be going over just the time.

2       Q    So you have no idea how long you were on

3   administrative leave?

4       A    No, not right now.

5       Q    Anything else that the Department did to

6   you that caused you emotional distress

7   intentionally?

8       A    I think the punishments.  Telling me to do

9   were one thing and enforcing it another way.  And

10   then when I would do other actions, they

11   would punish me for doing it the other way.

12       Q    Discipline?

13       A    Discipline, yes.

14       Q    So the discipline caused you emotional

15   distress?

16       A    Yes.

17       Q    And anything else that the Department did

14:55:28   18   to you intentionally that caused you emotional

19   distress?

20       A    I think putting me in situations to where

21   not knowing that I didn't have a backup, not

22   knowing if I was going to be covered or information

23   was going to be passed on.

24       Q    What evidence do you have that the

25   Department intentionally did not -- Department

**Ex. 2**   711

172

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455 (714) 693-1213

1   intentionally put you in situations where there was

2   no backup?

3.       A    Well, I have -- one incident that I

4   logged, but then other officers saying that pretty

5   much they know if they come around and associate

14:55:58   6   themselves with me, they put themselves in

7   jeopardy.

8        Q    What incident did you log?

9        A    The Lopez incident.

10       Q    That Lopez said that Dale scolded him for

11   assisting you on a possible meth lab?

12       A    Scolded.

13       Q    Scolded.

14            That's what I said.

15       A    I thought you said "stolen."

16       Q    You scolded him for not assisting you in a

17   possible meth lab?

18       A    Correct.

14:56:29   19       Q    You thought that put your life in danger?

20       A    I was at a meth lab and I scolded him.  So

21   you think an officer is going to want to go back

22   and assist me on anything else I'm doing?

23       Q    I'm asking you the questions, Mr. Tackett.

24            Do you feel that that put your life in

25   danger?

**Ex. 2**   712

173

1    A    That's correct, I did.

2    Q    Okay.

3         Anything else?  Any other specific

4    incidences that you felt the Department

5    intentionally put your life in danger?

6    A    There was numerous incidences, but I don't

7    recall.

8    Q    This is your chance to tell me about them.

9    A    I can't recall.

10   Q    Did you recall one?

11   A    The one I gave you.

12   Q    Can you recall another one?

13   A    Not at this time.

14:56:59   14   Q    Any other evidence that the Department

15   intentionally caused you emotional distress?

16   A    Not that I can recall at this time.

14:57:28   17   Q    At this time that you submitted this

18   resignation, had you gone to your Skelly meetings

19   in regards to the two notices of termination that

20   were pending against you?

21   A    I don't believe so.

22   Q    Is there any reason that you didn't go

23   through your Skelly meetings before deciding to

24   resign?

25   A    Like I said before, it's -- it got to the

**Ex. 2**  713

174

| | |
|---|---|
| | 1 |
| | 2 |

1   out of the academy, but I chose that I wanted to

2   come back here, not only to fulfill an obligation

3   that they had given me, but also because I wanted

4   to help the Valley because I grew up with a lot of

5   the individuals that were not committing a lot of

6   crimes.

15:29:54   7        Q   Okay.

8            You have alleged emotional distress as a

9   result of the County's actions towards you.

10           Did you ever see a doctor in regards to

11   the emotional distress that you are claiming?

12       A   Yes.

13       Q   Which doctor did you see?

15:30:29   14        MS. STRATTON:   You can answer.

15           THE WITNESS:   Dr. Ng, I believe it's

16   N-g.

17   BY MR. MEYERHOFF:

18       Q   And when did you see Dr. Ng?

19       A   I believe it was two visits.   And I

20   believe they were close proximity to my

21   resignation.

22       Q   How did you come to go see Dr. Ng?   Was it

23   your decision?   Or did you consult with anybody?

24       A   No, my parents and family approached me

25   telling me that I should -- I needed to go see

**Ex. 2**   748

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376)   (562) 907-4455 (714) 693-1213

|  |  |
|--|--|
| | 1 |
| | 2 |
| 15:39:29 | 4 |

1    like a couple of hours, so I would say a couple of

2    hours.

3         ·Q    Okay.

4              And did you ever take the medication that

5    was prescribed?

6         A    No, I didn't take the medication.  I

7    didn't believe in medication, and I advised him of

8    that.

9         Q    Did he respond in any way when you advised

10    him that you didn't want to take medication?

11        A    They responded that they couldn't force me

12    to take medication, that it was on my will, but

13    they would recommend me taking Prozac.  It would

14    help as far as the situations and symptoms, but

15    they understood my reasons for not wanting to take

16    medication.

17        Q    Have you seen any other doctors besides

18    Dr. Ng?

19        A    No, I said I don't like going to doctors

20    like that and never have.  I feel the --

21        Q    Sorry?

22        A    We feel the body's a quite extraordinary

23    thing and as long as you put your effort into it

24    and take care of it, it will heal itself.  And I

25    kind of have pretty much always been like that.

**Ex. 2**   756

176

REPORTER'S CERTIFICATE

1

2

3        I, VICTORIA IMHOF, RPR, CSR NO. 7999,

4   Certified Shorthand Reporter, certify:

5        That the foregoing proceedings were

6   taken before me at the time and place therein set

7   forth, at which time the witness was put under oath

8   by me;

9        That the testimony of the witness and

10  all objections made at the time of the examination

11  were recorded stenographically by me and were

12  thereafter transcribed;

13       That the foregoing is a true and

14  correct transcript of my shorthand notes so taken.

15       I further certify that I am not a

16  relative or employee of any attorney or of any of

17  the parties, nor financially interested in the

18  action.

19       Dated this 26th day of April, 2006.

20

21

22

23  _____

24  VICTORIA IMHOF, RPR, CSR No. 7999

25

**Ex. 2**   770

177

1        REPORTER CERTIFICATION OF CERTIFIED COPY

2

3

4

5                I, VICTORIA IMHOF, RPR, CSR

6       No. 7999, a Certified Shorthand Reporter in

7       the State of California, certify that the

8       foregoing pages 513 through 770 constitute a

9       true and correct copy of the original

10      deposition of JUSTIN TACKETT, taken on

11      Monday, April 17, 2006.

12                I declare under penalty of perjury

13      under the laws of the State of California

14      that the foregoing is true and correct.

15                Dated this 26th day of April,

16      2006.

17

18

19

20

21

22

23      _____

24      VICTORIA IMHOF, RPR, CSR No. 7999

25

**Ex. 2**

IMHOF COURT REPORTERS AND LEGAL VIDEOGRAPHERS
(800) 939-DEPO(3376) · (562) 907-4455 (714) 693-1213

1  J. Scott Tiedemann, Bar No. 180456
   stiedemann@lcwlegal.com
2  Mark H. Meyerhoff, Bar No. 180414
   mmeyerhoff@lcwlegal.com
3  LIEBERT CASSIDY WHITMORE
   A Professional Law Corporation
4  6033 W. Century Boulevard, Suite 500
   Los Angeles, CA  90045
5
   Telephone:   (310) 981-2000
6  Facsimile:    (310) 337-0837
7  Attorneys for Defendants
   County of Imperial, et al.
8

9             UNITED STATES DISTRICT COURT

10           SOUTHERN DISTRICT OF CALIFORNIA

11

12  JUSTIN TACKETT, an individual,,        Case No.  04cv2459 J (AJB)

13             Plaintiff,

                                           Assigned for All Purposes To:
14  v.                                     Judge Napoleon Jones
                                           Courtroom 12
15  COUNTY OF IMPERIAL, a
    governmental entity, and IMPERIAL      Complaint Filed:  December 9, 2004
16  COUNTY SHERIFF'S
    DEPARTMENT, a governmental             **DEFENDANTS' COUNTY OF
17  entity doing business in the State of  IMPERIAL AND IMPERIAL
    California; and, DOES 1 through 50,    COUNTY SHERIFF'S
18  inclusive,,                            DEPARTMENT FIRST SET OF
                                           SPECIAL INTERROGATORIES TO
19             Defendants.                 PLAINTIFF JUSTIN TACKETT**

20

21

22

23

24  **PROPOUNDING PARTY:**        DEFENDANTS, COUNTY OF
                                  IMPERIAL AND IMPERIAL COUNTY
25                                SHERIFF'S DEPARTMENT

26  **RESPONDING PARTY:**         PLAINTIFF, JUSTIN TACKETT

27  **SET NUMBER:**               ONE

28                                                      **Ex. 3**

177570.1 IM040-015                  1        DEFENDANTS' FIRST SET OF ROGS
                                                              179

1   Defendants COUNTY OF IMPERIAL AND IMPERIAL COUNTY

2   SHERIFF'S DEPARTMENT hereby request Plaintiff JUSTIN TACKETT to

3   respond to the following interrogatories within thirty (30) days after the

4   interrogatories are served pursuant to Rule 33 of the Federal Rule of Civil

5   Procedure.

6   Defendants COUNTY OF IMPERIAL AND IMPERIAL COUNTY

7   SHERIFF'S DEPARTMENT request that Plaintiff fully answer each of these

8   interrogatories under oath and in writing pursuant to Federal Rules of Civil

9   Procedure, Rule 33.

10   For purposes of these interrogatories, the term "Complaint" is Plaintiff's First

11   Amended Complaint filed on or about March 22, 2005.

12

13   **INTERROGATORY NO. 1**

14

15   Please state all facts upon which Plaintiff bases the contention that "[w]hile

16   on patrol, TACKETT made several high profile drug busts and arrests," as set forth

17   in paragraph 12 of the Complaint, or otherwise.

18   **INTERROGATORY NO. 2**

19

20   Please state all facts upon which Plaintiff bases the contention that

21   "TACKETT learned that while the Special Prosecution Deputy District Attorney

22   John Weis prepared to initiate an investigation, the Deputy District Attorney was

23   ultimately instructed by COUNTY and the District Attorney to close the case and

24

25   pursue it no further," as set forth in paragraph 18 of the Complaint, or otherwise.

26   ///

27

28

LIE~~'T CASSIDY WHITMORE
assional Law Corporation
6033 ... Century Boulevard, Suite 500
Los Angeles, CA 90045

**Ex. 3**

**INTERROGATORY NO. 3**

Please state all facts upon which Plaintiff bases the contention that the "District Attorney approved the case but later rejected the case on the Sheriff's Department's request," as set forth in paragraph 23 of the Complaint, or otherwise.

**INTERROGATORY NO. 4**

Please state all facts upon which Plaintiff bases the contention that "[a]fter each incident where TACKETT refused to look the other way on the criminal activity of a high profile campaign contributor or family members and elected officials, he was issued an Internal Audit based on falsified information and suspended from duty," as set forth in paragraph 25 of the Complaint, or otherwise.

**INTERROGATORY NO. 5**

Please state all facts upon which Plaintiff bases the contention that "[a]fter each incident, TACKETT followed all internal grievance procedures regarding the falsified Internal Audits," as set forth in paragraph 26 of the Complaint, or otherwise.

**INTERROGATORY NO. 6**

Please state all facts upon which Plaintiff bases the contention that Plaintiff "reported his concerns of interference with law enforcement activities to his superiors at the COUNTY because it is a crime to interfere, participate or further the commission of criminal activity" as set forth in paragraph 27 of the Complaint, or otherwise.

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 Century Boulevard, Suite 500
Los Angeles, CA 90045

177570.1 IN0040-015

- 3 -

**Ex. 3**

DEFENDANTS' FIRST SET OF ROGS

181

**INTERROGATORY NO. 7**

Please state all facts upon which Plaintiff bases the contention that Plaintiff "expressed his concern that he would be complicit in these crimes if he complied with his superior's orders and he did not want to participate in any such illegal activity" as set forth in paragraph 27 of the Complaint, or otherwise.

**INTERROGATORY NO. 8**

Please state all facts upon which Plaintiff bases the contention that "[i]n retaliation for TACKETT's refusal to ignore crimes of the well connected and due to his reported concerns in this regard, COUNTY intentionally sabotaged TACKETT's promotional and transfer positions, changed panel scores, procedures for transfer positions and revealed confidential information about TACKETT in violation of the Peace Officer Bill of Rights," as set forth in paragraph 29 of the Complaint, or otherwise.

**INTERROGATORY NO. 9**

Please state all facts upon which Plaintiff bases the contention that "[t]he officer who interviewed him in that case later became his Chief and it was clear that the Chief continued to hold a grudge against TACKETT due to his service as a witness," as set forth in paragraph 30 of the Complaint, or otherwise.

///

///

LIEP ... CASSIDY WHITMORE
sional Law Corporation
6033 ... Century Boulevard, Suite 500
Los Angeles, CA 90045

177570.1 IM040-015

- 4 -

**Ex. 3**

182

LIEP?T CASSIDY WHITMORE
ssional Law Corporation
6035  Century Boulevard, Suite 500
Los Angeles, CA 90045

**INTERROGATORY NO. 10**

Please state all facts upon which Plaintiff bases the contention that "TACKETT also noticed that he, as well as other Caucasian and Black deputies, were not provided preferential assignments given to Hispanic Deputies," as set forth in paragraph 31 of the Complaint, or otherwise.

**INTERROGATORY NO. 11**

Please state all facts upon which Plaintiff bases the contention that "COUNTY approached several Deputies and requested that they falsify reports regarding Caucasian Deputies including TACKETT," as set forth in paragraph 32 of the Complaint, or otherwise.

**INTERROGATORY NO. 12**

Please state all facts upon which Plaintiff bases the contention that "TACKETT reported his concerns of illegal favoritism based on race to his superiors at the COUNTY," as set forth in paragraph 33 of the Complaint, or otherwise.

**INTERROGATORY NO. 13**

Please state all facts upon which Plaintiff bases the contention that "COUNTY advised TACKETT not to perform the functions of his job," as set forth in paragraph 34 of the Complaint, or otherwise.

///

DEFENDANTS' FIRST SET OF ROGS

**Ex. 3**

183

1

**INTERROGATORY NO. 14**

2

3

Please state all facts upon which Plaintiff bases the contention that

4 "COUNTY instructed its deputies not to provide backup to TACKETT and to 'stay

5 away' from TACKETT," as set forth in paragraph 36 of the Complaint, or

6

otherwise.

7

8 **INTERROGATORY NO. 15**

9

Please state all facts upon which Plaintiff bases the contention that "[t]his

10

11 instruction was communicated to TACKETT," as set forth in paragraph 37 of the

12 Complaint, or otherwise.

13 **INTERROGATORY NO. 16**

14

15 Please state all facts upon which Plaintiff bases the contention that "[w]hile

16 in the line of duty, TACKETT was in numerous situations where he feared no

17 backup would arrive, even if called for, leaving him in grave danger," as set forth in

18

19 paragraph 38 of the Complaint, or otherwise.

20 **INTERROGATORY NO. 17**

21

Please state all facts upon which Plaintiff bases the contention that "[a]fter

22

23 TACKETT's forced resignation, COUNTY continued to violate and attempt to

24 violate TACKETT'S Police Office [sic] Bill of Rights and invaded his privacy

25 rights," as set forth in paragraph 41 of the Complaint, or otherwise.

26

27 ///

28

LIEP~°T CASSIDY WHITMORE
ssional Law Corporation
6035 . . Century Boulevard, Suite 500
Los Angeles, CA 90045

**Ex. 3**

DEFENDANTS' FIRST SET OF ROGS

184

## INTERROGATORY NO. 18

Please state all facts upon which Plaintiff bases the contention that Plaintiff "suffered adverse consequences in the workplace following his refusal to overlook or participate in illegalities; his reports of his refusal to commit obstruction of justice; his reports of disparate treatment based on illegal racial favoritism; and his reports of COUNTY's inherent interference and threats to his right to life," as set forth in paragraph 53 of the Complaint, or otherwise.

## INTERROGATORY NO. 19

Please state all facts upon which Plaintiff bases the contention that the "retaliatory backlash which followed shortly after TACKETT's reports included groundless suspensions, denied merit increases, unfounded write-ups and false internal audits," as set forth in paragraph 54 of the Complaint, or otherwise.

## INTERROGATORY NO. 20

Please state all facts upon which Plaintiff bases the contention that "TACKETT suffered and continues to suffer a loss of income, benefits and additional amounts of money he would have received had Defendants not violated his rights," as set forth in paragraph 56 of the Complaint, or otherwise.

///

///

///

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 Century Boulevard, Suite 500
Los Angeles, CA 90045

**Ex. 3**

DEFENDANTS' FIRST SET OF ROGS

185

## INTERROGATORY NO. 21

Please state all facts upon which Plaintiff bases the contention that Plaintiff "suffered intangible losses of employment-related opportunities as a result of Defendant's unlawful misconduct," as set forth in paragraph 56 of the Complaint, or otherwise.

## INTERROGATORY NO. 22

Please state all facts upon which Plaintiff bases the contention that "TACKETT has also suffered non-economic injuries as a direct result of each Defendant's unlawful conduct, including, but not limited to mental anguish, physical distress, defamation of character and humiliation," as set forth in paragraph 56 of the Complaint, or otherwise.

## INTERROGATORY NO. 23

Please state all facts upon which Plaintiff bases the contention that "COUNTY, under color of authority of statute, ordinance, regulation, custom, usage, and/or of the State, caused TACKETT to be deprived of his rights, privileges and immunities secured by the Constitution and other laws," as set forth in paragraph 69 of the Complaint, or otherwise.

///

///

///

LIEP⌐⌐T CASSIDY WHITMORE
ssional Law Corporation
6035  Century Boulevard, Suite 500
Los Angeles, CA 90045

**Ex. 3**

DEFENDANTS' FIRST SET OF ROGS

186

**INTERROGATORY NO. 24**

Please state all facts upon which Plaintiff bases the contention that "Defendants, and each of them, acted outrageously towards TACKETT in the manners detailed above," as set forth in paragraph 88 of the Complaint, or otherwise.

**INTERROGATORY NO. 25**

Please state all facts upon which Plaintiff bases the contention that "defendants acted with malice, fraud or oppression and in reckless disregard of TACKETT's rights with the intent to cause injury and emotional distress to TACKETT," as set forth in paragraph 91 of the Complaint, or otherwise.

Dated:  November 21, 2005

Liebert Cassidy Whitmore

By: _____
J. Scott Tiedemann
Mark H. Meyerhoff
Attorneys for Defendants
County of Imperial, et al.

LIEBERT CASSIDY WHITMORE
A
ssional Law Corporation
6033    _entury Boulevard, Suite 500
Los Angeles, CA 90045

177570.1 IM040-015

- 9 -

DEFENDANTS' FIRST SET OF ROGS

**Ex. 3**

187

## PROOF OF SERVICE BY MAIL

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 6033 W. Century Boulevard, Suite 500, Los Angeles, California 90045. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. On November 21, 2005, I placed with this firm at the above address for deposit with the United States Postal Service a true and correct copy of the within document(s): **DEFENDANTS' COUNTY OF IMPERIAL AND IMPERIAL COUNTY SHERIFF'S DEPARTMENT FIRST SET OF SPECIAL INTERROGATORIES TO PLAINTIFF JUSTIN TACKETT** in a sealed envelope, postage fully paid, addressed as follows:

>       Joe B. Cordileone, Esq.
>       Cynthia L. Stratton, Esq.
>       Silvia V. Townsend, Esq.
>       JOE B. CORDILEONE &
>       ASSOCIATES
>       438 Camino del Rio South, Suite 213
>       San Diego, California 92108

Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 21, 2005, at Los Angeles, California.

Bernadette V. Wilson

177048.1 IM040-015

**Ex. 3**

[PROPOSED] DISCOVERY PLAN

188

CYNTHIA L. STRATTON, ESQ. (BAR NO. 185652)
**Joe B. Cordileone & Associates**
438 Camino Del Rio South, Suite 213
San Diego, CA  92108
(619) 718-4820

Attorney for Plaintiff, **JUSTIN TACKETT**

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN TACKETT, an individual | ) Case No.:  04CV2459 J (AJB) |
| Plaintiff, | ) |
| v. | ) **RESPONSE TO DEFENDANTS, COUNTY** |
| | ) **OF IMPERIAL AND IMPERIAL COUNTY** |
| COUNTY OF IMPERIAL, a governmental | ) **SHERIFF'S DEPARTMENT'S SPECIAL** |
| entity, and IMPERIAL COUNTY SHERIFF'S | ) **INTERROGATORIES, SET ONE** |
| DEPARTMENT, a governmental entity doing | ) |
| business in the State of California; and | ) |
| DOES 1 through 50, inclusive, | ) |
| Defendants. | ) |
| | ) |
| | ) |

PROPOUNDING PARTY: COUNTY OF IMPERIAL, IMPERIAL COUNTY SHERIFF'S

DEPT.

RESPONDING PARTY:   JUSTIN TACKETT

SET NUMBER:        ONE

TO: ALL PARTIES HEREIN AND TO THEIR RESPECTIVE ATTORNEY'S OF RECORD

Plaintiff, JUSTIN TACKETT responds to Defendant's Special Interrogatories  (Set No.
One) as follows:

### PRELIMINARY STATEMENT:

These responses are made solely for the purpose of, and in relation to, this action.

Each answer is given subject to all appropriate objections (including, but not limited to,

**Ex. 4**

189

1   objections concerning privilege, relevancy and hearsay) which would require the exclusion

2   of any statement contained herein if the interrogatory were asked of, or a statement

3   contained herein were made by, a witness testifying in court.  All such objections and

4   grounds therefore are reserved and may be interposed at the time of trial.  The assertion of

5   any objection in any response to an interrogatory shall <u>not</u> be construed as a waiver of any

6   other objection to that or any other interrogatory.

7        The party on whose behalf the answers are given has not yet completed its

8   investigation of the facts relating to this litigation, has not yet completed discovery in this

9   action, and has not yet completed preparation for trial.  Consequently, the following answers

10  are given without prejudice to the answering party's right to produce at the time of trial

11  evidence subsequently discovered to be relevant.

12       Except for facts exclusively admitted herein, no admission of any nature whatsoever

13  is to be implied or inferred.  The fact that an interrogatory herein has been answered should

14  not be taken as an admission or as a concession of the existence of any fact as set forth or

15  assumed.  All answers are given on the basis of present recollection.

16       The foregoing preliminary statement is incorporated by reference to each of the

17  following responses.

18

19  <u>RESPONSE TO SPECIAL INTERROGATORY 1:</u>

20  Plaintiff has made drug busts that have been noted in departmental report logs that have

21  been noted in the local newspaper, Department of Justice statistic reports, and the Narcotic

22  Task Force/Drug Enforcement Administration report log.  These crimes are noted due to

23  their severity or high interest in noting such crimes within the community.  Such crimes

24  include, met amphetamine clandestine labs discovered in North Holtville on Holt Road

25  (mobile lab), East of Holtville on Highway 115 (mobile lab), North of Brawley off Highway

26  111, at the Del Rio Country Club (mobile lab), Southside of Niland (residential lab), and

27  downtown Brawley off of Main Street (residential lab).  Plaintiff was also involved in "High

28  profile" crimes such as the distribution of narcotics Wet of Brawley off Carter Road and

**Ex. 4**

**190**

marijuana cultivation West of Brawley off of Highway 86. Plaintiff arrested Randal Lackey (Brother In-law to a retired reserve officer and close friend to Sergeant, Chief, Sheriff, and former Sheriff), Reno Bertussi (Brother In-law to Board of Supervisor Hank Kuiper), and suspect Niaz Mohammed (Close friend and campaign contributor to District Attorney Gilbert Otero and Board of Supervisors, close friend to Sergeant Joe Nava, and campaign contributor to Sheriff election and re-election campaigns).

**RESPONSE TO SPECIAL INTERROGATORY 2:**

Special Prosecution Deputy District Attorney John Weiss advised Plaintiff that he was prepared to initiate an investigation, the Deputy District Attorney was ultimately instructed by County and the District Attorney to close the case and pursue it no further.

**RESPONSE TO SPECIAL INTERROGATORY 3:**

Plaintiff basis his contention on the Case Handling Form in the Reno Bertussi Internal Affairs case and upon a conversation with the District Attorney and Assistant District Attorney.

**RESPONSE TO SPECIAL INTERROGATORY 4:**

Plaintiff basis his contention on the Internal Affairs case that the Imperial County Sheriff's Department conducted on Reno Bertussi and Randal Lackey.

**RESPONSE TO SPECIAL INTERROGATORY 5:**

Plaintiff basis his contention upon the numerous grievances he submitted, the Internal Affairs investigations conducted and memos to the Imperial County Sheriff's Department personnel and the County of Imperial personnel.

**RESPONSE TO SPECIAL INTERROGATORY 6:**

Plaintiff basis his contention upon his grievances, Internal Affairs Investigation, memos to the Imperial County Sheriff's Department personnel and the memos to the County of Imperial personnel.

/ / / /

/ / / /

**Ex. 4**

191

1  **RESPONSE TO SPECIAL INTERROGATORY 7:**

2  Plaintiff basis his contention upon his grievances, Internal Affairs Investigation, memos to

3  the Imperial County Sheriff's Department personnel and the memos to the County of

4  Imperial personnel.

5  **RESPONSE TO SPECIAL INTERROGATORY 8:**

6  Plaintiff basis his contention upon a verbal communication by a panel member's counterpart

7  of the wrong-doings.

8  **RESPONSE TO SPECIAL INTERROGATORY 9:**

9  Plaintiff basis his contention upon facts contained in Internal Affairs cases that the Imperial

10  County Sheriff's Department conducted on Plaintiff, numerous grievances to County of

11  Imperial and a memo submitted to Chief in regards to Code of silence.

12  **RESPONSE TO SPECIAL INTERROGATORY 10:**

13  Plaintiff basis his contention upon conversations with both Caucasian and Black deputies

14  within the department.

15  **RESPONSE TO SPECIAL INTERROGATORY 11:**

16  Plaintiff basis his contention upon a communication made to Plaintiff by Deputy Fricke,

17  Deputy Dinsmoor, Deputy Carrasco and Deputy Lindberg.

18  **RESPONSE TO SPECIAL INTERROGATORY 12:**

19  Plaintiff basis his contention upon facts set forth in Internal Affairs cases that the Imperial

20  County Sheriff's Department conducted, Plaintiff's letter to the County of Imperial and verbal

21  communications to Imperial County Sheriff's Department personnel.

22  **RESPONSE TO SPECIAL INTERROGATORY 13:**

23  Plaintiff basis his contention upon facts set forth in Internal Affairs case that the Imperial

24  County Sheriff's Department conducted in reference to Sergeant Avila alleged

25  insubordination, Randal Lackey, Niaz Mohammed, Sergeant Avila's memos regarding

26  duties while on patrol and verbal communication to Plaintiff by Sergeant Avila and Sergeant

27  King. It was verbally re-enforced by Chief Housouer upon verbal complaint to her as a

28  direct supervisor.

**Ex. 4**

192

**RESPONSE TO SPECIAL INTERROGATORY 14:**

Plaintiff basis his contention upon facts set forth upon a verbal communication by Deputy Lopez.

**RESPONSE TO SPECIAL INTERROGATORY 15:**

Plaintiff basis his contention upon facts set forth upon a verbal communication by Deputy Lopez.

**RESPONSE TO SPECIAL INTERROGATORY 16:**

Plaintiff basis his contention upon verbal communication with numerous deputies within the department.

**RESPONSE TO SPECIAL INTERROGATORY 17:**

Plaintiff basis his contention upon discussion with Deputy De La Rosa Sr. in regards to medical records in my personnel file in violation of H.I.P.P.A. codes.

**RESPONSE TO SPECIAL INTERROGATORY 18:**

Plaintiff basis his contention upon grievances, Internal Affairs Investigations, memos to the Imperial County Sheriff's Department personnel and the County of Imperial personnel.

**RESPONSE TO SPECIAL INTERROGATORY 19:**

Plaintiff basis his contention upon grievances, Internal Affairs Investigations, memos to the Imperial County Sheriff's Department personnel and the County of Imperial personnel. Additionally, Plaintiff bases his contentions on verbal communication with other deputies with similar or more severe actions with no or less punishment. Plaintiff was never allowed to be off of Internal Affairs investigations as the department continued its onslaught to prevent him from due process of appealing decisions and Sheriff Carter's statement that the Sheriff's Department didn't start investigations on deputies, but had to be started by outside compliant.

**RESPONSE TO SPECIAL INTERROGATORY 20:**

Plaintiff applied at numerous law enforcement agencies including Brawley Police Department, Calipatria Police Department, Imperial Police Department, Indio Police

**Ex. 4**

193

1 | Department, Kern County Police Department, Ridgecrest Police Department, El Cajon

2 | Police Department, and the United States Border Patrol.

3

4

5

6 | Dated: _1-5-06_

By _Cynthia L. Stratton_

7 | **CYNTHIA L. STRATTON, ESQ.**
Attorneys for Plaintiff, **JUSTIN TACKETT**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Ex. 4**

194

*Tackett vs. County of Imperial, et al.*
U.S. District Court –Southern District Case No. 04cv2459 J(AJB)

## PROOF OF SERVICE

I, the undersigned, declare:

I am a citizen of the United States of America, am over the age of eighteen (18) years, and not a party to the within action. I am an employee of Joe B. Cordileone & Associates, and my business address is 438 Camino del Rio South, Suite 213, San Diego, CA  92108. On the date below, I caused to be served the following documents:

RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)
RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

on the parties involved addressed as follows:

J. Scott Tiedemann, Esq.
Mark Meyerhoff, Esq.
Liebert, Cassidy, Whitmore
6033 W. Century Blvd., Suite 500
Los Angeles, CA  90045-6410
Tel: 310-981-2000
Fax:310-337-0837

(✓)   **BY MAIL:** I caused each envelope, with postage thereon fully prepaid, to be placed in the United States mail at San Diego, California. I am readily familiar with the business practice for collection and processing of mail in this office; and that in the ordinary course of business said documents would be deposited with the U.S. Postal Service in San Diego on that same day. I understand that service shall be presumed invalid upon motion of a party served if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing contained in this declaration.

( )   **BY PERSONAL DELIVERY:** I caused each such envelope to be delivered by hand to the offices of each addressee above.   '

( )   **BY FACSIMILE:** By use of facsimile machine telephone number (619) 718-4825, I served a copy of the documents(s) on the above interested parties at the facsimile number(s) listed above. The transmission was reported as complete and without error. The transmission report, which is attached to this proof of service, was properly issued by the transmitting facsimile machine.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _5th_ day of January, 2006, at San Diego, California.

Jennifer Cannone

PROOF OF SERVICE

**Ex. 4**

195

1  CYNTHIA L. STRATTON, ESQ. (BAR NO. 185652)
   **Joe B. Cordileone & Associates**
2  438 Camino Del Rio South, Suite 213
   San Diego, CA  92108
3  (619) 718-4820

4

5  Attorney for Plaintiff, **JUSTIN TACKETT**

6

7                  UNITED STATES DISTRICT COURT

8                SOUTHERN DISTRICT OF CALIFORNIA

9
   JUSTIN TACKETT, an individual        ) Case No.:  04CV2459 J (AJB)
10                                       )
                  Plaintiff,             ) **SUPPLEMENTAL RESPONSE TO**
11                                       ) **DEFENDANTS, COUNTY OF IMPERIAL**
           v.                            ) **AND IMPERIAL COUNTY SHERIFF'S**
12                                       ) **DEPARTMENT'S SPECIAL**
   COUNTY OF IMPERIAL, a governmental    ) **INTERROGATORIES, SET ONE**
13 entity, and IMPERIAL COUNTY SHERIFF'S )
   DEPARTMENT, a governmental entity doing)
14 business in the State of California; and )
15 DOES 1 through 50, inclusive,         )
                                         )
16              Defendants.              )
                                         )
17                                       )
                                         )
18  _____

19
   PROPOUNDING PARTY: COUNTY OF IMPERIAL, IMPERIAL COUNTY SHERIFF'S
20
   DEPT.
21
   RESPONDING PARTY:   JUSTIN TACKETT
22
   SET NUMBER:         ONE
23
   TO: ALL PARTIES HEREIN AND TO THEIR RESPECTIVE ATTORNEY'S OF RECORD
24
       Plaintiff, JUSTIN TACKETT responds to Defendant's Supplemental Special
25
   Interrogatories  (Set No. One) as follows:
26
                      PRELIMINARY STATEMENT:
27
       These responses are made solely for the purpose of, and in relation to, this action.
28
   Each answer is given subject to all appropriate objections (including, but not limited to,

                                    **Ex. 5**
                                    196

1  objections concerning privilege, relevancy and hearsay) which would require the exclusion

2  of any statement contained herein if the interrogatory were asked of, or a statement

3  contained herein were made by, a witness testifying in court.  All such objections and

4  grounds therefore are reserved and may be interposed at the time of trial.  The assertion of

5  any objection in any response to an interrogatory shall <u>not</u> be construed as a waiver of any

6  other objection to that or any other interrogatory.

7        The party on whose behalf the answers are given has not yet completed its

8  investigation of the facts relating to this litigation, has not yet completed discovery in this

9  action, and has not yet completed preparation for trial.  Consequently, the following answers

10  are given without prejudice to the answering party's right to produce at the time of trial

11  evidence subsequently discovered to be relevant.

12        Except for facts exclusively admitted herein, no admission of any nature whatsoever

13  is to be implied or inferred.  The fact that an interrogatory herein has been answered should

14  not be taken as an admission or as a concession of the existence of any fact as set forth or

15  assumed.  All answers are given on the basis of present recollection.

16        The foregoing preliminary statement is incorporated by reference to each of the

17  following responses.

18  <u>INTERROGATORY 1:</u>

19  Please state all facts upon which Plaintiff bases the contention that "[w]hile on patrol,

20  TACKETT made several high profile drug busts and arrests," as set forth in paragraph 12 of

21  the Complaint, or otherwise.

22  <u>RESPONSE TO SPECIAL INTERROGATORY 1:</u>

23  Plaintiff has made drug busts that have been noted in departmental report logs that have

24  been noted in the local newspaper, Department of Justice statistic reports, and the Narcotic

25  Task Force/Drug Enforcement Administration report log.  These crimes are noted due to

26  their severity or high interest in noting such crimes within the community.  Such crimes

27  include, met amphetamine clandestine labs discovered in North Holtville on Holt Road

28  (mobile lab), East of Holtville on Highway 115 (mobile lab), North of Brawley off Highway

**Ex. 5**

197

1  111, at the Del Rio Country Club (mobile lab), Southside of Niland (residential lab), and

2  downtown Brawley off of Main Street (residential lab).  Plaintiff was also involved in "High

3  profile" crimes such as the distribution of narcotics Wet of Brawley off Carter Road and

4  marijuana cultivation West of Brawley off of Highway 86.  Plaintiff arrested Randal Lackey

5  (Brother In-law to a retired reserve officer and close friend to Sergeant, Chief, Sheriff, and

6  former Sheriff), Reno Bertussi (Brother In-law to Board of Supervisor Hank Kuiper), and

7  suspect Niaz Mohammed (Close friend and campaign contributor to District Attorney Gilbert

8  Otero and Board of Supervisors, close friend to Sergeant Joe Nava, and campaign

9  contributor to Sheriff election and re-election campaigns).

10  **INTERROGATORY 2:**

11  Please state all facts upon which Plaintiff bases the contention that "(w)hile on patrol,

12  TACKETT made several high profile drug busts and arrests," as set forth In paragraph 12 of

13  the Complaint, or otherwise.

14  **RESPONSE TO SPECIAL INTERROGATORY 2:**

15      1. It is unknown of the dates and times this was communicated to Plaintiff, at

16         this time.

17      2. Conversations between Deputy District Attorney Weis and Plaintiff were

18         verbal.

19      3. Deputy DA Weis stated (generally speaking) he was not allowed to proceed

20         further due to order by DA Gilbert Otero to not proceed further on case.

21      4. Not known, at this time, if anyone was present.

22      5. Deputy DA Weis advised Plaintiff of this in conversations between them on

23         this issue.

24      6. Plaintiff didn't witness conversation between DA and Deputy DA Weis.

25      7. Remarks on this issue were made in different locations.  Those conversations

26         can only be recalled occurring at El Centro Courthouse, Eagles in El Centro,

27         and Jail Court at this time.

28

**Ex. 5**

198

1    INTERROGATORY 3:

2    Please state all facts upon which Plaintiff bases the contention that the "District Attorney

3    approved the case but later rejected the case on the Sheriff's Department request," as set

4    forth in paragraph 23 of the Complaint, or otherwise.

5    RESPONSE TO SPECIAL INTERROGATORY 3:

6        1.  The complaint form filed against Reno Bertussi was filed on June 23, 2003

7            (per stamp) with the Imperial County District Attorney's Office.  For some

8            reason, unknown at this time, a second stamped received date was made on

9            June 25, 2003.  This file was approved by Deputy DA Queenan, but rejected

10           months later on 10-31-03, by Deputy DA Barrett – newly hired Deputy DA.

11       2.  It is unknown who prepared the complaint, at this time.

12       3.  The complaint has the following charges written upon it:  243 PC, 487 PC,

13           496(a) PC, 594 PC, 245(a)(1) PC / 17(b) PC, 242/243 PC, and 484 PC.  The

14           complaint also states Mr. Bertussi's full name and date of birth.  It has the

15           boxes checked for an approved complaint and rejected complaint.  It also has

16           a written summary that can not be completely deciphered.

17       4.  Plaintiff received access to complaint form when he received a copy of his

18           Internal Affair on this incident.

19       5.  The conversation between the DA and the Assistant DA was held in the DA's

20           personal office with Plaintiff's father.  Plaintiff was told by his father that DA

21           Otero had advised him that the Sheriff's Dept. approached their office to

22           dismiss the charges.  It was at this point that the DA's office rejected the

23           complaint.

24   INTERROGATORY 4:

25       Please state all facts upon which plaintiff bases the contention that, "[a]fter each

26       incident where TACKETT refused to look the other way in criminal activity of a

27       high profile campaign contributor or family members and elected officials, he was

**Ex. 5**

199

1   issued an Internal Audit based on falsified information and suspended from duty,"

2   as set forth in paragraph 25 of the Complaint, or otherwise.

3   <u>RESPONSE TO SPECIAL INTERROGATORY 4:</u>

4      1.  Charges of misconduct and illegal omissions are inaccurate.  The Complaint

5         against Bertussi was changed after the DA's office was approached by the

6         Sheriff's Dept. and then used the rejected complaint against me in justifying

7         their reasons for suspending Plaintiff.

8      2.  Probable cause was achieved by Plaintiff and citizen arrest forms' were signed

9         against Bertussi.  Obvious impacts to victims were witnessed by Plaintiff and

10        Co-workers (deputies).

11     3.  Consent was obtained to search Bertussi's shed.

12     4.  Bertussi, on his own admissions, met the elements of the crime for grand theft

13        and possession of stolen property.

14

15     5.  Bertussi's wife gave deputies and Plaintiff permission to enter residence to

16        retrieve stolen property.  All officers present corroborated Plaintiff's version of

17        incident.

18     6.  Bertussi's wife concentually agreed to allow property to be returned.

19     7.  Plaintiff didn't violate any laws or policies in actions against Lackey.

20     8.  Lackey's residence wasn't directly illuminated by Plaintiff.

21     9.  Lackey was advised of section 148 PC and the explanation of how it applied

22        three different times before he was arrested for 148 PC and 243 PC – battery

23        upon a peace officer.

24    10. Plaintiff was not allowed to collect evidence of crime and investigation was

25        corrupted and impeded by Sergeant King.  Even after a verbal request for

26        such evidence was made to Sergeant King along with the explanation of

27        reasons for the collection.

28

**Ex. 5**

200

11. Sheriff's Dept. failed to factor and acknowledges the personal friendship between the complaining parties and the individuals (Chief Housouer and Sergeant King) within the department who initiated the investigation against the Plaintiff.

12. Plaintiff and County possess correspondence that advises Plaintiff he is being suspended on this incidences mentioned.

## INTERROGATORY 5:

Please state all facts upon which Plaintiff bases the contention that [a]fter each incident, TACKETT followed all internal grievance procedures regarding the falsified Internal Audits," as set forth in paragraph 26 of the Complaint, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 5:

Plaintiff filed verbal complaints to his supervisors – Chief Prince, Sergeant Obeso, Sergeant Pompeyo Tabarez Sr., and others, in written grievances filed with the department and county, in written resignation letter, verbally in Skelly Hearings with Sheriff Carter, in Employment Appeals Board Hearing, in E.E.O.C complaint, in Plaintiff's Unemployment Appeals Hearings, and in his federal lawsuit filed against COUNTY.

## INTERROGATORY 6:

Please state all facts upon which Plaintiff bases the contention that Plaintiff "reported his concerns of interference with law enforcement with law enforcement activities to his superiors at the COUNTY because it is a crime to interfere, participate or further the commission of criminal activity" as set forth in paragraph 27 of the Complaint, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 6:

Plaintiff reported actions by Sergeant Avila to Chief Housouer, Assistant Sheriff Schneewind, Sheriff Carter, and COUNTY by filing grievances along with verbally complaining. Plaintiff reported illegal or hostile actions by Sergeant Avila and Chief Housouer to Sergeant Tabarez Sr. and Sergeant David Obeso.

**Ex. 5**
201

**INTERROGATORY 7:**

Please state all facts upon which Plaintiff bases the contention that Plaintiff, "expressed his concern that he would be complicit in these crimes if he complied with his superior's orders and did not want to participate in any such illegal activity" as set forth in paragraph 27 of the Complaint, or otherwise.

**RESPONSE TO SPECIAL INTERROGATORY 7:**

*Plaintiff advised Chief Housouer of the perceived problems noted in the federal lawsuit after Plaintiff received memos of actions targeting only him.*

**INTERROGATORY 8:**

Please state all facts upon which Plaintiff bases the contention that "[I]n retaliation for TACKETT's refusal to ignore crimes of the well connected and due to his reported concerns in this regard, COUNTY intentionally sabotaged TACKETT's promotional and transfer positions, changed panel scores, procedures for transfer positions and revealed confidential information about TACKETT in violation of the Peace Officer Bill of Rights," as set forth in paragraph 29 of the Complaint, or otherwise.

**RESPONSE TO SPECIAL INTERROGATORY 8:**

1. Plaintiff was isolated as co-workers feared assisting or interacting with Plaintiff would lead to punishment or termination by the Department.

2. Plaintiff was dramatically reduced for overtime as he was being punished by Department administrators financially by not allowing him overtime, even though it was available. Noted in Plaintiff's notebook.

3. Plaintiff's promotions were not allowed or sabotaged, illegally altered.  Canine interviews were sabotaged by Department.  Department advised interviewing board of past internal affairs complaints against me which was illegal and unethical and done with intent to impede me from getting the position.  Plaintiff was advised the scores/results of the applicants for the position were changed.  Plaintiff was advised of these acts by a co-worker and friend of a

**Ex. 5**

202

member of the interview board.  The member was from The United States Border Patrol.

4. Plaintiff was advised by the Chief Housouer that he was not allowed to gain or achieve special assignments such as a Field Training Officer, due to the fact that Plaintiff didn't possess over two years of experience and clear of internal affairs or investigations.  This was not enforced for other employees such as Mike Mistrial - Field Training Officer, Deputy Erro and Deputy Fried – S.E.R.T., and more recently Deputy Bostic - Canine Handler.  These are just a few examples of individuals who have received positions plaintiff was advised would not be allowed to obtained or achieved.

5. At the current time, Plaintiff cannot recall all the specific dates and times, along with all allegations into the grievances and internal affairs asked of.

6. Plaintiff ability for a special assignment within DEA was interfered with by appointing Deputy Soto to the position and not allowing an interview panel as conducted before.  This was due to the fact that Plaintiff was believed to be the next deputy in-line for this position.  Plaintiff was even brought to meet the Special Agent in-charge for the area by Deputy Mike Leon and Deputy Brewer, as it was their belief Plaintiff was the next appropriate individual.  The above deputies were the current deputies occupying the position to be filled.

## INTERROGATORY 9:

Please state all facts upon which Plaintiff bases the contention that "[t]he officer who interviewed him in that case later became his Chief and it was clear the Chief continued to hold a grudge against TACKETT due to his service as a witness," as set forth in paragraph 30 of the Complaint, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 9:

1. Chief Housouer allowed the illegal acts and harassments by Sergeant Avila against Plaintiff.

**Ex. 5**

203

2. Chief Housouer elevated suspension days against Plaintiff upon him acting on rights if attorney representation. This was documented and stated as retaliation in the decision made by the employment appeals board.

3. Chief Housouer advising to not request for special details as Plaintiff didn't meet requirement minimums.

4. Chief Housouer was upset do to me not structuring investigation against her secretary's in-law family member. This family member had been in physical and verbal conflict for some time. This family members' name was Larry Wyatt and his son, Miles Wyatt. Chief Housouer had placed me into investigations just to investigate this particular individual, but was removed from that position when Plaintiff eliminated them as suspects. Plaintiff was even made aware of these family conflicts involving Dorothy Wyatt and husband, Gary Wyatt. Including an incident involving Sheriff Department's issued red pick-up truck and it being used in a manner that could be seen as an assault with a deadly weapon and being run off the road.

## INTERROGATORY 10:

Please state all facts upon which Plaintiff bases the contention that "TACKETT also noticed that he, as well as other Caucasian and Black deputies, were not provided preferential assignments given to Hispanic deputies," as set forth in paragraph 3 of the Complain, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 10:

1. Plaintiff has held conversations with Deputy J.A. Higgins, Deputy Fowler, Deputy Garin, Deputy White, Deputy Fricke, Deputy Dinsmoor, Deputy Fannin, Deputy Smith, and Deputy Kincy.

2. Plaintiff cannot recall at this time place, time, dates, and specifics of the conversations.

**Ex. 5**

204

3. Letter written to Deputy Fricke by Sergeant Avila as president of the Association appeared to be racist in itself. This letter was read aloud in an executive board meeting that I was present at. I expressed my displeasure with this letter to Deputy Tabarez Jr. Plaintiff cannot recall the specific time, date, and conversation with Deputy Tabarez Jr.

4. Plaintiff ability for a special assignment within DEA was interfered with by appointing Deputy Soto to the position and not allowing an interview panel as conducted before. This was due to the fact that Plaintiff was believed to be the next deputy in-line for this position. Plaintiff was even brought to meet the Special Agent in-charge for the area by Deputy Mike Leon and Deputy Brewer, as it was their belief Plaintiff was the next appropriate individual. The above deputies were the current deputies occupying the position to be filled. Deputy Soto was a Hispanic deputy.

## INTERROGATORY 11:

Please state all facts upon the contention that "COUNTY approached several Deputies and requested that they falsify reports regarding Caucasian Deputies including TACKETT," as set forth in paragraph 32 of the Complaint, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 11:

Communication with Deputy Carrasco was held in personnel parking lot at an unknown time and date, at this time. Communication with Deputy Fricke and Deputy Dinsmoor was held at the same time outside the residence of Deputy Dinsmoor at an unknown time and date, at this time. Communication with Deputy Lindberg was held over the cellular phone while he was on suspension and in Mexicali, other specifics are not known at this time.

## INTERROGATORY 12:

Please state all facts upon which Plaintiff bases the contention that "TACKETT reported his concerns of illegal favoritism based on race to his superiors at the COUNTY," as set forth in paragraph 33 of the Complaint, or otherwise.

**Ex. 5**

205

## RESPONSE TO SPECIAL INTERROGATORY 12:

1. Plaintiff advised in internal affairs hearings that he felt the investigation was made against himself due to Sergeant Avila being Hispanic. Specifics to time, date, and specifics of conversations are not available at this time.

2. Plaintiff reported this actions and belief to J.B. Higgins in regards to favoritism by race. Specifics to time, date, and specifics of conversations are not available at this time.

3. These concerns can be found in transcribed interviews that were completed by the Sheriff's Department. Specifics to time, date, and specifics of conversations are not available at this time.

## INTERROGATORY 13:

Please state all facts upon which Plaintiff bases the contention that "COUNTY advised TACKETT not to perform the functions of his job," as set forth in paragraph 34 of the Complaint, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 13:

1. Plaintiff was advised not to advise residents that moved from County to City jurisdiction that they need to comply with re-registering within that city by Sergeant Avila. This was advised to Plaintiff over the cellular phone at an unknown specific time and date, at this time.

2. Sergeant Avila advised verbally and noted in a memo, that I was not to act on any crime being committed in my presence and to just contact that cities police department. I was verbally advised not to address a crime in city jurisdiction unless someone is being murdered and then amended that to just drive around and a call is dispatch to me. This was advised to Plaintiff at an unknown specific time and date, at this time.

**Ex. 5**

**206**

3.  My performance evaluations were absorbingly late and tardy, and intentionally sabotaged to further punish Plaintiff.   Specifics to time, date, and specifics of *conversations are not available at this time.*

4.  DA Gilbert Otero intentionally impeded an investigation into a suspected marijuana grower that Plaintiff had information was involved in, but was not allowed to pursue because of a close friendships and campaign contributor. Plaintiff was advised by Agent Seaman to ignore pursuing the suspect and the *crime in unspecific terms.  This is what I can recall at this time.*

5.  Plaintiff is unaware of the specific times, dates, and statements of all memos that were submitted at this time, but COUNTY should be in possession of them.

**INTERROGATORY 14:**

Please state upon all facts upon which Plaintiff bases the contention that "COUNTY instructed its deputies not to provide backup to TACKETT and to 'stay away' from TACKETT," as set forth in paragraph 37 of the Complaint, or otherwise.

**RESPONSE TO SPECIAL INTERROGATORY 14:**

The comment to not back-up Deputy Tackett was verbally expressed by J.L. Lopez at a local gathering point named The Owl.  Jason Lushia and Eric Granado were in the area of the conversation, but it is unknown whether or not they heard the conversation.  Plaintiff did communicate this comment to both individuals before leaving the OWL that J.L. Lopez had made to him.  Further specifics, time, date, etc. is not available at this time.

**INTERROGATORY 15:**

Please state all facts upon which Plaintiff bases the contention that "[t]his instruction was communicated to TACKETT," as set forth on paragraph 37 of the Complaint, or otherwise.

**RESPONSE TO SPECIAL INTERROGATORY 15:**

The comment to not back-up Deputy Tackett was verbally expressed by J.L. Lopez at a local gathering point named The Owl.  Jason Lushia and Eric Granado were in the area of

**Ex. 5**

**207**

1  the conversation, but it is unknown whether or not they heard the conversation.  Plaintiff did

2  communicate this comment to both individuals before leaving the OWL that J.L. Lopez had

3  made to him.  Further specifics, time, date, etc. is not available at this time.

4  <u>INTERROGATORY 16:</u>

5  Please state all facts upon which Plaintiff bases the contention that "[w]hile in the line of

6  duty, TACKETT was in numerous situations where he feared no backup would arrive, even

7  if called, leaving him in grave danger," as set forth in paragraph 38 of the Complaint, or

8  otherwise.

9  <u>RESPONSE TO SPECIAL INTERROGATORY 16:</u>

10  Even though specifics are not known, nor is the time and date of conversations, Plaintiff

11  expressed his fear of danger to Gary Tackett, Donna Tackett, Don Floyd, Deputy Peraza,

12  Deputy Fuentes, Eric Granado, Sergeant Tabarez Sr., Deputy Tabarez Jr., Deputy Kincy,

13  Deputy Smith, Deputy Garin, Deputy Higgins, Deputy Kevin White, Deputy Lushia, Officer

14  Espinoza, Deputy Hamilton, Deputy Lindberg, Deputy Erro, Deputy Mistriel, Deputy

15  Simpson, Deputy De La Rosa Jr., Heather Barrett, along with other that I can not recall at

16  this time.

17

18  <u>INTERROGATORY 17:</u>

19  Please state all facts upon which Plaintiff bases the contention that " [a]fter TACKETT's

20  forced resignation, COUNTY continued to violate and attempt to violate TACKETT's Police

21  Office [sic] Bill of Rights and invaded his privacy rights," as set forth in paragraph 41 of the

22  Complaint, or otherwise.

23  <u>RESPONSE TO SPECIAL INTERROGATORY 17:</u>

24        1.  Plaintiff was advised by former human resource staffer that Plaintiff's

25           personnel file was continuously looked at by unauthorized personnel and

26           discussed openly within the department.  Specifics to time, date, and specifics

27           of conversations are not available at this time.

28

**Ex. 5**

**208**

2. While reviewing personnel file with father (Gary Tackett), Plaintiff noticed that medical information was placed in his file in violation of HIPPA. Plaintiff made this aware to Deputy De La Rosa Sr. who was conducting other business in the Human Resource office. Specifics to time, date, and specifics of conversations are not available at this time.

3. Plaintiff was denied numerous times to view his personnel file by the Sheriff's Department personnel until a discussion was held with Chief David Prince. Specifics to time, date, and specifics of conversations are not available at this time.

4. My performance evaluations were absorbingly late and tardy, and intentionally sabotaged to further punish Plaintiff. Specifics to time, date, and specifics of conversations are not available at this time.

5. Plaintiff believes his rights pursuant to section 6253 of the Government Code were violated.

## INTERROGATORY 18:

Please state all facts upon which Plaintiff bases the contention that Plaintiff "suffered adverse consequences in the workplace following his refusal to overlook or participate in illegalities; his reports of his refusal to commit obstruction of justice; his reports of disparate treatment based on illegal racial favoritism; and his reports of COUNTY's inherent interference and threats to his right to life," as set forth in paragraph 53 of the Complaint, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 18:

Plaintiff basis his contention upon grievances, Internal Affairs Investigations, memos to the Imperial County Sheriff's Department personnel and the County of Imperial personnel.

## INTERROGATORY 19:

Please state all facts upon which Plaintiff bases the contention that the "retaliatory backlash which followed shortly after TACKETT's reports included groundless suspensions, denied

**Ex. 5**
209

14

merit increases, unfounded write-ups and false internal audits," as set forth in paragraph 56 of the *Complaint*, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 19:

1. My performance evaluations were absorbingly late and tardy, and intentionally sabotaged to further punish Plaintiff.   Specifics to time, date, and specifics of conversations are not available at this time.

2. Chief Housouer was upset do to me not structuring investigation against her secretary's in-law family member.  This family member had been in physical and verbal conflict for some time.  This family members' name was Larry Wyatt and his son, Miles Wyatt.  Chief Housouer had placed me into investigations just to investigate this particular individual, but was removed immediately from that position after Plaintiff eliminated them as suspects. Plaintiff was even made aware of these family conflicts involving Dorothy Wyatt and husband, Gary Wyatt. Including an incident involving Sheriff Department's issued red pick-up truck and it being used in a manner that could be seen as an assault with a deadly weapon and being ran off the road. Specifics to time, date, and specifics of conversations are not available at this time.

3. Chief Housouer advising to not request for special details as Plaintiff didn't meet requirement minimums.  This was done in retaliation to prevent me from gaining deserving promotions.  Specifics to time, date, and specifics of conversations are not available at this time.

4. Chief Housouer elevated suspension days against Plaintiff upon him acting on rights if attorney representation.  This was documented and stated as retaliation in the decision made by the employment appeals board.  Specifics to time, date, and specifics of conversations are not available at this time.

**Ex. 5**

210

5. COUNTY further retaliated against Plaintiff by giving false information to the Unemployment Review Board to have benefits extended to Plaintiff. This is noted in a decision by one of the administrative law judges' decisions and the judge noted that COUNTY was not a creditable witness. Specifics to time, date, and specifics of conversations are not available at this time.

6. Plaintiff's ability for a special assignment within DEA was interfered with by appointing Deputy Soto to the position and not allowing an interview panel as conducted before. This was due to the fact that Plaintiff was believed to be the next deputy in-line for this position. Plaintiff was even brought to meet the Special Agent in-charge for the area by Deputy Mike Leon and Deputy Brewer, as it was their belief Plaintiff was the next appropriate individual. The above deputies were the current deputies occupying the position to be filled. Specifics to time, date, and specifics of conversations are not available at this time.

7. Plaintiff was advised by the Chief Housouer that he was not allowed to gain or achieve special assignments such as a Field Training Officer, due to the fact that I didn't possess over two years of experience and clear of internal affairs or investigations. This was not enforced for other employees such as Mike Mistrial - Field Training Officer, Deputy Erro and Deputy Fried – S.E.R.T., and more recently Deputy Bostic - Canine Handler. These are just a few examples of individuals who have received positions plaintiff was advised would not be allowed to obtained or achieved. Specifics to time, date, and specifics of conversations are not available at this time.

8. Plaintiff's promotions were not allowed or sabotaged, illegally altered. Canine interviews were sabotaged by Department. Department advised interviewing board of past internal affairs complaints against me which was illegal and unethical and done with intent to impede me from getting the position. Plaintiff

**Ex. 5**
211

was advised the scores/results of the applicants for the position were changed. Plaintiff was advised of these acts by a co-worker and friend of a member of the interview board. The member was from The United States Border Patrol. Specifics to time, date, and specifics of conversations are not available at this time.

9. Plaintiff was dramatically reduced for overtime as he was being punished by Department administrators financially by not allowing him overtime, even though it was available. Noted in Plaintiff's notebook. Specifics to time, date, and specifics of conversations are not available at this time.

10. Plaintiff was isolated as co-workers feared assisting or interacting with Plaintiff would lead to punishment or termination by the Department. Specifics to time, date, and specifics of conversations are not available at this time.

11. Plaintiff read article in Imperial Valley Press regarding a murder/suicide by Deputy Arteberry where Sheriff Carter stated Sheriff's department didn't investigate any acts of misconduct unless a formal written complaint was brought forward against the department. This is in complete contrast to investigations on me initiated by the Sheriff's department. Specifics to time, date, and specifics of conversations are not available at this time.

**INTERROGATORY 20:**

Please state all facts upon which Plaintiff bases the contention that "TACKETT suffered and continues to suffer a loss of income, benefits and additional amounts of money he would have received had Defendant's not violated his rights," as set forth in paragraph 56 of the Complaint, or otherwise.

**RESPONSE TO SPECIAL INTERROGATORY 20:**

Before my resignation from the COUNTY on Dec. 2003, I was making approximately $52,000.00 per year. I became employed after resignation on Feb. 2004 with Congressman Duncan Hunter - House of Representatives. I was employed with no benefits while working

**Ex. 5**

212

17

1   under a government contract for 60 days.  My pay while under this contract was $24,000.00

2   per year. After the sixty days, I was hired full-time to Congressman Hunter's Office staff and

3   received benefits for health and dental.  Upon receiving the full-time position, my salary was

4   $28,000.00 per year.

5   I received a promotion on May 1, 2004, and my salary was increased to $28,000.00 per

6   year.  I received my second promotion on July 1, 2004, and my salary was increased to

7   $32,000.00 per year.  I received my third promotion on May 1, 2005, and my salary was

8   increased to $38,000.00 per year.

9   **INTERROGATORY 21:**

10   *Please state all facts upon which Plaintiff bases the contention that Plaintiff "suffered*

11   *intangible losses of employment –related opportunities as a result of Defendant's unlawful*

12   *conduct, including, but not limited to mental anguish, physical distress, defamation of*

13   *character and humiliation," as set forth in paragraph 56 of the Complaint, or otherwise.*

14   **RESPONSE TO SPECIAL INTERROGATORY 21:**

15   Due to the COUNTY's continues to place my Internal Affairs proposed discipline allegations

16   and actions against me without the upheld allegations that were found to be truthful by the

17   COUNTY at a later date.  One displays I have a termination with excessive and aggravated

18   charges against me, but later the discipline given were days off.  This is done numerous

19   times in my file.  This prejudices any potential hiring agencies as they see unsustained

20   allegations against me.  It is believed that this unveiling of the discipline proposed against

21   me in my personnel file is also a violation against my officer bill of rights as I have not been

22   given the opportunity to respond to a negative mark in my file, nor should Internal Affairs

23   allegations be placed in my personnel file.  I have been told by the Chief of Brawley Police

24   Department that I could not be hired due to the allegations and complaints falsely made

25   against me.  The Chief of Indio Police Department stated that I was not able to be hired,

26   even though I was at the top of their hire list, because the City Manager would feel

27   uncomfortable in hiring me because of the allegations in my file.  I have applied with

28   Ridgecrest Police Department and was considered a top hire to them until they became

**Ex. 5**

**213**

knowledgeable of the allegations by the COUNTY in my file. I was told by Kern County

Sheriff's Department that even though I was considered there top applicant, they could not

hire me because of the allegations in my file. I went through the background and polygraph

test for the City of Imperial, but it was later revealed to me that the individual conducting the

polygraph felt I was a good hire, but stated that there could be a negative appearance to the

department because I was so tarnished in the County.

## INTERROGATORY 22:

Please state all facts upon which Plaintiff bases the contention that "TACKETT" has also

suffered non-economic injuries as a direct result of each Defendant's unlawful conduct,

including, but not limited to mental anguish, physical distress, defamation of character and

humiliation," as set forth in paragraph 56 of the Complaint, or otherwise.

## RESPONSE TO SPECIAL INTERROGATORY 22:

During the repeated harassment, retaliation, and discrimination against me, I was

continually seen on a daily basis by my roommate and fellow deputy of my deterioration in

my physical and emotional stability. Before these actions became too overwhelming, I was

working-out on a daily basis, in top physical condition, went out with friends into the

community and socialized, getting excellent grades in school, attended school regularly,

ability to sleep at normal hours, clear headed, ability to make reasonable decisions, and

ability to communicate and have healthy compassionate relationships.

After the toll being taken on me from the continued onslaught by the COUNTY, made it

impossible for me to keep my physical condition as I stopped working out and battled

episodes of eating disorders where at first I binged and this was followed by my inability to

eat which lead to a large weight loss. This lead to nausea, headaches/migraines, irritability,

inability to focus on

daily activities, sharp stomach pains, painful bowel movements, ulcers and bloody bowel

movements, unstable sleeping patterns - little sleep or too much sleep, no motivation to

accomplish anything, school grades plummeted, my attendance in school was dismal, and

my relationships suffered do to the onslaught by community members questioning the

**Ex. 5**

214

RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

1  reasoning for the COUNTY's actions. I was continually down on myself and believed that I

2  had no self-worth. Felt abandoned and unwanted by those who I felt closest to: my family

3  and brothers - fellow deputies. Co-workers avoided me like the plaque as I was told they

4  were afraid to come around me because of fear of getting fired by administrators.

5  A federal lawsuit was lodged against me and the COUNTY in reference to a matter that I

6  handled. The individuals involved had committed a crime, yet due to political ties and

7  friendships the crime was thrown out and a complaint was alleged against me. This

8  complaint was pushed and supported by administrators that were close friends of the

9  individuals in question. This action placed an absorbent amount stress and anxiety upon me

10  as I knew I was being set-up. I had to write memos to the COUNTY asking for separate

11  counsel. I was informed by the sheriff upon discussing this matter with him that "we will just

12  have to wait to see what a trial by 12 will say." I agreed with him and stated I feel confident

13  that justice will prevail and the truth will come out. The problem with this is that I never was

14  afforded this trial. The COUNTY out of desperation to have this case settled against me

15  and pay a kickback to the individuals for assisting them, agrees to settle for a set amount

16  even though both counsel, COUNTY and my attorney, had advised them that this case

17  could be won in court, but the COUNTY decided against that information and decided to

18  settle. I note that the COUNTY claims that this was strictly a monetary decision as it would

19  cost less to settle than go to court, even though expense could be asked to be reimbursed

20  to the County after a victory. Along with the fact that my unemployment case that the

21  County fought me on was for an award of approximately $1000, even though their legal fees

22  to fight it was estimated in the $10,000's or close to $100,000. Knowing all of this, I was

23  burdened with extreme unrest and in ability to focus on my health or relationships.

24  Due to all these actions and downward spiral of my physical and mental health, my parents

25  and close friends in my life felt seeing a psychologist was necessary. Upon seeing the

26  psychologist he diagnosed me with numerous problems and related it to my work

27  environment. I resigned from work and moved on to finish my schooling in San Diego. I felt

28  that leaving the Imperial Valley was necessary due to the community being given the

**Ex. 5**
**215**

1   impression by administrators and COUNTY personnel that were not factual.

2   *Upon leaving the Imperial Valley and coming to San Diego, I was unable to afford a rental*

3   property and had to ask for assistance from my relatives in regards to a place to stay. They

4   only had a couch to sleep on, but it was the only thing affordable at the time. I slept on the

5   couch of my relatives for approximately a year and a half while I attended school and

6   began a job working for a Congressman. Life started to turn in a positive direction for me

7   until the COUNTY filed an appeal to my unemployment benefits that I received for a month.

8   It is believed that I am the first former employee in approximately 10 years that the Sheriff's

9   Department and the County chose to fight.

10  After a ruling by an Administrative Law Judge that the COUNTY had lied to them about

11  documents, a decision was ruled in my favor. This was appealed by the COUNTY. Another

12  ruling by an administrative law judge ruled in my favor, but again the COUNTY appealed

13  *this decision to Sacramento. It was here that the State of California ruled that the decision*

14  on my behalf was correct and the COUNTY was denied. With all these rulings I would like

15  to say that I felt at ease, but that was completely the opposite. The COUNTY continually

16  asked for continuances and further dates which affected my work and finances as I lost pay

17  and spent money for travel expense to make the appointments. In addition to this, I

18  suffered with stress and anxiety due to the fact that I was going to be unable to pay back the

19  money if I lost in my attempt to prove my case. At one point I broke down in the parking lot

20  of the EDD building and fell to the ground. I was shaking and had uncontrollable emotions.

21  My grandfather was next to me trying to help me cope with these on-going matters. This

22  was really the first time that I felt so overwhelmed that I couldn't contain it until I was out of

23  the view of the public. This was again where I was thinking about going back to the

24  *psychologist. I decided against it and with the help of my family and my religion, I was able*

25  to forge through these trying times.

26  At this current time, these are all the facts that I can recall pursuant to this request.

27

28

**Ex. 5**

216

1  **INTERROGATORY 23:**

2  Please state all facts upon which Plaintiff bases the contention that " COUNTY, under color

3  of authority of statute, ordinance, regulation, custom, usage, and/or of the State, caused

4  TACKETT to be deprived of his rights, privileges and immunities secured by the Constitution

5  and other laws," as set forth in paragraph 69 of the Complaint, or otherwise.

6  **RESPONSE TO SPECIAL INTERROGATORY 23:**

7  My first amendment right was violated in that on numerous occasions I was harassed and

8  retaliated against for expressing my right to free speech in addressing problems within the

9  department and there personnel. I was attacked and I heard through third parties that my

10  department administrators were outraged by Deputy Duran and myself forming a deputy

11  forum to vote on issues that were of concern.  Namely a vote of no confidence on Assistant

12  Sheriff Chuck Jernigan, a complaint by deputies against Josie Heath from overseeing our

13  personnel files, and numerous other issues.  We were chastised by administrators for

14  holding such a meeting and told that we could not hold such meetings unless we petitioned

15  the COUNTY.  That if we didn't we could be held in violation of regulations.  This was clearly

16  an intimidating act.

17  My fourth amendment right was violated in that my right to be secure in my papers and

18  effects were unreasonable searched and taken from personnel file. This was done with

19  papers that were submitted to Chief Housouer, but were later taken out of my file in order to

20  prevent it from being produced.  This document was written by Sgt. Steven Gutierrez, now a

21  lieutenant. I had accidentally let a door close on me in the Correctional Facility by the

22  County and was not let out upon numerous requests. I was forced to put my face in the

23  door window and pose for a picture before I was let out of the holding room.  This photo was

24  taken by the Lieutenant on duty that day and then it was later posted in the visitation

25  corridor where all visitors to inmates had access to view it.  My picture was attached to a

26  paper that stated have you seen this person as if I was a convict or criminal.  This violated

27  this amendment by seizing my person.

28

**Ex. 5**

217

1  My sixth amendment right was violated by the COUNTY not allowing me to have a speedy

2  trial by the Employment Appeals Board when I attempted to have my issues heard.  Some

3  were more than a year and a half past the date of incident before they were heard before

4  the County Employment Appeals Board. Upon our argument to the Board on this particular

5  fact, my counsel was told that their legal advisor, COUNTY COUNSEL, who also represents

6  the Sheriff's Department against me, had advised them that due to no punishment being

7  written in regards to this statue being violated that they were still going to proceed.  County

8  Counsel for the Sheriff's Department admitted they were in violation of the ordinance, but

9  there was no punishment and the COUNTY should proceed.  This was a blatant mockery of

10  the judicial system and why ordinances are implemented.

11  My seventh amendment was violated in that the COUNTY intently avoided a trial by jury on

12  the Federal lawsuit against me to avoid it being dismissed against the COUNTY and myself.

13  This was done in an attempt to save themselves in the actions that they took on this issue

14  within the department against me and the actions that were no taken by the District

15  Attorney's Office.

16  My eighth amendment was violated by the COUNTY and the Sheriff's Department imposing

17  unusual and excessive disciplines against me that was not consistent with other

18  punishments for the same type of incident. (i.e. car accident, property damage, etc.)

19  My thirteenth amendment was violated by COUNTY sheriff's administrators placing me on

20  administrative leave with pay, but advising me that I was to stay at home and call in every

21  morning to report since I was being paid. This was a form of involuntary servitude unto me

22  by forcing me to labor from inside my dwelling against my will and against my duly assigned

23  duties as a peace officer in order to benefit the COUNTY administrators.  The administrators

24  were able to benefit the administrators by gain the pleasure in unjustly punishing me.  This

25  was even continued even after investigations were completed in order to inflict more pain,

26  suffering, and stress to me. At this current time, these are all the facts that I can recall

27  pursuant to this request.

28

**Ex. 5**

**218**

RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

**INTERROGATORY 24:**

Please state all facts upon which Plaintiff bases the contention that "Defendants, and each
of them, acted outrageously towards TACKETT in the manners detailed above," as set forth
in paragraph 88 of the Complaint, or otherwise.

**RESPONSE TO SPECIAL INTERROGATORY 24:**

Due to a departmental philosophy and an administration that allows harassing, retaliation,
disregard for peace officer bill of rights, torting of statements in investigations, and stress
that is affecting my health, I must submit my resignation effectively immediately. I have tried
with little success to apprise you, as the department head, of the unprofessional and
unethical actions by administrators under your command. Each of these administrators has
limited time as such and has left the department in chaos as noted in the P.O.S.T.
evaluation of our department. This evaluation by he state informed you that your
administrators were the problems to address.

I have tried to use the County's grievance procedure in an effort to follow the chain of
command and inform you of the harassing, discriminating, retaliating, and hostile work
environment that I have been exposed to, as well as several other officers. My grievances
have not been handled in a timely manner as outlined in County Ordinances. Further, dates
have even been altered in an attempt to hide an administrator's untimely handling of
my grievances. My repeated attempts to get it completed in order receive my merit increase
just brought more retaliation. My evaluation was completed almost 6 months past its due
date and issues were addressed that were two years passed to deny my merit, instead of,
my performance during that time period. Please see the attached sheet showing date
completed and signed and the front due date. County Human Resources past practice with
departments have been that if an evaluation is grossly late, then no merit increase will be
withheld. Further, you should not utilize issues that happened two years ago from the
actual evaluation to deny a merit increase. This County has past practices and current
evaluation instructions themselves outline this to the evaluator completing the task. Please
note that my immediate supervisor that has more years in serving this department

**Ex. 5**
**219**

1   is the senior sergeant of this department, found no issues with my performance during this

2   year.  However, a newly promoted Lieutenant, that also had very little time as a sergeant

3   with this department, took it upon himself as further retaliation to interfere with my merit

4   increase.  This was done in an effort to set-up a political cover-up of a current supervisor's

5   relative by discrediting me in an effort to camouflage the unethical practice of serving a

6   political influential local government head.

7   Never mind that this individual helped support a campaign for the Chief of Police job in the

8   city of El Centro.  This was due ironically when the past Chief was removed for improper

9   activities.

10  The current allegations against me are more unethical actions from individuals who had

11  demonstrated their observations and investigative techniques were prompted by political

12  pressures.  Please note this happened in the discipline allegations pertaining to the Reno

13  Bertussi case.  It states that the District Attorney dismissed the case and found numerous

14  issues with it.  A closer look at this case shows that this is the brother-in-law of Board of

15  Supervisor Hank Kuiper, who had come down after his brother-in-law's arrest to get this

16  matter dismissed against his relative.  Additionally, and most importantly charges were

17  approved by a deputy district attorney reviewing this case in August of 2003.  Further, it was

18  not until the very last day of October 2003, with the urging of the current Internal

19  Investigating officer Jake Holguin to the District Attorney's Office, this matter did get

20  dismissed by another deputy district attorney.  It should also be noted that Jake Holguin was

21  involved with the campaign and election process for Supervisor Hank Kuiper.  Additionally,

22  the District Attorney Gilbert Otero expressed to Chief Deputy Probation Officer Gary

23  Tackett, that he did not nor did anyone in his office know Hank Kuiper had involved himself

24  in this case.  Further, the District Attorney was not aware of Jake Holguin's political history

25  with this supervisor.  All that Mr. Otero's office knew was that Jake Holguin was pressing for

26  these charges to be dismissed on Reno Bertussi who is Supervisor Kuiper's relative, and

27  this would not have occurred without Jake's interference.  Please find the attached charging

28  form with the dates, charges, and different deputy district attorney changing another deputy

**Ex. 5**
**220**

1  district attorney's approved charges.

2  Allegations were also made by Jake Holguin to the deputy district attorney that actually

3  dismissed the prior approved charges that I had a long term friendship with the female

4  victim. I did not and it is implied that I went to high school with this individual which is also a

5  lie.  This female did not go to Brawley Union High School at any time with me.  The female

6  is currently twenty-one years old while I am twenty-five years old.  Any knowledge with

7  mathematics would make a long term friendship in high school unlikely.  This female said at

8  first she did not know me and then said maybe from high school or possible met me at a

9  party.  I was a four sport letterman in high school and was well known in the County due to

10  my volunteer work in the community and interaction within the community.  So if she knew

11  of me or met me at a function that I surely do not remember, this doesn't make me her

12  friend.  Further, if you read our interviews by Jake Holguin, you will find that he based his

13  conclusion of a close personal friendship from two sentences.  One from myself and another

14  from Jaime Parsons.  These statements were not in the nature of a close personal

15  friendship, nor a friendship.  It was more of an association through a run-in or two at social

16  events in the Valley years prior.   Additionally, both of the victims signed citizens' arrest

17  forms for the arrest of Reno Bertussi.  Please see copies of these attached.

18  The issue of this department taking the word of someone that was drunk, one Reno

19  Bertussi, who had just assaulted a female and her father, and also involved in possession of

20  stolen property which he admitted to.  Mr. Bertussi admitted to taking of their property

21  without their permission or any oral or written agreements.  This just further demonstrates

22  that the facts of the arrest were correct.  Officer safety and safety of the female victim

23  presence, and with Mr. Bertussi having committed what I believed I had probable cause was

24  a felony prompted my actions I took that early evening in arresting Reno Bertussi.  Even Mr.

25  Bertussi's statements that were being definitely lead by Jake Holguin still demonstrated that

26  his account was different from the victims and his friend Grano that were present.  Mr.

27  Bertussi's account is incorrect and jumbled due to him being drunk and his memory of what

28  occurred is definitely tainted and untruthful.  A thorough background on Mr. Bertussi's

**Ex. 5**

**221**

1    character would have lead to the department finding he has been through rehabilitation in

2    an attempt to fix his problems, but to no avail.

3    The issue of the allegations on suspect Macias's case is also torted and wrong. I arrested

4    this individual for not coming to a complete stop at a stop sign. He did this not once but

5    twice, with me directly behind him, in my patrol vehicle. He had no identification, no proof of

6    insurance, and no proof he had the owners' permission to be driving this vehicle. I obtained

7    the sergeant's permission to allow him to be taken to his hotel room when he told me he had

8    identification there. I had his vehicle towed as I have been told to do by prior training

9    officers and this has been the practice of our department when they have no driver's license

10   or proof of insurance and is allowed under the California Vehicle Code. This was re-iterated

11   by Sergeant DeMorst when asked in his interview. For officer safety reasons I did advise

12   the defendant that I would need to put handcuffs on him, but if he did not want to proceed in

13   this manner we would not enter his hotel room. He consented and I tried to allow him to

14   produce the identification or license of some kind so I could just cite and release. This did

15   not happen as he had no identification and upon him checking his drawer, I observed drug

16   paraphernalia and methamphetamine. I arrested him on these additional charges and

17   booked him into County jail where Correctional Sergeant Dail and Correctional Sergeant

18   Figueroa determined Mr. Macias was an undocumented alien. It was at this time

19   Correctional Sergeant Dail asked Mr. Macias if he was a "wetback" and he acknowledged to

20   her not me that he was here illegally. This was the first time the fact he was an

21   undocumented immigrant came apparent to me. At no other time was Mr. Macias referred

22   to as a "wetback" by me. Never in over four years of working for this department and any of

23   my past employments has anyone ever said or implied that I have said racial name calling

24   or any improper actions to any other racial group. Again, Mr. Macias' lying and his criminal

25   offenses are overlooked, but I am automatically declared to not be truthful. This is being

26   done with nothing more than an allegation from someone that purposively made these

27   claims to Jake Holguin. Further, an investigator the department hired to further investigate

28   this issue asked the under sheriff Charles Jernigan and Jake

**Ex. 5**

**222**

RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

1   Holguin that he needed to speak to suspect Macias, but was told they were unable to locate
2   him. I know he could have been located by looking at the location placed in the computer
3   system of the Immigration services. I also saw him driving around the city of Brawley after
4   he was released from jail and I believe this was not looked into in order to prevent the
5   investigator from making contact with him. Each individual officer has his own techniques
6   and modes of operation. This is why some officers are better in one aspect of law
7   enforcement than others and vice versa. There has never been one type of law
8   enforcement to my knowledge to date. I was never allowed me to review my Peace Officer
9   File even after asking to view it several times at reasonable times during the work week. I
10  was later allowed to view my file after being told that Josie Heath had been direct to
11  allow me to view my file. The previous denials were a violation of my Peace Officer Bill of
12  Rights. I also find it disheartening that my own department will turn a statement of mine
13  around and tort it to work against me. I was asked why Mr. Macias would lie and I replied,
14  Well, if I were in his shoes (meaning a drug user, undocumented alien in this country
15  illegally, and had just been arrested for a criminal offense) and knowing I was looking at a
16  jail sentence, that I would probably create a story to get out of it.  As all law enforcement
17  officers know, mostly all criminals lie about their whereabouts or the process they went
18  through in order to cloud the issue of them committing the crime. This is what my statement
19  was supposed to represent, but my department showed their true colors in changing this
20  statement to meaning I would lie to get out of a situation.  I take issue with this department
21  even remotely inferring that I would ever lie or have ever used drugs as this is definitely
22  untrue and offensive. To put this cheap statement in an allegation against me was not only
23  unethical but again demonstrates what this department's administrators are capable in
24  torting and misrepresenting the "Truth." The "Truth" was never sought in these
25  investigations as the whole drive was to discredit me to achieve a criminal offense by a
26  supervisor's relative to be dismissed along with retaliating against me to ruin my career.
27  It is also difficult to accept how these investigative allegations were gathered from someone
28  that just got through being involved in driving a county vehicle drunk, hitting another vehicle,

**Ex. 5**
223

1   and injuring another person. I feel his inappropriate persuading of these defendants to

2   make false claims against me and other officers are unethical as well as unprofessional. I

3   do not agree with this department's choosing of this type of an officer being involved in an

4   on-going actions where he is investigating other officers. He has definitely demonstrated he

5   does not use good judgment but also willing to do things that are definitely unlawful. I do

6   not understand nor do I want to understand the reasoning for this selection of this individual

7   for a position of this stature. Further, the outside investigator was working off the

8   investigative materials that Jake Holguin had gathered, thereby tainting his investigation.

9   His investigation was very limited and guided to find fault with me no matter what I did or did

10   not do. I am the only officer that this department has utilized an outside investigator to redo

11   a completed investigation where other officers were also present, but I was the only officer

12   out of three that was re-interviewed about the incident. One of these officer, a veteran

13   of over twenty years, stated a Sergeant approached him and told him "not to worry that they

14   (administration) were after TACKETT and not to worry." This was done in an effort to try

15   and cover up the political influence that was being brought forth in an effect to clear a

16   supervisor's relative along with continuing to retaliate and harass me. This supervisor can

17   repay Jake Holguin by agreeing to pay off the victim to his drunk driving in a county vehicle

18   and the Sheriff's department can continue to hide this fact from the public which it has thus

19   far. Anyone can Monday night quarterback a situation and, as most officers know, when the

20   action is occurring you only have seconds to respond. The officer on the street does not

21   have the luxury of waiting several days or weeks to preview the situation and play it out

22   with several different scenarios and then choosing the best they feel will not be challenged.

23   This is why they say with time on the streets comes experience for incidences such as this.

24   Officers on the streets just do not have this time element to respond, I had one seasoned

25   veteran tell me that some administrators have been away from actual street duties so long

26   that they do not realize how times and people have changed on the streets.

27   I have also seen good officers being subjected to discipline review simply because they

28   associate or work with me. This again is a means of harassment by these administrators. I

**Ex. 5**

**224**

29

RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

1  do not want these officers to be subjected to any further retaliatory actions because of
2  association with me. I do not want another officer to be told to "just give them Tackett, you
3  know that is all they want." I should not have to be told this by officers who are veterans
4  and have no disciplinary actions whatsoever until politics started getting the better of
5  judgment of this department.  Therefore, as much as I wanted to stay in law enforcement
6  and serve our communities and citizens. I was forced due to stress, ongoing harassment
7  and retaliation to tender my resignation immediately.

8  **INTERROGATORY 25:**

9  Please state all facts upon which Plaintiff bases the contention that "defendants acted with
10 malice, fraud or oppression and in reckless disregard of TACKETT's rights with the intent to
11 cause injury and emotional distress to TACKETT," as set forth in paragraph 91 of the
12 Complaint, or otherwise.

13 **RESPONSE TO SPECIAL INTERROGATORY 25:**

14 Due to a departmental philosophy and an administration that allows harassing, retaliation,
15 disregard for peace officer bill of rights, torting of statements in investigations, and stress
16 that is affecting my health, I must submit my resignation effectively immediately.  I have tried
17 with little success to apprise you, as the department head, of the unprofessional and
18 unethical actions by administrators under your command.  Each of these administrators has
19 limited time as such and has left the department in chaos as noted in the P.O.S.T.
20 evaluation of our department.  This evaluation by he state informed you that your
21 administrators were the problems to address.

22 I have tried to use the County's grievance procedure in an effort to follow the chain of
23 command and inform you of the harassing, discriminating, retaliating, and hostile work
24 environment that I have been exposed to, as well as several other officers.  My grievances
25 have not been handled in a timely manner as outlined in County Ordinances.  Further, dates
26 have even been altered in an attempt to hide an administrator's untimely handling of
27 my grievances.  My repeated attempts to get it completed in order receive my merit increase
28 just brought more retaliation.  My evaluation was completed almost 6 months past its due

**Ex. 5**
225

1   date and issues were addressed that were two years passed to deny my merit, instead of,

2   my performance during that time period.  Please see the attached sheet showing date

3   completed and signed and the front due date.  County Human Resources past practice with

4   departments have been that if an evaluation is grossly late, then no merit increase will be

5   withheld.  Further, you should not utilize issues that happened two years ago from the

6   actual evaluation to deny a merit increase.  This County has past practices and current

7   evaluation instructions themselves outline this to the evaluator completing the task.  Please

8   note that my immediate supervisor that has more years in serving this department

9   is the senior sergeant of this department, found no issues with my performance during this

10  year.  However, a newly promoted Lieutenant, that also had very little time as a sergeant

11  with this department, took it upon himself as further retaliation to interfere with my merit

12  increase.  This was done in an effort to set-up a political cover-up of a current supervisor's

13  relative by discrediting me in an effort to camouflage the unethical practice of serving a

14  political influential local government head.

15  Never mind that this individual helped support a campaign for the Chief of Police job in the

16  city of El Centro.  This was due ironically when the past Chief was removed for improper

17  activities.

18  The current allegations against me are more unethical actions from individuals who had

19  demonstrated their observations and investigative techniques were prompted by political

20  pressures.  Please note this happened in the discipline allegations pertaining to the Reno

21  Bertussi case.  It states that the District Attorney dismissed the case and found numerous

22  issues with it.  A closer look at this case shows that this is the brother-in-law of Board of

23  Supervisor Hank Kuiper, who had come down after his brother-in-law's arrest to get this

24  matter dismissed against his relative.  Additionally, and most importantly charges were

25  approved by a deputy district attorney reviewing this case in August of 2003.  Further, it was

26  not until the very last day of October 2003, with the urging of the current Internal

27  Investigating officer Jake Holguin to the District Attorney's Office, this matter did get

28  dismissed by another deputy district attorney.  It should also be noted that Jake Holguin was

**Ex. 5**

**226**

RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

1   involved with the campaign and election process for Supervisor Hank Kuiper.  Additionally,

2   the District Attorney Gilbert Otero expressed to Chief Deputy Probation Officer Gary

3   Tackett, that he did not nor did anyone in his office know Hank Kuiper had involved himself

4   in this case.  Further, the District Attorney was not aware of Jake Holguin's political history

5   with this supervisor.  All that Mr. Otero's office knew was that Jake Holguin was pressing for

6   these charges to be dismissed on Reno Bertussi who is Supervisor Kuiper's relative, and

7   this would not have occurred without Jake's interference.  Please find the attached charging

8   form with the dates, charges, and different deputy district attorney changing another deputy

9   district attorney's approved charges.

10  Allegations were also made by Jake Holguin to the deputy district attorney that actually

11  dismissed the prior approved charges that I had a long term friendship with the female

12  victim.  I did not and it is implied that I went to high school with this individual which is also a

13  lie.  This female did not go to Brawley Union High School at any time with me.  The female

14  is currently twenty-one years old while I am twenty-five years old.  Any knowledge with

15  mathematics would make a long term friendship in high school unlikely.  This female said at

16  first she did not know me and then said maybe from high school or possible met me at a

17  party.  I was a four sport letterman in high school and was well known in the County due to

18  my volunteer work in the community and interaction within the community.  So if she knew

19  of me or met me at a function that I surely do not remember, this doesn't make me her

20  friend.  Further, if you read our interviews by Jake Holguin, you will find that he based his

21  conclusion of a close personal friendship from two sentences.  One from myself and another

22  from Jaime Parsons.  These statements were not in the nature of a close personal

23  friendship, nor a friendship.  It was more of an association through a run-in or two at social

24  events in the Valley years prior.  Additionally, both of the victims signed citizens' arrest

25  forms for the arrest of Reno Bertussi.  Please see copies of these attached.

26  The issue of this department taking the word of someone that was drunk, one Reno

27  Bertussi, who had just assaulted a female and her father, and also involved in possession of

28  stolen property which he admitted to.  Mr. Bertussi admitted to taking of their property

**Ex. 5**

**227**

RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

1  without their permission or any oral or written agreements. This just further demonstrates

2  that the facts of the arrest were correct. Officer safety and safety of the female victim

3  presence, and with Mr. Bertussi having committed what I believed I had probable cause was

4  a felony prompted my actions I took that early evening in arresting Reno Bertussi. Even Mr.

5  Bertussi's statements that were being definitely lead by Jake Holguin still demonstrated that

6  his account was different from the victims and his friend Grano that were present. Mr.

7  Bertussi's account is incorrect and jumbled due to him being drunk and his memory of what

8  occurred is definitely tainted and untruthful. A thorough background on Mr. Bertussi's

9  character would have lead to the department finding he has been through rehabilitation in

10 an attempt to fix his problems, but to no avail.

11 The issue of the allegations on suspect Macias's case is also torted and wrong. I arrested

12 this individual for not coming to a complete stop at a stop sign. He did this not once but

13 twice, with me directly behind him, in my patrol vehicle. He had no identification, no proof of

14 insurance, and no proof he had the owners' permission to be driving this vehicle. I obtained

15 the sergeant's permission to allow him to be taken to his hotel room when he told me he had

16 identification there. I had his vehicle towed as I have been told to do by prior training

17 officers and this has been the practice of our department when they have no driver's license

18 or proof of insurance and is allowed under the California Vehicle Code. This was re-iterated

19 by Sergeant DeMorst when asked in his interview. For officer safety reasons I did advise

20 the defendant that I would need to put handcuffs on him, but if he did not want to proceed in

21 this manner we would not enter his hotel room. He consented and I tried to allow him to

22 produce the identification or license of some kind so I could just cite and release. This did

23 not happen as he had no identification and upon him checking his drawer, I observed drug

24 paraphernalia and methamphetamine. I arrested him on these additional charges and

25 booked him into County jail where Correctional Sergeant Dail and Correctional Sergeant

26 Figueroa determined Mr. Macias was an undocumented alien. It was at this time

27 Correctional Sergeant Dail asked Mr. Macias if he was a "wetback" and he acknowledged to

28 her not me that he was here illegally. This was the first time the fact he was an

**Ex. 5**
228

33
RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

1  undocumented immigrant came apparent to me.  At no other time was Mr. Macias referred

2  to as a "wetback" by me.  Never in over four years of working for this department and any of

3  my past employments has anyone ever said or implied that I have said racial name calling

4  or any improper actions to any other racial group.  Again, Mr. Macias' lying and his criminal

5  offenses are overlooked, but I am automatically declared to not be truthful.  This is being

6  done with nothing more than an allegation from someone that purposively made these

7  claims to Jake Holguin.  Further, an investigator the department hired to further investigate

8  this issue asked the under sheriff Charles Jernigan and Jake

9  Holguin that he needed to speak to suspect Macias, but was told they were unable to locate

10  him.  I know he could have been located by looking at the location placed in the computer

11  system of the Immigration services.  I also saw him driving around the city of Brawley after

12  he was released from jail and I believe this was not looked into in order to prevent the

13  investigator from making contact with him.  Each individual officer has his own techniques

14  and modes of operation.  This is why some officers are better in one aspect of law

15  enforcement than others and vice versa.  There has never been one type of law

16  enforcement to my knowledge to date.  I was never allowed me to review my Peace Officer

17  File even after asking to view it several times at reasonable times during the work week.  I

18  was later allowed to view my file after being told that Josie Heath had been direct to

19  allow me to view my file.  The previous denials were a violation of my Peace Officer Bill of

20  Rights.  I also find it disheartening that my own department will turn a statement of mine

21  around and tort it to work against me.  I was asked why Mr. Macias would lie and I replied,

22  Well, if I were in his shoes (meaning a drug user, undocumented alien in this country

23  illegally, and had just been arrested for a criminal offense) and knowing I was looking at a

24  jail sentence, that I would probably create a story to get out of it.  As all law enforcement

25  officers know, mostly all criminals lie about their whereabouts or the process they went

26  through in order to cloud the issue of them committing the crime.  This is what my statement

27  was supposed to represent, but my department showed their true colors in changing this

28  statement to meaning I would lie to get out of a situation.  I take issue with this department

**Ex. 5**

**229**

1  even remotely inferring that I would ever lie or have ever used drugs as this is definitely
2  untrue and offensive.  To put this cheap statement in an allegation against me was not only
3  unethical but again demonstrates what this department's administrators are capable in
4  torting and misrepresenting the "Truth."  The "Truth" was never sought in these
5  investigations as the whole drive was to discredit me to achieve a criminal offense by a
6  supervisor's relative to be dismissed along with retaliating against me to ruin my career.
7  It is also difficult to accept how these investigative allegations were gathered from someone
8  that just got through being involved in driving a county vehicle drunk, hitting another vehicle,
9  and injuring another person.  I feel his inappropriate persuading of these defendants to
10 make false claims against me and other officers are unethical as well as unprofessional.  I
11 do not agree with this department's choosing of this type of an officer being involved in an
12 on-going actions where he is investigating other officers.  He has definitely demonstrated he
13 does not use good judgment but also willing to do things that are definitely unlawful.  I do
14 not understand nor do I want to understand the reasoning for this selection of this individual
15 for a position of this stature.  Further, the outside investigator was working off the
16 investigative materials that Jake Holguin had gathered, thereby tainting his investigation.
17 His investigation was very limited and guided to find fault with me no matter what I did or did
18 not do.  I am the only officer that this department has utilized an outside investigator to redo
19 a completed investigation where other officers were also present, but I was the only officer
20 out of three that was re-interviewed about the incident.  One of these officer, a veteran
21 of over twenty years, stated a Sergeant approached him and told him "not to worry that they
22 (administration) were after TACKETT and not to worry."  This was done in an effort to try
23 and cover up the political influence that was being brought forth in an effect to clear a
24 supervisor's relative along with continuing to retaliate and harass me.  This supervisor can
25 repay Jake Holguin by agreeing to pay off the victim to his drunk driving in a county vehicle
26 and the Sheriff's department can continue to hide this fact from the public which it has thus
27 far.  Anyone can Monday night quarterback a situation and, as most officers know, when the
28

**Ex. 5**

230

1  action is occurring you only have seconds to respond.  The officer on the street does not

2  have the luxury of waiting several days or weeks to preview the situation and play it out

3  with several different scenarios and then choosing the best they feel will not be challenged.

4  This is why they say with time on the streets comes experience for incidences such as this.

5  Officers on the streets just do not have this time element to respond, I had one seasoned

6  veteran tell me that some administrators have been away from actual street duties so long

7  that they do not realize how times and people have changed on the streets.

8  I have also seen good officers being subjected to discipline review simply because they

9  associate or work with me.  This again is a means of harassment by these administrators.  I

10  do not want these officers to be subjected to any further retaliatory actions because of

11  association with me.  I do not want another officer to be told to "just give them Tackett, you

12  know that is all they want."  I should not have to be told this by officers who are veterans

13  and have no disciplinary actions whatsoever until politics started getting the better of

14  judgment of this department.  Therefore, as much as I wanted to stay in law enforcement

15  and serve our communities and citizens.  I was forced due to stress, ongoing harassment

16  and retaliation to tender my resignation immediately.

17

18

19  Dated: _2-21-06_                          By _Cynthia L. Stratton_

20                                            CYNTHIA L. STRATTON, ESQ.
                                              Attorneys for Plaintiff, **JUSTIN TACKETT**

21

22

23

24

25

26

27

28

# Ex. 5

231

36

RESPONSE TO SPECIAL INTERROGATORIES (SET ONE)

*Tackett vs. County of Imperial, et al.*
U.S. District Court –Southern District Case No. 04cv2459 J(AJB)

## PROOF OF SERVICE

I, the undersigned, declare:

I am a citizen of the United States of America, am over the age of eighteen (18) years, and not a party to the within action. I am an employee of Joe B. Cordileone & Associates, and my business address is 438 Camino del Rio South, Suite 213, San Diego, CA 92108. On the date below, I caused to be served the following documents:

SUPPLEMENTAL RESPONSE TO SPECIAL INTERROGATORIES– SET ONE
SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS- SET ONE

on the parties involved addressed as follows:

J. Scott Tiedemann, Esq.
Mark Meyerhoff, Esq.
**Liebert, Cassidy, Whitmore**
6033 W. Century Blvd., Suite 500
Los Angeles, CA 90045-6410
Tel: 310-981-2000
Fax:310-337-0837

(✓)   **BY MAIL:** I caused each envelope, with postage thereon fully prepaid, to be placed in the United States mail at San Diego, California. I am readily familiar with the business practice for collection and processing of mail in this office; and that in the ordinary course of business said documents would be deposited with the U.S. Postal Service in San Diego on that same day. I understand that service shall be presumed invalid upon motion of a party served if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing contained in this declaration.

( )   **BY PERSONAL DELIVERY:** I caused each such envelope to be delivered by hand to the offices of each addressee above.

( )   **BY FACSIMILE:** By use of facsimile machine telephone number (619) 718-4825, I served a copy of the documents(s) on the above interested parties at the facsimile number(s) listed above. The transmission was reported as complete and without error. The transmission report, which is attached to this proof of service, was properly issued by the transmitting facsimile machine.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _21st_ day of February, 2006, at San Diego, California.

*Jennifer Cannone*

**Ex. 5**

PROOF OF SERVICE

232




# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## *HAROLD D. CARTER*
### SHERIFF•CORONER•MARSHAL

September 25, 2001

Justin Tackett
Deputy Sheriff
P.O. Box 595
Brawley, CA 92227

RE:   NOTICE OF PROPOSED DISCIPLINARY ACTION

Dear Deputy Tackett:

You are hereby officially notified that I propose to suspend your employment with the Imperial County Sheriff's Department as a Deputy Sheriff. Such suspension shall be without pay for two (2) days effective October 3rd and October 4th, 2001, which is the fifth calendar day following service of this notice.

Whether or not you request an evidentiary hearing before the Employment Appeals Board, your compensation will cease on the above dates. The specific acts, omissions, causes and reasons upon which this proposed disciplinary action is based are set forth herein and in the documents attached hereto and incorporated herein by reference as though fully set forth.

The causes for the proposed discipline are as follows:

## COUNTY ORDINANCE

24452(g)    **Violation of or Refusal to Obey Reasonable Regulations Prescribed by the Board of Supervisors or by the Department Head:**

24452(i)    **Neglect**

## IMPERIAL COUNTY SHERIFF'S DEPARTMENT POLICY & PROCEDURES

2.1.01    **Violation of Rules**

2.3.07    **Operation of Vehicles**

The specific acts or omissions upon which the proposed discipline is based are set forth below:

On June 13, 2001, at approximately 0200 you were involved in a traffic accident while on duty. You wrecked a marked Sheriff's unit, a white Crown Victoria causing $1,042.52 worth of damages because you failed to see that the road ahead intersected a dry dirt ditch. An investigation was conducted by the California Highway Patrol, which determined that you caused this collision by driving improperly on a private dirt access

**Ex. 6**

00465    233

Page 2
September 25, 2001

road, which you were unfamiliar with. You were traveling at 25 miles per hour on this road. It was determined that a safe speed of 10 miles per hour would have allowed you to see the ditch ahead. This is a violation of the Imperial County Sheriff's Department Policy and Procedures, Section 2.1.01 Violation of Rules, and Section 2.3.07 Operation of Vehicles.

On April 15, 2001 at approximately 1538 hours you reported that while in pursuant of a suspect who had fled from custody, you drove your marked Sheriff's unit into a trench causing damage to the left fender. This is a violation of the Imperial County Sheriff's Department Policy and Procedures, Section 2.1.01 Violation of Rules, and Section 2.3.07 Operation of Vehicles.

On July 23, 2000, at approximately 1500 hours you reported that you had driven onto soft sand causing the unit to bottom out. This caused damage to the right bumper.   This is a violation of the Imperial County Sheriff's Department Policy and Procedures, Section 2.1.01 Violation of Rules, and Section 2.3.07 Operation of Vehicles.

You have the right to respond to the matters raised in this notice both orally and in writing, prior to the end of the workday on October 2, 2001. You also have the right to appear personally before me at an informal conference to discuss the proposed disciplinary action prior to the end of the day on October 2, 2001. *You must request this informal conference and schedule it with me within the five (5) workday period.* Any response, which you timely provide will be considered by me before I take final action on October 2, 2001.

If you do not agree with this discipline you may contact the Sheriff's Administrative office either in writing to 328 Applestill Road, El Centro, 92243 or by phone at (760) 339-6301 to schedule an appointment with Assistant Sheriff-Coroner, Michael T. Schneewind. If you do not respond in writing or by phone by Tuesday, October 2, 2001, by 1700 hours, the proposed discipline will be immediately imposed.

Whether or not you respond to this letter or request an informal conference with me, if the discipline becomes final on October 2, 2001, as a regular full-time employee, you have the right to file an appeal of your suspension with the Imperial County Employment Appeals Board within ten (10) working days pursuant to Chapter 10.5 of Division 4 of Title 2 of the Codified Ordinances of Imperial County.

THIS DOCUMENT WILL BE PLACED IN YOUR OFFICIAL PERSONNEL FILE ALONG WITH ALL ATTACHMENTS WITHIN FIVE (5) WORKING DAYS OF THE DATE OF YOUR RECEIPT OF THIS LETTER.  PRIOR TO THE EXPIRATION OF THE ABOVE PERIOD, YOU HAVE THE RIGHT TO SUBMIT A STATEMENT WHICH WILL BE ATTACHED TO THIS DOCUMENT AND PLACED IN YOUR PERSONNEL FILE.

00466

Ex. 6

234

Page 3
September 25, 2001

Sincerely,

Harold D. Carter
Sheriff, Coroner-Marshal

By:   Sharon M. Housouer
      Chief Deputy

HDC:SH:jlmh

Enclosures:      Copy of County Ordinance
                 Copy of Department Policy

00467      **Ex. 6**

235

§ 24452. . Cause for Disciplinary Action.

The causes justifying disciplinary action against a County employe
shall include, but not be limited to, the following:

(a)  Immoral or unprofessional conduct;

(b)  Deliberate or repeated absence from duty without
authorization;

(c)  Dishonesty;

(d)  Incompetence;

(e)  Evident unfitness for service;

(f)  Physical or mental condition unfitting him to discharge
his duties;

(g)  Violation of or refusal to obey reasonable regulations
prescribed by the Board of Supervisors or by the department
head;

(h)  Conviction of a felony or a crime involving moral turpitude;

(i)  Neglect;

(j)  Insubordination;

(k)  Continued absence after exhaustion of sick leave, compensato
overtime, vacation and leave of absence;

(l)  Improper political activity which constitutes a violation
of Federal or State laws or ordinances of the County of
Imperial; (Ord. No. 703; eff. Aug. 31, 1979, retroactive to June
29, 1979.)

(m)  Neglect or willful damage to public property or waste of
public supplies or equipment;

(n)  Falsifying information on employment application, personnel
records or County records;

(o)  Gambling on County premises;

(p)  Drinking or possessing any alcoholic beverage on County
premises or on County time;

(q)  Reporting to work while under the influence of alcohol or drugs;

(r)  Sleeping on duty.

00468        **Ex. 6**

236

| DATE | DISSEMINATION | TITLE | NUMBER |
|------|---------------|-------|--------|
|      |               | RULES OF CONDUCT | 2.1 |

| SUBJECT: | PAGE |
|----------|------|
| RULES OF CONDUCT, IMPERIAL CO. SHERIFF'S DEPT. | 2 |

2.1.01    UNDERLINE{VIOLATION OF RULES}

EMPLOYEES SHALL NOT COMMIT ANY OTHER ACTS OR OMIT ANY OTHER ACTS WHICH CONSTITUTE A VIOLATION OF ANY OF THE RULES, REGULATIONS, DIRECTIVES, ORDERS OR POLICIES OF THIS DEPARTMENT, WHETHER STATED IN THIS GENERAL ORDER OR ELSEWHERE.    IGNORANCE OF THE RULES, REGULATIONS, DIRECTIVES, ORDERS, OR POLICIES SHALL NOT BE CONSIDERED AS A JUSTIFICATION FOR ANY SUCH VIOLATIONS.    EMPLOYEES SHALL BE RESPONSIBLE FOR THEIR OWN ACTS, AND THEY SHALL NOT SHIFT TO OTHERS THE BURDEN OF RESPONSIBILITY FOR EXECUTING OR FAILING TO EXECUTE A LAWFUL ORDER OR POLICE DUTY.

2.1.02    INSUBORDINATION

EMPLOYEES SHALL PROMPTLY OBEY ANY LAWFUL ORDERS OF A SUPERVISING EMPLOYEE.    THIS WILL INCLUDE ORDERS RELAYED FROM AN EMPLOYEE SUPERVISOR BY AN EMPLOYEE OF THE SAME OR LESSER RANK.

00469

Ex. 6

| DATE | DISSEMINATION | TITLE | NUMBER |
|------|---------------|-------|--------|
|      |               | RULES OF CONDUCT | 2.3 |

| SUBJECT: | | |
|----------|---|---|
| RULES OF CONDUCT, IMPERIAL CO. SHERIFF'S DEPT. | PAGE 15 |

## 2.3.07    OPERATION OF VEHICLES

EMPLOYEES SHALL OPERATE OFFICIAL VEHICLES IN A CAREFUL
AND PRUDENT MANNER, AND SHALL OBEY ALL LAWS OF THE STATE
AND ALL DEPARTMENTAL ORDERS PERTAINING TO SUCH OPERATION.
EMPLOYEES SHALL SET A PROPER EXAMPLE FOR OTHER PERSONS BY
THEIR OPERATION OF A VEHICLE.  LOSS, SUSPENSION OF A
CIVILIAN DRIVING LICENSE, SHALL BE REPORTED TO THE
DEPARTMENT IMMEDIATELY.  (FURTHER INFORMATION REFER TO
COUNTY ORDINANCE - USE OF COUNTY VEHICLES.)

00470

**Ex. 6**

238



# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## *HAROLD D. CARTER*
### SHERIFF•CORONER•MARSHAL



November 16, 2001

Justin Tacket
Deputy Sheriff
P.O. Box 595
Brawley, CA 92227

**RE:    NOTICE OF FINAL DISCIPLINARY ACTION [*PURSUANT TO
CHAPTER 4.5 OF THE IMPERIAL COUNTY ORDINANCES*]**

Dear Deputy Tackett:

You are hereby officially notified that after carefully considering your oral response to
me in our meeting of November 15, 2001, I have determined to proceed with the two (2)
day suspension of your employment pursuant to the Notice of Proposed Disciplinary
Action dated September 25, 2001.  Therefore, your two (2) day suspension shall be
without pay November 26th and November 27th, 2001.

As you were previously advised, you have the right to file an appeal of your two (2) day
suspension with the Imperial County Employment Appeals Board within ten (10)
working days pursuant to Chapter 10.5 of Division 4 of Title 2 of the Codified Ordinances
of Imperial County.

*THIS DOCUMENT WILL BE PLACED IN YOUR OFFICIAL PERSONNEL FILE
ALONG WITH ALL ATTACHMENTS WITHIN FIVE (5) WORKING DAYS OF THE
DATE OF YOUR RECEIPT OF THIS LETTER. PRIOR TO THE EXPIRATION OF THE
ABOVE PERIOD, YOU HAVE THE RIGHT TO SUBMIT A STATEMENT WHICH
WILL BE ATTACHED TO THIS DOCUMENT AND PLACED IN YOUR PERSONNEL
FILE.*

Harold D. Carter
Sheriff-Coroner-Marshal

By:    Michael T. Schneewind
       Assistant Sheriff-Coroner

HDC:MTS

Enclosures:        1)   Letter from Chief Housouer dated September 25, 2001.
                   2)   Copy of County Ordinance
                   3)   Copy of Department Policy

00464                        **Ex. 7**

                                          239

# *Imperial County Sheriff's Department*
## *Significant Event Review Committee*



*Deputy Sheriff Justin Tackett*
*C.R. 0111-0017*

00595

**Ex. 8**

240

# *Imperial County Sheriff's Department*

## Harold D. Carter
### Sheriff-Coroner-Marshal

## INTEROFFICE MEMO

**Date:**       November 27, 2001

**TO:**         Significant Event Review Committee (SERC)

**FROM:**       Sergeant Manuel Avila

**SUBJECT:**    Deputy Justin Tackett

S.E.R.C.,

Please review the attached crime report, accident report and O.J.I. report involving Deputy Justin Tackett and Patrol Unit 310.

Thanks

**Ex. 8**

241

# *Table of Contents*

1. *Committee members*

2. *S.E.R.C. Findings*

3. *Imperial County Sheriff's incident reports*
   *C.R. 0111-0017*

4. *California Highway Patrol Accident Report*
   *Number 011101*

5. *D.M.V. Print out/Estimate of Damage*

00597

**Ex. 8**

242

1.  *Chief Deputy J. Obeso*

2.  *Lt.   W. Willard*

3.  *Sgt. D. Matus*

4.  *Sgt. M. Garcia*

00598

**Ex. 8**

243

# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## SIGNIFICANT EVENT REVIEW COMMITTEE

February 15, 2002

TO:      Sheriff Harold D. Carter

FROM:    Significant Event Review Committee (SERC)

Re:      Deputy Justin Tackett
         On duty accident, dated November 1, 2001
         Imperial County Sheriff CR # 0111-0017
         California highway Patrol report # 011101

     On February 7, 2002, the Significant Event Review Committee
(SERC), consisting of Chief Deputy Jesse Obeso, Lieutenant. Bill
Willard, Sergeant Manny Garcia and Sergeant Delfino O. Matus
convened for the purpose of reviewing an on-duty accident that
involved Deputy Justin Tackett. The accident occurred on November
1, 2001, at approximately 1000 hours, near State Route 115 and
Wirt Road East of Brawley, California. Deputy Tackett was driving
a marked sheriff's unit # 310, a white 2001 Ford Crown
Victoria, California exempt plate 1094307. Deputy Tackett was
assigned to the North County Operations Division. His immediate
supervisor was Imperial County Sheriff's Sergeant Pompeyo
Tabarez. The Chief Deputy responsible for North County Operations
is Sharon Housouer.

     SERC reviewed Imperial County Sheriff's CR # 0111-0017 that
was prepared by Deputy Tackett and California Highway Patrol
report number 011101. Deputy Tackett reported that he was
responding "CODE-3" to a call of an explosive devise found in the
desert east of the city of Brawley, California. Deputy Tackett
states that he was traveling southbound on State Route 115 and
entered a curve on the roadway at approximately 80 to 90 Miles
per hour. As Deputy Tackett negotiated the curve he felt the rear
of the unit begin to slide. Deputy Tackett states that he
regained control of the unit, but was force to steer the unit
over the embankment of the curve to avoid colliding with a
tractor/trailer rig that was northbound on State Route 115.

1

00599   **Ex. 8**

244

The investigation has revealed that Deputy Tackett had reported four (4) other property damage incidents that involved county vehicles. Listed below is a summary of the incidents.

1.   On June 11, 2001 Deputy Tackett drove his unit into a dirt embankment near the City of Westmorland while enroute to take custody of a person arrested for outstanding warrants. The California Highway Patrol investigated the accident and determined that Deputy Tackett caused the accident by driving at an unsafe speed for conditions, in violation of C.V.C. section 22350. Deputy Tackett did receive administrative discipline in the form of a two-day suspension without pay.

2.   On July 23, 2000, at approximately 1500 hours, Deputy Tackett reported to the sheriff's communication center that he had driven on to soft sand causing the unit to bottom out which caused damage to the right bumper of the unit. The location of incident is believed to be the New River and Evan Hewes Highway near Seeley, California. There was crime report number issued (0007-1058). It is not known if any corrective action was taken.

3.   On April 15, 2001, at approximately 1538 hours, Deputy Tackett reported that while in pursuit of a suspect who had fled from custody he drove the patrol unit into a trench causing damage to the left fender of unit 244(B). The location of the incident was the Glamis area east of Brawley, California. It is not known if any corrective action was taken.

4.   On June 20, 2001 at approximately 0141 hours, Deputy Tackett reported that while responding to call, an owl struck the red lens cover of the overhead lights causing it to break.

Based on Deputy Tackett's report number 0111-0017 and California Highway Patrol report number 011101, SERC concludes that this accident was preventable and that Deputy Tackett caused this traffic accident by driving at a speed greater than is reasonable or prudent for the type of call assigned to him. SERC Finds that reports of explosive devices are frequent occurrences in Imperial County and that the majority of these calls are in unpopulated isolated areas, as was in this case. Reports of unexploded ordnance in remote unpopulated areas should not require a CODE-3 response.

California Highway Patrol traffic collision report number 011101 finds that the safe speed for the curve that Deputy

2

00600   **Ex. 8**

245

Tackett was traveling on was 60/65 miles per hour. By Deputy Tackett's admission he was traveling at approximately 85/90 miles per hour. The C.H.P. report concludes that Deputy Tackett was the cause of the collision by being in violation of California Vehicle Code section 22350. Which states that no person shall drive a vehicle upon a highway at a speed greater than reasonable or prudent having due regard for weather, visibility, traffic and the surface and width of the highway and in no event at a speed, which endangers the safety of persons or property.

SERC also finds that it is apparent that Deputy Tackett has developed a pattern of negligent and reckless vehicle operation, placing himself and the citizens of Imperial County in harms way.

Deputy Tackett violated the following Imperial County Sheriff's Department Policies and Procedures:

- 2.1.01-Violation of Rules
  Employees shall not commit any other acts or omit any other acts, which constitute a violation of any of the rules, regulations, directives, order or policies of this department, whether stated in this general order or elsewhere.

- 2.3.07-Operation of Vehicles
  Employees shall operate official vehicles in a careful and prudent manner, and obey all laws of the state and all departmental orders pertaining to such operation.

- 5.2.04-Response Driving Situations
  In all cases when officers activate their emergency warning devices, in response to an assignment, they shall notify the communications center of their CODE-3 response and the location they are responding from.

After reviewing all reports SERC recommends the following action be taken:

- That Deputy Tackett complies with all departmental policies and procedures.

3

00601

**Ex. 8**

246

- That Deputy Tackett be attentive, and that he uses sound judgment while operating a motor vehicle.

- That Deputy Tackett be held accountable for his non-compliance of departmental policies and procedures, and request that the Imperial County Sheriff's Department dispense discipline and/or provide training that the department deems appropriate for the violations.

- There are several issues that are out of the scope of this committee, which SERC feels should be addressed by the Administrative Investigation Unit.

    1. Radio communications tapes of this incident were requested by SERC, but were found to be deleted or tampered with.

    2. Witness George Galvez Acosta should be interviewed to verify accounts of incident (were lights and siren activated for CODE-3).

    3. Deputy Tackett should be interviewed regarding the violation Imperial County Sheriff's Manual of Policies and Procedures section 5.2.04(did he notify the communications center of CODE-3 response)

//////

4

00602

**Ex. 8**
247

# Imperial County Sheriff Department
## HAROLD D. CARTER
### Sheriff-Coroner-Marshal

### INTEROFFICE MEMO

DATE:    02/27/01

TO:      Sergeant P. Tabarez

FROM:    Deputy J. Tackett

SUBJECT: Accident Report

---

I am writing this memo in regards to a request of my accident report, occurring on 11/01/01 at 1000 hours, being written onto the Spillman system. I advised Sergeant Tabarez that pursuant to my attorney's request to review this prior to submittal, I have not written it to Spillman at this time. The report should be submitted into the Spillman system by 12/05/01. Attorney Brad Fields is reviewing the report at the Everett Bobbitt Law Office. Sorry for the inconvenience and thank you for your patience.

Deputy Justin Tackett  # 871

00603

**Ex. 8**

248

```
ident Number: 0111-0017
ure: Medical           Case Number: _____  _____ _        Image: _____
ddr: 115/WIRT                              Area: DIST4 SUPERVISOR DI>
ty: Calipatria     St: CA  Zip: 92233      Contact:
  mplainant:     100673 --------------------------------------------------+
     TACKETT                   Fst: JUSTIN       Mid:                     |
b.   /  /    SSN:   -  -      Adr: IMPERIAL COUNTY SHERIFFS DEPT          |
ac:   Sx:  Tel: (760)339-6311  Cty:               St:   Zip:              |
  --------------------------------------------------------------------------+
ffense Codes: AMAS ____ ____ ____ ____ _    Reported: AMAS  Observed:
ircumstances: ____ ____ ____ ____ ____ ____ ____ ____ ____ ____ _
ndg Officers: Tackett, J      Ruiz, M.        Tabarez, P.   _
nsbl Officer: Tackett, J      Agency: AISO         CAD Call ID:    133504
 Received By: Flores, N.      Last RadLog: 12:08:40 11/01/01    98
How Received: T Telephone        Clearance:
hen Reported: 09:58:43 11/01/01   Disposition: ACT  Disp Date: 11/01/01
urrd between: 09:58:43 11/01/01   Judicial Sts: _____
       and: 09:58:43 11/01/01    Misc Entry:
 _____ _____                _____        _
rrative: (None)                                              +
plement: (See below)              + (See below)              + _

 = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =


OLVEMENTS:
e Record #    Date      Description              Relationship
   38652      /  /      ACOSTA, GEORGE GALVEZ     WITNESS
  100673      /  /      TACKETT, JUSTIN          *Complainant
  133504   11/01/01     09:58 11/01/01 Medical   *Initiating Call

 ..ncident Offenses Detail:
             Offense Codes
 Code _____    Amount
 AMAS Assist Ambulance / Medical               0.00


 Incident Responders Detail
  Responding Officers
 Name _____   Unit __
  Tackett, J       871
 Ruiz, M.          576
 Tabarez, P.       563


in Radio Log Table:
e/Date          Unit   Code   Zone  Agnc  Description
08:40 11/01/01   576    98    DIST4  AISO  incid#=0111-0017 Completed Call c
08:40 11/01/01   563    98    DIST4  AISO  incid#=0111-0017 Completed Call c
49:00 11/01/01   563    4     COVR   AISO  98 OJI 871
26:26 11/01/01   871    98    DIST4  AISO  incid#=0111-0010 Completed call c
```

00604

**Ex. 8**

249

```
7:15  11/01/01  2652  UNR??  DIST4  GOLD  incid#=43129  ENRT  650  call=228
5:08  11/01/01  553   ARR    DIST4  AISO  incid#=0111-0017  Arrived on scene
4:43  11/01/01  576   ENRT   DIST4  AISO  incid#=0111-0017  Enroute to a call
3:45  11/01/01  2652  ARRVD  DIST4  GOLD  incid#=43129  Arrived on scene cal
 19  11/01/01  871   29     1      AISO  PO884176
  8  11/01/01  2652  ENRT   DIST4  GOLD  incid#=43129  Enroute to a call ca
..13  11/01/01  871   ARRVD         AISO  incid#=0111-0017  Arrived on scene
```

00605

**Ex. 8**

250

I understand that I am being ordered by Sergeant
Tabarez at approximately 1500 hours to make a report
or answer questions and that if I do not comply with the
order, I may be disciplined for insubordination.
Therefore, I have no alternative but to abide by the
order.  However, by so doing, I do not waive my
Constitutional rights to remain silent under the Fifth
and Fourteenth Amendments to the United States
Constitution, under the protections of the California
Constitution, and the protections afforded me under case
law.  Furthermore, by submitting to this coerced
interview, I am waiving no right afforded me under the
Peace Officer's Bill of Rights Act."  Government Code
Sec. 3300, et.seq.

ime Report:    0111-0017

puty:          Justin Tackett      # 871

ime:           Damage to County Property

ctim(s):       Imperial County Sheriff's Department

iver:          Justin Tackett
               383 Main Street
               Brawley, Ca.   92227
               760-339-6312

esses:     1)  George Galvez Acosta
               354 Larsen Road
               Imperial, Ca.   92251
               760-355-2312
               D.O.B.:  10-20-48

           2)  Sergeant P. Tabarez
               383 Main Street
               Brawley, Ca.   92227
               760-339-6312

maged Property:
               Patrol Unit # 310

hicles:        Unit # 310
               2001 Ford Sedan
               White   4-Door
               California Plate # 1094307

rrative:
     On November 01, 2001 at approximately 1000 hours, I(Deputy
tin Tackett) was dispatched to an explosives call.  Dispatch advised
that I was to break-away from assisting Calipatria Police Department,

**Ex. 8**
251

area East of ___ and ___ Highway 78 and this beat was not my assigned beat to patrol.

I knew that this area was highly populated by off-highway ___les and pedestrians. The area also had vehicles from the busy ___ y 78 passing by the area. Due to the possibility of death by the ___ ___ives and damage to property from the explosives along with the ___rcumstances stated in the previous paragraph, I believed it was ___cessary to respond CODE 3. I responded by activating my patrol ___it's lights and siren and accelerated in speed, with due regard for ___ople, property, and conditions I would encounter, when responding to ___e call. I exited the Calipatria area eastbound/southbound lane of ___ghway 115 which had no visible traffic at this time. Upon ___proaching a curve on Highway 115 at approximately 80 - 90 M.P.H., that ___d a roadway(Wirt Road) running off the beginning of the curve, I ___ticed a semi-truck appear from behind a business that in located on ___e corner of Highway 115 and Yocum Road, Calipatria, Ca. After ___ticing the semi-truck travelling in the northbound lane, I applied the ___akes to my patrol unit for the fact of due regard for on-coming ___affic.

I had previously, along with other deputies, responded at the ___me speed and same fashion while responding CODE 3 to the same ___rticular area. While still pressing the brake, I drove over a slight ___p in the roadway of Highway 115, just prior to the curve were the ___adway proceeds in a southbound and northbound direction. The dip in ___e roadway is from farm implement and semi-trucks entering and exiting ___ghway 115 from Wirt Road, an extension road in an eastbound direction ___ing off Highway 115. After driving over the slight dip, the rear of ___atrol unit began to slid to the left. I counter-steered and began ___ ide sideways around the curve. I was negotiating the curve and had ___ ___ost control of my patrol unit and began to navigate the vehicle ___ck into the southbound lane. At this time I noticed the semi-truck ___avelling in the northbound lane had entered the curve and was in close ___oximity to colliding with me. I believed the only option of possibly ___t causing damage to the unit and not colliding with the semi-truck was ___ steer the vehicle off the top of the curve.

Upon steering my patrol unit off the curve and not colliding ___th the semi-truck, my patrol unit began to slid down the backside of ___e curve. At the bottom of the curve was a patch of soft sand which ___opped my tires from sliding causing my unit to began to roll-over. ___ter my patrol unit came to a complete stop from rolling over, I ___vised dispatch that my unit had been rolled over and it's location. I ___ited my patrol unit and located the semi-truck that had been ___avelling in the northbound lane. (W1) GEORGE GALVEZ ACOSTA was the ___iver of the semi-truck and had pulled to the side of the roadway. ___) GEORGE GALVEZ ACOSTA stated he saw the rear of my patrol unit slide ___ the left as I was just going into the curve, just passing Wirt Road. ___advised him that he was to stand-by in order to advise California ___ghway Patrol and my supervisor of what he observed.

At this time, Calipatria Fire Department arrived and placed me

**00607**

**Ex. 8**

252

Pioneer's me... ...eased.

　　Refer to records.

　　Tackett   # 871
　　Sheriff
...h County Patrol
...erial County Sheriff's Department

**Ex. 8**

253

me Report:                    0111-0017

·ty:                          Pompeyo Tabarez Sr.

    class:                    Damage to County Property (Traffic accident).

tim:

        Justin tackett  Deputy Sheriff  I.C.S.O., North County
        Operations

        County of Imperial, Sheriff's Office

nesses:

        Acosta, George Galvez    DOB: 10-20-48   ADD: 354 Larsen road,
        Imperial, Ca.

idence:

        Refer to California Highway Patrol's report #01 11 01

icle(s):

        Imperial County Sheriff's Office Patrol unit #310, stored at the
        Imperial County garage.

  ative:

  rsday, November 01, 2001, at approximately 0959 hours, while
sponding to an explosives call along with Deputy Justin Tackett, I,
erial County Sheriff's Office Sergeant Pompeyo Tabarez heard over the
erial County Sheriff's Office radio frequency as Deputy Tackett
quested and ambulance at Highway 115 and Wirt road and notified the on
ty dispatcher, he had been involved in a traffic accident in which his
it, Imperial County Sheriff's Office patrol vehicle # 310 had
tally damaged.

responded to Deputy Tackett's location and upon arrival found him on
  ground on a gurney and being tended to by Calipatria's Fire
partment's personnel.  Deputy tackett was later transported to the
awley Pioneers Memorial Hospital via ambulance.

uty Tackett's patrol unit #310 was resting on its wheels on a dirt
a East of Highway 115.

  California Highway Patrol Office and responded Officers P. Torres
 P. Flanders to take the accident report.

notified the Imperial County Sheriff's Office on duty Chief Deputy J.
 ns of the incident, and later met with him and briefed him.

**00609**

**Ex. 8**

254

ATIVE:

On 11-██-01 at approx. 1050 hrs, ██ arrived at Hwy 115 and Wirt Road and met with Sgt. F. Tabarez. I photographed the scene of an accident involving unit 310, a Imperial County Sheriff's patrol vehicle. I photographed the road way and the damaged vehicle.

| DUTY EMERGENCY VEHICLE | | | INCORPORATED | BRAWLEY | | | |
|---|---|---|---|---|---|---|---|
| NUMBER KILLED: 0 | HIT & RUN MISDEMEANOR | COUNTY | REPORTING DISTRICT | BEAT 23 | 01 11 01 | | |
| NUMBER KILLED: 0 | | IMPERIAL | | | | | |

| COLLISION OCCURRED ON: | | MO DAY YEAR TIME (2400) | NCIC # | OFFICER I.D. |
|---|---|---|---|---|
| S-115 | | 11/01/2001  1000 | 9625 | 15990 |

| POST INFORMATION: | DAY OF WEEK | TOW AWAY | PHOTOGRAPHS BY: |
|---|---|---|---|
| 543 FEET SOUTH OF 115 MPM 31.63 | THURSDAY | X YES  NO | X NONE |
| AT INTERSECTION WITH: | | STATE HWY REL | |
| X OR:  543 FEET SOUTH OF WIRT ROAD | | X YES  NO | |

| DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY EQUIP. | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|
| B4621319 | CA | C | G | 2001 | FORD SEDAN WHI | 1094307 | CA |

NAME (FIRST, MIDDLE, LAST)

JUSTIN CRAIG TACKETT

OWNER'S NAME   ☐ SAME AS DRIVER

STREET ADDRESS

383 MAIN STREET

IMPERIAL COUNTY SHERIFF

OWNER'S ADDRESS   ☐ SAME AS DRIVER

CITY / STATE / ZIP

BRAWLEY                CA    92227

328 APPLESTILL ROAD, EL CENTRO, CA 92243

DISPOSITION OF VEHICLE ON ORDERS OF:   ☐ OFFICER   ☐ DRIVER   X OTHER

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE MO Day Year | RACE |
|---|---|---|---|---|---|---|
| M | RED | BRN | 5-09 | 170 | 06/20/1978 | W |

BEACH & SONS - (760)352-8009

PRIOR MECH. DEFECTS    X NONE APP.    ☐ REFER TO NARRATIVE

| HOME PHONE | BUSINESS PHONE |
|---|---|
| (760)344-2615 | (760)344-2615 |

VEHICLE IDENTIFICATION NUMBER:          2FAFP71W91X159562

| INSURANCE CARRIER | POLICY NUMBER |
|---|---|
| SELF-INSURED | N/A |

CHP USE ONLY   DESCRIBE VEHICLE DAMAGE        SHADE IN DAMAGED AREA

VEHICLE TYPE   ☐ UNK  ☐ NONE  ☐ MINOR

| DIR OF TRAVEL | ON STREET OR HIGHWAY | SPEED LIMIT |
|---|---|---|
| S | SR-115 | 65 |

48   ☐ MOD  ☐ MAJOR  X ROLL-OVER

CA              DOT

CAL-T        TCP/PSC         MC/MX

| DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

NAME (FIRST, MIDDLE, LAST)

OWNER'S NAME   ☐ SAME AS DRIVER

STREET ADDRESS

OWNER'S ADDRESS   ☐ SAME AS DRIVER

CITY / STATE / ZIP

DISPOSITION OF VEHICLE ON ORDERS OF   ☐ OFFICER   ☐ DRIVER   ☐ OTHER

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE MO Day Yea | RACE |
|---|---|---|---|---|---|---|
| | | | | | | |

PRIOR MECHANICAL DEFECTS   ☐ NONE APP   ☐ REFER TO NARRATIVE

| HOME PHONE | BUSINESS PHONE |
|---|---|
| | |

VEHICLE IDENTIFICATION NUMBER:

CHP USE ONLY   DESCRIBE VEHICLE DAMAGE        SHADE IN DAMAGED AREA

VEHICLE TYPE   ☐ UNK  ☐ NONE  ☐ MINOR

| INSURANCE CARRIER | POLICY NUMBER |
|---|---|
| | |

☐ MOD  ☐ MAJOR  ☐ ROLL-OVER

CA              DOT

| DIR OF TRAVEL | ON STREET OR HIGHWAY | SPEED LIMIT |
|---|---|---|
| | | |

CAL-T        TCP/PSC         MC/MX

| DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

NAME (FIRST, MIDDLE, LAST)

OWNER'S NAME   ☐ SAME AS DRIVER

STREET ADDRESS

OWNER'S ADDRESS   ☐ SAME AS DRIVER

CITY / STATE / ZIP

DISPOSITION OF VEHICLE ON ORDERS OF   ☐ OFFICER   ☐ DRIVER   ☐ OTHER

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE MO Day Yea | RACE |
|---|---|---|---|---|---|---|
| | | | | | | |

PRIOR MECHANICAL DEFECTS   ☐ NONE APP.   ☐ REFER TO NARRATIVE

| HOME PHONE | BUSINESS PHONE |
|---|---|
| | |

VEHICLE IDENTIFICATION NUMBER:

CHP USE ONLY   DESCRIBE VEHICLE DAMAGE        SHADE IN DAMAGED AREA

VEHICLE TYPE   ☐ UNK  ☐ NONE  ☐ MINOR

| INSURANCE CARRIER | POLICY NUMBER |
|---|---|
| | |

☐ MOD  ☐ MAJOR  ☐ ROLL-OVER

CA              DOT

| DIR OF TRAVEL | ON STREET OR HIGHWAY | SPEED LIMIT |
|---|---|---|
| | | |

CAL-T        TCP/PSC         MC/MX

___ HDQ
___ FARS
___ CALTRA
___ COURT
___ JUV.
___ U.O. RD
___ CORON
___ MILITA
___ P.D.
___ CHP

00611

| PREPARER'S NAME | DISPATCH NOTIFIED | REVIEWER'S NAME | DATE REVIEWED |
|---|---|---|---|
| TORREZ 15990 | X YES  INC  NO | M. Kindly | 11-15-01 |

Ex. 8

256

| 'PERTY | OWNER | OWNER ADDRESS | NOTIFIED |
|---|---|---|---|
| MAGE | | | YES ☐ NO |

DESCRIPTION OF DAMAGE

| POSITION | | OCCUPANTS | SAFETY EQUIPMENT | M/C BICYCLE - HELMET | EJECTED FROM VEHICLE |
|---|---|---|---|---|---|

**OCCUPANTS**
A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP/SHOULDER HARNESS USED
H - LAP/SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED

**SAFETY EQUIPMENT**
L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

**CHILD RESTRAINT**
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE
U - NONE IN VEHICLE

**M/C BICYCLE - HELMET**
DRIVER
V - NO
W - YES

PASSENGER
X - NO
Y - YES

**EJECTED FROM VEHICLE**
0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

1 - DRIVER
2 TO 6 - PASSENGERS
7 - STA. WGN REAR
8 - RR. OCC TRK. OR VAN
9 - POSITION UNKNOWN
0 - OTHER

2 3
5 6
7

ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.

| PRIMARY COLLISION FACTOR<br>LIST NUMBER (#) OF PARTY AT FAULT | TRAFFIC CONTROL DEVICES | 1 | 2 | 3 | TYPE OF VEHICLE | 1 | 2 | 3 | MOVEMENT PRECEDING COLLISION |
|---|---|---|---|---|---|---|---|---|---|
| A VC SECTION VIOLATED  CITED ☐ YES<br>22350 ☒ NO | A CONTROLS FUNCTIONING | | | | A PASSENGER CAR / STATION WAGON | | | | A STOPPED |
| | B CONTROLS NOT FUNCTIONING* | | | | B PASSENGER CAR W / TRAILER | | | | B PROCEEDING STRAIGHT |
| B OTHER IMPROPER DRIVING* | C CONTROLS OBSCURED | | | | C MOTORCYCLE / SCOOTER | X | | | C RAN OFF ROAD |
| | X D NO CONTROLS PRESENT / FACTOR* | | | | D PICKUP OR PANEL TRUCK | | | | D MAKING RIGHT TURN |
| C OTHER THAN DRIVER* | TYPE OF COLLISION | | | | E PICKUP / PANEL TRUCK W/ TRAILER | | | | E MAKING LEFT TURN |
| D UNKNOWN* | A HEAD - ON | | | | F TRUCK OR TRUCK TRACTOR | | | | F MAKING U TURN |
| E FELL ASLEEP* | B SIDE SWIPE | | | | G TRUCK / TRUCK TRACTOR W/ TRLR. | | | | G BACKING |
| | C REAR END | | | | H SCHOOL BUS | | | | H SLOWING / STOPPING |
| WEATHER   (MARK 1 TO 2 ITEMS) | D BROADSIDE | | | | I OTHER BUS | | | | I PASSING OTHER VEHICLE |
| A CLEAR | E HIT OBJECT | | | | J EMERGENCY VEHICLE | | | | J CHANGING LANES |
| B CLOUDY | X F OVERTURNED | | | | K HIGHWAY CONST. EQUIPMENT | | | | K PARKING MANEUVER |
| C RAINING | G VEHICLE / PEDESTRIAN | | | | L BICYCLE | | | | L ENTERING TRAFFIC |
| D SNOWING | H OTHER*: | | | | M OTHER VEHICLE | | | | M OTHER UNSAFE TURNING |
| E FOG / VISIBILITY        FT. | I | | | | N PEDESTRIAN | | | | N XING INTO OPPOSING LANE |
| F OTHER*: | MOTOR VEHICLE INVOLVED WITH | | | | O MOPED | | | | O PARKED |
| WIND | X A NON - COLLISION | | | | | | | | P MERGING |
| LIGHTING | B PEDESTRIAN | | | | | | | | Q TRAVELING WRONG WAY |
| DAYLIGHT | C OTHER MOTOR VEHICLE | 1 | 2 | 3 | OTHER ASSOCIATED FACTORS<br>(MARK 1 TO 2 ITEMS) | | | | R OTHER*: |
| 0K - DAWN | D MOTOR VEHICLE ON OTHER ROADWAY | | | | | | | | |
| D 0K - STREET LIGHTS | E PARKED MOTOR VEHICLE | | | | A VC SECTION VIOLATED  CITED ☐ YES ☐ NO | | | | |
| E DARK - NO STREET LIGHTS | F TRAIN | | | | | | | | |
| DARK - STREET LIGHTS NOT<br>FUNCTIONING* | G BICYCLE | | | | B VC SECTION VIOLATED  CITED ☐ YES ☐ NO | | | | SOBRIETY - DRUG<br>-PHYSICAL<br>(MARK 1 TO 2 ITEMS) |
| ROADWAY SURFACE | H ANIMAL: | | | | C VC SECTION VIOLATED  CITED ☐ YES ☐ NO | 1 | 2 | 3 | |
| A DRY | I FIXED OBJECT: | | | | | | | | A HAD NOT BEEN DRINKING |
| B WET | | | | | D | X | | | B HBD - UNDER INFLUENCE |
| C SNOWY - ICY | J OTHER OBJECT: | | | | E VISION OBSCUREMENT: | | | | C HBD - NOT UNDER INFLUENCE |
| D SLIPPERY (MUDDY, OILY, ETC.) | | | | | F INATTENTION* | | | | D HBD - IMPAIRMENT UNKNOWN* |
| ROADWAY CONDITION(S)<br>(MARK 1 TO 2 ITEMS) | | | | | G STOP & GO TRAFFIC | | | | E UNDER DRUG INFLUENCE* |
| | PEDESTRIAN'S ACTIONS | | | | H ENTERING / LEAVING RAMP | | | | F IMPAIRMENT - PHYSICAL* |
| A HOLES, DEEP RUT* | X A NO PEDESTRIANS INVOLVED | | | | I PREVIOUS COLLISION | | | | G IMPAIRMENT NOT KNOWN |
| B LOOSE MATERIAL ON ROADWAY* | B CROSSING IN CROSSWALK<br>AT INTERSECTION | | | | J UNFAMILIAR WITH ROAD | | | | H NOT APPLICABLE |
| C OBSTRUCTION ON ROADWAY* | | | | | K DEFECTIVE VEH. EQUIP.: CITED | | | | I SLEEPY / FATIGUED |
| D CONSTRUCTION - REPAIR ZONE | C CROSSING IN CROSSWALK - NOT<br>AT INTERSECTION | | | | ☐ YES ☐ NO | | | | SPECIAL INFORMATION |
| E REDUCED ROADWAY WIDTH | D CROSSING - NOT IN CROSSWALK | | | | L UNINVOLVED VEHICLE | | | | A HAZARDOUS MATERIAL |
| F FLOODED* | E IN ROAD - INCLUDES SHOULDER | | | | M OTHER*: | | | | B CELL PHONE IN USE |
| G OTHER*: | F NOT IN ROAD | X | | | N NONE APPARENT | | | | C CELL PHONE NOT IN USE |
| H NO UNUSUAL CONDITIONS | G APPROACHING / LEAVING SCHOOL BUS | | | | O RUNAWAY VEHICLE | | X | | D CELL PHONE NONE/UNKNOWN* |

SKETCH



DOUBLE
YELLOW LINES
SOLID WHITE
LINE

SR-115

S/B    N/B

WIRT ROAD
INDICATE NORTH

SOLID WHITE
LINE

ASPHALT
SHOULDERS

V-1

MISCELLANEOUS

4 ft → ← 12 ft → ← 12 ft → ← 4 ft

00612

**Ex. 8**
257

'01/2001

| NESS LY | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY('X' ONE) | | | | INJURED WAS ('X' ONE) | | | | | PARTY NUMBER | SEAT POS | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FATAL INJURY | SEVERE INJURY | OTHER VISIBLE INJURY | COMPLAINT OF PAIN | DRIVER | PASS. | PED. | BICLYCLIST | OTHER | | | | |
| | ☐ | 53 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

ME / D.O.B. / ADDRESS                                                                                       TELEPHONE
GORGE GALVEZ ACOSTA  (10/20/1948)  354 LARSEN ROAD, IMPERIAL, CA 92251          (760)355-2312

JURED ONLY) TRANSPORTED BY:                              TAKEN TO:

SCRIBE INJURIES:

| | | | | | | | | | | | | | VICTIM OF VIOLENT CRIME NOTIFIED ☐ | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F | ☐ | 23 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | 1 | 1 | G | 0 |

ME / D.O.B. / ADDRESS                                                                                       TELEPHONE
JSTIN CRAIG TACKETT   (06/20/1978)  383 MAIN STREET, BRAWLEY, CA 92227          (760)344-2615

JURED ONLY) TRANSPORTED BY:                              TAKEN TO:
OLD CROSS AMBULANCE                              PIONEER'S MEM HOSP, BRAWLEY CA

SCRIBE INJURIES:     TRANSPORTED FOR PRECAUTIONARY REASONS.  NO COMPLAINTS OF PAIN OR
IJURIES.

| | | | | | | | | | | | | | VICTIM OF VIOLENT CRIME NOTIFIED ☐ | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

ME / D.O.B. / ADDRESS                                                                                       TELEPHONE

JURED ONLY) TRANSPORTED BY:                              TAKEN TO:

RIBE INJURIES:

| | | | | | | | | | | | | | VICTIM OF VIOLENT CRIME NOTIFIED ☐ | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

ME / D.O.B. / ADDRESS                                                                                       TELEPHONE

JURED ONLY) TRANSPORTED BY:                              TAKEN TO:

SCRIBE INJURIES:

| | | | | | | | | | | | | | VICTIM OF VIOLENT CRIME NOTIFIED ☐ | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

ME / D.O.B. / ADDRESS                                                                                       TELEPHONE

JURED ONLY) TRANSPORTED BY:                              TAKEN TO:

SCRIBE INJURIES:

| | | | | | | | | | | | | | VICTIM OF VIOLENT CRIME NOTIFIED ☐ | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

ME / D.O.B. / ADDRESS                                                                                       TELEPHONE

RED ONLY) TRANSPORTED BY:                              TAKEN TO:

**00613**

INJURIES.

VICTIM OF VIOLENT CRIME NOTIFIED

| EPARER'S NAME | I.D NUMBER | IMO | DAY | YEAR | REVIEWER'S NAME | | IMO | DAY | YEAR |
|---|---|---|---|---|---|---|---|---|---|
| TORREZ | 15990 | 11/01/2001 | | | | **Ex. 8** | | | |

258



ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE

12'   12'

SR 115

INDICATE
NORTH

00614

**Ex. 8**

PREP'D BY
P. FLANDERS

I.D. NUMBER
9420

MO   DAY   YEAR
11-02-01

REVIEWER'S NAME

MO   DAY   YEAR
259

ALL MEASUREMENTS APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE = )



STATION LINE          0+00          WIRT ROAD   E/B ONLY

12"     12"

INDICATE
NORTH

| P. FLANDERS | I.D NUMBER 9420 | MO DAY YEAR 11-02-01 | REVIEWER'S NAME | 00615 | MO DAY YEAR |
|-------------|------------------|------------------------|------------------|--------|--------------|

**Ex. 8**
260

| CHP 556 OPI 042 | | | | |
|---|---|---|---|---|
| DATE 11-01-01 | TIME (24 HOUR) 1000 | NCIC NUMBER 9625 | OFFICER I.D. NUMBER 15790 | NUMBER 01 11 01 |

## FACTUAL DIAGRAM LEGEND

STATION LINE LOCATION 0+00 LOCATED 6 FEET S/OF THE SOUTH PROLONGATION LINE OF WIRT ROAD AND ON THE EAST ROADS EDGE OF S.R.115 STATION LINE INCREASES AS YOU TRAVEL SOUTH.

### VEHICLE POINT OF REST

| | |
|---|---|
| V-1 L/F TIRE 723 FEET S/OF STATION LINE AND 48 FEET E/OF EAST ROADS EDGE | |
| V-1 L/R TIRE 724 FEET S/OF STATION LINE AND 42 FEET E/OF EAST ROADS EDGE | |
| | |
| | |
| | |
| | |

### PHYSICAL EVIDENCE IDENTIFICATION

| 1 | TO | 2 | SKID MARK ON ASPHALT | |
|---|---|---|---|---|
| 3 | TO | 4 | SKID MARK ON ASPHALT | |
| 5 | TO | 6 | SKID MARK ON ASPHALT | |
| 7 | TO | 8 | SKID MARK ON ASPHALT | |
| 9 | TO | 10 | SKID MARK ON DIRT | 4 |
| 11 | TO | 12 | SKID MARK ON DIRT | 6 |
| 13 | TO | 14 | SKID MARK ON DIRT | |
| 15 | | | DIRT IMPRESSION | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

00616

| PREPARER'S NAME AND I.D. NUMBER P. FLANDERS # 9420 | DATE 11/02/01 | REVIEWER'S NAME | DATE |
|---|---|---|---|

**Ex. 8**
261

P 556 OPI 042

| TE | TIME (24 HOUR) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 11-01-01 | 1000 | 9625 | 15-990 | 01 11 01 |

## PHYSICAL EVIDENCE LOCATION

| 1 | 16 | FT | W/OF | STATION LINE | 0+06 | |
|---|---|---|---|---|---|---|
| 2 | 0 | FT | ON | STATION LINE | 5+70 | |
| 3 | 17 | FT | W/OF | STATION LINE | 0+06 | |
| 4 | 0 | FT | ON | STATION LINE | 5+65 | |
| 5 | 21 | FT | W/OF | STATION LINE | 0+18 | |
| 6 | 0 | FT | ON | STATION LINE | 5+37 | |
| 7 | 18 | FT | W/OF | STATION LINE | 3+33 | |
| 8 | 0 | FT | ON | STATION LINE | 5+57 | |
| 9 | 10 | FT | E/OF | STATION LINE | 6+03 | |
| 10 | 45 | FT | E/OF | STATION LINE | 7+10 | |
| 11 | 14 | FT | E/OF | STATION LINE | 6+24 | |
| 12 | 36 | FT | E/OF | STATION LINE | 7+10 | |
| 13 | 12 | FT | E/OF | STATION LINE | 6+24 | |
| 14 | 33 | FT | E/OF | STATION LINE | 7+10 | |
| 15 | 43 | FT | E/OP | STATION LINE | 7+18 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

00617

| ...ARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| P. FLANDERS # 9420 | 11/02/01 | | |

**Ex. 8**

262

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D.# | NUMBER |
|---|---|---|---|---|
| 11/01/2001 | 100● | 9625 | 15●● | 01 11 01 |

## FACTS:

## NOTIFICATION:

5 I WAS DISPATCHED TO A TRAFFIC COLLISION WITH AN AMBULANCE EN ROUTE,
6 INVOLVING A IMPERIAL COUNTY SHERIFF'S PATROL VEHICLE AT 1005 HOURS. I
7 RESPONDED FROM SR-78 AT GECKO ROAD AND ARRIVED ON SCENE AT APPROXIMATELY
8 1025 HOURS.
9
10 ALL TIMES, SPEEDS, AND MEASUREMENTS WERE APPROXIMATE. MEASUREMENTS WERE
11 OBTAINED BY ROLLMETER.
12

## SCENE:

14
15 THE COLLISION OCCURRED ON SR-115 SOUTH OF WIRT ROAD. IN THIS AREA SR-115 IS A
16 NORTH/SOUTH DESIGNATED ASPHALT CONSTRUCTED ROADWAY WHICH TRAVELS IN A
17 NORTH-EASTERLY/SOUTH-WESTERLY DIRECTION WITH ONE LANE FOR EACH DIRECTION
18 OF TRAVEL. THE NORTHBOUND LANE IS SEPARATED FROM THE SOUTHBOUND LANE BY
19 SOLID DOUBLE YELLOW LINES. THE TRAFFIC LANES ARE 12 FEET WIDE, AND THERE ARE 4
20 FEET ASPHALT SHOULDERS. THE TRAFFIC LANES ARE SEPARATED FROM THE ASPHALT
21 SHOULDERS BY SOLID WHITE EDGE LINES. THERE IS A DIRT EMBANKMENT TO THE EAST
    AND WEST OF SR-115. AT THIS LOCATION SR-115 CURVES IN A NORTHEASTERLY
23 DIRECTION AS YOU TRAVEL NORTH AND A SOUTHWESTERLY DIRECTION AS YOU TRAVEL
24 SOUTH. THERE ARE YELLOW CURVE WARNING SIGNS APPROXIMATELY 400 FEET PRIOR
25 TO ENTERING THE CURVE IN BOTH DIRECTIONS WITH A RECOMMENDED SPEED OF 55
26 MPH.. SR-115 IS LEVEL AND IN GOOD REPAIR. SR-115 TRAVERSES THROUGH AN
27 AGRICULTURAL AREA. REFER TO FACTUAL DIAGRAM AND LEGEND FOR FURTHER
28 DETAILS.
29

## PARTIES:

31
32 V-1 (FORD) WAS LOCATED AT IT'S POINT OF REST. V-1 SUSTAINED ROLL-OVER DAMAGE
33 CONSISTING OF BUT NOT LIMITED TO DENTED LEFT FRONT FENDER, SMASHED IN
34 WINDSHIELD AND CRUSHED IN ROOF AND LIGHTBAR. I PHYSICALLY INSPECTED THE
35 DRIVER SIDE SEATBELT OF V-1 AND FOUND IT TO BE IN GOOD WORKING ORDER. NO
36 OTHER MECHANICAL DEFECTS WERE NOTED OR CLAIMED.
37
38 P-1 WAS CONTACTED AT BED #1 OF THE PIONEERS MEMORIAL HOSPITAL EMERGENCY
39 ROOM AT APPROXIMATELY 1045 HOURS. HE WAS DETERMINED TO BE THE DRIVER OF V-1
40 BY THE FOLLOWING:
 1 -HIS VALID DRIVER LICENSE                    -UNIT #310 SIGNED OUT BY HIM
 2 -HE BEING ON DUTY (I.C.S.O. DEPUTY UNIFORM)  -HIS OWN ADMISSION

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| P. TORREZ | 15990 | 11/01/2001 | | 00618 |

**Ex. 8**

263

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER'S I.D. | PAGE NUMBER |
|---|---|---|---|---|
| 11/01/2001 | 1000 | 9625 | 15990 | 01 11 01 |

**PHYSICAL EVIDENCE:**

3 SEE FACTUAL DIAGRAM AND LEGEND OF THIS REPORT FOR FURTHER DETAILS.
4
5 **STATEMENTS:**
6
7 P-1 (TACKETT) WAS CONTACTED AT BED #1 OF THE PIONEERS MEMORIAL HOSPITAL
8 EMERGENCY ROOM AT APPROXIMATELY 1045 HOURS AND RELATED THE FOLLOWING: HE
9 WAS S/B ON SR-115 AT APPROXIMATELY 85-90 MPH RESPONDING CODE 3 TO AN
0 EXPLOSIVES CALL. AS HE WAS APPROACHING THE CURVE SOUTH OF WIRT ROAD, HE
1 BEGAN TO SLOW DOWN. HE THEN FELT THE REAR OF V-1 (FORD) BEGIN FLOATING TO HIS
2 LEFT. HE STARTED SKIDDING SIDEWAYS IN A SOUTH-EASTERLY DIRECTION AND SAW A
3 BIG RIG APPROACHING HIS LOCATION FROM THE OPPOSITE DIRECTION. IN ORDER TO
4 AVOID A COLLISION WITH THE BIG RIG, HE STEERED HARD TO HIS LEFT CAUSING V-1 TO
5 TURN AROUND AND BEGIN SKIDDING IN AN EASTERLY DIRECTION. V-1 THEN SKIDDED
6 OFF THE ROAD AND ROLLED-OVER. HE DOESN'T REMEMBER HOW MANY TIMES HE
7 ROLLED-OVER.
8
9 W-1 (ACOSTA) WAS CONTACTED AT THE SCENE AND RELATED THE FOLLOWING: HE WAS
20 N/B SR-115 APPROACHING THE CURVE IN A NORTH-WESTERLY DIRECTION WHEN HE
   OBSERVED THE SHERIFF'S UNIT SIDEWAYS ACROSS BOTH LANES. HE STEERED HARD TO
   HIS LEFT IN ORDER TO AVOID BROAD SIDING THE SHERIFF'S UNIT.

24 **OPINIONS AND CONCLUSIONS:**
25
26 **SUMMARY:**
27
28 P-1 (TACKETT) WAS DRIVING V-1 (FORD) S/B ON SR-115 AT A STATED SPEED OF 85-90 MPH
29 RESPONDING CODE 3 TO AN EXPLOSIVES CALL. AS HE WAS TRAVERSING THROUGH THE
30 CURVATURE OF THE ROAD, HE LOST CONTROL OF V-1. V-1 BEGAN TO SKID SIDEWAYS IN
31 A SOUTH-EASTERLY DIRECTION. P-1 STEERED HARD TO HIS LEFT TO AVOID BEING
32 BROAD SIDED BY A BIG RIG APPROACHING HIM FROM THE OPPOSITE DIRECTION. BY P-1
33 STEERING HARD TO HIS LEFT, IT CAUSED V-1 TO BEGIN SKIDDING IN AN EASTERLY
34 DIRECTION. V-1 SKIDDED OFF THE ROAD BEFORE ROLLING OVER ONCE AND COMING TO
35 REST ON IT'S WHEELS.
36
37 SUMMARY WAS BASED ON PHYSICAL EVIDENCE, VEHICLE DAMAGE AND STATEMENTS.
38
39
-0
-1

00619

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| P. TORREZ | 15990 | 11/01/2001 | | |

**Ex. 8**

264

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11/01/2001 | 1000 | 9625 | 15990 | 01 11 01 |

## AREA OF IMPACT:

3  THE AREA OF IMPACT WAS BASED ON PHYSICAL EVIDENCE (TIRE FRICTION MARKS AND
4  DISTURBED DIRT), THE TYPE OF DAMAGE SUSTAINED TO THE VEHICLE AND VEHICLE
5  POINT OF REST.
6
7  THE AREA OF IMPACT WAS LOCATED 724' FEET SOUTH OF THE SOUTH ROAD EDGE
8  PROLONGATION OF WIRT ROAD AND 43' EAST OF THE EAST PAVED ROAD EDGE OF SR-115.
9
10 ## CAUSE:
11
12 THE CAUSE OF THIS COLLISION IS ATTRIBUTED TO P-1 (TACKETT) FOR VIOLATION OF
13 SECTION 22350 VC- UNSAFE SPEED FOR CONDITIONS. TACKETT WAS TRAVELING AT A
14 STATED SPEED OF APPROXIMATELY 85-90 MPH.  A SAFE SPEED AT THE TIME OF THE
15 COLLISION WOULD HAVE BEEN 60-65 MPH.
16
17 THE CAUSE WAS DETERMINED BY PHYSICAL EVIDENCE, VEHICLE DAMAGE AND
18 STATEMENTS.
19
20 ## RECOMMENDATIONS:
1

NONE.

23

**00620**

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| P. TORREZ | 15990 | 11/01/2001 | | |

**Ex. 8**

265

May 21 02 02:36p    BRAWL● PD    (760) ●1-1719    p.3

STATE OF CALIFORNIA
**AFFIC COLLISION REPORT**
555 Page 1 (Rev. 8-97) OPI 042

| | NUMBER INJURED | HIT & RUN FELONY | CITY | JUDICIAL DISTRICT | LOCAL REPORT NUMBER |
|---|---|---|---|---|---|
| CC CHP | 0 | | BRAWLEY | BRAWLEY | 014194 |
| | NUMBER KILLED | HIT & RUN MISDEMEANOR | COUNTY | REPORTING DISTRICT | BEAT |
| | 0 | ☒ | IMPERIAL | | 01 |

| COLLISION OCCURRED ON | MO. DAY YEAR | TIME (2400) | NCIC # | OFFICER I.D. |
|---|---|---|---|---|
| RIO VISTA | 12 25 2001 | 0023 | 1301 | 910 |

MILEPOST INFORMATION

FEET/MILES    OF

DAY OF WEEK  S M T W T (F) S    TOW AWAY ☐ YES ☒ NO    PHOTOGRAPHS BY: ☐ NONE    922

☒ AT INTERSECTION WITH: K "7"    FEET/MILES   5   OF   3    STATE HWY REL. ☐ YES ☒ NO

| DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|
| 20002 VL | | | | UNK | PASS JEEP / BLK | UNK | |

NAME (FIRST, MIDDLE, LAST)

OWNER'S NAME  ☐ SAME AS DRIVER

STREET ADDRESS

OWNER'S ADDRESS  ☐ SAME AS DRIVER

CITY/STATE/ZIP

DISPOSITION OF VEHICLE ON ORDERS OF:  ☐ OFFICER  ☐ DRIVER  ☐ OTHER

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo. Day Year | RACE |
|---|---|---|---|---|---|---|

PRIOR MECHANICAL DEFECTS:  ☐ NONE APPARENT  ☐ REFER TO NARRATIVE

HOME PHONE    BUSINESS PHONE

VEHICLE IDENTIFICATION NUMBER:

CHP USE ONLY VEHICLE TYPE    DESCRIBE VEHICLE DAMAGE    SHADE IN DAMAGED AREA
☐ UNK  ☐ NONE  ☐ MINOR
☐ MOD.  ☐ MAJOR  ☐ ROLL-OVER

INSURANCE CARRIER    POLICY NUMBER

DIR OF TRAVEL: S  ON STREET OR HIGHWAY: RIO VISTA    SPEED LIMIT: 25

CA _____ DOT _____
CAL-T _____ TCP/PSC _____ MC/MX _____

| DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|
| | | | | 1967 | DODGE / / RED-WHT | 5D97538 | CA |

NAME (FIRST, MIDDLE, LAST)

OWNER'S NAME  ☐ SAME AS DRIVER  COLLINS, GARY JAMES

STREET ADDRESS

OWNER'S ADDRESS  ☐ SAME AS DRIVER  392 W. B ST.

CITY/STATE/ZIP

DISPOSITION OF VEHICLE ON ORDERS OF:  ☐ OFFICER  ☐ DRIVER  ☐ OTHER

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo. Day Year | RACE |
|---|---|---|---|---|---|---|

PRIOR MECHANICAL DEFECTS:  ☐ NONE APPARENT  ☐ REFER TO NARRATIVE

HOME PHONE    BUSINESS PHONE

VEHICLE IDENTIFICATION NUMBER: 128/672325

CHP USE ONLY VEHICLE TYPE    DESCRIBE VEHICLE DAMAGE    SHADE IN DAMAGED AREA
☐ UNK  ☐ NONE  ☐ MINOR
☐ MOD.  ☐ MAJOR  ☐ ROLL-OVER

INSURANCE CARRIER    POLICY NUMBER

DIR OF TRAVEL: N  ON STREET OR HIGHWAY: RIO VISTA    SPEED LIMIT: 25

CA _____ DOT _____
CAL-T _____ TCP/PSC _____ MC/MX _____

PARTY 3

| DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY EQUIP. | VEH. YEAR | MAKE/MODEL/COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|
| | | | | N/A | SPE. VE/TRAILER / RED | 1HM4414 | CA |

NAME (FIRST, MIDDLE, LAST)

OWNER'S NAME  ☐ SAME AS DRIVER  COLLINS GARY JAMES

STREET ADDRESS

OWNER'S ADDRESS  ☐ SAME AS DRIVER  392 W. B ST.

CITY/STATE/ZIP

**01082**

DISPOSITION OF VEHICLE ON ORDERS OF:  ☐ OFFICER  ☐ DRIVER  ☐ OTHER

**Ex. 9**

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo. Day Year | RACE |
|---|---|---|---|---|---|---|

**266**

PRIOR MECHANICAL DEFECTS:  ☐ NONE APPARENT  ☐ REFER TO NARRATIVE

HOME PHONE    BUSINESS PHONE

VEHICLE IDENTIFICATION NUMBER: CA875412

CHP USE ONLY VEHICLE TYPE    DESCRIBE VEHICLE DAMAGE    SHADE IN DAMAGED AREA
☐ UNK  ☐ NONE  ☐ MINOR
☐ MOD.  ☐ MAJOR  ☐ ROLL-OVER

INSURANCE CARRIER    POLICY NUMBER

DIR OF TRAVEL: ON STREET OR HIGHWAY    SPEED LIMIT

CA _____ DOT _____

29.21 02 02:37p        BRAWLE●PD              (760)●-1719         p.4

| Date of collision | Time | NCIC # | Officer # | DR #/ INC # |
|---|---|---|---|---|
| 12-28-01 | 0023 | 1301 | 910 | 014194/ 11228005 |

**NOTIFICATION:** I received this collision call at 0023 hours. I arrived on scene at approx 0025 hours. All times, measurements, and speeds are approximate.

**STATEMENTS:** D-1 (unknown) fled the scene and the other vehicle involved was a parked vehicle. There were no statements taken in this collision.

**SUMMARY:** V-2 (Dodge) and T-1 (trailer) were legally parked North bound along the East curb of Rio Vista. V-1 (Unknown) was traveling South bound on Rio Vista. V-1 (unknown) struck the front left bumper and fender of V-2 (Dodge). Then struck the left fender of the trailer. There was moderate damage to both V-2 (Dodge) and T-1 (trailer).

**AREA OF IMPACT:** The Area of Impact (AOI) #1 (Dodge) was 8'-7" South of South prolongation of B and 8'-7" West of the East curb of Rio Vista. The AOI #2 was 36'-1" South of the South prolongation of B and 6'-10" West of the East curb of Rio Vista. The AOI  was established by the point of rest of involved vehicles.

**CAUSE:** V-1 (unknown) caused this collision by being in violation of California Vehicle Code section 21650 VC, failure to drive on right side of roadway. This was established by the AOI and matching damage to the vehicles on scene. D-1 (unknown) is also in violation of California Vehicle Code section 20002 VC, failure to remain at the scene of a traffic collision.

**RECOMMENDATIONS:** None

01083

Ex. 9
267

ORIGINAL

# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## ADMINISTRATIVE INVESTIGATIONS UNIT

## IA # 2002-009



INVESTIGATION CONDUCTED
BY
SGT. DELFINO O. MATUS

00589

**Ex. 10**

268

**Ex. 10**

269

# TABLE OF CONTENTS

1. Internal affair investigation report # 2002-009 by Sgt. Delfino O. Matus.

2. Significant Event Review Committee (SERC) investigative report.

3. Memos.

4. Notice to Deputy Justin Tackett.

5. Imperial County Sheriff's Department CR # 0111-0017.

6. Interview of Deputy Justin Tackett.

7. Interview of Communication's Supervisor Norma Flores.

8. Interview of George Galvez Acosta.

00590

**Ex. 10**

270

# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## ADMINISTRATIVE INVESTIGATIONS UNIT

April 10, 2002

TO:     Chief Deputy Sharon Housouer
        North County Operations

FROM:   Sgt. Delfino O. Matus
        Administrative Investigations Unit

RE:     IA # 2002-009
        CR # 0111-0017

On March 5, 2002, the Imperial County Sheriff's Department
Administrative Investigations Unit (AIU) received a memo,
dated March 3, 2002, from Chief Deputy Sharon Housouer
requesting that AIU follow up several issues of a traffic
accident that occurred on November 1, 2001, involving
Deputy Justin Tackett. The accident was reported to have
occurred on Hwy 115 and Wirt Road, east of Calipatria,
California. The follow up that Chief Deputy Housouer
requested was at the request of the Imperial County
Sheriff's Department Significant Event Review Committee
(SERC).

The issues that were requested to be followed up were as
follows;

1.  Obtain the Imperial County Sheriff's Department
    communication tapes that were related to CR # 0111-
    0017.
2.  Interview the truck driver, identified as George
    Galvez Acosta, and verify accounts of the traffic
    accident.
3.  Interview Deputy Justin Tackett, regarding Imperial
    County Sheriff's Department Manual of Policies and
    Procedures Section 5.2.04.

The following is a summary of the incident that occurred on
November 1, 2001. Deputy Tackett reported he was responding
"Code 3" to a call of an explosive device found in the
desert, east of Brawley, California. He was responding from

**Ex. 10**

**00591**

271

Calipatria, California, where he had been assisting
Calipatria Police Department.

Deputy Tackett responded by traveling eastbound on Hwy 115
from Calipatria. Deputy Tackett reported he proceeded
eastbound on Hwy 115, traveling at a speed of approximately
80-90 MPH. As he approached the curve at Hwy 115 and Wirt
Road, he observed a semi-truck traveling northbound on Hwy
115, south of the curve. Deputy Tackett reported he began
applying the brakes to the patrol unit, and while doing so,
he drove over a slight dip on the roadway, prior to
reaching the curve. As he drove over the dip on the
roadway, the patrol unit went out of control, subsequently
causing it to roll over.

The California Highway Patrol investigated the traffic
accident and determined the cause was attributed to Deputy
Tackett's violation of section 22350 of the California
Vehicle Code Unsafe Speed for Conditions. Deputy Tackett
was traveling at a stated speed of approximately 85-90 MPH.
A safe speed at the time of the collision would have been
60-65 MPH.

On March 5, 2002, AIU Sgt. Delfino O. Matus, submitted to
Imperial County Sheriff's Department Communications
Supervisor Norma Flores a memo requesting any and all audio
recordings as related to CR # 0111-0017, date of November
1, 2001. On March 13, 2002, Sgt. Matus received from
Supervisor Flores a memo advising that there is negative
data for that particular day, due to a malfunction of the
recording system at the sheriff's department.

Sgt. Matus contacted the El Centro Police Department,
Brawley Police Department, and the California Highway
Patrol in an attempt to locate a recorded copy of the event
on November 1, 2001. The three agencies were unable to
provide audio copies of the event.

On March 22, 2002, at approximately 0708 hours, Sgt. Matus
interviewed Mr. George Galvez Acosta. The interview was
conducted by telephone. The following is a summary of the
tape-recorded interview.

Mr. Acosta stated he was traveling northbound on Hwy 115,
driving a truck with a set of doubles, transporting hay. As
he approached the curve, that curves westbound toward
Calipatria, at an approximate speed of 45 MPH, he observed

4

00592

Ex. 10

272

the patrol unit lose control at the curve, stating he took
evasive action to avoid a head on collision with the unit.
Mr. Acosta does not recall if the patrol unit had its red
lights and siren on at the time of the accident.

Mr. Acosta stated he contacted Deputy Tackett after the
accident to check on his well-being. Deputy Tackett told
him that he was all right. Mr. Acosta further spoke with
Deputy Tackett and that Deputy Tackett told him that he
thought he had a tire blow out, which caused him to lose
control of the patrol unit. Mr. Acosta also stated that
Deputy Tackett told him that he was traveling a speed of
approximately 95 MPH at the time of the accident.

On March 28, 2002, at approximately 1110 hours, Sgt. Matus
interviewed Deputy Tackett at the Imperial County Sheriff's
Department, present was his representative Ms. Brenda
Coughlin from the office of Attorney's Bobbitt and
Pinckard. The following is a summary of the tape-recorded
interview.

Deputy Tackett stated he responded to a call of an
explosive device in the desert, east of Brawley,
California. He responded "Code 3." While in route he was
involved in a traffic accident at Hwy 115 and Wirt Road,
east of Calipatria, California.

Deputy Tackett stated his "Code 3" response consisted of
utilizing the emergency red lights, siren, and wigwags.
Deputy Tackett thinks that he may have informed dispatch by
cellular telephone that he was responding, "code" while
inquiring about the call. Deputy Tackett believes that he
didn't notify dispatch over the patrol unit's communication
system of his "code 3" response. Deputy Tackett also stated
that he didn't notify his supervisor that he was responding
"Code 3."

On April 4, 2002, at approximately 1129 hours, Sgt. Matus
interviewed Communications Supervisor Ms. Norma Flores. Ms.
Flores was the on duty dispatcher on the day of the traffic
accident that involved Deputy Tackett.

Ms. Flores states the sheriff's department received a call
from a company, stating an explosive device was found at a
location where the company was working. The company was
requesting that a patrol unit be dispatched to the location
of incident.

**Ex. 10**

**00593**

273

5

Ms. Flores does not recall having been informed by Deputy
Tackett that he was responding "Code 3," she believes that
she may have heard the siren in the back ground and asked
him if he was responding "Code 3." Ms. Flores does not
recall what Deputy Tackett's response was. Ms. Flores
stated when a unit is responding "Code 3" she will include
that information in the CAD comments of the radio history
of the call.

The CAD comments and radio history for CR # 0111-0015 &
0111-0017 were checked and there were negative entries
found that indicated that Deputy Tackett was responding
"Code 3."

After considering the witness statements and those of the
accused, Deputy Tackett, and the lack of supporting
information, such as audio recordings to establish what was
said prior to the traffic accident either by telephone, or
over the two-way radio it has been concluded that the
investigation failed to conclusively establish that Deputy
Tackett notified or didn't notify the sheriff's
communication center that he was responding "Code 3" to the
explosives call.

Section 5.2.04 B (2) of the Imperial County Sheriff's
Department Manual of Policies and Procedures requires that
"In all cases when officers activate their emergency
warning devices (lights/sirens, rear amber light, flashing
parking/tail lights, high beam headlights), in response to
an assignment, they shall notify the communications center
of their code 3 response and the location they are
responding from."

So based on the facts revealed by the investigation, which
failed to prove or disprove the misconduct, the disposition
of the investigation is **NOT SUSTAINED**, as related to
section 5.2.04 B (2) of the Imperial County Sheriff's
Department Manual of Policies and Procedures.
/////

# *Imperial County Sheriff's Department*
## *Significant Event Review Committee*



*Deputy Sheriff Justin Tackett*
*C.R. 0111-0017*

00595

**Ex. 10**
275

*Imperial County Sheriff's Department*

# Harold D. Carter
## Sheriff-Coroner-Marshal

## INTEROFFICE MEMO

Date:        November 27, 2001

TO:          Significant Event Review Committee (SERC)

FROM:        Sergeant Manuel Avila *Avila*

SUBJECT:     Deputy Justin Tackett

S.E.R.C.,

Please review the attached crime report, accident report and
O.J.I. report involving Deputy Justin Tackett and Patrol Unit
310.

Thanks

**Ex. 1**
276

# *Table of Contents*

1.  *Committee members*

2.  *S.E.R.C. Findings*

3.  *Imperial County Sheriff's incident reports*
    *C.R. 0111-0017*

4.  *California Highway Patrol Accident Report*
    *Number 011101*

5.  *D.M.V. Print out/Estimate of Damage*

00597

**Ex. 10**

277

*1.  Chief Deputy J. Obeso*

*2.  Lt.   W. Willard*

*3.  Sgt. D. Matus*

*4. Sgt. M. Garcia*

**00598**

**Ex. 10**
278

# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## SIGNIFICANT EVENT REVIEW COMMITTEE

February 15, 2002

TO:      Sheriff Harold D. Carter

FROM:    Significant Event Review Committee (SERC)

Re:      Deputy Justin Tackett
         On duty accident, dated November 1, 2001
         Imperial County Sheriff CR # 0111-0017
         California highway Patrol report # 011101


On February 7, 2002, the Significant Event Review Committee (SERC), consisting of Chief Deputy Jesse Obeso, Lieutenant. Bill Willard, Sergeant Manny Garcia and Sergeant Delfino O. Matus convened for the purpose of reviewing an on-duty accident that involved Deputy Justin Tackett. The accident occurred on November 1, 2001, at approximately 1000 hours, near State Route 115 and Wirt Road East of Brawley, California. Deputy Tackett was driving a marked sheriff's unit # 310, a white 2001 Ford Crown Victoria, California exempt plate 1094307. Deputy Tackett was assigned to the North County Operations Division. His immediate supervisor was Imperial County Sheriff's Sergeant Pompeyo Tabarez. The Chief Deputy responsible for North County Operations is Sharon Housouer.

SERC reviewed Imperial County Sheriff's CR # 0111-0017 that was prepared by Deputy Tackett and California Highway Patrol report number 011101. Deputy Tackett reported that he was responding "CODE-3" to a call of an explosive devise found in the desert east of the city of Brawley, California. Deputy Tackett states that he was traveling southbound on State Route 115 and entered a curve on the roadway at approximately 80 to 90 Miles per hour. As Deputy Tackett negotiated the curve he felt the rear of the unit begin to slide. Deputy Tackett states that he regained control of the unit, but was force to steer the unit over the embankment of the curve to avoid colliding with a tractor/trailer rig that was northbound on State Route 115.

1

The investigation has revealed that Deputy Tackett had reported four (4) other property damage incidents that involved county vehicles. Listed below is a summary of the incidents.

1.   On June 11, 2001 Deputy Tackett drove his unit into a dirt embankment near the City of Westmorland while enroute to take custody of a person arrested for outstanding warrants. The California Highway Patrol investigated the accident and determined that Deputy Tackett caused the accident by driving at an unsafe speed for conditions, in violation of C.V.C. section 22350. Deputy Tackett did receive administrative discipline in the form of a two-day suspension without pay.

2.   On July 23,2000, at approximately 1500 hours, Deputy Tackett reported to the sheriff's communication center that he had driven on to soft sand causing the unit to bottom out which caused damage to the right bumper of the unit. The location of incident is believed to be the New River and Evan Hewes Highway near Seeley, California. There was crime report number issued (0007-1058). It is not known if any corrective action was taken.

3.   On April 15,2001, at approximately 1538 hours, Deputy Tackett reported that while in pursuit of a suspect who had fled from custody he drove the patrol unit into a trench causing damage to the left fender of unit 244(B). The location of the incident was the Glamis area east of Brawley, California. It is not known if any corrective action was taken.

4.   On June 20, 2001 at approximately 0141 hours, Deputy Tackett reported that while responding to call, an owl struck the red lens cover of the overhead lights causing it to break.

Based on Deputy Tackett's report number 0111-0017 and California Highway Patrol report number 011101, SERC concludes that this accident was preventable and that Deputy Tackett caused this traffic accident by driving at a speed greater than is reasonable or prudent for the type of call assigned to him. SERC Finds that reports of explosive devices are frequent occurrences in Imperial County and that the majority of these calls are in unpopulated isolated areas, as was in this case. Reports of unexploded ordnance in remote unpopulated areas should not require a CODE-3 response.

California Highway Patrol traffic collision report number 011101 finds that the safe speed for the curve that Deputy

Ex. 10

Tackett was traveling on was 60/65 miles per hour. By Deputy Tackett's admission he was traveling at approximately 85/90 miles per hour. The C.H.P. report concludes that Deputy Tackett was the cause of the collision by being in violation of California Vehicle Code section 22350. Which states that no person shall drive a vehicle upon a highway at a speed greater than reasonable or prudent having due regard for weather, visibility, traffic and the surface and width of the highway and in no event at a speed, which endangers the safety of persons or property.

SERC also finds that it is apparent that Deputy Tackett has developed a pattern of negligent and reckless vehicle operation, placing himself and the citizens of Imperial County in harms way.

Deputy Tackett violated the following Imperial County Sheriff's Department Policies and Procedures:

- 2.1.01-Violation of Rules
  Employees shall not commit any other acts or omit any other acts, which constitute a violation of any of the rules, regulations, directives, order or policies of this department, whether stated in this general order or elsewhere.

- 2.3.07-Operation of Vehicles
  Employees shall operate official vehicles in a careful and prudent manner, and obey all laws of the state and all departmental orders pertaining to such operation.

- 5.2.04-Response Driving Situations
  In all cases when officers activate their emergency warning devices, in response to an assignment, they shall notify the communications center of their CODE-3 response and the location they are responding from.

After reviewing all reports SERC recommends the following action be taken:

- That Deputy Tackett complies with all departmental policies and procedures.

3

00601

**Ex. 10**

281

- That Deputy Tackett be attentive, and that he uses sound judgment while operating a motor vehicle.

- That Deputy Tackett be held accountable for his non-compliance of departmental policies and procedures, and request that the Imperial County Sheriff's Department dispense discipline and/or provide training that the department deems appropriate for the violations.

- There are several issues that are out of the scope of this committee, which SERC feels should be addressed by the Administrative Investigation Unit.

  1. Radio communications tapes of this incident were requested by SERC, but were found to be deleted or tampered with.

  2. Witness George Galvez Acosta should be interviewed to verify accounts of incident (were lights and siren activated for CODE-3).

  3. Deputy Tackett should be interviewed regarding the violation Imperial County Sheriff's Manual of Policies and Procedures section 5.2.04(did he notify the communications center of CODE-3 response)

//////

4

00602

**Ex. 10**

282

# Imperial County Sheriff Department
## HAROLD D. CARTER
### Sheriff-Coroner-Marshal

### INTEROFFICE MEMO

**DATE:**   02/27/01

**TO:**      Sergeant P. Tabarez

**FROM:**   Deputy J. Tackett

**SUBJECT:** Accident Report

---

I am writing this memo in regards to a request of my accident report, occurring on 11/01/01 at 1000 hours, being written onto the Spillman system. I advised Sergeant Tabarez that pursuant to my attorney's request to review this prior to submittal, I have not written it to Spillman at this time. The report should be submitted into the Spillman system by 12/05/01. Attorney Brad Fields is reviewing the report at the Everett Bobbitt Law Office. Sorry for the inconvenience and thank you for your patience.

Deputy Justin Tackett  # 871

**00603**

**Ex. 10**

283

```
cident Number: 0111-0017
ture: Medical            Case Number: _____  _____ _      Image: ____ _
ocr: 115 WIRT                                    ___: Area: DIST4 SUPERVISOR IID
ty: Calipatria     St: CA  Zip: 92233     Contact:
mplainant:   100673 ----------------------------------------------------+
: TACKETT                    Fst: JUSTIN         Mid:                     |
DOB:  /  /     SSN:    -  -    Adr: IMPERIAL COUNTY SHERIFFS DEPT         |
Rac:   Sx:  Tel: (760)339-6311  Cty:                  St:    Zip:         |
--------------------------------------------------------------------------+
Offense Codes: AMAS ____ ____ ____ ____ _     Reported: AMAS  Observed:
Circumstances: ____ ____ ____ ____ ____  ____ ____ ____ ____ ____ _
pndg Officers: Tackett, J      Ruiz, M.        Tabarez, P.      _
onsbl Officer: Tackett, J      Agency: AISO         CAD Call ID:    133504
   Received By: Flores, N.        Last RadLog: 12:08:40 11/01/01   98
   How Received: T  Telephone       Clearance: _____
When Reported: 09:58:43 11/01/01   Disposition: ACT  Disp Date: 11/01/01
:currd between: 09:58:43 11/01/01   Judicial Sts: _____
        and: 09:58:43 11/01/01   Misc Entry:
): _____  _____ _       _____  _____ _
larrative: (None)                                               +
ipplement: (See below)              + (See below)               + _

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =


NVOLVEMENTS:
/pe  Record #    Date      Description                 Relationship
NM    38652     /  /     ACOSTA, GEORGE GALVEZ         WITNESS
     100673     /  /     TACKETT, JUSTIN              *Complainant
     133504  11/01/01    09:58 11/01/01 Medical       *Initiating Call

AW Incident Offenses Detail:
               Offense Codes
eq Code                            Amount
 1 AMAS Assist Ambulance / Medical       0.00


AW Incident Responders Detail
   Responding Officers
eq Name          Unit
 1 Tackett, J      871
 2 Ruiz, M.        576
 3 Tabarez, P.     563


ain Radio Log Table:
ime/Date       Unit   Code  Zone  Agnc Description
2:08:40 11/01/01   576    98   DIST4 AISO incid#=0111-0017 Completed Call c
2:08:40 11/01/01   563    98   DIST4 AISO incid#=0111-0017 Completed Call c
1:49:00 11/01/01   563    4    COVR  AISO 98 0JI 871
1:26:26 11/01/01   871    98   DIST4 AISO incid#=0111-0010 Completed call c
```

**00604**

**Ex. 10**

284

```
50:57  11/01/01  2652  ON     DIST4 GOLD incid#=43129  RT 530 call=22e
17:15  11/01/01  2652  ON     DIST4 GOLD incid#=43129  RT 530 call=22e
15:08  11/01/01  563   ARRVD  DIST4 AISO  incid#=0111-0017 Arrived on scene
14:43  11/01/01  576   ENRT   DIST4 AISO  incid#=0111-0017 Enroute to a cal
3:43  11/01/01  2652  ARRVD  DIST4 GOLD  incid#=43129 Arrived on scene cal
:19  11/01/01  871   29    1     AISO  P0884176
:18  11/01/01  2652  ENRT   DIST4 GOLD  incid#=43129 Enroute to a call ca
:01:13  11/01/01  871   ARRVD        AISO  incid#=0111-0017 Arrived on scene
```

**00605**

**Ex. 10**

285

I understand that I am being ordered by Sergeant
Tabarez at approximately 1500 hours to make a report
or answer questions and that if I do not comply with the
order, I may be disciplined for insubordination.
Therefore, I have no alternative but to abide by the
order. However, by so doing, I do not waive my
Constitutional rights to remain silent under the Fifth
and Fourteenth Amendments to the United States
Constitution, under the protections of the California
Constitution, and the protections afforded me under case
law. Furthermore, by submitting to this coerced
interview, I am waiving no right afforded me under the
Peace Officer's Bill of Rights Act." Government Code
Sec. 3300, et.seq.

Crime Report:    0111-0017

Deputy:          Justin Tackett    # 871

Crime:           Damage to County Property

Victim(s):       Imperial County Sheriff's Department

Driver:          Justin Tackett
                 383 Main Street
                 Brawley, Ca.  92227
                 760-339-6312

Witnesses:   1)  George Galvez Acosta
                 354 Larsen Road
                 Imperial, Ca.  92251
                 760-355-2312
                 D.O.B.: 10-20-48

             2)  Sergeant P. Tabarez
                 383 Main Street
                 Brawley, Ca.  92227
                 760-339-6312

Damaged Property:
                 Patrol Unit # 310

Vehicles:        Unit # 310
                 2001 Ford Sedan
                 White   4-Door
                 California Plate # 1094307

Narrative:
        On November 01, 2001 at approximately 1000 hours, I(Deputy
Justin Tackett) was dispatched to an explosives call.  Dispatch advised
me that I was to break-away from assisting Calipatria Police Department,

00606

**Ex. 10**

286

...the area East of the Highline Canal, off Highway 78, Brawley, Ca. and this beat was not my assigned beat to patrol.

I knew that this area was highly populated by off-highway cycles and pedestrians. The area also had vehicles from the busy highway 78 passing by the area. Due to the possibility of death by the explosives and damage to property from the explosives along with the circumstances stated in the previous paragraph, I believed it was necessary to respond CODE 3. I responded by activating my patrol unit's lights and siren and accelerated in speed, with due regard for people, property, and conditions I would encounter, when responding to the call. I exited the Calipatria area eastbound/southbound lane of highway 115 which had no visible traffic at this time. Upon approaching a curve on Highway 115 at approximately 80 - 90 M.P.H., that had a roadway(Wirt Road) running off the beginning of the curve, I noticed a semi-truck appear from behind a business that in located on the corner of Highway 115 and Yocum Road, Calipatria, Ca. After noticing the semi-truck travelling in the northbound lane, I applied the brakes to my patrol unit for the fact of due regard for on-coming traffic.

I had previously, along with other deputies, responded at the same speed and same fashion while responding CODE 3 to the same particular area. While still pressing the brake, I drove over a slight dip in the roadway of Highway 115, just prior to the curve were the roadway proceeds in a southbound and northbound direction. The dip in the roadway is from farm implement and semi-trucks entering and exiting highway 115 from Wirt Road, an extension road in an eastbound direction ing off Highway 115. After driving over the slight dip, the rear of patrol unit began to slid to the left. I counter-steered and began slide sideways around the curve. I was negotiating the curve and had not lost control of my patrol unit and began to navigate the vehicle back into the southbound lane. At this time I noticed the semi-truck travelling in the northbound lane had entered the curve and was in close proximity to colliding with me. I believed the only option of possibly not causing damage to the unit and not colliding with the semi-truck was to steer the vehicle off the top of the curve.

Upon steering my patrol unit off the curve and not colliding with the semi-truck, my patrol unit began to slid down the backside of the curve. At the bottom of the curve was a patch of soft sand which stopped my tires from sliding causing my unit to began to roll-over. After my patrol unit came to a complete stop from rolling over, I advised dispatch that my unit had been rolled over and it's location. I exited my patrol unit and located the semi-truck that had been travelling in the northbound lane. (W1) GEORGE GALVEZ ACOSTA was the driver of the semi-truck and had pulled to the side of the roadway. (W1) GEORGE GALVEZ ACOSTA stated he saw the rear of my patrol unit slide to the left as I was just going into the curve, just passing Wirt Road. I advised him that he was to stand-by in order to advise California Highway Patrol and my supervisor of what he observed.

At this time, Calipatria Fire Department arrived and placed me

00607

**Ex. 10**

287

Pioneer Memorial Hospital where no medical aid was leased.

    Refer to records.

n Tackett  # 871
uty Sheriff
th County Patrol
erial County Sheriff's Department

00608        **Ex. 10**

288

 ...e report:                    01 1-0017

 ...ty:                          Pompeyo Tabarez Sr.

 ...me class:                    Damage to County Property (Traffic accident).

ictim:

.       Justin tackett  Deputy Sheriff  I.C.S.O., North County
        Operations

.       County of Imperial, Sheriff's Office

itnesses:

.       Acosta, George Galvez   DOB: 10-20-48   ADD: 354 Larsen road,
        Imperial, Ca.

vidence:

.       Refer to California Highway Patrol's report #01 11 01

ehicle(s):

.       Imperial County Sheriff's Office Patrol unit #310, stored at the
        Imperial County garage.

  ative:

  hursday, November 01, 2001, at approximately 0959 hours, while
esponding to an explosives call along with Deputy Justin Tackett, I,
mperial County Sheriff's Office Sergeant Pompeyo Tabarez heard over the
mperial County Sheriff's Office radio frequency as Deputy Tackett
equested and ambulance at Highway 115 and Wirt road and notified the on
uty dispatcher, he had been involved in a traffic accident in which his
nit, Imperial County Sheriff's Office patrol vehicle # 310 had
otally damaged.

 responded to Deputy Tackett's location and upon arrival found him on
he ground on a gurney and being tended to by Calipatria's Fire
epartment's personnel.  Deputy tackett was later transported to the
rawley Pioneers Memorial Hospital via ambulance.

eputy Tackett's patrol unit #310 was resting on its wheels on a dirt
rea East of Highway 115.

he California Highway Patrol Office and responded Officers P. Torres
nd P. Flanders to take the accident report.

 notified the Imperial County Sheriff's Office on duty Chief Deputy J.
urns of the incident, and later met with him and briefed him.

**00609**     **Ex. 10**

289

RATIVE:          On 1●1-0  at approx. 1050 hrs. ● arrived at
Hwy 115 and Wixt Road and met with Sgt. P. Tabarez. I
photographed the scene of an accident involving unit
310, a Imperial County Sheriff's patrol vehicle.  I
photographed the road way and the damaged vehicle.

| SPECIAL CONDITIONS: | | | | | |
|---|---|---|---|---|---|
| ON DUTY EMERGENCY VEHICLE | | UNINCORPORATED | BRAWLEY | | |
| NUMBER KILLED | HIT & RUN | COUNT | REPORTING DISTRICT | BEAT | 01 01 01 |
| 0 | MISDEMEANOR | 0 | | | |
| 0 | | IMPERIAL | | | |

**LOCATI**

| COLLISION OCCURRED ON | MO | DAY | YEAR TIME (2400) | NCIC # | OFFICER I.D. |
|---|---|---|---|---|---|
| SR-115 | 11/01/2001 | | 1000 | 9625 | 15990 |

| MILEPOST INFORMATION: | DAY OF WEEK | TOW AWAY | PHOTOGRAPHS BY | NONE |
|---|---|---|---|---|
| 543 FEET SOUTH OF 115 MPM 31.63 | THURSDAY | X YES ☐ NO | | X |
| AT INTERSECTION WITH: | | STATE HWY REL | | |
| X OR:  543 FEET SOUTH OF WIRT ROAD | | X YES ☐ NO | | |

| PARTY 1 | DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY EQUIP. | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|
| | B4621319 | CA | C | G | 2001 | FORD SEDAN WHI | 1094307 | CA |

**DRIVER** X

| NAME (FIRST, MIDDLE, LAST) |
|---|
| JUSTIN CRAIG TACKETT |

**PEDES-TRIAN**

| STREET ADDRESS | OWNER'S NAME ☐ SAME AS DRIVER |
|---|---|
| 383 MAIN STREET | IMPERIAL COUNTY SHERIFF |

**PARKED VEHICLE**

| CITY / STATE / ZIP | | | OWNER'S ADDRESS ☐ SAME AS DRIVER |
|---|---|---|---|
| BRAWLEY | CA | 92227 | 328 APPLESTILL ROAD, EL CENTRO, CA 92243 |

**BICY-CLIST**

| SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo Day Year | RACE | DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER ☐ DRIVER X OTHER |
|---|---|---|---|---|---|---|---|
| M | RED | BRN | 5-09 | 170 | 06/20/1978 | W | BEACH & SONS - (760)352-8009 |

**OTHER**

| HOME PHONE | BUSINESS PHONE | PRIOR MECH. DEFECTS X NONE APP. ☐ REFER TO NARRATIVE |
|---|---|---|
| (760)344-2615 | (760)344-2615 | VEHICLE IDENTIFICATION NUMBER:  2FAFP71W91X159562 |

| INSURANCE CARRIER | POLICY NUMBER | CHP USE ONLY | DESCRIBE VEHICLE DAMAGE | SHADE IN DAMAGED AREA |
|---|---|---|---|---|
| SELF-INSURED | N/A | VEHICLE TYPE 48 | ☐ UNK ☐ NONE ☐ MINOR ☐ MOD ☐ MAJOR X ROLL-OVER | |

| DIR OF TRAVEL | ON STREET OR HIGHWAY | SPEED LIMIT | CA | DOT |
|---|---|---|---|---|
| S | SR-115 | 65 | CAL-T | TCP/PSC   MC/MX |

| PARTY 2 | DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|

| DRIVER | NAME (FIRST, MIDDLE, LAST) |
|---|---|

| PEDES-TRIAN | STREET ADDRESS | OWNER'S NAME ☐ SAME AS DRIVER |
|---|---|---|

| PARKED VEHICLE | CITY / STATE / ZIP | OWNER'S ADDRESS ☐ SAME AS DRIVER |
|---|---|---|

| BICY-CLIST | SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo Day Year | RACE | DISPOSITION OF VEHICLE ON ORDERS OF ☐ OFFICER ☐ DRIVER ☐ OTHER |
|---|---|---|---|---|---|---|---|---|

| OTHER | HOME PHONE | BUSINESS PHONE | PRIOR MECHANICAL DEFECTS ☐ NONE APP. ☐ REFER TO NARRATIVE |
|---|---|---|---|

| INSURANCE CARRIER | POLICY NUMBER | CHP USE ONLY VEHICLE TYPE | DESCRIBE VEHICLE DAMAGE ☐ UNK ☐ NONE ☐ MINOR ☐ MOD ☐ MAJOR ☐ ROLL-OVER | SHADE IN DAMAGED AREA |
|---|---|---|---|---|

| DIR OF TRAVEL | ON STREET OR HIGHWAY | SPEED LIMIT | CA | DOT |
|---|---|---|---|---|
| | | | CAL-T | TCP/PSC   MC/MX |

| PARTY 3 | DRIVER'S LICENSE NUMBER | STATE | CLASS | SAFETY | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|

| DRIVER | NAME (FIRST, MIDDLE, LAST) |
|---|---|

| PEDES-TRIAN | STREET ADDRESS | OWNER'S NAME ☐ SAME AS DRIVER |
|---|---|---|

| PARKED VEHICLE | CITY / STATE / ZIP | OWNER'S ADDRESS ☐ SAME AS DRIVER |
|---|---|---|

| BICY-CLIST | SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE Mo Day Year | RACE | DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER ☐ DRIVER ☐ OTHER |
|---|---|---|---|---|---|---|---|---|

| OTHER | HOME PHONE | BUSINESS PHONE | PRIOR MECHANICAL DEFECTS ☐ NONE APP. ☐ REFER TO NARRATIVE |
|---|---|---|---|

| INSURANCE CARRIER | POLICY NUMBER | CHP USE ONLY VEHICLE TYPE | DESCRIBE VEHICLE DAMAGE ☐ UNK ☐ NONE ☐ MINOR ☐ MOD ☐ MAJOR ☐ ROLL-OVER | SHADE IN DAMAGED AREA |
|---|---|---|---|---|

| DIR OF TRAVEL | ON STREET OR HIGHWAY | SPEED LIMIT | CA | DOT |
|---|---|---|---|---|
| | | | CAL-T | TCP/PSC   MC/MX |

HDQ
FARS
CALTRANS
JUV.
COURT
CO. RD
CORONER
MILITARY
P.D.
CHP

00611

| PREPARER'S NAME | DISPATCH NOTIFIED | REVIEWER'S NAME | DATE REVIEWED |
|---|---|---|---|
| P TORREZ 15990 | X YES ☐ NO ☐ N/A | M. Kirkby | 11-15-01 |

Ex. 10

291



| 0[/250. | .1000 | | 15990 | |
|---|---|---|---|---|

**[OF COLLISION] DAY [TIME]**  ... 10 1 1 01

**PROPERTY DAMAGE** — OWNER / OWNER ADDRESS / NOTIFIED: YES NO

DESCRIPTION OF DAMAGE

## SEATING POSITION

1 - DRIVER
2 TO 6 - PASSENGERS
7 - STA. WGN REAR
8 - RR. OCC TRK. OR VAN
9 - POSITION UNKNOWN
0 - OTHER

1 2 3
4 5 6
7

## OCCUPANTS

A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP/SHOULDER HARNESS USED
H - LAP/SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED

## SAFETY EQUIPMENT

L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

CHILD RESTRAINT
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE
U - NONE IN VEHICLE

M/C BICYCLE - HELMET
DRIVER
V - NO
W - YES
PASSENGER
X - NO
Y - YES

## EJECTED FROM VEHICLE

0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

| PRIMARY COLLISION FACTOR LIST NUMBER (#) OF PARTY AT FAULT | TRAFFIC CONTROL DEVICES | 1 | 2 | 3 | TYPE OF VEHICLE | 1 | 2 | 3 | MOVEMENT PRECEDING COLLISION |
|---|---|---|---|---|---|---|---|---|---|
| A  VC SECTION VIOLATED  CITED  YES / NO  22350 | A  CONTROLS FUNCTIONING | | | | A  PASSENGER CAR / STATION WAGON | | | | A  STOPPED |
| | B  CONTROLS NOT FUNCTIONING* | | | | B  PASSENGER CAR W / TRAILER | | | | B  PROCEEDING STRAIGHT |
| B  OTHER IMPROPER DRIVING* | C  CONTROLS OBSCURED | | | | C  MOTORCYCLE / SCOOTER | X | | | C  RAN OFF ROAD |
| | X D  NO CONTROLS PRESENT / FACTOR* | | | | D  PICKUP OR PANEL TRUCK | | | | D  MAKING RIGHT TURN |
| C  OTHER THAN DRIVER* | TYPE OF COLLISION | | | | E  PICKUP / PANEL TRUCK W/ TRAILER | | | | E  MAKING LEFT TURN |
| D  UNKNOWN* | A  HEAD - ON | | | | F  TRUCK OR TRUCK TRACTOR | | | | F  MAKING U TURN |
| E  FELL ASLEEP* | B  SIDE SWIPE | | | | G  TRUCK / TRUCK TRACTOR W/ TRLR. | | | | G  BACKING |
| | C  REAR END | | | | H  SCHOOL BUS | | | | H  SLOWING / STOPPING |
| WEATHER  (MARK 1 TO 2 ITEMS) | D  BROADSIDE | | | | I  OTHER BUS | | | | I  PASSING OTHER VEHICLE |
| X A  CLEAR | E  HIT OBJECT | | | | J  EMERGENCY VEHICLE | | | | J  CHANGING LANES |
| B  CLOUDY | X F  OVERTURNED | | | | K  HIGHWAY CONST. EQUIPMENT | | | | K  PARKING MANEUVER |
| D  RAINING | G  VEHICLE / PEDESTRIAN | | | | L  BICYCLE | | | | L  ENTERING TRAFFIC |
| D  SNOWING | H  OTHER*: | | | | M  OTHER VEHICLE | | | | M  OTHER UNSAFE TURNING |
| E  FOG / VISIBILITY  FT. | | | | | N  PEDESTRIAN | | | | N  XING INTO OPPOSING LANE |
| F  OTHER* | MOTOR VEHICLE INVOLVED WITH | | | | O  MOPED | | | | O  PARKED |
| WIND | X A  NON - COLLISION* | | | | | | | | P  MERGING |
| LIGHTING | B  PEDESTRIAN | | | | | | | | Q  TRAVELING WRONG WAY |
| DAYLIGHT | C  OTHER MOTOR VEHICLE | | | | OTHER ASSOCIATED FACTORS (MARK 1 TO 2 ITEMS) | | | | R  OTHER*: |
| DUSK - DAWN | D  MOTOR VEHICLE ON OTHER ROADWAY | 1 | 2 | 3 | | | | | |
| D  DARK - STREET LIGHTS | E  PARKED MOTOR VEHICLE | | | | A  VC SECTION VIOLATED  CITED  YES / NO | | | | |
| D  DARK - NO STREET LIGHTS | F  TRAIN | | | | B  VC SECTION VIOLATED  CITED  YES / NO | | | | |
| E  DARK - STREET LIGHTS NOT FUNCTIONING* | G  BICYCLE | | | | C  VC SECTION VIOLATED  CITED  YES / NO | | | | SOBRIETY - DRUG - PHYSICAL (MARK 1 TO 2 ITEMS) |
| ROADWAY SURFACE | H  ANIMAL: | | | | | 1 | 2 | 3 | |
| X A  DRY | I  FIXED OBJECT: | | | | D  ........................ | | | X | A  HAD NOT BEEN DRINKING |
| B  WET | | | | | E  VISION OBSCUREMENT: | | | | B  HBD - UNDER INFLUENCE |
| C  SNOWY - ICY | J  OTHER OBJECT: | | | | F  INATTENTION*: | | | | C  HBD - NOT UNDER INFLUENCE* |
| D  SLIPPERY (MUDDY, OILY, ETC.) | | | | | G  STOP & GO TRAFFIC | | | | D  HBD - IMPAIRMENT UNKNOWN* |
| ROADWAY CONDITION(S) (MARK 1 TO 2 ITEMS) | PEDESTRIAN'S ACTIONS | | | | H  ENTERING / LEAVING RAMP | | | | E  UNDER DRUG INFLUENCE* |
| A  HOLES, DEEP RUT* | X A  NO PEDESTRIANS INVOLVED | | | | I  PREVIOUS COLLISION | | | | F  IMPAIRMENT - PHYSICAL* |
| B  LOOSE MATERIAL ON ROADWAY* | B  CROSSING IN CROSSWALK AT INTERSECTION | | | | J  UNFAMILIAR WITH ROAD | | | | G  IMPAIRMENT NOT KNOWN |
| C  OBSTRUCTION ON ROADWAY* | | | | | K  DEFECTIVE VEH. EQUIP.:  CITED  YES / NO | | | | H  NOT APPLICABLE |
| D  CONSTRUCTION - REPAIR ZONE | C  CROSSING IN CROSSWALK - NOT AT INTERSECTION | | | | | | | | I  SLEEPY / FATIGUED |
| E  REDUCED ROADWAY WIDTH | | | | | | | | | SPECIAL INFORMATION |
| F  FLOODED* | D  CROSSING - NOT IN CROSSWALK | | | | L  UNINVOLVED VEHICLE | | | | A  HAZARDOUS MATERIAL |
| G  OTHER*: | E  IN ROAD - INCLUDES SHOULDER | | | | M  OTHER*: | | | | B  CELL PHONE IN USE |
| X H  NO UNUSUAL CONDITIONS | F  NOT IN ROAD | X | | | N  NONE APPARENT | | | X | C  CELL PHONE NOT IN USE |
| | G  APPROACHING / LEAVING SCHOOL BUS | | | | O  RUNAWAY VEHICLE | | | | D  CELL PHONE NONE/UNKNOWN* |

SKETCH

MISCELLANEOUS

INDICATE NORTH

WIRT ROAD

DOUBLE YELLOW LINES

SOLID WHITE LINE

SOLID WHITE LINE

SR-115

ASPHALT SHOULDERS

S/B    N/B

V-1

00612

# Ex. 10

292

| | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY ('X' ONE) | | | | INJURED WAS ('X' ONE) | | | | | PARTY NUMBER | SEAT POS. | SAFETY EQUIP | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FATAL INJURY | SEVERE INJURY | OTHER VISIBLE INJURY | COMPLAINT OF PAIN | DRIVER | PASS. | PED. | BICLYCLIST | OTHER | | | | |
| | ☐ | 53 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

NAME / D.O.B. / ADDRESS
GEORGE GALVEZ ACOSTA  (10/20/1948)  354 LARSEN ROAD, IMPERIAL, CA 92251     TELEPHONE (760)355-2312

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| | ☐ | 23 | M | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | 1 | 1 | G | 0 |

NAME / D.O.B. / ADDRESS
JUSTIN CRAIG TACKETT   (06/20/1978)  383 MAIN STREET, BRAWLEY, CA 92227     TELEPHONE (760)344-2615

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:
GOLD CROSS AMBULANCE                       PIONEER'S MEM HOSP, BRAWLEY CA

DESCRIBE INJURIES:  TRANSPORTED FOR PRECAUTIONARY REASONS.  NO COMPLAINTS OF PAIN OR
INJURIES.

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

NAME / D.O.B. / ADDRESS                                TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

RIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

NAME / D.O.B. / ADDRESS                                TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

NAME / D.O.B. / ADDRESS                                TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

DESCRIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | |

NAME / D.O.B. / ADDRESS                                TELEPHONE

RED ONLY) TRANSPORTED BY:                    TAKEN TO:

**00613**

RIBE INJURIES:

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| PREPARER'S NAME | | I.D. NUMBER | MO | DAY | YEAR | REVIEWER'S NAME | | MO. | DAY | YEAR |
|---|---|---|---|---|---|---|---|---|---|---|
| P. TORREZ | | 15990 | 11/01/2001 | | | | **Ex. 10** | | | |

293

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED SCALE



SR 115

INDICATE NORTH

00614

| PREPARED BY | I.D. NUMBER | MO DAY YEAR | REVIEWER'S NAME | | MO DAY YEAR |
|---|---|---|---|---|---|
| P. FLANDERS | 9420 | 11-02-01 | | **Ex. 10** | |

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED   SCALE

STATION LINE ———→———— 0+00

WIRT ROAD   E/B ONLY

12"   12"

NORTH
INDICATE

| PREPARED BY | I.D. NUMBER | MO   DAY   YEAR | REVIEWER'S NAME | | |
|---|---|---|---|---|---|
| P. FLANDERS | 9420 | 11-02-01 | | 00615 | Ex. 10 |

MO   DAY   YEAR

295

OSP 99 2857

CHP 556 OPI 042

| DATE | TIME (24 HOUR) | NCIC NUMBER | OFFICER NUMBER | NUMBER |
|---|---|---|---|---|
| 11-01-01 | 1000 | 9625 | 15790 | 01 11 01 |

# FACTUAL DIAGRAM LEGEND

STATION LINE LOCATION 0+00 LOCATED 6 FEET S/OF THE SOUTH PROLONGATION LINE OF WIRT ROAD AND ON THE EAST ROADS EDGE OF S.R.115 STATION LINE INCREASES AS YOU TRAVEL SOUTH.

## VEHICLE POINT OF REST

| |
|---|
| V-1 L/F TIRE 723 FEET S/OF STATION LINE AND 48 FEET E/OF EAST ROADS EDGE |
| V-1 L/R TIRE 724 FEET S/OF STATION LINE AND 42 FEET E/OF EAST ROADS EDGE |
| |
| |
| |
| |

## PHYSICAL EVIDENCE IDENTIFICATION

| | | | |
|---|---|---|---|
| 1 | TO | 2 | SKID MARK ON ASPHALT |
| 3 | TO | 4 | SKID MARK ON ASPHALT |
| 5 | TO | 6 | SKID MARK ON ASPHALT |
| 7 | TO | 8 | SKID MARK ON ASPHALT |
| 9 | TO | 10 | SKID MARK ON DIRT |
| 11 | TO | 12 | SKID MARK ON DIRT |
| 13 | TO | 14 | SKID MARK ON DIRT |
| 15 | | | DIRT IMPRESSION |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

4
6

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| P. FLANDERS # 9420 | 11/02/01 | | |

00616

**Ex. 10**

296

NARRATIVE/SUPPLEMENTAL
CHP 555 CPI 042

| DATE | TIME (24 HOUR) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|------|---------------|-------------|---------------------|--------|
| 11-01-01 | 1000 | 9625 | s-990 | 0 1 1 1 0 1 |

## PHYSICAL EVIDENCE LOCATION

| | | | | | |
|----|----|----|------|--------------|------|
| 1 | 16 | FT | W/OF | STATION LINE | 0+06 |
| 2 | 0 | FT | ON | STATION LINE | 5+70 |
| 3 | 17 | FT | W/OF | STATION LINE | 0+06 |
| 4 | 0 | FT | ON | STATION LINE | 5+65 |
| 5 | 21 | FT | W/OF | STATION LINE | 0+18 |
| 6 | 0 | FT | ON | STATION LINE | 5+37 |
| 7 | 18 | FT | W/OF | STATION LINE | 3+33 |
| 8 | 0 | FT | ON | STATION LINE | 5+57 |
| 9 | 10 | FT | E/OF | STATION LINE | 6+03 |
| 10 | 45 | FT | E/OF | STATION LINE | 7+10 |
| 11 | 14 | FT | E/OF | STATION LINE | 6+24 |
| 12 | 36 | FT | E/OF | STATION LINE | 7+10 |
| 13 | 12 | FT | E/OF | STATION LINE | 6+24 |
| 14 | 33 | FT | E/OF | STATION LINE | 7+10 |
| 15 | 43 | FT | E/OF | STATION LINE | 7+18 |

00617

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|----------------------------------|------|-----------------|------|
| P. FLANDERS # 9420 | 11/02/01 | | |

**Ex. 10**

297

| DATE OF INCIDENT | | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11/01/2001 | 1000 | 9625 | 15990 | 01 11 01 |

1 **FACTS:**
2
3 **NOTIFICATION:**
4
5 I WAS DISPATCHED TO A TRAFFIC COLLISION WITH AN AMBULANCE EN ROUTE,
6 INVOLVING A IMPERIAL COUNTY SHERIFF'S PATROL VEHICLE AT 1005 HOURS. I
7 RESPONDED FROM SR-78 AT GECKO ROAD AND ARRIVED ON SCENE AT APPROXIMATELY
8 1025 HOURS.
9
10 ALL TIMES, SPEEDS, AND MEASUREMENTS WERE APPROXIMATE. MEASUREMENTS WERE
11 OBTAINED BY ROLLMETER.
12
13 **SCENE:**
14
15 THE COLLISION OCCURRED ON SR-115 SOUTH OF WIRT ROAD. IN THIS AREA SR-115 IS A
16 NORTH/SOUTH DESIGNATED ASPHALT CONSTRUCTED ROADWAY WHICH TRAVELS IN A
17 NORTH-EASTERLY/SOUTH-WESTERLY DIRECTION WITH ONE LANE FOR EACH DIRECTION
18 OF TRAVEL. THE NORTHBOUND LANE IS SEPARATED FROM THE SOUTHBOUND LANE BY
19 SOLID DOUBLE YELLOW LINES. THE TRAFFIC LANES ARE 12 FEET WIDE, AND THERE ARE 4
20 FEET ASPHALT SHOULDERS. THE TRAFFIC LANES ARE SEPARATED FROM THE ASPHALT
21 SHOULDERS BY SOLID WHITE EDGE LINES. THERE IS A DIRT EMBANKMENT TO THE EAST
22 AND WEST OF SR-115. AT THIS LOCATION SR-115 CURVES IN A NORTHEASTERLY
23 DIRECTION AS YOU TRAVEL NORTH AND A SOUTHWESTERLY DIRECTION AS YOU TRAVEL
24 SOUTH. THERE ARE YELLOW CURVE WARNING SIGNS APPROXIMATELY 400 FEET PRIOR
25 TO ENTERING THE CURVE IN BOTH DIRECTIONS WITH A RECOMMENDED SPEED OF 55
26 MPH. SR-115 IS LEVEL AND IN GOOD REPAIR. SR-115 TRAVERSES THROUGH AN
27 AGRICULTURAL AREA. REFER TO FACTUAL DIAGRAM AND LEGEND FOR FURTHER
28 DETAILS.
29
30 **PARTIES:**
31
32 V-1 (FORD) WAS LOCATED AT IT'S POINT OF REST. V-1 SUSTAINED ROLL-OVER DAMAGE
33 CONSISTING OF BUT NOT LIMITED TO DENTED LEFT FRONT FENDER, SMASHED IN
34 WINDSHIELD AND CRUSHED IN ROOF AND LIGHTBAR. I PHYSICALLY INSPECTED THE
35 DRIVER SIDE SEATBELT OF V-1 AND FOUND IT TO BE IN GOOD WORKING ORDER. NO
36 OTHER MECHANICAL DEFECTS WERE NOTED OR CLAIMED.
37
38 P-1 WAS CONTACTED AT BED #1 OF THE PIONEERS MEMORIAL HOSPITAL EMERGENCY
39 ROOM AT APPROXIMATELY 1045 HOURS. HE WAS DETERMINED TO BE THE DRIVER OF V-1
40 BY THE FOLLOWING:
41 -HIS VALID DRIVER LICENSE              -UNIT #310 SIGNED OUT BY HIM
42 -HE BEING ON DUTY (I.C.S.O. DEPUTY UNIFORM)   -HIS OWN ADMISSION   **Ex. 10**

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| P. TORREZ | 15990 | 11/01/2001 | | 00618 |

298

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11/01/2001 | 1000 | 9825 | 1599 | 01 11 01 |

## PHYSICAL EVIDENCE:

2

3  SEE FACTUAL DIAGRAM AND LEGEND OF THIS REPORT FOR FURTHER DETAILS.

4

## STATEMENTS:

6

7  P-1 (TACKETT) WAS CONTACTED AT BED #1 OF THE PIONEERS MEMORIAL HOSPITAL
8  EMERGENCY ROOM AT APPROXIMATELY 1045 HOURS AND RELATED THE FOLLOWING:  HE
9  WAS S/B ON SR-115 AT APPROXIMATELY 85-90 MPH RESPONDING CODE 3 TO AN
10 EXPLOSIVES CALL. AS HE WAS APPROACHING THE CURVE SOUTH OF WIRT ROAD, HE
11 BEGAN TO SLOW DOWN.  HE THEN FELT THE REAR OF V-1 (FORD) BEGIN FLOATING TO HIS
12 LEFT.  HE STARTED SKIDDING SIDEWAYS IN A SOUTH-EASTERLY DIRECTION AND SAW A
13 BIG RIG APPROACHING HIS LOCATION FROM THE OPPOSITE DIRECTION. IN ORDER TO
14 AVOID A COLLISION WITH THE BIG RIG, HE STEERED HARD TO HIS LEFT CAUSING V-1 TO
15 TURN AROUND AND BEGIN SKIDDING IN AN EASTERLY DIRECTION. V-1 THEN SKIDDED
16 OFF THE ROAD AND ROLLED-OVER.  HE DOESN'T REMEMBER HOW MANY TIMES HE
17 ROLLED-OVER.

18

19 W-1 (ACOSTA) WAS CONTACTED AT THE SCENE AND RELATED THE FOLLOWING: HE WAS
20 N/B SR-115 APPROACHING THE CURVE IN A NORTH-WESTERLY DIRECTION WHEN HE
   OBSERVED THE SHERIFF'S UNIT SIDEWAYS ACROSS BOTH LANES. HE STEERED HARD TO
   HIS LEFT IN ORDER TO AVOID BROAD SIDING THE SHERIFF'S UNIT.

23

## OPINIONS AND CONCLUSIONS:

25

## SUMMARY:

27

28 P-1 (TACKETT) WAS DRIVING V-1 (FORD) S/B ON SR-115 AT A STATED SPEED OF 85-90 MPH
29 RESPONDING CODE 3 TO AN EXPLOSIVES CALL. AS HE WAS TRAVERSING THROUGH THE
30 CURVATURE OF THE ROAD, HE LOST CONTROL OF V-1.  V-1 BEGAN TO SKID SIDEWAYS IN
31 A SOUTH-EASTERLY DIRECTION.  P-1 STEERED HARD TO HIS LEFT TO AVOID BEING
32 BROAD SIDED BY A BIG RIG APPROACHING HIM FROM THE OPPOSITE DIRECTION. BY P-1
33 STEERING HARD TO HIS LEFT, IT CAUSED V-1 TO BEGIN SKIDDING IN AN EASTERLY
34 DIRECTION. V-1 SKIDDED OFF THE ROAD BEFORE ROLLING OVER ONCE AND COMING TO
35 REST ON IT'S WHEELS.

36

37 SUMMARY WAS BASED ON PHYSICAL EVIDENCE, VEHICLE DAMAGE AND STATEMENTS.

38

39

40

41

**00619**

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| P. TORREZ | 15990 | 11/01/2001 | | **Ex. 10** |

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11/01/2001 | 1000 | 9625 | 15990 | 01-11-01 |

## AREA OF IMPACT:

2

3  THE AREA OF IMPACT WAS BASED ON PHYSICAL EVIDENCE (TIRE FRICTION MARKS AND
4  DISTURBED DIRT), THE TYPE OF DAMAGE SUSTAINED TO THE VEHICLE AND VEHICLE
5  POINT OF REST.

6

7  THE AREA OF IMPACT WAS LOCATED 724' FEET SOUTH OF THE SOUTH ROAD EDGE
8  PROLONGATION OF WIRT ROAD AND 43' EAST OF THE EAST PAVED ROAD EDGE OF SR-115.

9

10  CAUSE:

11

12  THE CAUSE OF THIS COLLISION IS ATTRIBUTED TO P-1 (TACKETT) FOR VIOLATION OF
13  SECTION 22350 VC- UNSAFE SPEED FOR CONDITIONS. TACKETT WAS TRAVELING AT A
14  STATED SPEED OF APPROXIMATELY 85-90 MPH. A SAFE SPEED AT THE TIME OF THE
15  COLLISION WOULD HAVE BEEN 60-65 MPH.

16

17  THE CAUSE WAS DETERMINED BY PHYSICAL EVIDENCE, VEHICLE DAMAGE AND
18  STATEMENTS.

19

20  RECOMMENDATIONS:

1

2  NONE.

23

**00620**

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| P. TORREZ | 15990 | 11/01/2001 | | |

**Ex. 10**

300

# Memorandum

**To:** Manuel Garcia

**From:** Ted Turner, Fleet Superintendent – County Garage

**Date:** 2/7/02

**Re:** Unit #310

---

An estimate for Unit #310 is attached and there are some areas that are not complete. There are nine lines that have INC on it and only after the vehicle is torn apart can a true value be set. It has been our experience in the past that these incomplete lines range from $100 to $500. With this in mind the base estimate of $9,378.09 could range from $10, 278.09 to as much as $13,878.09. Currently the insurance is working on the case. If you have any questions, please feel free to call me at 336-2270.

*Imperial County Garage*



00621

Ex. 10

301

Estimate ID:   4746
Estimate Version:   0
Preliminary
Profile ID:   MODERN

**MODERN PAINT & BODY SHOP**

830 STATE STREET EL CENTRO, CA 92243-2828
(760) 352-1271
Fax: (760) 352-4334
Tax ID: 33-0180286   BAR #: AO126373 173199   EPA #: CAL000055168

Damage Assessed By:   TONY ZAMORA

Deductible:   UNKNOWN

Owner   CAR#310 COUNTY OF IMPERIAL
Address:   1125 MAIN ST EL CENTRO, CA 92243

Mitchell Service:   910674

Description:   2001 Ford Crown Victoria Police
Body Style:   4D Sed
VIN:   2FAFP71W91X159562

Vehicle Production Date:   3/01
Drive Train:   4.6L Inj 8 Cyl AO
License:   1094307 CA

| Line Item | Entry Number | Labor Type | Operation | Line Item Description | Part Type/ Part Number | Dollar Amount | Labor Units | |
|---|---|---|---|---|---|---|---|---|
| 1 | AUTO | BDY | OVERHAUL | FRT COVER ASSY | | | 0.8 | |
| 2 | 001442 | BDY | REPAIR | FRT BUMPER COVER | Existing | | 2.0* | |
| 3 | AUTO | REF | REFINISH | FRT BUMPER COVER | | C | 2.8 | |
| 4 | 000011 | BDY | REMOVE/REPLACE | FRT BUMPER REINFORCEMENT | YW1Z 17757 AA | 179.40 | INC | |
| 5 | 000014 | BDY | REMOVE/REPLACE | R FRT BUMPER IMPACT ABSORBER | F8AZ 17754 AA | 51.37 | 0.2 # | |
| 6 | 000015 | BDY | REMOVE/REPLACE | L FRT BUMPER IMPACT ABSORBER | F8AZ 17755 AA | 47.47 | 0.2 # | |
| 7 | 000026 | BDY | REMOVE/REPLACE | GRILLE HEADER PANEL | F8AZ 8190 AA | 200.90 | 2.2 # | |
| 8 | AUTO | REF | REFINISH | HEADER PANEL | | C | 1.8 | |
| 9 | AUTO | REF | REFINISH | HEADER PANEL EDGE | | C | 0.5 | |
| 10 | AUTO | BDY | CHECK/ADJUST | HEADLAMPS | | | 0.4 | |
| 11 | 000054 | BDY | REMOVE/REPLACE | L PARK/SIGNAL LAMP ASSEMBLY | XW7Z 15A201 BB | 65.52 | INC # | |
| 12 | 000075 | BDY | REMOVE/REPLACE | HOOD PANEL | F8AZ 16612 AA | 484.10 | 0.5 | |
| 13 | AUTO | REF | REFINISH | HOOD OUTSIDE | | C | 2.8 | |
| 14 | AUTO | REF | REFINISH | HOOD UNDERSIDE | | | 1.6 | |
| 15 | 000082 | BDY | REMOVE/REPLACE | R HOOD HINGE | F8AZ 16796 AA | 15.70 | 0.3 # | |
| 16 | AUTO | REF | REFINISH | R HINGE | | | 0.2 | |
| 17 | 000083 | BDY | REMOVE/REPLACE | L HOOD HINGE | F8AZ 16797 AA | 15.70 | INC # | |
| 18 | AUTO | REF | REFINISH | L HINGE | | | 0.2 | |
| 19 | 000094 | BDY | REPAIR | COOLING RADIATOR SUPPORT | Existing | | 4.0* # | |
| 20 | AUTO | REF | REFINISH | RADIATOR SUPPORT | | | 0.5 | |
| 21 | 000146 | BDY | REPAIR | R FENDER PANEL | Existing | | 2.0* # | |
| 22 | AUTO | REF | REFINISH | R FENDER OUTSIDE | | C | 2.1 | |
| 23 | 000147 | BDY | REMOVE/REPLACE | L FENDER PANEL | F8AZ 16006 AA | 245.00 | 3.3 # | |
| 24 | AUTO | REF | REFINISH | L FENDER OUTSIDE | | C | 2.1 | |
| 25 | AUTO | REF | REFINISH | L FENDER EDGE | | C | 0.5 | |
| 26 | 000149 | BDY | REMOVE/REPLACE | L FENDER APRON ASSY | 1W7Z 16055 AA | 32.63 | 0.6 # | |
| 27 | 001887 | FRM | REPAIR | FRAME ASSEMBLY | Existing | | 10.0* | |
| 28 | 000269 | MCH | ALIGN | FRONT SUSPENSION   -M | | | 1.8 | |
| 29 | 000471 | GLS | REMOVE/REPLACE | W/SHIELD GLASS | DW01327GBY | 677.85 | INC # | |
| 30 | | | | LINE DISCOUNT %50.00 | | 338.93- | | |
| 31 | 000472 | BDY | REMOVE/REPLACE | W/SHIELD REVEAL MOULDING | F8AZ 5403144 AA | 31.33 | INC # | |
| 32 | 001382 | BDY | REMOVE/REPLACE | L W/SHIELD GARNISH MLDG | ORDER FROM DEALER | 22.05 | INC | |
| 33 | 001730 | BDY | REPAIR | L CTR PILLAR W/RCKR & ROOF RAIL | Existing | | 4.0* # | |
| 34 | AUTO | REF | REFINISH | L PILLAR W/ROOF RAIL & ROCKER | | C | 2.8 | |
| 35 | 000561 | BDY | REMOVE/REPLACE | L COWL/DASH HINGE PILLAR | XW7Z 54025A01 AA | 141.85 | 7.5 | |

ESTIMATE RECALL NUMBER: 11/ 5/01 12:48:57  4746

Mitchell Data Version:   OCT_01_A
UltraMate Version:   4.7.007

UltraMate is a Trademark of Mitchell International
Copyright (C) 1994 - 2000 Mitchell International
All Rights Reserved

Page  1  of  3

**Ex. 10**

302

Estimate ID:   4746
Estimate Version:   0
Preliminary
Profile ID:   MODERN

| Line | Code | Type | Operation | Description | Part | Price | Labor |
|------|------|------|-----------|-------------|------|-------|-------|
| | 001732 | BDY | REMOVE/REPLACE | L UPR COWL/DASH UPR HINGE PILLAR | 1W1Z 5402509 AA | 52.75 | 3.5 |
| | 001743 | BDY | REPAIR | R FRT DOOR SHELL | Existing | | 1.0* # |
| 36 | AUTO | REF | REFINISH | R FRT DOOR OUTSIDE | | C | 2.0 |
| 39 | 001744 | BDY | REMOVE/REPLACE | L FRT DOOR SHELL | YW7Z 5420125 BA | 565.40 | 5.4 # |
| 40 | AUTO | REF | REFINISH | L FRT DOOR OUTSIDE | | C | 2.0 |
| 41 | AUTO | REF | REFINISH | L FRT ADD FOR JAMBS & INSIDE | | C | 1.0 |
| 42 | 000707 | BDY | REMOVE/REPLACE | L FRT DOOR WINDOW MOULDING | F8AZ 5420551 AAA | 80.90 | INC # |
| 43 | 000712 | BDY | REMOVE/REPLACE | R FRT DOOR REAR VIEW MIRROR | F8AZ 17682 AA | 117.88 | 0.3 # |
| 44 | AUTO | REF | REFINISH | R FRT DOOR MIRROR | | C | 0.5 |
| 45 | 000713 | BDY | REMOVE/REPLACE | L FRT DOOR REAR VIEW MIRROR | F8AZ 17682 BA | 117.88 | INC # |
| 46 | AUTO | REF | REFINISH | L FRT DOOR MIRROR | | C | 0.5 |
| 47 | 000777 | BDY | REMOVE/REPLACE | L FRT UPR DOOR HINGE | F8AZ 5422800 AA | 20.68 | 2.3 # |
| 48 | AUTO | REF | REFINISH | L FRT UPR DOOR HINGE | | C | 0.2 |
| 49 | 001788 | BDY | REMOVE/REPLACE | L FRT LWR DOOR HINGE | 1W7Z 5422810 AA | 30.00 | 0.5 ,# |
| 50 | AUTO | REF | REFINISH | L FRT LWR DOOR HINGE | | C | 0.2 |
| 51 | 000811 | BDY | REPAIR | L REAR DOOR SHELL | Existing | | 2.0* |
| 52 | AUTO | REF | REFINISH | L REAR DOOR OUTSIDE | | C | 1.8 |
| 53 | 000978 | BDY | REMOVE/REPLACE | ROOF PANEL | XW3Z 5450202 AA | 321.07 | 18.0 |
| 54 | AUTO | REF | REFINISH | ROOF PANEL | | C | 5.0 |
| 55 | AUTO | REF | REFINISH | ROOF EDGE | | C | 1.2 |
| 56 | 000979 | BDY | REMOVE/REPLACE | FRT ROOF HEADER | F2AZ 5403408 A | 87.32 | 1.5 |
| 57 | 001627 | BDY | REMOVE/REPLACE | R INR ROOF RAIL | YW7Z 5451180 AA | 43.02 | 2.5 |
| 58 | 001628 | BDY | REMOVE/REPLACE | L INR ROOF RAIL | YW7Z 5451181 AA | 43.02 | 2.5 |
| 59 | 001629 | BDY | REMOVE/REPLACE | ROOF REINFORCEMENT | 1W7Z 5450244 BA | 136.67 | 0.5 |
| 60 | 001629 | BDY | REMOVE/REPLACE | ROOF REINFORCEMENT | 1W7Z 5450244 BA | 136.67 | 0.5 |
| 61 | 001630 | BDY | REPAIR | ROOF HEADLINER | Existing | | 2.0* |
| 62 | 001004 | BDY | REMOVE/REPLACE | BACK WINDOW REVEAL MLDG | F2MY 5442404 A | 76.05 | INC # |
| 63 | 001041 | REF | REFINISH | LUGGAGE LID OUTSIDE | | C | 2.5 |
| 64 | 900500 | BDY | REMOVE/INSTALL | CAGE AND RADIOS | Existing | | 5.0* |
| 65 | 900500 | BDY | REMOVE/REPLACE | WINDSHIELD/BACKGLASS KIT | URETHANE | 24.00 | 0.0* |
| 66 | 001042 | REF | REFINISH | LUGGAGE LID UNDERSIDE | | C | 1.4 |
| 67 | AUTO | REF | ADD'L OPR | CLEAR COAT | | | 2.1* |
| 68 | 933006 | FRM | ADD'L OPR | FRAME/RACK SET UP | | | 2.5* |
| 69 | 933007 | REF | ADD'L OPR | FILL, SAND AND FEATHER | | | 0.5* |
| 70 | 933018 | REF | ADD'L OPR | MASK FOR OVERSPRAY | | | 0.3* |
| 71 | AUTO | | ADD'L COST | PAINT/MATERIALS | | 0.00 | |
| 72 | AUTO | | ADD'L COST | HAZARDOUS WASTE DISPOSAL | | 814.00 | |
| | | | | | | 5.00 | |

" - Judgement Item
# - Labor Note Applies
C - Included in Clear Coat Calc

| I. Labor Subtotals | Units | Rate | Add'l Labor Amount | Sublet Amount | Totals |
|---|---|---|---|---|---|
| Body | 76.3 | 34.00 | 0.00 | 0.00 | 2,594.20 |
| Refinish | 37.3 | 34.00 | 0.00 | 0.00 | 1,268.20 |
| Frame | 12.5 | 45.00 | 0.00 | 0.00 | 562.50 |
| Mechanical | 1.8 | 50.00 | 0.00 | 0.00 | 90.00 |
| | Non-Taxable Labor | | | | 4,514.90 |
| Labor Summary | 127.9 | | | | 4,514.90 |

| II. Part Replacement Summary | | Amount |
|---|---|---|
| Taxable Parts | | 4,044.18 |
| Parts Adjustments | | 338.93- |
| Sales Tax | @ 7.500% | 277.89 |
| Total Replacement Parts Amount | | 3,983.14 |

ESTIMATE RECALL NUMBER: 11/5/01 12:46:57  4746

Mitchell Data Version:       OCT_01_A
UltraMate Version:           4.7.007

UltraMate is a Trademark of Mitchell International
Copyright (C) 1994 - 2000 Mitchell International
All Rights Reserved

00623

Ex. 10

303

Estimate ID:  4746
Estimate Version:  0
Preliminary
Profile ID:  MODERN

| Additional Costs | | | | Amount | | IV. | Adjustments | Amount |
|---|---|---|---|---|---|---|---|---|
| Taxable Costs | | | | 814.00 | | | Customer Responsibility | 0.00 |
| | Sales Tax | @ | 7.500% | 61.05 | | | | |
| Non-Taxable Costs | | | | 5.00 | | | | |
| Total Additional Costs | | | | 880.05 | | | | |

| | | Amount |
|---|---|---|
| I. | Total Labor: | 4,514.80 |
| II. | Total Replacement Parts: | 3,983.14 |
| III. | Total Additional Costs: | 880.05 |
| | Gross Total: | 9,378.09 |
| IV. | Total Adjustments: | 0.00 |
| | Net Total: | 9,378.09 |

### This is a preliminary estimate.
### Additional changes to the estimate may be required for the actual repair.

00624

ESTIMATE RECALL NUMBER: 11/ 8/01 12:46:57  4746

Mitchell Data Version:        OCT_01_A
UltraMate Version:            4.7.007

UltraMate is a Trademark of Mitchell International
Copyright (C) 1994 - 2000 Mitchell International
All Rights Reserved

Page  3  of  3

# Ex. 10

304

Estimate ID:   4987
Estimate Version:   0
Preliminary
Profile ID:   MODERN

## MODERN PAINT & BODY SHOP

830 STATE STREET EL CENTRO, CA 92243-2829
(760) 352-1271
Fax: (760) 352-6334
Tax ID: 33-0180296   BAR #: AO126373 173198   EPA #: CAL000055168

Damage Assessed By:   TONY ZAMORA

Deductible:   UNKNOWN

Owner   COUNTY OF IMPERIAL
Address:   1125 MAIN ST EL CENTRO, CA 92243

Mitchell Service:   911494

Description:   2000 Chevrolet Malibu
Body Style:   4D Sed
VIN:   1G1ND52J5Y6291674
Mileage:   42,793

Vehicle Production Date:   4/00
Drive Train:   3.1L Inj 6 Cyl AO
License:   NO PLATES  CA

| Line Item | Entry Number | Labor Type | Operation | Line Item Description | Part Type/ Part Number | Dollar Amount | Labor Units |
|---|---|---|---|---|---|---|---|
| 1 | 800109 | BDY | REMOVE/REPLACE | R FRT REPLACE DOOR ASSY | Qual Recycled Part | 750.00 * | 1.5 |
| 2 | AUTO | REF | REFINISH | R FRT DOOR | | C | 1.5 |
| 3 | AUTO | REF | REFINISH | R FRT ADD FOR JAMBS & INTERIOR | | C | 1.0 |
| 4 | 900500 | BDY * | REPAIR | USED PART CLEAN UP | Existing | | 3.0 * |
| 5 | 300135 | BDY | REMOVE/REPLACE | R REAR REPLACE DOOR ASSY | Qual Recycled Part | 750.00 * | 1.4 |
| 6 | AUTO | REF | REFINISH | R REAR DOOR | | C | 1.1 |
| 7 | AUTO | REF | REFINISH | R REAR ADD FOR JAMBS & INTERIOR | | C | 1.0 |
| 8 | | | | *** END OF ATG SECTION *** | | | |
| 9 | 100177 | BDY | REPAIR | R FENDER PANEL | Existing | | 1.0 * # |
| 10 | AUTO | REF | REFINISH | R FENDER OUTSIDE | | C | 1.6 |
| 11 | 100836 | BDY | REMOVE/REPLACE | R DOOR OPENING FRAME        -6 | 22652752   GM PART | 858.00 | 20.1 |
| 12 | AUTO | REF | REFINISH | R DOOR OPENING FRAME | | C | 2.9 |
| 13 | 900500 | GLS * | ADD'L LABOR OP | A/M WINDOW TINT | Sublet | 55.00 * | 0.0 * |
| 14 | 900500 | FRM * | REPAIR | RT UNIBODY SECTION | Existing | | 8.0 * |
| 15 | 101086 | BDY | REMOVE/REPLACE | R QUARTER OUTER PANEL | Existing | | 4.0 * |
| 16 | AUTO | REF | REFINISH | R QUARTER PANEL OUTSIDE | | C | 1.7 |
| 17 | AUTO | REF | ADD'L OPR | CLEAR COAT | | | 2.7 |
| 18 | 833003 | BDY * | ADD'L OPR | TINT COLOR | | | 0.3 * |
| 19 | 833006 | FRM | ADD'L OPR | FRAME/RACK SET UP | | | 2.5 * |
| 20 | 833018 | REF * | ADD'L OPR | MASK FOR OVERSPRAY | | 0.00 * | 0.3 * |
| 21 | AUTO | | ADD'L COST | PAINT/MATERIALS | | 324.00 * | |
| 22 | AUTO | | ADD'L COST | HAZARDOUS WASTE DISPOSAL | | 5.00 * | |

* - Judgement Item
# - Labor Note Applies
C - Included in Clear Coat Calc

**00625**

ESTIMATE RECALL NUMBER:  1/14/02 16:42:11  4987

Mitchell Data Version:       JAN_02_A
UltraMate Version:            4.7.007

UltraMate is a Trademark of Mitchell International
Copyright (C) 1994 - 2000 Mitchell International
All Rights Reserved

**Ex. 10**

305

Date ID:   1987
Estimate Version:   C
Preliminary
Profile ID.   MODERN

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Body | 36.0 | 38.00 | 0.00 | 0.00 | 0.00 | | | |
| Refinish | 13.8 | 38.00 | 0.00 | 0.00 | 524.40 | Sales Tax | @   7.750% | 182.75 |
| Glass | 0.0 | 38.00 | 0.00 | 55.00 | 55.00 | | | |
| Frame | 8.5 | 50.00 | 0.00 | 0.00 | 425.00 | Total Replacement Parts Amount: | | 2,540.75 |

|  |  |  |
|---|---|---|
| Non-Taxable Labor | | 2,193.80 |
| Labor Summary | 53.8 | 2,193.80 |

III. Additional Costs

| | | | | Amount |
|---|---|---|---|---|
| Taxable Costs | | | | 324.00 |
| | Sales Tax | @ | 7.750% | 25.11 |
| Non-Taxable Costs | | | | 5.00 |
| Total Additional Costs | | | | 354.11 |

IV. Adjustments

| | Amount |
|---|---|
| Customer Responsibility | 0.00 |

| | | | |
|---|---|---|---|
| I. | Total Labor: | | 2,193.80 |
| II. | Total Replacement Parts: | | 2,540.75 |
| III. | Total Additional Costs: | | 354.11 |
| | | Gross Total: | 5,088.66 |
| IV. | Total Adjustments: | | 0.00 |
| | | Net Total: | 5,088.66 |

**This is a preliminary estimate.**
**Additional changes to the estimate may be required for the actual repair.**

ESTIMATE RECALL NUMBER: 1/14/02 16:42:11  4987

Mitchell Data Version:        JAN_02_A
Ultramate Version:           4.7.007

UltraMate is a Trademark of Mitchell International
Copyright (C) 1994 - 2000 Mitchell International
All Rights Reserved

Page   2   of   2

00627

**Ex. 10**

307

# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## ADMINISTRATIVE INVESTIGATIONS UNIT

March 5, 2002

TO:      Communications Supervisor Norma Flores

FROM:    Sgt. Delfino O. Matus
           AIU

RE:      Audio recordings reference CR # 0111-0017

I am requesting any and all audio recordings regarding CR# 0111-0017. This incident occurred on November 1, 2001 at approximately 0958 hours.

Any questions contact Sgt. Matus at 339-6319.
/////

00628

**Ex. 10**

308

# IMPERIAL COUNTY SHERIFF'S OFFICE
## INTEROFFICE MEMO

Date: March 13, 2002

To:   Sgt. Delfino O. Matus/AIU

From: Norma M. Flores/Communications Supervisor

Re:   Audio recordings reference Case # 0111-0017

Regarding your request I have come to find out I have no data for that day.  There must have been some type of malfunction in the back where the recording system is. The power was turn off for remodeling or repairs.

Thank You

00629

**Ex. 10**

309

Imperial County Sheriff's Department
Harold D. Carter
Sheriff-Coroner-Marshal
Interoffice Memo



TO: Sergeant Delfino O. Matus/ AIU
FROM: Chief Deputy Sharon Housouer
DATE: March 03, 2002
SUBJECT: Traffic Accident/Deputy Tackett

Per SERC recommendation, I am requesting the
Administrative Investigation Unit follow up several issues
of this accident, CR#0111-0017.  They are as follows:

1.Radio communications tapes of this incident were
requested by SERC, but were found to be deleted or
tampered with.

2. Witness George Galvez Acosta should be interviewed
to verify accounts of incident (were lights and siren
activated for CODE-3).

3. Deputy Tackett should be interviewed regarding the
violation of Imperial County Sheriff's Manual of Policies
and Procedures Section 5.2.04 (did he notify the
communications center of CODE-3 response?)

Thank You.

00630

**Ex. 10**

310



**Harold J. Carter**
**Sheriff-Coroner-Marshal**

## Imperial County Sheriff's Office

P.O. Box 1040/328 Applestill Road
El Centro, CA 92244
OFFICE:  (760) 339-6301
FAX:  (760) 339-0170

# Fax

| | | | |
|---|---|---|---|
| **To:** | Ms. Sandra Lopez/CHP | **From:** | Sgt D.O. Matus/AIU |
| **Fax:** | 760·352·0937 | **Date:** | 4-9-02   1020 Hr |
| **Phone:** | | **Pages:** | (Including Cover Page) |
| **Re:** | TC of 11-1-01 | **CC:** | |
| | Audio Recordings | | |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

•**Comments:**

If you have any questions please feel free to call me at (760) ~~339-6301~~  355·6319.

Thank you...

# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## ADMINISTRATIVE INVESTIGATIONS UNIT

April 9, 2002

TO:        Ms. Sandra Lopez
                California Highway Patrol
                El Centro, California

FROM:    Sgt. Delfino O. Matus
                Administrative Investigations Unit (AIU)

RE:        Traffic collision, date of incident November 1, 2001
                AIU case number 2002-009

On November 1, 2001 at approximately 0958 hours, a sheriff's patrol unit was involved in a traffic accident that occurred on Highway 115 and Wirt Road, Calipatria, California. The CHP case number is 01 11 01, the ICSO case number is 0111-0017.

The sheriff's department is conducting an administrative investigation into the accident, and is requesting any and all audio recordings regarding the sheriff's department traffic, that the CHP may have.

If you have any questions, please contact Sgt. Matus at 760-339-6319. Thanking you in advance for your cooperation and assistance.
/////

00632        **Ex. 10**

312

# IMPERIAL COUNTY SHERIFF'S DEPARTMENT
## ADMINISTRATIVE INVESTIGATIONS UNIT

August 19, 2002

TO:      Deputy Justin Tackett

FROM:    Sgt. Delfino O. Matus

RE:  Copies of the following IA reports.

     1.   IA # 2002-002
          Complainant: Lisa DiMaria (ICDA)
          Disposition: NOT SUSTAINED

     2.   IA # 2002-009
          Complainant: Chief Deputy Sharon Housouer
          Disposition: NOT SUSTAINED

     3.   IA # 2002-011
          Complainant: Zane Running
          Disposition: NOT SUSTAINED

     4.   PC # 2001-001
          Complainant: Beverly Bates
          Disposition: RESOLVED

Per your memo dated July 12, 2002, that was received by AIU on July 26, 2002; AIU is releasing the above listed investigations that were completed.

Enclosed you will find copies of tape-recorded interviews as related to IA #2002-009. The copies consist of three (3) audiocassette tapes that include the interviews of Deputy Justin Tackett, George Acosta, and Norma Flores.

You will also find copies of tape-recorded interviews as related to IA # 2002-002. The copies consist of seven (7) audiocassette tapes that include the interviews of Deputy Rick Breland, Sgt. John Lemon, Deputy Rafael Peraza, Agent Jose Cuellar, interview of G. Gutierrez by Agent Cuellar, Lisa DiMaria, Deputy Justin Tackett, Deputy Nick Simpson, Sgt. Jake Holguin, and Communication recordings.

**Ex. 10**

00633 313

AIU does not have any audiocassette recordings for IA # 2002-011 and PC # 2001-001.

As to on-going investigations, IA #'s 2002-007, and 2002-018, those investigations are in the possession of the sheriff's administration. The investigations are not complete.

Any questions contact Sgt. Matus at 339-6319.

*I hereby acknowledge that I have received the above listed completed/investigations.

DATE: 08/19/02

Deputy Justin Tackett

DATE: 8-19-02

Sgt. Delfino O. Matus

00634

**Ex. 10**

314

2

Sgt Matua

00635

# IMPERIAL COUNTY SHERIFF'S DEPARTMENT

## ADMINISTRATIVE INVESTIGATIONS UNIT

**DATE:**      March 20, 2002

**COMPLAINANT:**   Imperial County Sheriff's Department

**DATE OF INCIDENT:**   November 1, 2001

**LOCATION OF INCIDENT:**    Hwy 115 & Wirt Road, Brawley, CA.

**ALLEGATION:**      1. Section 2.1.01 VIOLATION OF RULES
2. Section 5.2.04 VIOLATION OF CODE 3 RESPONSE
\*Above sections are from the Imperial County Sheriff's Department Policy & Procedures Manual.

**CASE #:**   IA # 2002-009
CR # 0111-0017

**TO:**     Deputy Justin Tackett

**FROM:**    Sgt. Delfino O. Matus

This is to inform you that Administrative Investigations Unit (AIU) has received a complaint regarding your conduct. Sgt. Delfino O. Matus will handle the investigation of this complaint. Sgt. Matus will contact you to arrange an interview.

As a sworn member of this department, you should be aware of your rights contained in the California Government Code Sections 3300-3311 (Peace Officer's Bill of Rights) or contact any employee representative or attorney for advice.

The Imperial County Sheriff's Department Policy and Procedure Manual Rules of Conduct also contain your responsibilities during the investigation. Your attention is specifically directed to Sections 2.1.02 INSUBORDINATION, 2.5.07 INTERVENTION, AND 2.5.09 TESTIMONY.

If you have any questions, please contact Sgt. Matus at 760-339-6319./////

**Ex. 10**

316

00636

Deputy Report                                    Page:

Incident Number: 0111-0017
Nature: Medical                          Case Numbers:

    Nr: 115/WIPT                         Area: DIST4  SUPERVISOR DISTRICT 4
City: Calipatria     St: CA  Zip: 92233      Contact:

Complainant:     100673    Alert Codes:

Lst: TACKETT                          Fst: JUSTIN        Mid:
DOB: **/**/**  SSN:   -  -   Adr: IMPERIAL COUNTY SHERIFFS DEPT
Rac:    Sx:  Tel: (760)339-6311  Cty:                  St:   Zip:

Reported:  AMAS   Assist Ambulance / Medica
Observed:
Offense
  Codes:  AMAS   Assist Ambulance / Medica

Circumstances:

Responding Officers: Tackett, J        971
                     Ruiz, M.          576
                     Tabares, P.       563
Rsonsbl Officer: Tackett, J       Agency: AISO
    Received By: Flores, N.        Last RadLog: 12:08:40 11/01/01     99
   How Received: T  Telephone              Clearance: RBR  Received by Records

Wen Reported:  09:58:43 11/01/01     Disposition: ACT  Disp Date: 11/01/01

Rerd between:  09:58:43 11/01/01     Judicial Sts:
          and:  09:58:43 11/01/01     Misc Entry:

Modus Operandi:
      Factor        Description                    Method

INVOLVEMENTS:
te        Description                          Relationship
-------   -------------------------------------  --------------------------

**Ex. 10**

**00637**        317

"I understand that I am being ordered by Sergeant
Tabarez at approximately 1500 hours to make a report
or answer questions and that if I do not comply with the
order, I may be disciplined for insubordination.
Therefore, I have no alternative but to abide by the
order.  However, by so doing, I do not waive my
Constitutional rights to remain silent under the Fifth
and Fourteenth Amendments to the United States
Constitution, under the protections of the California
Constitution, and the protections afforded me under case
law.  Furthermore, by submitting to this coerced
interview, I am waiving no right afforded me under the
Peace Officer's Bill of Rights Act."  Government Code
Sec. 3300, et.seq.

Crime Report:    0111-0017

Deputy:          Justin Tackett    # 871

Crime:           Damage to County Property

Victim(s):       Imperial County Sheriff's Department

Driver:          Justin Tackett
                 383 Main Street
                 Brawley, Ca.  92227
                 760-339-6312

Witnesses:  1)  George Galvez Acosta
                354 Larson Road
                Imperial, Ca.  92251
                760-355-2312
                D.O.B.: 10-20-48

            2)  Sergeant P. Tabarez
                383 Main Street
                Brawley, Ca.  92227
                760-339-6312

Damaged Property:
                 Patrol Unit # 310

Vehicles:        Unit # 310
                 2001 Ford Sedan
                 White   4-Door
                 California Plate # 1094307

Narrative:
        On November 01, 2001 at approximately 1000 hours, I(Deputy
Justin Tackett) was dispatched to an explosives call.  Dispatch advised
that I was to break-away from assisting Calipatria Police Department,
wh we both had arrested three juveniles in the Calipatria area, and
the Bomb Squad and Hazmat had already been advised to start
responding to the scene.  Dispatch advised me that the explosives was in
the area East of the Highline Canal, off Highway 78, Brawley, Ca. and

**Ex. 10**

00638
                                          318

s boat was not my assigned boat to patrol.

I know that this area was highly populated by off-highway
les and pedestrians. The area also had vehicles from the busy
nway 78 passing by the area. Due to the possibility of death by the
losives and damage to property from the explosives along with the
cumstances stated in the previous paragraph, I believed it was
ecessary to respond CODE 3. I responded by activating my patrol
t's lights and siren and accelerated in speed, with due regard for
ple, property, and conditions I would encounter, when responding to
call. I exited the Calipatria area eastbound/southbound lane of
ghway 115 which had no visible traffic at this time. Upon
roaching a curve on Highway 115 at approximately 80 - 90 M.P.H., that
d a roadway(Wirt Road) running off the beginning of the curve, I
ticed a semi-truck appear from behind a business that is located on
corner of Highway 115 and Yocum Road, Calipatria, Ca. After
ticing the semi-truck travelling in the northbound lane, I applied the
akes to my patrol unit for the fact of due regard for on-coming
affic.

I had previously, along with other deputies, responded at the
me speed and same fashion while responding CODE 3 to the same
rticular area. While still pressing the brake, I drove over a slight
p in the roadway of Highway 115, just prior to the curve were the
adway proceeds in a southbound and northbound direction. The dip in
e roadway is from farm implement and semi-trucks entering and exiting
hway 115 from Wirt Road, an extension road in an eastbound direction
ning off Highway 115. After driving over the slight dip, the rear of
atrol unit began to slid to the left. I counter-steered and began
lide sideways around the curve. I was negotiating the curve and had
t lost control of my patrol unit and began to navigate the vehicle
ck into the southbound lane. At this time I noticed the semi-truck
avelling in the northbound lane had entered the curve and was in close
oximity to colliding with me. I believed the only option of possibly
t causing damage to the unit and not colliding with the semi-truck was
steer the vehicle off the top of the curve.

Upon steering my patrol unit off the curve and not colliding
th the semi-truck, my patrol unit began to slid down the backside of
e curve. At the bottom of the curve was a patch of soft sand which
opped my tires from sliding causing my unit to began to roll-over.
ter my patrol unit came to a complete stop from rolling over, I
vised dispatch that my unit had been rolled over and it's location. I
ited my patrol unit and located the semi-truck that had been
avelling in the northbound lane. (W1) GEORGE GALVEZ ACOSTA was the
iver of the semi-truck and had pulled to the side of the roadway.
1) GEORGE GALVEZ ACOSTA stated he saw the rear of my patrol unit slide
the left as I was just going into the curve, just passing Wirt Road.
advised him that he was to stand-by in order to advise California
ghway Patrol and my supervisor of what he observed.

At this time, Calipatria Fire Department arrived and placed me
a straight body board. They also applied a neckbrace as a
cautionary measure due to me advising them of lower back pain and
ht neck pain. Gold Cross Ambulance arrived and transported me to
Pioneer's Memorial Hospital. I received medical aid and was
leased.

**Ex. 10**

      Refer to records.

   n Tackett  # 871
puty Sheriff
rth County Patrol
perial County Sheriff's Department


------------------------------------------------
sponsible LEO:

------------------------------------------------
proved by:

---------------------------
te

**Ex. 10**

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

## IA 2002-009
## 3-28-02

**SGT. MATUS:** Okay uh, today's date is March 28th the year is 2002, time is approximately 1110 hours this is an interview with uh, Deputy Justin Tackett, who is being represented by Brenda Coughlin from Bobbitt's office in San Diego, this is in regards to, uh IA number 2002-009, as it relates to Crime Report Number 0111-0017, okay uh, this interview is being conducted at the Imperial County Sheriff's Office present is Imperial County Sheriff's Sergeant Delfino Matus, who is conducting the interview, okay uh Justin this interview is being recorded and your admonished that you answer all questions asked of you completely and that all your questions, answers are to be truthful, knowingly making false or misleading statements during this interview will be considered a separate offense that can result in discipline up to and including termination do you understand this admonishment?

**TACKETT:** Yes.

**SGT. MATUS:** Okay at this time I will advise you of your right's per A. B. 301, okay you have the right to have a representative of your choice present during this interview and you have chosen uh, Brenda is that correct?

**TACKETT:** Correct.

**SGT. MATUS:** Okay you have the right to make your own tape recording of this interview, okay you will have access to the departments tape recordings of your interview if further proceedings are contemplated or prior to any further interrogation of a subsequent time, do you understand that?

**TACKETT:** Yes.

**SGT. MATUS:** After the interview your entitled to a transcribed copy of any notes or any reports or complaints except those that are deemed confidential, do you understand that?

**TACKETT:** Yes.

**SGT. MATUS:** Okay, you'll be questioned by no more than two inter-interrogators at on time during this course if this interview, in this case I will be the sole interrogator, okay if this interrogation is occurring during your off duty time, you'll be compensated in accordance with

00641

**Ex. 10**
321

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

IA 2002-009
3-28-02

regular department procedures and you will not be released from
any employment for any time missed, this interview session will be
for a reasonable period of time based on all the circumstances and
you will be allowed to attend to your own personal physical
necessities, Do you understand these rights?

TACKETT:        Yes.

SGT. MATUS:     While you have the right to remain silent with regards to any
                criminal investigations you do not have the right to refuse to
                answer my admin- to answer my administrative questions, this is
                an administrative investigations and therefore I am now ordering
                you to discuss this matter with me if you refuse to discuss this
                matter your silence can be deemed insubordination and could
                result in an administrative discipline up to and including
                termination, do you understand that?

TACKETT:        Yes.

SGT. MATUS:     Any statements you make under compulsion of threats of such
                discipline cannot be used against you in a later criminal
                proceeding, do you understand that?

TACKETT:        Yes.

SGT. MATUS:     Okay, Justin Tackett, I will order you to answer any and all
                questions asked of you in a truthful and accurate manner failure to
                do so may be deemed to insubordination and result in an in an
                administrative discipline up to and including termination of your
                employment with the Imperial County Sheriff's De-partment, do
                you understand what I just explained to you?

TACKETT:        Yes.

SGT. MATUS:     Do you have any questions concerning what I explained to you?

TACKETT:        No.

SGT. MATUS:     Okay. Uh, Justin this uh investigations is a uh an incident that
                occurred back on November 1st of 2001, where you had an traffic
                accident, I believe it was, East of Calipat and the allegations
                against you are uh, that you violated the policy of, code three

**Ex. 10**

2

00642                    322

Imperial County Sheriff's Department
328 Appiestill Road
El Centro, CA 92243

IA 2002-009
3-28-02

policy of the department, what I want to do is basically start from the beginning, how you got the call can you tell me how you got the call?

TACKETT:    Um, basically I got the call from uh, Dispatch.

SGT. MATUS:    And what was the call about?

TACKETT:    Explosives.

SGT. MATUS:    Do you recall what area?

TACKETT:    I think it was, East of the Highline on 78.

SGT. MATUS:    Okay.

TACKETT:    Which is the Glamis Area.

SGT. MATUS:    You responded?

TACKETT:    Correct.

SGT. MATUS:    Okay, where did you respond from?

TACKETT:    Um, Calipat.

SGT. MATUS:    The city of Calipat?

TACKETT:    Correct.

SGT. MATUS:    Okay, when you responded, can you tell me what direction you went, what road?

TACKETT:    It was their Main Street, which then becomes Highway 115 on the outside of Calipat going East Bound.

SGT. MATUS:    Okay, I some point in time you determine the uh respond to code 3 is that correct?

TACKETT:    From the point I received the call, correct.

SGT. MATUS:    Okay, uh, code 3 includes what?

**Ex. 10**

**00643**

3

323

Imperial County Sheriff's Department
328 Applesrill Road
El Centro, CA 92243

### IA 2002-009
### 3-28-02

TACKETT:        I don't understand the questions, code 3 includes?

SGT. MATUS:     Did you have your lights and siren on?

TACKETT:        Correct, lights, sirens uh, wig-wags.

SGT. MATUS:     Okay you proceeded out of uh, Calipat?

TACKETT:        Correct.

SGT. MATUS:     On 115?

TACKETT:        Correct.

SGT. MATUS:     At what speed?

TACKETT:        Uh, when I got outside the city, it increase between 80 to 90 I believe it was something before, I'm not exactly sure, exactly.

SGT. MATUS:     Okay, while you were in route uh, you had a traffic accident is that correct?

TACKETT:        Correct.

SGT. MATUS:     Can you tell me what happened?

TACKETT:        Uh, basically what happened I was coming down the road way, uh, no traffic, there was nothing on the roads and coming around coming up to the corner, looking ahead of me my field-field view and there's a residence or shop, that's just South of the curve and as I was coming approaching the curve I saw a semi-rig and started coming out from the residence and so I sl-proceeded to slow down no with lane discipline, I had to stay in my lane.

SGT. MATUS:     Okay this curve, where is this curve located at?

TACKETT:        It's uh, 115 and Wirt Road, it's like an inter, I should say like an intersection,

SGT. MATUS:     Okay so um, and this truck that you saw, coming from behind the residence?

4

00644 **Ex. 10**

324

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

IA 2002-009
3-28-02

TACKETT: It came from the, the field, you can't see it until it comes pass the residence, cause the residence is right off of I15. It's I15, I think.

SGT. MATUS: How far, uh, is it South of the uh, curve?

TACKETT: Correct.

SGT. MATUS: How far South?

TACKETT: Fourth of a mile? I, remember I showed you, don't know? About fourth of a mile I think, I'm not sure, exactly.

SGT. MATUS: Okay, as you were making the curve, how fast were you going?

TACKETT: Well it was below 80, I would probably say about 70, cause I was already slowing down, when I was going before the curve, cause I saw the traffic, so when I was coming in the curve I was still slowing down, staying in my lane.

SGT. MATUS: Okay, what is the speed limit there, do you know?

TACKETT: Uh, on the curve?

SGT. MATUS: Umm.

TACKETT: Presume since it's a?

COUGHLIN: If you know?

TACKETT: I don't know, it's an assumption.

SGT. MATUS: So you come to the curve and, and what happened, you lost control?

TACKETT: No the back end came from behind me, I went over a bump that where Wirt road comes from a start of the curve, when I went over that little it's like a little indention in Wirt road were the vehicle pass, and the back end came out.

SGT. MATUS: Okay and that's where Wirt, cause before you made the curve to go South, Wirt goes straight from I15?

**Ex. 10**

5

**00645**

325

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

IA 2002-009
3-28-02

| | |
|---|---|
| TACKETT: | Wirt comes off of uh, the curve or it's already in the curve. |
| SGT. MATUS: | Okay let's say this is Calipat here *( writing on a pad)* |
| TACKETT: | Okay. |
| SGT. MATUS: | And the curve that's going this way, this is 115. |
| TACKETT: | Okay. |
| SGT. MATUS: | Where is Wirt road at, this is no? |
| TACKETT: | Okay this is, this is the exit. |
| SGT. MATUS: | Okay |
| TACKETT: | That's were you come |
| SGT. MATUS: | So it would be on the North side |
| TACKETT: | That's where were going West bound, the curve were your going to go Eastbound where the intersect is into the curve, it comes up and over and back down. |
| SGT. MATUS: | Okay, so it be at the basically on the North side of the curve. |
| TACKETT: | Yeah, yeah, I guess you can say that, I mean you can say the North side but it's inside, on the curve, the were you, get on. |
| SGT. MATUS: | Yeah were you get off but it will be it's not over here on the South side? |
| TACKETT: | No, no it's actually on the curve, it, it |
| SGT. MATUS: | It's like an extension? |
| TACKETT: | I guess you can say technically it's an extension because an extension will be the were your going Westbound on because it's not really an extension I mean you can say technically it's an extension off the curve. |

00646 **Ex. 10**

6

326

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92245

## IA 2002-009
### 3-28-02

**SGT. MATUS:** Okay,

**TACKETT:** But not an extension off.

**SGT. MATUS:** So as you were coming to the curve you were slowing down you said, you said you saw the truck somewhere around this area, to the South, South of the curve.

**TACKETT:** Correct say this is the uh dirt road way there's a residence right here like a farm residence or an implement whatever, and as I saw it coming out here when I saw it here I was by like right around here, that's why I started slowing down, end of the curve before the curve.

**SGT. MATUS:** Okay, so as you were entering the curve you lost control the back side of your car, was it?

**TACKETT:** Correct the back side I don't know what happened but the backside of my vehicle just came off the side.

**SGT. MATUS:** And once that happened, what happened?

**TACKETT:** Uh, I tried to correct it, by steering with the, uh curve and with the skid, I tried correcting it, steering in the curve to pull my vehicle back around, and slid, I slid and just slid down I then corrected the other way and I started going back into the curve but by the time the semi-rig was already coming around pretty close (unintelligible).

**SGT. MATUS:** How fast do you think you were going there?

**TACKETT:** I have no idea I was too busy trying to work my feet on the pedals back and forth and work the steering wheel.

**SGT. MATUS:** So you crashed?

**TACKETT:** Eventually correct, it the rolled unit.

**SGT. MATUS:** Okay, you didn't strike any other vehicle is that correct?

**TACKETT:** No, just the unit vehicle.

**Ex. 10**

00647

327

7

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

IA 2002-009
3-28-02

**SGT. MATUS:** Uh, did you make contact with an individual by the name of uh Acosta, a truck driver?

**TACKETT:** Yeah, I did.

**SGT. MATUS:** Did you ever tell him that you had a flat, a blow out?

**TACKETT:** No, I said I didn't know what happened I said I don't know if it was a flat blow out or what have you but I said I told him I, my back end just came up and he said I know I saw that, so I said I need you here as a witness that's the reason I got out of the car to grab him so when they responded they can have him as a witness.

**SGT. MATUS:** Did you sustain any injuries?

**TACKETT:** Uh, my neck and my back, that's I mean they still give me, I mean I still get pains from them but nothing excruciated like that but.

**SGT. MATUS:** So you have a clear recollection of the events that day?

**TACKETT:** Uh, vague, I mean I can't really say clear but vague everything happened so fast.

**SGT. MATUS:** When you were responding code 3 uh, did you notify anyone, that you were going code 3?

**TACKETT:** I when they called me they called me on the cell phone cause they couldn't get the station 7 so I was talking to Dispatch about the about the whole I guess you can say criteria of what was going on there and...

**SGT. MATUS:** So when you got the call, you made a phone call?

**TACKETT:** Correct.

**SGT. MATUS:** Who did you talk to?

**TACKETT:** One of the Dispatchers

**SGT. MATUS:** Hmm, do you remember who it was?

**TACKETT:** No, I can't recall.

**Ex. 10**

**00648**

328

8

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

## IA 2002-009
### 3-28-02

**SGT. MATUS:**  And what did you tell her?

**TACKETT:**  Basically I asked her what was going on because there telling me to break to a call that was out of my area, and at the time I was with station 7 we had uh 3 uh 3 people custody for drugs, paraphernalia, and drugs.

**SGT. MATUS:**  Okay did you tell them at that time that you were responding code 3?

**TACKETT:**  Um, I believe I did I told them I was I'd be responding Calipat, I'd going code there.

**SGT. MATUS:**  Did you tell them code 3?

**TACKETT:**  I don't know, if I told them it would be code 3 but I believe I told them I was going code.

**SGT. MATUS:**  Okay did you uh notify your Supervisor?

**TACKETT:**  Uh, I don't know if my Supervisor, I believe if he was, it's been past, present where Supervisor hears your going enroute somewhere and you have your sirens and if he doesn't want you going code they call you off but I never hear people just call that there going code down here.

**SGT. MATUS:**  So uh when you got the call you didn't say I'd be responding code 3?

**TACKETT:**  Not over the air, I don't believe.

**SGT. MATUS:**  And you may have done that over on the telephone, on the telephone?

**TACKETT:**  Correct.

**SGT. MATUS:**  Are you clear on that that you may had told them on the telephone?

**TACKETT:**  Clear on?

**SGT. MATUS:**  Notifying Dispatch?

**Ex. 10**

**00649**

329

**Imperial County Sheriff's Department**
**328 Applestill Road**
**El Centro, CA 92243**

**IA 2002-009**
**3-28-02**

| | |
|---|---|
| TACKETT: | I notified Dispatch I was going to Calipat there and when I had what I'm saying but I am not clear as far as whether I told them I was going code or not. |
| SGT. MATUS: | Okay but you don't recall what time you told the Supervisor, that? |
| TACKETT: | That, if I told him? |
| SGT. MATUS: | Hmm. |
| TACKETT: | I never advised any of my Supervisors. |
| SGT. MATUS: | Do you know who your Supervisor was that day? |
| TACKETT: | Uh, no, I don't know, I know afterwards he responded to the scene but. |
| SGT. MATUS: | Was it Tabarez? |
| TACKETT: | I believe so. |
| SGT. MATUS: | Did you go to the hospital afterwards? |
| TACKETT: | Yes. |
| SGT. MATUS: | And were you in there for any period of time or just you (unintelligible)? |
| TACKETT: | I was there for a period of time I guess some bruising and some check my back and my neck. |
| SGT. MATUS: | And you prepared a report on this, right? |
| TACKETT: | Correct. |
| SGT. MATUS: | Okay, did you talk to the Highway Patrol? |
| TACKETT: | Correct. |
| SGT. MATUS: | Do you recall who the officer was? |

**Ex. 10**

00650

10

330

Imperial County Sheriff's Department
328 Appiestill Road
El Centro, CA 92243

IA 2002-009
3-28-02

| | |
|---|---|
| **TACKETT:** | Uh, I believe there was two, I think one of them was a Pablo Torres I'm not positive on that. |
| **SGT. MATUS:** | I don't think I have any further questions, is there any questions from anyone? |
| **COUGHLIN:** | I don't think so. |
| **SGT. MATUS:** | Okay uh, do you have any questions? |
| **TACKETT:** | Nnnnot really, can we break real quick? |
| **SGT. MATUS:** | Okay, I'm going to take a short break time is approximately 1124 hours. ---- Okay uh time is approximately 1128 hours continuing with the interview of Justin Tackett, do you have anything further, anything further to add or? |
| **COUGHLIN:** | No. |
| **SGT. MATUS:** | Okay we are going to end the interview time is approximately 1128 hours, thank you. |

Typed by:
Galdy Gutierrez
Office Assistant 111
REVIEWED BY SGT. DELFINO O. MATUS 4/3/02

**Ex. 10**

00651

11

331

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

IA 2002-009
04-04-02

| | |
|---|---|
| SGT. MATUS: | Okay, today's date is uh, April the 4th, the year is 2002, time is 1129 hours this is uh, an interview with Imperial County Sheriff's Communications supervisor Norma Flores. Uh, this is in regards to IA number 2002-009, as related to uh, CR# 0111-0017 uh, this is an incident that occurred on uh, November 1st uh, 2001, uh east of Calipat, uh, California. It's a accident, traffic accident that involved uh, Deputy Justin Tackett. Norma I showed you a copy right know of a crime report number 0111-0017, uh, apparently you were dispatching on that particular day according to the uh, information on the first page of the report, do you recall ever dispatching uh, Deputy Tackett to a uh explosive device call, somewhere in the area east of Brawley, California? |
| FLORES: | Yes, yes I do. |
| SGT. MATUS: | Do you recall the, what the call was about or? |
| FLORES: | Uh, apparently this company that is working out there had um, found this device, they verified they told me that the people weren't going to touch anything what ever but they needed a unit. So I go ahead and went and notified uh, Justin, uh, Tackett regarding the call. |
| SGT. MATUS: | Okay. |
| FLORES: | To respond. |
| SGT. MATUS: | And to your knowledge when he responded you know if he ever responded code 3 or did he ever notified dispatch that he was responding code 3 or? |
| FLORES: | That I recall, no. |
| SGT. MATUS: | Okay, do you ever recall having a telephone conversation with him, regarding the uh call. |
| FLORES: | Not that I recall of. |
| SGT. MATUS: | Okay. Okay so if there's a possibility that me he may have uh, informed you that he was responding code 3? |

**Ex. 10**

00652

332

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

IA 2002-009
04-04-02

| | |
|---|---|
| **FLORES:** | He could but...I'm pretty good in verifying cause there usually nine out of ten, I'll put, he's responding code three on the CAD comments and I re-don't recall that, at all of him telephoning me or letting me know, I think I'm the one that asked him, cause I heard it in the back ground. |
| **SGT. MATUS:** | As a practice here at the department when there is a code 3 situation do the officers or supervisors go or who ever is handling a code 3 call, do they normally notify dispatch? |
| **FLORES:** | It's rare but they do, uh, it's not very often, usually the dispatcher will pick it up or something or? |
| **SGT. MATUS:** | And how will you pick it up? |
| **FLORES:** | You here it in the back ground when they are transmitting in the radio. |
| **SGT. MATUS:** | Siren? |
| **FLORES:** | Hmm. |
| **SGT. MATUS:** | Okay, but they don't say uh, hey you know what I'm responding code 3 to this particular call. |
| **FLORES:** | It's rare I can count them, you know there not very often. |
| **SGT. MATUS:** | So, but in this particular case, it, may have happened or it may not had happened where you informed you, I mean is it clear in your mind that he did inform you or if he didn't inform you or you just don't recall? |
| **FLORES:** | I don't recall but I think I'm the one that ask him cause I heard it in the background. |
| **SGT. MATUS:** | Okay, so you made, you made an inquiry then cause uh you heard, the response in the background about? |
| **FLORES:** | Yes, I did. |
| **SGT. MATUS:** | And do you remember what he said if he was or if he wasn't? |

**Ex. 10**

2

00653

333

Imperial County Sheriff's Department
328 Applestill Road
El Centro, CA 92243

IA 2002-009
04-04-02

| | |
|---|---|
| FLORES: | No, I don't recall. |
| SGT. MATUS: | Okay. |
| FLORES: | No, cause I think I just heard it. |
| SGT. MATUS: | But you heard? |
| FLORES: | I heard sirens. |
| SGT. MATUS: | Okay, you don't happen to remember the uh, supervisor was on that particular day, do you? Patrol supervisor? |
| FLORES: | I think it was Tabarez? |
| SGT. MATUS: | Okay, do you know if uh, if he ever notified Tabarez that he was responding code 3? |
| FLORES: | No. |
| SGT. MATUS: | Okay, Norma I don't think I have further questions, is there anything you'll like to add or maybe something I didn't ask you that you'll like to bring up or? |
| FLORES: | Um, maybe a suggestion um, cause I know we are not the only ones that do recordings, maybe asking another agency? Cause they do monitor our channels, maybe they have a recording of us to maybe have a more precise, you know indication, you know that went down, or something, I can offer that I can, I can ask around. |
| SGT. MATUS: | Okay, I don't have any further questions um, I'm going to end the interview, time is approximately 1134 hours. |
| FLORES: | Okay. |

Typed by:
Galdy Gutierrez
Office Assistant 111
REVIEWED BY SGT. DELFINO O. MATUS 4/4/02

**Ex. 10**

3.

00654

334

IMPERIAL COUNTY SHERIFF'S DEPARTMENT
328 Applestill Road
El Centro, CA 92243

IA 2002-009
3-22-02

**SGT. MATUS:** Okay uh, today's date is uh March 22, time is approximately 0708 hours, this is an interview with Mr. George Galvez Acosta, regarding uh, a TC that occurred on November 1st uh 2001. That involved uh, Deputy Justin Tackett, Mr. Acosta did you witness that traffic accident with the Deputy Sheriff?

**ACOSTA:** Uh, yes.

**SGT. MATUS:** Can, can you tell me uh or do you remember what you saw?

**ACOSTA:** Well I was, I was going uh let me see like North?

**SGT. MATUS:** Uh, ha.

**ACOSTA:** On the curve.

**SGT. MATUS:** Right.

**ACOSTA:** And he was, all of the sudden he was coming at me, but he was coming about probably 95 miles an hour.

**SGT. MATUS:** Uh, ha, did he?

**ACOSTA:** I think what had happened, I think he lost control on the curve.

**SGT. MATUS:** Okay, did he have his red lights and siren on, do you remember?

**ACOSTA:** Uh,

**SGT. MATUS:** Or could you, uh?

**ACOSTA:** No, no I don't remember.

**SGT. MATUS:** Uh, ha.

**ACOSTA:** But when I saw it uh, uh he went over the little cliff that there.

**SGT. MATUS:** Uh, ha

**ACOSTA:** The curve, he, he I think he turned over, he thought it was a flat tire but it wasn't.

**Ex. 10**

00655

1

335

## IMPERIAL COUNTY SHERIFF'S DEPARTMENT
### 328 Applestill Road
### El Centro, CA 92243

## IA 2002-009
### 3-22-02

**SGT. MATUS:**   So, uh.

**ACOSTA:**   And I ran over there, I parked in the side, ran over there, you know maybe he needed help.

**SGT. MATUS:**   Uh, ha, how close did you get to his, the car before uh?

**ACOSTA:**   Uuu, man pretty close, I, I, swerved, I moved the steering wheel, to the left and he moved it to his left because he was coming and I was going.

**SGT. MATUS:**   Uh, ha, okay, you said, you said you were going north on what 115?

**ACOSTA:**   Uh, yeah, well it's North but in the curve it turns into West, you know.

**SGT. MATUS:**   And.

**ACOSTA:**   I think it 's 115

**SGT. MATUS:**   Uh, ha

**ACOSTA:**   You know where it's at.

**SGT. MATUS:**   Right, so as he was coming uh you think he lost control there?

**ACOSTA:**   Lost control in the curve, yeah.

**SGT. MATUS:**   Uh, ha, okay was there any other traffic, that you remember?

**ACOSTA:**   No, no, lucky, lucky, lucky was nobody.

**SGT. MATUS:**   Uh, ha.

**ACOSTA:**   Uh, if he would of hit me probably, would of, probably gotten killed.

**SGT. MATUS:**   Uh, ha.

**ACOSTA:**   Probably I would of gotten killed too, if it was, I had a truck with doubles, hauling hay.

**Ex. 10**

2                                                   **00656**     336

IMPERIAL COUNTY SHERIFF'S DEPARTMENT
328 Appiestill Road
El Centro, CA 92243

IA 2002-009
3-22-02

**SGT. MATUS:**     How fast were you going?

**ACOSTA:**          I was going about 55.

**SGT. MATUS:**     Okay, so

**ACOSTA:**          45 maybe the curve.

**SGT. MATUS:**     So but you estimated his speed going what 95, you said?

**ACOSTA:**          95, Yeah.

**SGT. MATUS:**     Uh, ha.

**ACOSTA:**          He said himself,

**SGT. MATUS:**     Uh, ha

**ACOSTA:**          When the other uh, uh, CHP came,

**SGT. MATUS:**     Uh, ha, so uh but you don't remember him having his lights and siren on?

**ACOSTA:**          Uh, no, I don't remember you know,

**SGT. MATUS:**     Uh, ha.

**ACOSTA:**          Uh, I would have seen them.

**SGT. MATUS:**     Could he have had them on?

**ACOSTA:**          I would have seen them.

**SGT. MATUS:**     Uh, ha.

**ACOSTA:**          I don't think so but I don't remember but I would, I would of seen them but all I saw is coming at me, ha, ha,ha,ha

**SGT. MATUS:**     Okay, okay, so you parked your truck on the side?

**ACOSTA:**          Yeah, a little ahead after the curve.

**Ex. 10**

3

00657

337

IMPERIAL COUNTY SHERIFF'S DEPARTMENT
328 Applestill Road
El Centro, CA 92243

IA 2002-009
3-22-02

| | |
|---|---|
| **SGT. MATUS:** | Uh, ha |
| **ACOSTA:** | And then I came running uh to see if he needed help because uh he went over the little cliff that's there. |
| **SGT. MATUS:** | Uh, ha |
| **ACOSTA:** | It, it turned over because uh the lights were all crushed. . .   . . . |
| **SGT. MATUS:** | Uh, ha |
| **ACOSTA:** | The lights of the patrol. |
| **SGT. MATUS:** | Okay did he say anything to you? |
| **ACOSTA:** | Uh. |
| **SGT. MATUS:** | When you went up to him? |
| **ACOSTA:** | Uh, no, he just told me that uh he was all right and that um, he thinks it had a flat tire... |
| **SGT. MATUS:** | Oh, he thought that? |
| **ACOSTA:** | Blow out. |
| **SGT. MATUS:** | Uh, ha |
| **ACOSTA:** | But he didn't we checked all the tires. |
| **SGT. MATUS:** | Oh, you thought he had a blow out? |
| **ACOSTA:** | No that's what he said. |
| **SGT. MATUS:** | Uh, ha, when he wrecked, that caused the wreck? |
| **ACOSTA:** | Yeah, he told me that he thought he had a blow out that's why he lost control. |
| **SGT. MATUS:** | Oh. |

**Ex. 10**

4

00658

338

IMPERIAL COUNTY SHERIFF'S DEPARTMENT
328 Applestill Road
El Centro, CA 92243

### IA 2002-009
### 3-22-02

| | |
|---|---|
| ACOSTA: | He had, he had a call um, some where in the Holtville area, about a bomb. |
| SGT. MATUS: | Okay. |
| ACOSTA: | That's why he was going fast. |
| SGT. MATUS: | Oh, okay, okay George, uh you know I appreciate your time, um |
| ACOSTA: | Okay. |
| SGT. MATUS: | You know that's all the questions that I had. |
| ACOSTA: | Yeah, what is your name? |
| SGT. MATUS: | Uh, Delfino Matus. |
| ACOSTA: | Oh, okay Señor Delfino |
| SGT. MATUS: | Okay. |
| ACOSTA: | Gracias eeh    *(thank you, okay)* |
| SGT, MATUS: | Andale, adios.    *(okay, bye)* |
| ACOSTA: | Porque tengo que ir a trabajar.   *(Because I have to go to work)* |
| SGT. MATUS: | Okay, adios    *(okay, bye)* |
| ACOSTA: | Bye. |
| SGT. MATUS: | Bye...0711 hours. |

Typed by:
Galdy Gutierrez
Office Assistant 111
REVIEWED BY SGT. DELFINO O. MATUS 3/22/02

**Ex. 10**

00659

5

339




IMPERIAL COUNTY SHERIFF'S DEPARTMENT
*HAROLD D. CARTER*
SHERIFF·CORONER·MARSHAL

June 21, 2002

*Justin Tackett*
*Deputy Sheriff*
*687 S. Imperial Avenue*
*Brawley, CA  92227*

**RE:    NOTICE OF PROPOSED DISCIPLINARY ACTION**

*Dear Deputy Tackett:*

*You are hereby officially notified that I propose to suspend you from your position of Deputy Sheriff.  Such suspension shall be without pay for five (5) days (40 hours) effective June 27th, 28th and July 1st, 2nd and 3rd which is the fifth calendar day following service of this notice.  You have the right to have this decision reviewed through an informal conference with Sheriff Carter or his designee, and an evidentiary hearing before the Employment Appeals Board.*

*Whether or not you request an evidentiary hearing before the Employment Appeals Board, your compensation will cease on the above dates.  The specific acts, omissions, causes and reasons upon which this proposed disciplinary action is based are set forth herein and in the documents attached hereto and incorporated herein by reference as though fully set forth.*

*The causes for the proposed discipline are as follows:*

**COUNTY ORDINANCE**

24452(g)     *Violation of or Refusal to Obey Reasonable Regulations Prescribed by the Board of Supervisors or by the Department Head;*
24452(i)     *Neglect:*

**IMPERIAL COUNTY SHERIFF'S DEPARTMENT POLICY & PROCEDURES**

2.1.01     *Violation of Rules*
2.3.07     *Operation of Vehicles*
5.2.04     *Response Driving Situations*

*The specific acts or omissions upon which the proposed discipline is based are set forth below:*

# Ex. 11

P.C. Box 1040  E. Centre  CA 92244-1040   Phone (760) 339-6311  Fax (760) 339-6340  www.

An Equal Opportunity Employer

Page 2
June 21, 2002

On November 1, 2001 while on duty you were involved in an on-duty vehicle accident at approximately 1000 hours, near State Route 115 and Wirt Road east of Brawley. You wrecked a marked Sheriff's Department unit (white 2001 Ford Crown Victoria) and you caused approximately $9,378.09 worth of damages. You were traveling at an unsafe speed and failed to negotiate the curve and lost control of your vehicle. During the investigation (copy of C.R. file attached hereto and incorporated herein) you stated that you were responding "CODE 3" to an explosive device call and you were traveling southbound on State Route 115 and entered the curve speeding at approximately 80 to 90 miles per hour.

The California Highway Patrol (CHP) traffic collision report finds that the safe speed for that curve was 60 to 65 miles per hour. The CHP report concludes that you were the cause of the collision by being in violation of the California Vehicle Code section 22350, which states that no person shall drive a vehicle upon a highway at a speed greater than reasonable or prudent having due regard for weather, visibility, traffic and the surface and width of the highway and in no event at a speed, which endangers the safety of persons or property.

In determining whether the recommended level of discipline is appropriate, I considered the following information:

- On November 16, 2001 you were served with a two (2) day suspension letter (attached hereto and incorporated herein) for wrecking a Sheriff's unit on June 13, 2001, causing $1,042.52 worth of damages. You failed to see that the road ahead intersected a dry dirt ditch. An investigation was conducted by the California Highway Patrol, which determined that you caused this collision by driving improperly on a private dirt access road, which you were unfamiliar with. You were traveling at 25 miles per hour on this road. It was determined that a safe speed of 10 miles per hour would have allowed you to see the ditch ahead.

- On April 15, 2001 at approximately 1538 hours you reported that while on a pursuit of a suspect who had fled from custody, you drove your patrol car into a trench causing damage to the left fender of the unit.

- On July 23, 2000, at approximately 1500 hours you reported to the communication center that you had driven onto soft sand which caused the unit to bottom out causing damage to the right bumper

I find that this accident was preventable and that you caused this accident by driving at a speed greater than is reasonable or prudent for the type of call that was dispatched to you. The reports of explosive devices are frequent occurrences in Imperial County and the majority of these calls are in unpopulated isolated areas, as was this case. During your academy training on May 26, 2000 you were provided with 24 hours of Basic Driver Training by the San Bernardino

**Ex. 11**

0018-341

Page 3
June 21, 2002

County Sheriff's Department (certificate of completion attached hereto and incorporated herein).

You have the right to respond to the matters raised in this notice both orally and in writing, prior to the end of the workday on June 26, 2002. **You must request this informal conference with the Sheriff-Coroner or his designee and schedule it with him within the five (5) workday period.** Any response, which you timely provide will be considered by him before final action on June 26, 2002.

If you do not agree with this discipline you may contact the Sheriff's Administrative office either in writing to 328 Applestill Road, El Centro, 92243 or by phone at (760) 339-6301 to schedule an appointment with Sheriff Carter or his designee. If you do not respond in writing or by phone by Wednesday, June 26, 2002, by 1700 hours, the proposed discipline will be immediately imposed.

Whether or not you respond to this letter or request an informal conference, if the discipline becomes final on June 26, 2002, as a regular full-time employee, you have the right to file an appeal of your suspension with the Imperial County Employment Appeals Board within ten (10) working days pursuant to Chapter 10.5 of Division 4 of Title 2 of the Codified Ordinances of Imperial County.

**THIS DOCUMENT WILL BE PLACED IN YOUR OFFICIAL PERSONNEL FILE ALONG WITH ALL ATTACHMENTS WITHIN THIRTY (30) CALENDAR DAYS OF THE DATE OF YOUR RECEIPT OF THIS LETTER. PRIOR TO THE EXPIRATION OF THE ABOVE PERIOD, YOU HAVE THE RIGHT TO SUBMIT A STATEMENT WHICH WILL BE ATTACHED TO THIS DOCUMENT AND PLACED IN YOUR PERSONNEL FILE.**

Sincerely,

Harold D. Carter
Sheriff-Coroner-Marshal

By:     Sharon Housouer
          Chief Deputy

HDC:SH:jimh

Enclosures:       Copy of County Ordinance
                       Copies of Department Policies
                       Copy of C.R. File
                       Copy of Letter dated November 16, 2001
                       Copy of Basic Driving Certificate dated May 26, 2000

*I hereby acknowledge that I have received, read and am aware of the contents of this Notice of Proposed Disciplinary Action.*

*Signature* _____  *Date* __06/21/02__

**Ex. 11**

00183
342

**Imperial County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

Skelly Hearing
7/12/2002

Deputy Justin Tackett

**ASSN'T SHERIFF JERNIGAN:** Okay um, today's date is 7/12/02 it's 10:00 AM we're at the Imperial County Sheriff's Office which is 328 Applestill Road, present is Assistant Sheriff Chuck Jernigan, uh Deputy Justin Tackett, and Mr. Brad Fields, Attorney of the Firm of Bobbitt and Pik, Pikhart, Pintar?

**FIELDS:** Pinckard.

**ASSN'T SHERIFF JERNIGAN:** Pinckard, excuse me, uh, this is the Skelly Conference uh, for Deputy Tackett on a letter of Notice of Proposed Discipline dated June 21, 02. Uh, this meeting is being recorded by myself and by Mr. Fields. Is that correct?

**FIELDS:** That's correct.

**ASSN'T SHERIFF JERNIGAN:** Okay, um, Mr. Fields, Deputy Tackett this is your opportunity to, uh present any mitigating circumstances or conditions that may effect the proposed discipline of 5 days or 40 hours.

**FIELDS:** Thank you, uh what we're going to be doing and I, and I think being in these hearing with you before Sheriff, um, we'd be going back and forth um, if you have any questions with either of us, i.e. points or um, issues towards the end whether you feel are appropriate, um, right off the, the there's a list of a couple of County ordinances, and three Sheriff's P and P's that were allegedly violated um, but when it comes down to it, as you can see on page two um, the actual allegation is that he was in violations of California Vehicle Code Section 22350, um, that actually doesn't apply here um, and I'll just handle you a couple of things um, 22350 is the basic speed law but as I'm sure you're well aware 21055 uh, exempts and 21056 gives a different standard, um, for someone rolling code and um, the initial allegation was that he

**Ex. 12**

**Imperial County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

Skelly Hearing
7/12/2002

Deputy Justin Tackett

was perhaps not rolling code which was not sustained in fact it said that he was rolling code, there's absolutely no evidence to support the fact that the um, that he was not or certainly no evidence to support the uh theory that he wasn't um, as again it was not sustained, so the very violation that sided here is inapplicable to um to this particular circumstances, you were rolling code, correct?

TACKETT:    Correct.

FIELDS:    Um, as and he said that in his report as well so um you know really that um that effects us to a great extent because again that's, that's the vehicle section that's being relied on by uh by the Department for the Disciplinary Action um, but getting past that which is a certainly a very important issue and one which should really take care of the whole thing um, we certainly want to get into uh, describing to you a little bit about why he was rolling code, what he was going to and the circumstances of the uh of the collision uh or the accident. Um, why were you rolling code?

TACKETT:    Well there's a couple of factors and to start off with when I got there.

FIELDS:    Well where, where were you going, we need to start, where were you going?

TACKETT:    As far as the call?

FIELDS:    Yeah.

TACKETT:    The call was in the Glamis area.

FIELDS:    And what was the call, what, what, how did the call come out?

Imperial County Sheriff's Department
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

Skelly Hearing
7/12/2002

Deputy Justin Tackett

**TACKETT:** Came out to me that there was a bomb and a bomb call in the Glamis area that uh they had already started rolling haz mat and the bomb squad was already in route.

**FIELDS:** Okay now you said in the Glamis area, now describe for me in terms of you know it's I know just depending on the time of the year and everything but um, you know what kind of population is around there what kind of people are around there in terms of the circumstances?

**TACKETT:** The population fluctuates during the year the peaks season starts in October and it usually goes to around February sometimes a little farther than February, March sometimes a little bit of April and then when it starts getting a little hotter you go to the riv, to the river, um,

**FIELDS:** Was it your impression at this point thought that there were a lot of people in the area?

**TACKETT:** Yes, actually that point in that time of the year actually almost equals the size of the Valley's population.

**ASSN'T SHERIFF JERNIGAN:** Let me ask, what, what was the date in the incident?

**TACKETT:** November 1st, I believe.

**ASSN'T SHERIFF JERNIGAN:** And what day of the week was that?

**TACKETT:** I believe it was uh exactly sure, Friday or Thursday,

**FIELDS:** November 1st is a Thursday.

00662 **Ex. 12**

345

**Imperial County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

Skelly Hearing
7/12/2002

Deputy Justin Tackett

| | |
|---|---|
| **ASSN'T SHERIFF JERNIGAN:** | Thursday?  So it was in the middle of the week. |
| **TACKETT:** | End of the week, right, Thursday, |
| **ASSN'T SHERIFF JERNIGAN:** | I'm sorry, go ahead. |
| **FIELDS:** | Um, obviously more people are there in the weekends some people arrive early. |
| **TACKETT:** | Correct, usually, they usually arrive early with their trailers and with their property, so they can station it somewhere, so cause most of the late comers that come on the weekends they usually don't get a spot, or a good spot, that's what they call it. |
| **FIELDS:** | Okay.  Now time of year, November 1st, 2001, obviously close to September 11th did any of those factors play into mind or your mind at all? |
| **TACKETT:** | Actually it did, because we were receiving a lot of memos, at that time saying any calls and uh regarding any kind of powders or anything like that, we we're going to take with extreme caution and uh, and we we're going to take them, we weren't going to take them lightly, and we were told, that we were suppose to respond to them and respond to them in a matter we felt that they should be responded to. |
| **FIELDS:** | Okay, now when you got the call, when you got this call, where were you? |
| **TACKETT:** | I was actually in the, what we call one beat, which is uh north just north of Albright, Albright and Rueggers where the separating line is, up north over the County line of north of the Imperial County. |
| **FIELDS:** | So was this in your beat? |

**Ex. 12**

4

00663

346

**Imperi●County Sheriff's Department●**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

**Skelly Hearing**
**7/12/2002**

Deputy Justin Tackett

| | |
|---|---|
| **TACKETT:** | Uh the call was not my beat. |
| **FIELDS:** | Okay so what was the distance you needed to travel in order to get from where you were on patrol, obviously you were on patrol, is that correct? |
| **TACKETT:** | Correct, |
| **FIELDS:** | Where you were on Patrol approximately, to where you believe the incident was taken place? |
| **TACKETT:** | Uh, I would say approximately 40 miles, maybe, maybe a little further. |
| **FIELDS:** | Um, now you made some reference a moment ago to uh haz mat already been rolled out and that type of thing, um, is, is that a little bit different than what you might normally expect on a call of a uh a potential bomb? |
| **TACKETT:** | Correct, the most uh bomb calls or bomb threats that we get uh from Dispatch, we, we are the usually ones once we get there that evaluates the situation, evaluate whether it's a bomb or what it is and from that point we then inform Dispatch whether roll haz mat or bomb squad. |
| **FIELDS:** | So the fact that the call came out and already ha, already Hazmat and the bomb squad were rolling, how, how did that make you feel about how serious this must be, this might be? |
| **TACKETT:** | Well it made me conclude or have the opinion of that somebody already determined this to be a bomb and a credible bomb, and a threat to the people around and they were rolling |

**Ex. 12**

00664

347

**Imperial County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

**Skelly Hearing**
**7/12/2002**

Deputy Justin Tackett

> already so that way it wouldn't waste time in solving, I guess you would say uh, stopping a threat.

FIELDS:      Now were there other Deputies already on scene here?

TACKETT:      No, no Deputies.

FIELDS:      So you were going to be the first one on scene?

TACKETT:      I was the only one call that I know of, to that point.

FIELDS:      And that was the call where they had already called out haz mat and the bomb squad?

TACKETT:      Correct.

FIELDS:      Um now when you were traveling um, on this road, just so we can show the Sheriff, um, why don't we get through it just a few of them and just kind go through and show the Sheriff, you know,

ASSN'T SHERIFF JERNIGAN:      Let me correct, let me correct you, it's Assistant Sheriff.

FIELDS:      I'm sorry, sir, so, the Assistant Sheriff, (Laughed)

ASSN'T SHERIFF JERNIGAN:      I don't want you to get me in trouble with my boss, can I, can I look at the pictures?

FIELDS:      Absolutely,

ASSN'T SHERIFF JERNIGAN:      I'm kind a familiar, I use to be a patrolman on that area. This is looking eastbound on uh 115?

**Ex. 12**

**00665**

348

Imperi●County Sheriff's Departmen●
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

**Skelly Hearing**
**7/12/2002**

*Deputy Justin Tackett*

| | |
|---|---|
| TACKETT: | 115 correct the one on |
| ASSN'T SHERIFF JERNIGAN: | 115/78. |
| TACKETT: | Correct. |
| ASSN'T SHERIFF JERNIGAN: | Right?  Okay.  This is still close to the Intersection where it's posted 55 and the curve goes to the right and also goes to left without do not enter, right? |
| TACKETT: | Correct. |
| ASSN'T SHERIFF JERNIGAN: | And if you were to go that way you go to Glamis, correct? |
| TACKETT: | No that's not, that's not, this ain't 78-115, this is 115 curve, |
| ASSN'T SHERIFF JERNIGAN: | Okay. |
| TACKETT: | It goes to 178, it's north of 78 right outside of Calipat, you'll see Calipat. |
| ASSN'T SHERIFF JERNIGAN: | Okay, you're right. |
| TACKETT: | That's actually Wirt Road right there. |
| ASSN'T SHERIFF JERNIGAN: | You're right, okay.  This is where your car came off? |
| TACKETT: | Uh, I can't tell from that picture but as you can see it's on the other picture, |
| ASSN'T SHERIFF JERNIGAN: | Yeah, that's your tire tracks there? |
| TACKETT: | Uh, I think mine are over here more, I think it's on the other pictures, those are mine. I, also |

**Ex. 12**

7

00666

349

**Imperi██ County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

**Skelly Hearing**
**7/12/2002**

Deputy Justin Tackett

|  |  |
|---|---|
| | you think you can see on that one,... those are mine. |
| **ASSN'T SHERIFF JERNIGAN:** | Okay. |
| **TACKETT:** | You can see there are another pair of tracks coming off. |
| **ASSN'T SHERIFF JERNIGAN:** | Okay. |
| **FIELDS:** | Um, so obviously Assistant Sheriff, is familiar with this um, with this area, um, when you enter the curve and as you pointed it out there is a sign there that says you know, I guess one of those suggested signs that says "55" um, |
| **ASSN'T SHERIFF JERNIGAN:** | Posted signs. |
| **FIELDS:** | Posted signs um, that says "55" when you entered the curve, there some reference you going you know 80 or 90 or something like that, at, at some point did you start to slow down? |
| **TACKETT:** | Correct that was before the curve. |
| **FIELDS:** | So actually before the curve you were starting to slow down? |
| **TACKETT:** | Correct. |
| **FIELDS:** | So is it clear to say the 80 then 90 or that referenced is actually as you were approaching the curve, is that a better way of saying it? |
| **TACKETT:** | Correct as it states on my report. |
| **FIELDS:** | Okay, um, |
| **ASSN'T SHERIFF JERNIGAN:** | What does your report say Justin? |

**Ex. 12**

00667

8

350

**Imperial County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

Skelly Hearing
7/12/2002

Deputy Justin Tackett

TACKETT:
As I'm approaching the curve I was going approximately 80 to 90 and I started slowing down, upon seeing the truck, cause I was actually going to use like they teach us in _ "EVOC" you use a roadway and most of the roadway you can use to navigate the curve, curve and when I saw the semi come out from the,

FIELDS:
You might one to pull of the picture where it kind a show,

TACKETT:
The house?

FIELDS:
The Assistant Sheriff, approximately where you first saw the uh?

TACKETT:
Actually prior to where I saw the diesel come out was right around here, by right around here,

ASSN'T SHERIFF JERNIGAN:
Okay so how fast were you when you hit the curve?

TACKETT:
When I hit the curve, I was probably be going about 60 about I'd say between the 60's and lower 70's cause I was already slowing down.

FIELDS:
And um, you started talking about your training, you want to just briefly go into, you talked about I think "EVOC" training, do you want just briefly talk about what you mean by negotiating the, the use of much road way as possible?

TACKETT:
Well in the, when you go to "EVOC" they teach you in uh navigating turns and curves and uh corners and they teach you on how you know, find the apex and how to come into the curves and using all the road that you're allowed to

**Ex. 12**

9

00668

351

**Imperial County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

**Skelly Hearing**
**7/12/2002**

Deputy Justin Tackett

use, and at that time, with no vehicles on the roadway, then I was going to use the whole curve to navigate the curve and when I saw the semi-rig come out from a residence, as you can see, out from one of these pictures,

FIELDS: Yeah that was on (unintelligible).

TACKETT: Yeah the one on Yocum and uh 115, when a semi-produce rig came out then I had, then I had to take in lane discipline and that's when I had to start slowing down.

ASSN'T SHERIFF JERNIGAN: You had to take you on what?

TACKETT: Lane discipline, to stay within that lane as a (unintelligible) out of Yocum and when he came out of that residence, that's when I started to slowing down.

FIELDS: And that was before the curve?

TACKETT: Right when I seen it come past, right here, past this residence, when I seen it come out from that tree that's when I had to slow down.

FIELDS: Aaa, actually when you look at the um, do you just want to describe these for the Sheriff to (unintelligible)?

TACKETT: Right this is, this is uh, a sketch of what, I guess you can say a close proximity, what the CHP Officer believed was my tracks, and it comes out and you can see,

ASSN'T SHERIFF JERNIGAN: What, what you said, you believe that they were your tracks?

TACKETT: The, the CHP Officer.

**Ex. 12**

10

**00669**

352

**Imperial County Sheriff's Department**

*Administrative Investigations Unit*

328 Applestill Road
El Centro, CA 92243

Skelly Hearing
7/12/2002

Deputy Justin Tackett

| | |
|---|---|
| **ASSN'T SHERIFF JERNIGAN:** | Those aren't your tracks? |
| **TACKETT:** | No, these are my tracks. |
| **ASSN'T SHERIFF JERNIGAN:** | Oh, okay cause you, |
| **TACKETT:** | But they are closer, they are not exact, but these what his drawings are, on the road. |
| **ASSN'T SHERIFF JERNIGAN:** | And is it safe to say that his drawings depict, what represent the scene? |
| **TACKETT:** | Oh yeah, correct, correct and uh as you can see as I started going to the skid and I go in there and I start correcting it before I get into the other lane and then once I get into the, the lane where the diesel, diesel is coming in, you see where I starting to navigate were I was coming already back into my lane and then once I saw the diesel I could still hear my rear end is when I turned my wheel and accelerated and pulled my vehicle back off, off under the bank, cause I figured it why damage, I figured that the person and the and the vehicle that was coming my way would be damaged rather I still have the opportunity of coming out the bank and still controlling possibly the skip of the bank and still saving the unit and myself without any damage and the diesel and the person inside so instead of having a collision, I tried to slide it off the embankment and when I did I came down and still navigated but when I hit the soft dirt, on the lower portion of the bank, is where the wheels got caught, and that's when I rolled once. |
| **FIELDS:** | And you did avoid any collision with the on-coming vehicle, correct? |
| **TACKETT:** | Correct. |

**Ex. 12**

11                    00670           353

**Imperial County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

Skelly Hearing
7/12/2002

Deputy Justin Tackett

| | |
|---|---|
| FIELDS: | Okay, now the speed you're entering this intersection, I mean, you, you patrol this area at least from time to time, correct? |
| TACKETT: | Correct. |
| FIELDS: | Um, as soon as you entered this intersection or I mean the, the curve, is that something that is, you know, an unusually high speed for that curve? |
| TACKETT: | No, actually the Deputies, a lot of the Deputies they, it's common for us to enter that, that curve. |
| ASSN'T SHERIFF JERNIGAN: | Who? |
| TACKETT: | Numerous Deputies. |
| ASSN'T SHERIFF JERNIGAN: | Who? |
| FIELDS: | Uh, uh, what you want us to name names? |
| ASSN'T SHERIFF JERNIGAN: | Well I mean he said numerous Deputies enter that, that curve exceeding the posted speed limit, I mean, I'm asking who they are? |
| FIELDS: | Well I, I mean, I don't know what you want us to, this isn't an Evidentiary Hearing, do you want us to prove our case then we can provide you a list of names if that's what you need, we frankly hadn't had, it's his impression if that's the case as you know we weren't serve with this until fairly recently um we didn't have this packet we did not know exactly what we were defending against and this hearing was just set up, arbitrarily, it wasn't set up at my convenience, it was set up at his convenience, it was set up at your convenience, we don't |

**Ex. 12**

12

00671        354

**Imperi⬤County Sheriff's Departmen⬤**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

Skelly Hearing
7/12/2002

Deputy Justin Tackett

have that information, you know, to provide you but what we certainly can do,

**A.S. JERNIGAN:**   I withdrawal the question, go ahead.

**FIELDS:**   Um, at that time, um, the time of this of this incident uh where you working uh, a lot of hours?

**TACKETT:**   Correct, I was actually uh working on double that day, I was on going on to uh my second portion of uh another shift.

**FIELDS:**   Um, now at the level of discipline um it's, uh our impression that you would have a better information on this than we would, um because of course we don't have access to personnel files but it's our impression that generally speaking there are others that have been involved in um, serious, you know incidents you know not all that similar to this but if not received, not received discipline action commiserate with, with what we have in front of us here, now I know that part of the rational or is the um, are the three allegations or three incidents that are list on page 2, I think it's 2 of the uh, of the uh notice to propose disciplinary action, excuse me, those three disciplinary actions are once together at a two-day suspension that is currently the subject of Administrative Appeal to the uh, um, uh to the Personnel Appeals Board.  Uh it's inappropriate to consider them at this point because they are still subject to Appeal, at least one of those is completely barred by the statue of limitations so it's certainly shouldn't be upheld, um the other's we believe were, were easily explainable as well but um, it just seems as though uh the beside the fact that there are a lot of circumstances that apparently

15

**Ex. 12**

00672

355

### Imper● County Sheriff's Departmen●
### *Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

### Skelly Hearing
### 7/12/2002

Deputy Justin Tackett

went in to, you know, the unfortunate circumstances surrounding this, this incident um the level of discipline um, seems quite high, 5-day suspension um, it's typically reserved for you know very, very serious misconduct and not that this, you know, I mean, it certainly was an accident, Deputy was, you were um, I know you were taken to the hospital, I don't believe you were seriously injured, were you?

**TACKETT:**  No.

**FIELDS:**  No, um, you know, no other, you know, no, no damage to anyone else, you know, no accident or anything like that, in terms of a collision with another vehicle, um, this seems as though it's, you know, considerably out of line with what we normally would be uh appropriate under these circumstances, um, actually you take a look at it, take a look at, at you know, just a few things that we brought up to your attention as to the circumstances surrounding as why he was rolling code, um the intersection kind of what was going on at the time, um, you know frankly a, a, a sign posted that said 55 miles an hour or curve, having a Deputy going into that curve at 65 or 70 just on its face doesn't seem you know unrealistic, I mean that's obviously a, a 55 mile an hour um curve, it's not a, it's not a significant curve, otherwise it's speed need to be quite a bit lower um, given the generally posted speed limit so um you know obviously something happened, do you have that impression as to maybe what caused this in terms of um you know the circumstances?

**TACKETT:**  Well there's a roadway that comes off uh right when you go into the curve on uh on 115 on the curve, there's a roadway comes off which is extension of Wirt and there is a lot of farm

14

00673

**Ex. 12**

356

**Imperial County Sheriff's Department**
*Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

**Skelly Hearing**
**7/12/2002**

Deputy Justin Tackett

implement's going up and down and as you
drive down the curve or up the curve which
ever way going east or westbound, you can
feel, you can feel there's like a dent indentation
in the roadway from there from the farm
implements and one of, one of the things that I,
that I was, that after I was thinking about and of
all the things that a freak accident could
happen with is if I loaded the front springs as I
was slowing down, taking lane discipline that
maybe it would of prompt the back, weight in
the back end, when I went in that groove and
prompt the back end around, as I was coming
on the curve, and the only thing, the only other
thing, I could of though was um, with that
would be maybe something else that was
wrong with that car because I know we have a
lot of problems with our cars in the County with
the transmissions, and, and the braking
systems, and our uh like just throughout the
units were having problems with and uh I know
we were sending a lot to the County garage
numerous times and there coming back and
still weren't fixed and we have to send them
back with the same problems because
Deputies are actually running through stop
signs and almost colliding people because they
weren't properly at the County garage. And so
I asked, when I actually went to the County
garage the next day, I asked them if they would
check it and I don't know if they were did that
or not.

FIELDS:                          I think that's all we have unless you have any
                                 other questions for us?

ASSN'T SHERIFF JERNIGAN:         No, that's all I have right now, we'll conclude
                                 the uh conference at 1022, thank you.

End of interview.

**Ex. 12**

**00674**

15

357

## Imperial County Sheriff's Department
### *Administrative Investigations Unit*
328 Applestill Road
El Centro, CA 92243

**Skelly Hearing**
**7/12/2002**

Deputy Justin Tackett

Typed by:
. Galdy Gutierrez
Office Assistant III

Ex. 12

00675

358

16




IMPERIAL COUNTY SHERIFF'S OFFICE
# HAROLD D. CARTER
SHERIFF-CORONER-MARSHAL

*October 18, 2002*

*Justin Tackett*
*Deputy Sheriff*
*687 S. Imperial Avenue*
*Brawley, CA  92227*

**RE:   *NOTICE OF FINAL DISCIPLINARY ACTION***

*Dear Deputy Tackett:*

*You are hereby officially notified that after carefully considering your oral response to me in our meeting of July 12, 2002 I have determined that the five (5) day suspension (40 hours) without pay is appropriate.  Therefore, your five (5) day suspension without pay shall be October 21st, 22nd, 23rd, 24th, and 25th.*

*Whether or not you request an administrative hearing before the Employment Appeals Board, your five (5) day suspension without pay shall be imposed.  The specific acts, omissions, causes and reasons upon which this disciplinary action is based are set forth herein and in the documents attached hereto and incorporated herein by reference as though fully set forth.*

*The causes for the discipline are as follows:*

**COUNTY ORDINANCE**

*24452(g)   Violation of or Refusal to Obey Reasonable Regulations Prescribed by the Board of Supervisors or by the Department Head;*
*24452(i)   Neglect:*

**IMPERIAL COUNTY SHERIFF'S DEPARTMENT POLICY & PROCEDURES**

*2.1.1     Violation of Rules*
*2.3.7     Operation of Vehicles*
*5.2.04    Response Driving Situations*

*The specific acts or omissions upon which the discipline is based are set forth below:*

*On November 1, 2001 while on duty you were involved in an on-duty vehicle accident at approximately 1000 hours, near State Route 115 and Wirt Road east*

**Ex. 13**

00185   359

October 18, 2002
Page 2

of Brawley.  You wrecked a marked Sheriff's Department unit (white 2001 Ford
Crown Victoria) and you caused approximately $9,378.09 worth of damages.
You were traveling at an unsafe speed and failed to negotiate the curve and lost
control of your vehicle.  During the investigation by the Significant Event Review
Committee (S.E.R.C.), a copy of which is attached hereto and incorporated herein
you, stated that you were responding "CODE 3" to an explosive device call and
you were traveling southbound on State Route 115 and entered the curve
speeding at approximately 80 to 90 miles per hour.

The California Highway Patrol (CHP) traffic collision report finds that the safe
speed for that curve was 60 to 65 miles per hour.  The CHP report concludes that
you were the cause of the collision by being in violation of the California Vehicle
Code section 22350, which states that no person shall drive a vehicle upon a
highway at a speed greater than reasonable or prudent having due regard for
weather, visibility, traffic and the surface and width of the highway and in no
event at a speed, which endangers the safety of persons or property.

In determining whether the recommended level of discipline is appropriate, I
considered the following information:

- On November 16, 2001 you were served with a two (2) day suspension
  letter (attached hereto and incorporated herein) for wrecking a Sheriff's
  unit on June 13, 2001, causing $1,042.52 worth of damages.  You failed to
  see that the road ahead intersected a dry dirt ditch.  An investigation was
  conducted by the California Highway Patrol, which determined that you
  caused this collision by driving improperly on a private dirt access road,
  which you were unfamiliar with.  You were traveling at 25 miles per hour
  on this road.  It was determined that a safe speed of 10 miles per hour
  would have allowed you to see the ditch ahead.

- On April 15, 2001 at approximately 1538 hours you reported that while on
  a pursuit of a suspect who had fled from custody, you drove your patrol
  car into a trench causing damage to the left fender of the unit.

- On July 23, 2000, at approximately 1500 hours you reported to the
  communication center that you had driven onto soft sand which caused
  the unit to bottom out causing damage to the right bumper

On July 12, 2002, I held a pre-imposition Skelly conference with yourself and
your representative.  Since that time, I have had some discussions with your
representative regarding the possibility of combining this matter with another for
disciplinary purposes.  Those discussions have failed to persuade me that any

October 18, 2002
Page 3

reasonable alternative would better serve in this instance. I am satisfied that the original level of discipline proposed by Chief Housouer is the most appropriate.

I find that this accident was preventable and that you caused this accident by driving at a speed greater than is reasonable or prudent for the type of call that was dispatched to you. The reports of explosive devices are frequent occurrences in Imperial County and the majority of these calls are in unpopulated isolated areas, as was this case. I note that during your academy training on May 26, 2000 you were provided with 24 hours of Basic Driver Training by the San Bernardino County Sheriff's Department (certificate of completion attached hereto and incorporated herein).

As you were previously advised, you have the right to file an appeal of this discipline decision with the Imperial County Employment Appeals Board within ten (10) working days pursuant to Chapter 10.5 of Division 4 of Title 2 of the Codified Ordinances of Imperial County.

**THIS DOCUMENT WILL BE PLACED IN YOUR PERSONNEL FILE ALONG WITH ALL ATTACHMENTS WITHIN (30) CALENDAR DAYS OF THE DATE OF YOUR RECEIPT OF THIS LETTER. PRIOR TO THE EXPIRATION OF THE ABOVE PERIOD, YOU HAVE THE RIGHT TO SUBMIT A STATEMENT WHICH WILL BE ATTACHED TO THIS DOCUMENT AND PLACED IN YOUR PERSONNEL FILE.**

Sincerely,

Harold D. Carter
Sheriff-Coroner-Marshal

By: Charles Jernigan
    Assistant Sheriff

HDC:SH:ba

Enclosures:    Copy of County Ordinance
               Copies of Department Policies
               Copy of S.E.R.C.Report
               Copy of Letter dated November 16, 2001
               Copy of Basic Driving Certificate dated May 26, 2000

**I hereby acknowledge that I have received, read and am aware of the contents of this Notice of Disciplinary Action:**

**Signature** _____ **Date** _10/18/02_

/ AJ — @ 0905

00187

**Ex. 13**

361

# Memorandum

**To:**   Chief Sharon Housouer

**From:**   Sgt. Myron King

**Date:**   12/29/01

**Re:**   Deputy Justin Tackett

On 122801 around midnight, Brawley PD broadcast a lookout for a vehicle involved in a 20002 VC. The vehicle was described as a blue jeep with a ragtop. The vehicle was lifted and had fresh front-end damage. It was last seen S/B on Hwy. 86 from Brawley. It was unknown if the driver was male or female.

About two hours later Brawley PD requested a deputy respond to an address on Elder Rd. to see if the jeep could be at that residence. Deputy Tackett responded to the residence. I heard him advise dispatch that a black jeep with no top but had front-end damage was at the scene. He requested what Brawley PD wanted him to do. He was told to standby and Brawley would send an officer to the scene.

A couple of minutes later I heard Deputy Tackett request a cover officer. I told dispatch that Deputy Tackett was requesting 10-18 and to advise Brawley PD. I started responding to the scene. Deputy Tackett advised it was code 4 and he had a 10-15 for 148 PC. I continued to the scene.

Upon arriving at the scene on Elder Rd., I saw two Brawley PD units parked on Elder. I did not see the sheriff unit. Two Brawley PD officers met me on Elder Rd. One of them was an agent. I did not get his name. He told me that the jeep was not the one involved in the accident. He said the damaged area was obviously from an old accident. The damaged area was covered in rust, and the rims had a layer of dirt on them indicating the vehicle had not been moved recently.

I walked to the driveway and saw the sheriff unit parked in the driveway directly opposite the house. Its headlights and right alley light were on illuminating the house. I contacted Deputy Tackett to find out what happened. He told me he could see the jeep parked on the back of the property from the roadway. I looked and saw the jeep. It was 75 to 100 yards from the road inside the fenced yard. Deputy Tackett said he drove in the driveway, passed the house back to the jeep. He drove around



**Ex. 14**

362

the jeep, looked at the damage, and called in the license number. He then drove back out the driveway. He made a three point turn in the driveway and positioned his unit illuminating the doorways while he waited for Brawley PD. When I asked him why he did not wait for them on Elder Rd., he replied he was afraid someone might try to leave the house. He told me while he was waiting a male dressed in pants, no shirt or shoes came outside the house to see what was happening. Deputy Tackett told him the Brawley PD was enroute to talk to him about something one of the family members might be involved in. He did not tell him what it was about. The male then told him he was going inside to get a jacket and shoes. Deputy Tackett told me he told the subject he could not and had to wait outside. The male insisted on going inside to get dressed and started to walk toward the house. Deputy Tackett told me he grabbed the subject by the arm. The subject jerked away and said he was going inside. Deputy Tackett told me he told the subject about four times he would arrest him for interfering if he insisted on going inside. When the subject kept insisting to go inside to get dressed, he arrested him.

I asked Deputy Tackett what his reasoning was for not letting the subject get dressed as the temperature was in the high 30's or low 40's and the subject was obviously cold. He replied it was an officer safety issue. Deputy Tackett said he told the wife she could go back in the house and get a jacket for him but he could not. I asked Deputy Tackett if while he was inspecting the jeep if he noticed the damaged area was covered in rust and that was dirt piled up on the rims. He said he had not noticed that. I told Deputy Tackett that the department and he were on shaky grounds and it was in his best interest we OR the subject and submit the report to the DA's office. He insisted on booking the subject. I explained the situation several times to him but he was insistent on booking the subject into jail. Deputy Tackett said that because of who the subject was, was why I did not want him booked. He could not understand that he had done anything wrong. At that point, I ordered him to OR the subject. He reluctantly complied. I had Deputy Lowenthal unhandcuff the subject, who was still dressed only in pants and he signed the OR release. We left the area and I had Deputy Tackett meet me at the Brawley Substation.

At the Brawley Substation, I again went over the incident with him. He again stressed that it was an officer safety issue was why he would not let the male subject go get dressed. I explained to him that if officer safety was his concern he was the worst violator in this incident. He was told a Brawley PD officer was in route to meet with him. He should have waited on the street. I reminded him that during his FTO training of what he was taught and waiting directly in front of the house was contrary to his training. I told him any prudent person would come outside the house when they saw a Sheriff's unit parked lighting up their house. Wanting to get dressed in the cold weather was normal. His own actions instigated the incident. All we were asked was to see if a jeep was there and wait for Brawley PD.

**Ex. 14** ₂

December 29, 2001

This was an avoidable incident. It should never have happened.

It is debatable if Deputy Tackett could legally drive to where the jeep was parked. It was in the back part of the fenced yard not open to normal traffic to the house.

Once the decision was made to inspect the vehicle, it should have been done properly. A careful inspection of the jeep would have showed the damage was old and the jeep had not been moved recently and could not be the suspect jeep.

Deputy Tackett should have waited on the road. Parking in front of the house exposed him to unnecessary risks.

The subject who came out of the house was not a suspect as far as Deputy Tackett knew. He should not have detained him, or stopped him from putting on proper clothing suiting the weather.

His reluctance to accept my advice even after it was explained to him it was for his and the departments benefit demonstrates he allows his emotions to control his thinking.

Deputy Tackett's actions unnecessarily exposed himself and the Sheriff's Department to a citizen complaint or civil suit.

This information is provided for your benefit, to handle as you deem fit.

**Ex. 14** 3

00904          364

Agency case number:: _0112-0990_   Submitting agency: _IC St Dau____

Date of incident:: _12-30-01_   Date submitted: _1-4-02_

Judicial District: _Bau Hill_

investigating Officer from submitting agency responsible for any follow-up information or investigation requested by the District Attorney's Office:

Officer's Name : _R P J. Jar Hott_   Telephone number: _760-339-6311_

List the name, date of birth and social security number for each and every individual against whom a criminal complaint is sought involving the same incident:

| | Last Name | First Name | Middle Name | D.O.B. | S.S.I. |
|---|---|---|---|---|---|
| 1 | Jackin | Randy | Lee | 1-10-58 | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |

A.   Was the case submitted before? Yes ☐ No ☑   If YES, attach a copy of the previous CH form.

B.   Was each named suspect interviewed by the investigating agency? Yes ☐  No. ☐  If not, why not?

C.   Are there other investigations or complaints pending against any of the above-named suspects? Please explain:

LIST THE CHARGES THAT YOUR AGENCY IS SEEKING TO HAVE THIS OFFICE FILE:

(If a charge is to be enhanced because of a prior conviction, list the date of the conviction, the court and the charge.)

148 PC

[THIS SPACE IS FOR USE BY THE DISTRICT ATTORNEY'S OFFICE]

☑ Reject        ☐ Re-submit with information requested below.

☐ Approved FELONY        ☐ Approved MISDEMEANOR

_In interests of justice, Not A. out aharli to district_

**Ex. 15**

page _1_ of ____

_____
(Assistant or Deputy) District Attorney

00923
365

2062-018

*Imperial County Sheriff's Department*
## *HAROLD D. CARTER*
### *Sheriff-Coroner-Marshall*

## INTEROFFICE MEMO

RECEI—
APR 3 0 2002
BY:_____

DATE: April 26, 2002

TO: Sergeant Delfino Matus, AIU

FROM: Chief Deputy Sharon Housouer, North County Operations

SUBJECT: Deputy Sheriff Justin Tackett

Please initiate an Internal Affairs Investigation on Deputy Justin Tackett reference attached report involving a case where he was checking on a vehicle for the Brawley Police Department.

Attachments:

Memo from Sergeant Myron King
Cr# 0112-0996 as prepared by Deputy Sheriff Justin Tackett

Cc: Assistant Sheriff Jernigan
    Chief Deputy David Prince

RECEIVED
APR 3 0 2002
BY:_____

REC—————D
APR — — 2002
BY:_____

**Ex. 16**

00901        366